## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW YORK; COMMONWEALTH OF MASSACHUSSETTS; STATE OF HAWAI'I; STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; ATTORNEY GENERAL DANA NESSEL FOR THE PEOPLE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; and STATE OF WISCONSIN; <br><br>      Plaintiffs, <br><br>        v. <br><br> LINDA McMAHON, in her official capacity as Secretary of Education; U.S. DEPARTMENT OF EDUCATION; and DONALD J. TRUMP, in his official capacity as President of the United States; <br><br>      Defendants. | Case No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    The Department of Education is essential. Plaintiff States rely on the Department for an extraordinary array of programs. The Department provides funds for low-income children and students with disabilities. It enforces the laws that prohibit discrimination in education. It administers federal student aid programs. These are just some of the key ways the congressional acts governing the existence and responsibilities of the Department are deeply intertwined with the education systems in Plaintiff States.  Incredibly, all of these significant and statutorily-mandated

1

functions were covered by a lean staff of only 4,133 people—until March 11, when the Department of Education announced through a press release that it is reducing that staff by 50%. *U.S. Department of Education Initiates Reduction in Force*, Press Release, Department of Education (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("March 11 Press Release"). This massive reduction in force (RIF) is equivalent to incapacitating key, statutorily-mandated functions of the Department, causing immense damage to Plaintiff States and their educational systems.

2.      Although the Department's March 11 Press Release says that the Department "will continue to deliver on all statutory programs that fall under the agency's purview," *id.*, that assertion is easily belied by the extent and effect of the RIF. So too is the assertion from Secretary McMahon, later on March 11, that the terminations were the "first step" on the road to a "total shutdown" of the Department. Filip Timotija, *Education Secretary: Mass layoffs First Step Toward Total Shutdown*, The Hill (Mar. 12, 2025), https://thehill.com/homenews/education/5190161-linda-mcmahon-education-department-mass-layoffs.

3.      Far from being just a "first step," the lay-offs are an effective dismantling of the Department. Based on figures provided in the March 11 Press Release, the announced RIF displaces approximately 1,378 employees, all of whom "will be placed on administrative leave" beginning on March 21. March 11 Press Release. These employees join around 600 others who took earlier buy-out offers. *Id.* The press release states that "[a]fter today's actions, the Department's workforce will total roughly 2,183 workers," an approximately 50% cut from the 4,133 workers the Department of Education had "[w]hen President Trump was inaugurated." *Id.*

4.      The RIF is so severe and extreme that it incapacitates components of the Department responsible for performing functions mandated by statute, effectively nullifying those

mandates. For example, seven regional offices of the Department's Office for Civil Rights (OCR)—including those in New York, Boston, San Francisco, Philadelphia, and Chicago—have been closed down entirely. Juan Perez, Jr. & Rebecca Carballo, *Education Department Documents Detail Massive Scope of Agency Worker Terminations*, Politico (Mar. 12, 2025), https://www.politico.com/news/2025/03/12/education-department-documents-detail-agency-worker-terminations-00226222.

5. This massive RIF is not supported by any actual reasoning or specific determinations about how to eliminate purported waste in the Department—rather, the RIF is part and parcel of President Trump's and Secretary McMahon's opposition to the Department of Education's entire existence. The Administration's goal of eliminating the Department of Education by any means necessary has been plainly and repeatedly stated: President Trump called the Department "a big con job" and declared that he would "like to close it immediately." Michael C. Bender, *Trump Is Said to Be Preparing Order That Aims to Eliminate Education Dept.*, The New York Times (Mar. 6, 2025), https://www.nytimes.com/2025/03/06/us/politics/trump-education-department-executive-order.html. He also stated that he would like Secretary McMahon to put herself "out of a job." Zachary B. Wolf, *Trump and Musk are moving to smother these three pieces of the government*, CNN (Feb. 5, 2025). Secretary McMahon has affirmed that "President Trump believes that the bureaucracy in Washington should be abolished so that we can return education to the states, where it belongs," and that she "wholeheartedly support[s] and agree[s] with this mission." Lexi Lonas Cochran, *McMahon says she 'wholeheartedly' agrees with Trump plan to abolish Education Department*, The Hill (Feb. 25, 2025), https://thehill.com/homenews/education/5162816-mcmahon-abolish-education-department-trump/. On March 3, 2025, Secretary McMahon asked employees to join her in "perform[ing] one

final, unforgettable public service to future generations of students" by dismantling the Department of Education. *Secretary McMahon: Our Department's Final Mission*, U.S. Department of Education (Mar. 3, 2025), https://perma.cc/F7BT-MQ3D. On the evening of March 11, Secretary McMahon stated that "the President's mandate," his "directive to me, clearly, is to shut down the Department of Education." *See* Timotija, *Education Secretary*, cited *supra* ¶ 2.

6.     But the Trump Administration cannot dismantle the Department of Education. It cannot override—whether through large-scale RIFs or otherwise—the statutory framework prescribing the Department's responsibilities. As the Supreme Court put it nearly a century ago, "[t]o Congress under its legislative power is given the establishment of offices [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926). And, thus, administrative agencies "are creatures of statute." *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022).

7.     Past attempts to eliminate the Department of Education have reflected these limitations on executive power. President Reagan sought legislation to dismantle the Department of Education, which Congress did not pass. *See* Ronald Reagan, *Address Before a Joint Session of the Congress Reporting on the State of the Union* (Jan. 26, 1982) ("The budget plan I submit to you . . . will realize major savings by dismantling the Departments of Energy and Education."), *available at* https://nationalcenter.org/ncppr/2001/11/04/ronald-reagans-first-state-of-the-union-1982. Since then, numerous bills have been introduced to shutter the Department of Education. *See* Mona Vakilifathi, *Why Trump is Trying to Reduce the Status of the Department of Education*, Brookings Inst. (July 16, 2018), https://www.brookings.edu/articles/why-trump-is-trying-to-reduce-the-status-of-the-department-of-education. Each of these efforts reflects the uncontroversial understanding that only Congress may abolish an agency it created.

4

8.    And while Congress has granted the Secretary of Education—though not the President—the authority to modestly restructure the Department of Education, she is expressly limited to "allocat[ing] or reallocat[ing] functions among the officers of the Department" or modifying "organizational entities within the Department as may be necessary or appropriate." 20 U.S.C. § 3473(a). She is not permitted to eliminate or disrupt functions required by statute, nor can she transfer the Department's responsibilities to another agency outside of its statutory authorization. *Id.*

9.    Because neither the President nor his agencies can undo the many acts of Congress that authorize the Department, dictate its responsibilities, and appropriate funds for it to administer, the President's directive to eliminate the Department of Education ("Directive")—including through the March 11 decimation of the Department's workforce and any other agency implementation—is an unlawful violation of the separation of powers, and the Executive's obligation to take care that the law be faithfully executed.

10.    The Department's implementation of the Directive, including through the March 11 RIF, is separately unlawful because it violates the Administrative Procedure Act (APA). It is arbitrary and capricious, and contrary to law.

11.    For these reasons, Plaintiff States seek declaratory and injunctive relief against the Directive and any implementation of it by Secretary McMahon and the Department of Education, including the March 11 RIF.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States). Jurisdiction is also proper under the judicial review provisions of the APA. 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties

within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705, 706.

13.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district, and Defendants are United States agencies or officers acting in their official capacities.

## PARTIES

### A. Plaintiffs

14.     Plaintiff State of New York is a sovereign state of the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, and political subdivisions of New York. Attorney General Letitia James is the chief law enforcement officer for New York.

15.     Plaintiff Commonwealth of Massachusetts is a sovereign commonwealth in the United States of America. Massachusetts is represented by Attorney General Andrea Campbell, who is the chief law enforcement officer of Massachusetts.

16.     Plaintiff State of Hawai'i, represented by and through Attorney General Anne E. Lopez, is a sovereign state of the United States of America. The Attorney General is Hawai'i's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statutes § 28-1 to pursue this action.

17.     Plaintiff State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

18.     Plaintiff State of Arizona, represented by and through its Attorney General, is a sovereign state of the United States of America. Arizona is represented by and through its chief legal officer, Kristin K. Mayes. *See* Ariz. Rev. Stat. § 41-192(A). Attorney General Mayes is authorized to pursue this action on behalf of the State of Arizona. *Id.*

19.     Plaintiff State of Colorado is a sovereign state in the United States of America. Colorado is represented by and through its Attorney General Phil Weiser. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

20.     Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

21.     Plaintiff State of Delaware, represented by and through its Attorney General, Kathleen Jennings, is a sovereign state of the United States of America. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.

22.     Plaintiff District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

23.     Plaintiff State of Illinois is a sovereign state in the United States of America. Illinois is represented by Attorney General Kwame Raoul, who is the chief law enforcement officer of Illinois.

24.     Plaintiff State of Maine is a sovereign state of the United States of America. Maine is represented by its Attorney General, who is authorized to pursue this action pursuant to 5 Me. Rev. Stat. § 191.

25.     Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

26.     Plaintiff the People of the State of Michigan is represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

27.     Plaintiff State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Attorney General Keith Ellison, who is the chief law enforcement officer of Minnesota.

28.     Plaintiff State of Nevada is a sovereign state of the United States of America. Nevada is represented by and through its chief legal officer, Attorney General Aaron D. Ford. The Attorney General has the authority to file this suit to protect and secure the interests of the State. NRS 228.170.

29.     Plaintiff State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.

30.     Plaintiff State of Oregon is a sovereign state of the United States of America. Oregon is represented by Attorney General Dan Rayfield, who is the chief law enforcement officer of Oregon.

31.     Plaintiff State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

32.     Plaintiff State of Vermont is a sovereign state of the United States of America. Vermont is represented by its Attorney General, who is the State's chief legal officer and authorized to pursue this action on behalf of the State. Vt. Stat. Ann. tit. 3, § 159.

33.     Plaintiff State of Washington, represented by and through its Attorney General, is a sovereign state of the United States of America. The Attorney General is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

34.     Plaintiff State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Attorney General Josh Kaul, who is the chief law enforcement officer of Wisconsin.

**B. Defendants**

35.     Defendant Linda McMahon is the Secretary of the United States Department of Education and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of the agency. She is sued in her official capacity. 20 U.S.C. § 3412.

36.     Defendant the United States Department of Education is a cabinet agency within the executive branch of the United States government that has been created by Congress. 20 U.S.C.

§ 3411. Defendants United States Department of Education and Linda McMahon are jointly referred to as "Agency Defendants."

37.    Defendant Donald J. Trump is the President of the United States. He is responsible for the actions and decisions that are being challenged by Plaintiffs in this action and is sued in his official capacity.

## LEGAL BACKGROUND

### A.  The Executive Has No Authority to Incapacitate a Congressionally Created Agency.

38.    It is a bedrock constitutional principle that the President and his agencies cannot make law. Rather, they can only—and indeed, they must—implement the laws enacted by Congress, including those statutes that create federal agencies and dictate their duties. The Executive thus can neither outright abolish an agency nor incapacitate it by cutting away the personnel required to implement the agency's statutorily-mandated duties.

39.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in Congress." U.S. Const. Art. I, § 1.

40.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and No. 51, at 350).

41.    "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L.Ed. 253 (1825)).

42.     Congress has exclusive authority to abolish executive agencies, and either redistribute their functions to existing or newly created agencies, or to discontinue their functions. *See, e.g.*, Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, §§ 471, 441, and 451(b) (abolishing Immigration and Naturalization Service and transferring its functions to the newly-created Department of Homeland Security); Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. 105-277, Division G; 112 Stat. 2681 (abolishing several agencies and consolidating their functions within the Department of State, and creating USAID as an independent executive agency).

43.     The Constitution vests executive power in the President. U.S. Const., art. II, § 1. The primary function of the President is understood to be cabined in the "Take Care" clause, which requires that the President "shall take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. Nothing in Article II can be construed to authorize the Executive to dismantle a statutorily created agency directly or indirectly.

44.     The Executive has no authority to enact, amend, or repeal statutes. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). The Executive does not have, under the Constitution or otherwise, an undefined "inherent" power, even in "emergency" circumstances, to unilaterally decide to ignore statutes. *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579 (1952).

45.     Indeed, the Executive acts at the "lowest ebb" of his constitutional authority and power when he acts contrary to "the express or implied will of Congress." *Id.* at 637 (Jackson, J., concurring).

**B.  The Statutory Framework Authorizing the Department of Education.**

46.     In 1979, pursuant to its constitutional authority, Congress established the Department of Education, and many of its offices, by statute with the enactment of the Department

of Education Organization Act. That Act made express findings about the importance of the Department's mission. Department of Education Organization Act, Pub. L. 96-88, 93 Stat. 669 (1979) (codified as amended at 20 U.S.C. §§ 3401–3510); *see also* 20 U.S.C. §§ 3411–3427 (offices); *id.* §§ 3401–3402 (findings and purpose).

47.    "[P]rimary responsibility for establishing policy and providing funding for elementary and secondary education rests with the states and instrumentalities therein," but the Department of Education "has primary responsibility for administering federal elementary, secondary, and postsecondary education programs." *See* Rebecca R. Skinner et al., *A Summary of Federal Education Laws Administered by the U.S. Department of Education*, Cong. Rsch. Serv. (Dec. 12, 2024) (hereinafter, "the Skinner Report").

48.    Over time, Congress has enacted more statutes authorizing additional functions for the Department of Education and appropriating additional funds for it to administer. The major statutes administered by the Department (as detailed in the Skinner Report, *see id.*) include:

        a.    The Elementary and Secondary Education Act (ESEA). The ESEA (Pub. L. 89-10, as amended) was enacted in 1965 and was last reauthorized in 2015 by the Every Student Succeeds Act (ESSA) (Pub. L. 114-95). Title I-A, the largest ESEA program, provides compensatory grants to local educational agencies (LEAs). Congress appropriates funds for ESEA on an annual basis.

        b.    The Individuals with Disabilities Education Act (IDEA). In 1975, Congress enacted Pub. L. 94-142 (now known as the IDEA), which authorizes grant programs that support legally-mandated early intervention and special education services for children with disabilities from birth to age 21. The IDEA was last reauthorized in 2004 (Pub. L. 108-446). Over 90% of IDEA funds are appropriated

for Part B (Section 611), which provides funding for special education services for school-aged children. The authorization of appropriations for Part B is permanent. Funds for Part C—which authorizes state grants for infants and toddlers with disabilities—and Part D—which authorizes national activities—have been appropriated on an annual basis.

   c. <u>Higher Education Act of 1965 (HEA)</u>. The HEA (Pub. L. 89-329, as amended) was enacted in 1965. It was last comprehensively reauthorized by the Higher Education Opportunity Act of 2008 (HEOA) (Pub. L. 110-315) and has since been amended multiple times. Title IV of the HEA authorizes a number of student aid programs that assist students with postsecondary education expenses. These include the Federal Pell Grant program, the William D. Ford Federal Direct Loan program, and the Federal Work-Study program. The HEA also authorizes programs providing federal support directly to institutions of higher education through Title III and Title V. HEA programs are funded through a combination of discretionary and mandatory appropriations. Mandatory funding for the Direct Loan program is permanently authorized, and mandatory funding for the Federal Pell Grant program is permanently appropriated. Funding continues to be appropriated for other HEA programs annually.

   d. <u>Rehabilitation Act of 1973</u>. Under the Rehabilitation Act of 1973 (Pub. L. 93-112, as amended), the Department provides funds to support vocational rehabilitation services primarily through the State Vocational Rehabilitation Services Program, which supports services to help individuals with disabilities. Congress continues to appropriate funding for the program annually.

e.    <u>Civil Rights Laws</u>. The Department is also charged with enforcing various civil rights laws that prohibit discrimination in all programs or activities that receive federal financial assistance (unless otherwise noted). These include Title VI of the Civil Rights Act of 1964 (Pub. L. 88-352, as amended); Title IX of the Education Amendments of 1972 (Pub. L. 92-318, as amended); Section 504 of the Rehabilitation Act of 1973 (Pub. L. 93-112, as amended); the Age Discrimination Act of 1975 (Pub. L. 94-135, as amended); and Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-336, as amended).

f.    <u>Privacy Rights Laws</u>. The Department also enforces laws that protect student privacy rights: (1) the Family Educational Rights and Privacy Act (FERPA); and (2) the Protection of Pupil Rights Amendment (PPRA).

49.    Congress has granted the Secretary of Education limited discretion to reallocate functions within the Department, but that authority is modest, and in no way includes the power to eliminate statutorily-created functions. The Secretary is authorized to "allocate or reallocate functions among the officers of the Department, and to establish, consolidate, alter, or discontinue such organizational entities within the Department as may be necessary or appropriate." 20 U.S.C. § 3473(a). "[B]ut the authority of the Secretary" under these provisions "does not extend to: (1) any office, bureau, unit, or other entity transferred to the Department and established by statute or any function vested by statute in such an entity or officer of such an entity, except as provided in subsection (b); (2) the abolition of organizational entities established by this chapter; or (3) the alteration of the delegation of functions to any specific organizational entity required by this chapter." *Id.* By statute, there are fourteen offices and programs that may be "consolidate[d], alter[ed], or discontinue[d]," or have their "functions" "reallocate[d]" by the Secretary. *Id.*

§ 3473(b)(1). Even then, however, the Secretary must give the congressional committees of jurisdiction "a full and complete statement of the action proposed to be taken pursuant to this subsection and the facts and circumstances relied upon in support of such proposed action," and then wait ninety days before acting. *Id.* § 4373(b)(2).

50.     Thousands of employees have administered the many programs the Department is mandated to operate. Nothing in the numerous statutes creating the Department and describing its mandated functions can be construed as authorizing the Executive to gut an agency such that it can no longer meet its statutory obligations.

**C. Requirements Governing RIFs.**

51.     The Department may engage in limited restructuring and downsizing of its workforce through a RIF, "an administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002). But the Department's authority to administer RIFs does not override Congress's exclusive authority to abolish executive agencies or to discontinue their functions. And an agency cannot use a RIF to unilaterally cease implementing the agency's statutorily-mandated duties.

52.     Consistent with those limits, any federal agency reducing staff pursuant to a RIF must follow specific statutory and regulatory procedures. These include following required retention preferences for employees. "[I]n any reduction in personnel in any civilian service of any Federal agency, competing employees shall be released in accordance with Civil Service Commission regulations which shall give due effect to tenure of employment, military preference, length of service, and efficiency ratings." *James*, 284 F.3d at 1314–15; *see also* 5 U.S.C. § 3502(a).

53.     All civilian employees in the executive branch of the federal government, including employees of the Department of Education, are covered by the Office of Personal Management's (OPM) regulations regarding RIFs. 5 C.F.R. § 351.202(a). All agencies of the federal government are required to follow the OPM regulations "when the agency determines that a [RIF] is necessary." 5 C.F.R. § 351.204.

## FACTUAL ALLEGATIONS

54.     The Department of Education operates programs that touch on nearly every aspect and level of education. The Department's elementary and secondary programs annually serve nearly 18,200 school districts and over 50 million students attending roughly 98,000 public schools and 32,000 private schools, while the Department's higher education programs provide services and support to more than 12 million postsecondary students.

**A.  The Department of Education's Support Across All Spectrums of Education.**

55.     The Department of Education is among the smallest federal agencies, yet it is charged with performing an immense breadth of work.

**The Department's Support for Birth-to-Grade 12 Educational Programs.**

56.     In federal fiscal year 2024, the Department directed 25.4% of its total spending to states and local governments. The federal government provides 13.6% of the funding for public K–12 education.

57.     The two largest sources of federal funding for schools are Title I funding and IDEA funding. The Department of Education distributes over $18 billion under the Title I program to help support schools with high-poverty populations, providing benefits like extra staff to supplement reading instruction. The Department disburses over $15 billion in IDEA funding, which helps cover the costs of special education.

16

58.     Public education funding varies significantly across states. K–12 schools in Alaska receive the most federal funding per pupil, followed by North Dakota. Utah and Kansas receive the least federal funding per pupil. New York and Massachusetts are among those that receive the least federal funding per pupil. Nevertheless, every state receives considerable federal funding and services from the Department.

59.     The K–12 funding provided by the Department supports a wide variety of educational programs and needs: special education, including paying for assistive technology for students with disabilities; the payment of teacher salaries, and benefits, school counselors, and homeless liaisons; the professional development and salaries for special education teachers, paraprofessionals, and reading specialists; transportation to help children receive the services and programming they need; and physical therapy, speech therapy, and social workers.

60.     For instance, Department of Education funding supports education of students with disabilities, both in public and private schools. Funding through IDEA, 20 U.S.C. §§ 1400–1409, pays for a broad range of special education services required by individualized education programs (IEPs) for students with disabilities attending public schools. IDEA funding also helps school districts pay for the costs of placing students with disabilities who need out-of-district placements in special education schools and programs that can meet their needs. *E.g.*, 34 C.F.R. §§ 300.145– 300.146. IDEA also provides funding for equitable services for students with disabilities attending regular private schools. 34 C.F.R. §§ 300.130–300.138. IDEA funding helps support the cost of salaries of special education teachers and other service providers who provide direct instruction and services to students with disabilities, such as speech-language pathologists, reading specialists, physical and occupational therapists, audiologists, psychologists, behavioral therapists, deaf and hard of hearing instructors, and other service providers. IDEA funding also supports the cost of

augmentative communication equipment and devices for students with disabilities with speech, language or communication impairments. IDEA also funds the costs of providing Extended School Year programs for students with disabilities who need continuous support outside of the academic year to help students maintain their academic, social, behavioral, and communication skills. IDEA funding also supports professional development activities for special education teachers and other service providers who work with students with disabilities to better meet the students' needs. IDEA funding supports special education instruction and services to students with disabilities who are in institutional settings.

61.     The Department of Education also administers grants for various disaster and emergency-related relief and preparations, through the Office of Elementary and Secondary Education and the Department's Disaster Recovery Unit.

62.     Department of Education funding also supports early childhood education for children from birth through kindergarten. For instance, the Preschool Development Grant Birth through Five program is a $250 million competitive federal grant designed to improve states' early childhood systems by building upon existing federal, state, and local early care and learning investments.

### The Department's Role in Providing Administrative and Substantive Services for Birth-to-Grade 12 Education.

63.     The Department of Education's statutory mission includes promoting "improvements in the quality and usefulness of education through federally supported research, evaluation and sharing of information." 20 U.S.C. § 3402(4).

64.     To that end, the Department of Education gathers data, identifies best practices in pedagogy, and disseminates that research to educators and others. The Department also operates several National Centers housed within the Institute of Education Sciences, all of which conduct

research, collect and analyze data, and provide technical assistance to educators, parents, students, policymakers, and the general public on a range of topics aimed at improving academic achievement for all children and ensuring the effectiveness of educational programs. *See* 20 U.S.C. §§ 3419, 9511(a) (establishing the Institute of Education Sciences); 20 U.S.C. § 9531(a) (establishing a National Center for Educational Research); 20 U.S.C. § 9541(a) (establishing the National Center for Education Statistics); 20 U.S.C. § 9561(a) (establishing the National Center for Education Evaluation and Regional Assistance); 20 U.S.C. § 9567(a) (establishing the National Center for Special Education Research). The Department, for example, creates resources to support educators and school districts in meeting academic standards, providing education to children who are English language learners, addressing school safety, bullying, and chronic absenteeism, supporting children with significant behavioral issues, and other important topics.

65.     The Department's Office of English Language Acquisition, Language Enhancement and Academic Achievement for Limited English Proficient Students oversees policy for the education needs of linguistically and culturally diverse students. 20 U.S.C. § 3420.

66.     The Student Privacy Policy Office implements FERPA and PPRA, both of which specifically mandate the creation of an office and review board to investigate, process, review, and adjudicate violations of the student privacy laws. 20 U.S.C. §§ 1232g(g), 1232h(f).

67.     The Department's Office of Safe and Healthy Schools administers, coordinates and recommends policy for programs such as drug and violence prevention programs, character and civic education, and a variety programs supporting students' physical and mental health.

68.     The Department's Office of Special Education and Rehabilitative Services (OSERS) provides guidance, technical assistance, and oversight of special education requirements under the IDEA. 20 U.S.C § 3417. The Office of Special Education Programs, established within

OSERS, administers programs concerning education of children with disabilities. 20 U.S.C. § 1402(a).

69.    The Department provides guidance relating to the educational rights of students who are homeless under the McKinney-Vento Homeless Assistance Act, 42 U.S.C. §§ 11301–11481. Similarly, the Department provides guidance regarding protections for students in foster care under the ESSA.

70.    The Department collects and publishes data relating to education services across the country. For example, it conducts the Civil Rights Data Collection, through which it compiles and publishes data on a broad range of civil rights related topics that serve as a valuable resource to state educational agencies.

### The Department's Role in Safeguarding Equal Access to Public Education.

71.    The Department of Education plays a critical role in safeguarding equal access to public education through transparency and accountability. The Department's Office for Civil Rights (OCR) was created by Congress and has historically focused on ensuring that schools provide equal access to education across diverse student bodies. 20 U.S.C. § 3413.

72.    OCR directs, coordinates, and recommends policy for activities that are designed to, among other things, comply with legislative and regulatory civil rights requirements. For example, in May 2022, OCR announced proposed amendments to the Department of Education's regulations implementing Section 504 of the Rehabilitation Act of 1973. *U.S. Department of Education Announces Intent to Strengthen and Protect Rights for Students with Disabilities by Amending Regulations Implementing Section 504* (May 2022), available at https://www.ed.gov/about/ed-offices/ocr/news-room#2022. As part of that process, OCR sought and considered written suggestions from the public about how best to improve the current

regulations. *Id.* In 2024, OCR also promulgated regulations implementing Title IX of the Education Amendments of 1972, restoring strong protections against sexual harassment and assault and reinforcing critical protections for LGBTQ+ students. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024).

73.    OCR is charged with enforcing and investigating alleged violations of various federal civil rights laws that protect students against discrimination, including Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975. OCR has a responsibility to act in a reasonably prompt manner in response to alleged violations of these laws.

74.    In FY 2024, OCR reviewed the highest volume of complaints ever, totaling 22,687 complaints. U.S. Department of Education Office for Civil Rights, *2024 Fiscal Year Annual Report* (2024), available at https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf. That number represented an 18% increase over a previous record high in FY 2023 of 19,201 complaints. *Id.*

75.    In addition to their enforcement and investigative work, OCR has provided trainings and technical assistance to state educational agencies and local educational agencies on civil rights laws. For example, OCR provided training to state and local educational agencies regarding digital accessibility of websites and other electronic documents for individuals who have disabilities, including blindness.

### The Department's Administration of Higher Education Programs and the Federal Student Loan System.

76.    The federal student loan programs administered under Title IV of the Higher Education Act of 1965, as amended, are central components of the financial aid provided to

students in Plaintiff States. These programs are designed to provide critical assistance to prospective students and expand access to higher education to students who could not otherwise afford to pursue a degree or certificate.

77.    The Department manages the federal student loan system through its Office of Federal Student Aid (FSA), which handles loan disbursement, servicing and borrower assistance. 20 U.S.C. § 1018.

78.    Included in this system is the administration of Pell Grants, work-study programs and subsidized loans. The Department awards more than $120 billion a year in grants, work-study funds, and low-interest loans to approximately 13 million students. Much of this funding is sent directly to colleges and universities, including public colleges and universities in the Plaintiff States. If Program Participation Renewals are not processed in a timely manner, it could impact the ability of institutions to operate and most of their student to attend the institution by functionally eliminating the availability of financial aid.

79.    The Office of Federal Student Aid develops the *Free Application for Federal Student Aid* (FAFSA) form and processes, with vendors, more than 17.6 million FAFSA forms each year. The deadline for applicants to submit their FAFSA forms is June 30, 2025, although many students submit their FAFSA forms earlier, as their decision about whether they can afford to attend college and, if so, which college, is necessarily dependent on learning what financial aid they qualify for. If FAFSA forms are not processed on time, this will mean that many students may seek to delay their decisions about *which* college to attend, and many students will decide to *postpone* attending college, for a year or indefinitely.

80.    While the Department distributes this funding to institutions of higher education, it also ensures that the institutions receiving Title IV funding are financially responsible. The

Secretary of Education determines the standard of financial responsibility and enforces it as required under the HEA. When something happens that could affect an institution's financial responsibility, the institution is required to notify the Department within 21 days. If such notifications are no longer monitored by the Department, institutions that continue to receive Title IV funding could engage in wasteful or unnecessary spending without repercussion.

81.     Under the HEA, the Department enforces the requirement that institutions of higher education provide counseling to new students as well as graduating students with information about debt management and repayment. If the Department ceased enforcement of these programs, it would become substantially more difficult to ensure that institutions provide this counseling. Accordingly, students could lose the opportunity to make informed decisions about their student loan debt, or could even become unwitting victims of predatory lending.

82.     The Department's responsibilities are not just financial. The Department manages large-scale data collection and enforcement which would not be possible on a state-by-state basis. Such data are described in various Congressional Acts and often implicate campus safety. Collecting this vital data across states, and therefore monitoring nationwide trends, would be infeasible for individual states to perform and would thereby go unenforced.

83.     For instance, the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act") also requires colleges and universities to disclose, via an annual report, certain crimes that occur in certain places if they are reported to certain people. *See* 20 U.S.C. § 1092; 34 CFR 668.46. If the Department no longer processed the notice and reports made under this and other statutes, colleges and universities would lose a valuable partner in supporting their compliance with these reporting requirements and in interpreting and responding to the

information gathered, which in turn would impede the ability of colleges and universities to keep their campus safe.

84.    Similarly, the Department enforces reporting and compliance of campus safety with regard to drug and alcohol use under the Drug Free Schools and Communities Act and the HEA. These statutes require institutions of higher education to maintain policies surrounding illegal drug and alcohol use, and to determine the number of drug- and alcohol-related violations and fatalities associated with the institution. The Department collects this information from institutions and ensures compliance. Were the Department to cease enforcement of these Acts, institutions would no longer need to monitor and report this data, impacting campus safety.

85.    The Violence Against Women Act requires the Secretary of Education to nationally survey reports of sexual and domestic violence or harassment across institutes of higher education. The Secretary of Education is required to report the data biennially, which institutions receiving federal funding must in turn publish (at a campus level) on their websites. This allows current or prospective students to make informed decisions regarding their place of education. Were the Department to cease collection of this information, not only would campus safety be affected by the lack of enforcement, but the Secretary of Education would be in violation of the Violence Against Women Act.

86.    The Family Educational Rights and Privacy Act (FERPA) is enforced by the Department. It requires that institutions of higher education allow students to inspect their records, and that institutions obtain written request before sharing such records with external personnel. Lack of enforcement of FERPA places students' data security and private records at risk.

87.    The Department's Office of Postsecondary Education is responsible for formulating federal postsecondary education policy and administering programs to support of increased access to quality postsecondary education. 20 U.S.C. § 3415.

88.    The Department is also responsible for vital aspects of higher education accreditation. The accreditation of institutions of higher education is a joint process between the educational institutions, states, the Department, and third-party accreditation authorities. Accreditation ensures that educational institutions meet certain standards for quality and assures students that a degree from that institution has and will continue to have value in the workplace. The Department is responsible for reviewing the accreditation standards of agencies that review programs and institutions of higher education. While some accrediting agencies work without Department of Education recognition, these agencies need not conform to any standards of quality or integrity. Without Department-recognized accreditation, institutions of higher education may engage in profit-seeking behaviors without relating any educational benefits to students. Many unaccredited institutions are profit-hungry "diploma mills," which lack external quality control or educational standards and whose diplomas are therefore meaningless to the job market and worthless to graduates.

**The Department's Programs Supporting Vocational Education and Rehabilitation.**

89.    The Department of Education provides both vocational education and vocational rehabilitation services to help individuals gain skills for employment and support those with disabilities in finding and maintaining jobs.

90.    The Department's Office of Vocational and Adult Education oversees programs that assist adults with obtaining a high school diploma or the equivalent and support them in their pursuit of postsecondary, career, or technical education.

91.    The Department's Office of Career, Technical, and Adult Education (OCTAE) administers and coordinates programs related to career and technical education, adult education and literacy, and community colleges for advancing workforce development. 20 U.S.C. § 3416.

92.    OCTAE's Division of Academic and Technical Education (DATE) is responsible for helping adult students acquire academic and technical skills to be prepared for high-skill, high-wage, or high-demand occupations.

93.    DATE administers formula and discretionary grant programs under the Carl D. Perkins Career and Technical Education Act (Perkins V), 20 U.S.C. §§ 2301–2414, which is the primary source of federal funding for career and technical education. DATE also provides assistance to states to improve program quality, implementation, and accountability, and establish national initiatives that help states implement rigorous career and vocational education programs.

94.    DATE also administers the Perkins Collaborative Resource Network, which provides resources and tools for state directors and state staff who administer career and technical education programs.

95.    OCTAE's Division of Adult Education and Literacy (DAEL) administers adult education and literacy programs that help adults acquire the basic skills they need including reading, writing, math, English language proficiency, and problem-solving. The Office of Correctional Education, which coordinates efforts to support educational opportunities in correctional settings, is also located in DAEL.

96.    DAEL administers formula grant programs to adults under the Adult Education and Family Literacy Act (AEFLA) and Title II of the Workforce Innovation and Opportunity Act. 29 U.S.C. §§ 3271–3333; 29 U.S.C. §§ 3101–3361. These programs provide assistance to states to

improve program quality, accountability, and capacity, and establish national leadership activities to enhance the quality of adult education.

97.    OCTAE provides national leadership to strengthen the role of community colleges in expanding access to postsecondary education for youth and adults and advancing workforce development.

98.    OCTAE's community college initiatives are designed to build public support for community colleges as centers of innovation and providers of excellent education and training that are affordable and accessible to all Americans, facilitate the dissemination of timely and actionable guidance on community college educations for teachers, administrators, students, parents, and employers, and promote the development of strategies that support students in the completion of their postsecondary certification and degree programs.

99.    The Department of Education also provides critical vocational rehabilitation services and funding for individuals with disabilities through its Rehabilitation Services Administration (RSA), a component of the Department's Office of Special Education and Rehabilitative Services (OSERS). 29 U.S.C. § 702. RSA provides leadership and resources to assist state and other agencies in providing vocational rehabilitation and other services to individuals with disabilities to maximize their employment, independence, and integration into the community and the competitive labor market.

100.    The Rehabilitation Services Administration funds and administers many programs, including disability employment programs, an independent living program, technical assistance centers, training programs, and disability innovation fund programs.

101.    Two disability employment programs—the State Vocational Rehabilitation Services Program and the State Supported Employment Services Program—provide formula grants to states to provide employment services for individuals with disabilities.

102.    The State Vocational Rehabilitation Services Program is authorized by the Rehabilitation Act of 1973 (Rehabilitation Act), as amended by Title IV of the Workforce Innovation and Opportunity Act. This program provides grants to assist states in operating statewide vocational rehabilitation programs, each of which is an integral part of a statewide workforce development system.

103.    The State Supported Employment Services Program is authorized by Title VI of the Rehabilitation Act of 1973 (Rehabilitation Act), as amended by Title IV of the Workforce Innovation and Opportunity Act. This program provides grants to assist states in developing and implementing collaborative programs with appropriate entities to provide supported employment services for individuals with the most significant disabilities, including youth with the most significant disabilities, who require supported employment services following the achievement of a supported employment outcome.

104.    Supported employment grant funds are used to supplement funds provided under the State Vocational Rehabilitation Services Program to provide supported employment services. Program funds may be used to provide supported employment services, once an individual has been placed in supported employment, for up to 24 months and to supplement other vocational rehabilitation services necessary to help individuals with the most significant disabilities find work in the integrated labor market.

105.    The Rehabilitation Services Administration also provides Independent Living Services for Older Individuals Who Are Blind formula grants to states under Title VII, Chapter II

of the Rehabilitation Act of 1973, as amended by Title IV of the Workforce Innovation and Opportunity Act, to support services for individuals age 55 or older whose severe visual impairment makes competitive employment difficult to obtain but for whom independent living goals are feasible.

106.    The Rehabilitation Services Administration further provides critical technical assistance, training programs, and disability innovation fund programs to states supported through discretionary grants.

107.    Certain technical assistance centers provide training and technical assistance to states and state agencies including those that ensure: that transition-age youth with disabilities receive high-quality education services, state agencies are trained to provide adequate vocational rehabilitation services to individuals who are blind, the increase in number and quality of employment outcomes for individuals with disabilities.

108.    The Rehabilitation Services Administration also provides training programs and assistance to states. For example, it administers training programs to help fund undergraduate and graduate programs in the field of rehabilitation and training programs for the use of braille for personnel providing vocational rehabilitation services or education services to youth and adults who are blind. They also allow new and innovative training programs to improve methods of training rehabilitation personnel for more effective delivery of rehabilitation services.

109.    The Rehabilitation Services Administration also provides funds through Disability Innovation Fund Programs ("Disability Innovation Fund") to state agencies to conduct innovative activities aimed at improving outcomes for individuals with disabilities. For example, these funds allow evidence-based practices for individuals with disabilities to advance in high-demand and high-quality careers, foster partnerships among agencies, evaluate new or substantially improved

model strategies to transition youth and adults with disabilities to competitive integrated employment, and increase the opportunity for Subminimum Wage to Competitive Integrated Employment program participants to obtain competitive integrated employment.

**The Department's Administration of Impact Aid.**

110.    Because school districts rely heavily on local property taxes for funding, property tax exemptions on federal land create funding shortages for neighboring school districts. The Impact Aid program, signed into law by President Harry Truman in 1950 (Pub. L. 815 and Pub. L. 874), is a critical method of ensuring the financial survival of local school districts whose revenue is decreased due to the presence of non-taxable federal land. School districts that are near, or serve students from, military bases, federal lands, federal low-rent housing facilities, and tribal communities lose local revenue because of the presence of these nontaxable federal activities. While these school districts typically continue to receive funding from their states, Impact Aid funding partially reimburses school districts for this loss of locally-derived revenue.

111.    The Department is the primary agency responsible for administering Impact Aid payments to local school districts. *See* ESEA, Title VII, 20 U.S.C. § 7701–7714, 34 C.F.R. § 222. Every year, each school district seeking Impact Aid must submit an application to the Department. Typically this is January 31, though late application deadlines can extend to April 1 with payment of a penalty. The Department reviews the applications and processes payments based on congressional appropriations each fiscal year and allocates funding in multiple installments until all available funds are distributed.

112.    Many school districts within the Plaintiff States are heavily dependent on the Department's effective funding distribution and administration of Impact Aid due to the large amount of nontaxable federal property within their boundaries, as the amount of Impact Aid

received by each school district is based on the number of affected students who live on federal property or whose parents work in federal facilities. School districts within Plaintiff States receive hundreds of millions of dollars annually in Impact Aid funding for construction, special education, maintenance, and operations.

113.    The Impact Aid Program is the only K–12 Federal education program that is not forward funded. Any delay in either appropriations or administration has an immediate impact on Impact Aid-recipient school districts' ability to fund day-today operations, instructional expenditures, utility payments or payroll.

**B.  The President's Directive to Dismantle the Department of Education and the Secretary of Education's Elimination of Nearly Half of the Department's Workforce.**

114.    President Trump has publicly described his intention to dismantle the Department of Education. That goal has been plainly and repeatedly stated: President Trump called the Department of Education "a big con job" and declared that he would "like to close it immediately." *See, e.g.*, Michael C. Bender, *Trump Is Said to Be Preparing Order That Aims to Eliminate Education Dept.*, The New York Times (Mar. 6, 2025), https://www.nytimes.com/2025/03/06/us/politics/trump-education-department-executive-order.html. He also stated that he would like the newly installed Secretary of Education, Linda McMahon, to put herself "out of a job." Zachary B. Wolf, *Trump and Musk are moving to smother these three pieces of the government*, CNN (Feb. 5, 2025) ("I told Linda, 'Linda, I hope you do a great job in putting yourself out of a job.' I want her to put herself out of a job – Education Department.").

115.    Secretary McMahon has indicated that she plans to heed this call and break down the Department of Education from within. She affirmed that "President Trump believes that the

bureaucracy in Washington should be abolished so that we can return education to the states, where it belongs," and that she "wholeheartedly support[s] and agree[s] with this mission." Cochran, *McMahon*, cited *supra* ¶ 5. On March 3, 2025, Secretary McMahon asked employees to join her in "perform[ing] one final, unforgettable public service to future generations of students" by dismantling the Department of Education. *Secretary McMahon: Our Department's Final Mission*, U.S. Department of Education (Mar. 3, 2025), https://perma.cc/F7BT-MQ3D.

116.    On March 6, 2025, news outlets reported that the White House had drafted an executive order calling on the Secretary of Education to "take all necessary steps to facilitate the closure of the Department of Education (DOE) and return authority over education to the States and local communities, the maximum extent allowed by law."

117.    On March 11, 2025, five days after reports of the draft executive order calling for the Department's dismantling, the U.S. Department of Education announced that its workforce is being cut virtually in half. The Department described a massive reduction in force (RIF)—as part of its "final mission"—that affects "[a]ll divisions within the Department." *U.S. Department of Education Initiates Reduction in Force*, Press Release (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force.

118.    Based on figures provided by the Department, the RIF displaces approximately 1,378 employees, all of whom "will be placed on administrative leave beginning Friday, March 21st." The total reduction in force to the Department of Education is "roughly" 1,950 people: the approximately 1,378 employees subject to the RIF, the 259 employees that accepted the so-called "Fork in the Road" offer (referred to in the press release as the "Deferred Resignation Program"), and the 313 employees that accepted a "Voluntary Separation Incentive Payment." The press

release states that "[a]fter today's actions, the Department's workforce will total roughly 2,183 workers," an approximately 50% cut from the 4,133 workers the Department of Education had "[w]hen President Trump was inaugurated."

119.     On March 11, 2025, Secretary McMahon stated, during an interview with Laura Ingraham of Fox News, that the workforce reductions were the first steps in dismantling the Department of Education:

> Ingraham:     Now, is this the first step on the road to a total shutdown?
>
> McMahon:     Yes, actually it is, because that was the President's mandate. His directive to me, clearly, is to shut down the Department of Education, which we know we'll have to work with Congress, you know, to get that accomplished. But what we did today was to take the first step of eliminating what I think is bureaucratic bloat.

*See* Fox News Channel, https://www.foxnews.com/video/6369901522112 (televised interview).

120.     On information and belief, the RIF devastated important segments of the Department of Education, rendering the agency unable to perform its core functions.

121.     On information and belief, almost the entire staff of the Institute of Education Sciences has been eliminated.

122.     On information and belief, the majority of staff in the Office for Civil Rights have been eliminated or otherwise removed. The Office for Civil Rights, created by Congress and codified at 20 U.S.C. § 3413, enforces federal civil rights laws in schools and other recipients of Department of Education funding, and directs, coordinates, and recommends policy for activities that are designed to administer the provisions of legislation and Departmental policy prohibiting discrimination on the basis of race, color, national origin, sex, handicap, or age. Regional offices of the Office for Civil Rights in Boston, San Francisco, Cleveland, New York, Chicago, Dallas, and Philadelphia have been eliminated and closed, with employees terminated in each of those offices.

123.    The cuts to the Office for Civil Rights will have deep impacts on the Department of Education's ability to carry out its vital work. Given that the RIF heavily impacted investigative staff, on information and belief the cuts will force remaining investigators to nearly double their caseloads, severely limiting meaningful investigation of discrimination in schools.

124.    On information and belief, the Office of General Counsel has also been gutted, with many divisions eliminated and approximately three-quarters of OGC's staff terminated. One such eliminated division, the Ethics Division, is responsible for counseling current and past Department employees on ethics matters. On information and belief, the Office of General Counsel advised offices and units across the Department and its effective gutting will negatively impact the Department's ability to perform statutory functions.

125.    On information and belief, all OGC attorneys specializing in K–12 grants, IDEA grants, and equity grants have been terminated. The RIF has also resulted in the termination of most OGC attorneys focused on privacy issues.

126.    On information and belief, the RIF has had a material impact on the Office of Special Education and Rehabilitation Services, which serves as the principal adviser to the Secretary on Departmental matters related to special education and rehabilitative services. *See* 20 U.S.C. § 3417. In particular, the RIF may hamstring OSERS activities related to policy, program and strategic planning, regulations, evaluation, and grant activities.

127.    On information and belief, the RIF has also effectively eliminated the Office of Elementary and Secondary Education's State and Grantee Relations Team, which partners with stakeholders and connects them to the resources and relationships they need to support and educate students nationally.

128.    On information and belief, the RIF has also seriously impacted the Department of Education's FSA. FSA directs, coordinates, and recommends policies for programs that are designed to provide financial assistance to eligible students enrolled in postsecondary educational institutions. This assistance includes grants, loans, and work-study assistance to nearly 12.9 million students through approximately 6,100 postsecondary institutions.

129.    Upon information and belief, given the impending challenges of students facing renewed payments following the pandemic, the Department employed contractors to help borrowers weather the resumed payments. Even prior to the RIF, it was reported on March 7, that "the agency hasn't been able to provide any communication to schools, servicers, or borrowers about how to navigate the changes that are coming." https://edition.cnn.com/2025/03/07/politics/student-loans-education-trump. "And many staffers with institutionalized knowledge about the aid programs have been fired or left." *Id.*

130.    In a public LinkedIn post, the Executive Director of the newly formed Office of Loan Portfolio Management at Federal Student Aid wrote:

> When I accepted the position two months ago, I dove in, putting together a strategy for tackling the challenges that I knew would come with managing a group of 200 dedicated public servants and shepherding 43M borrowers back into our complex repayment environment after a long payment pause and on-ramp. But now, I have lost many of those 200 staff, with more to come. I spend my days justifying our existence, our dignity, and our mission. I try to keep the work going in spite of the impossible environment we find ourselves in. I'm afraid of what the coming days, weeks, months, years will bring not just for me and the Department, but for the borrowers we serve. I've dedicated my career to the work of supporting college affordability and a student aid system that supports our most vulnerable, and it is heartbreaking to see that dissolving before my eyes. I'm not sure what the future will bring, but as always, I'm here to fight, to work for the mission, to do the right thing.

https://www.linkedin.com/feed/update/urn:li:activity:7299489353838350337.

131.    On information and belief, within FSA, the RIF has resulted in the termination of many of the Department's employees in the School Eligibility and Oversight Services Group,

which is responsible for administering a program of eligibility, certification, financial analysis, and oversight of schools participating in Federal Student Aid programs. In order to receive Federal Student Aid funds, schools must remain compliant with Title IV requirements and submit to audits which confirm compliance. Department employees responsible for Title IV oversight ensure compliance, process auditing results, and release Title IV funding timely.

132.    On information and belief, the RIF has effectively eliminated FSA's Vendor Oversight Division, which oversees and assists federal student loan servicers. The Vendor Oversight Division is responsible for ensuring that loan servicers fulfill their contracts while meeting Department requirements. When such requirements are not met, it is responsible for enforcing corrective action. For example, when the Higher Education Loan Authority of the State of Missouri (MOHELA) failed to comply with its contractual requirements after the return to repayment in August 2023, including mismanaging borrower accounts, the Department imposed a corrective action plan on MOHELA, which the Vendor Oversight Division is responsible for overseeing and defending. The Vendor Oversight Division also plays a key role in verifying compliance with the requirements of the Public Service Loan Forgiveness (PSLF) program and the Income-Based Repayment plan before instructing federal loan servicers to discharge a student's debt under these programs.

133.    On information and belief, the RIF has eliminated key staff members in FSA's Product Management Group, including those responsible for the online income-driven repayment application, Direct Loan Consolidation application, and PSLF Help Tool, which enables borrowers to certify their qualifying employment for the PSLF Program.

134.    In sum, on information and belief, the RIF has so severely impaired the Department of Education that it can no longer function, and cannot comply with its statutory requirements.

**C. The Incapacitation of the Department of Education Will Cause Grave Harm to the States and Their Residents.**

135.    The effective gutting of the Department of Education will result in a wide range of devastating harms for Plaintiff States and their residents that could be neither prevented nor mitigated.

136.    The Directive and RIF will result in the loss of or delays in Department funding and supports impacting nearly every aspect of K–12 education in the Plaintiff States because there will be such a significant reduction in staff. These impacts will include teacher shortages from the loss in salary funding, which in turn will result in increased class sizes. The impacts will also include a loss of professional development and salaries for special education teachers, paraprofessionals, reading specialists, physical therapists, speech therapists, and social workers, which in turn will result in lost educational opportunities for students that cannot be recovered or remedied. Without Department of Education financial support, states will lose critical services from special education students and students with IEPs. States would lose funding for assistive technology for students with disabilities, and funding for transportation to help children receive the services and programming they need. The dismantling of the Department will also result in the termination of afterschool programs.

137.    Regardless of what alternative resources are put in the place of the Department of Education, the process of the Department's dismantling will create and has created chaos, disruption, uncertainty, delays and confusion for Plaintiff States and their residents. States anticipating federal fund disbursements do not know whether staff will be employed and able to be contacted regarding those disbursements. Students at state universities do not know whether their federal student aid packages will be timely processed and made available before the Fall 2025 semester begins.

138.    For instance, on March 12, 2025, the day after the RIF was announced, the Department's website for administering the distribution of federal funds (referred to as the "G6" system) became unavailable. G6 was the Department system used for managing federal funds, and allowed schools to request payments, adjust drawdowns, and return cash to the Department for many Title IV programs. On March 12, the website for the G6 system stated: "G6.ed.gov will no longer exist, G5.gov will be the correct URL. To access G5, external users should enter their G5 email ID and their G5 email password."

139.    When certain users then attempted to then access the G5.gov system for the distribution of federal funds, the G5 website announced:

> ALERT: Due to severe staffing restraints, you can expect delays in connecting to a live help desk agent for assistance with G5. We recommend sending an email to obssed@servicenowservices.com with a summary of your issue or question. The next available agent during normal business hours will respond to your email in the order it was received.

140.    On March 12, 2025, a user of the G5 system from the Massachusetts Department of Elementary and Secondary Education attempted to access the G5 system in order to process a request for anticipated disbursements of federal funds, but was unable to access the G5 system for hours. The user was told that the G5 system was experiencing a "system glitch."

141.    The harms from the dismantling of the Department go beyond systems breakdowns and unresponsive administrators.

142.    On information and belief, the dismantling of the Department has more than decimated the Office for Civil Rights (OCR). Without a functioning OCR, school districts in Plaintiff States may be emboldened to restrict access to quality education and ignore complaints of discrimination or hate against students based on race, gender identity, disability status, religion, and immigration status. Students with current complaints will likely see no meaningful resolution,

with cases backlogged due to the shortage of employees to resolve them. Students facing discrimination, sexual harassment, or sexual assault will lose a critical avenue to report their case.

143.    On information and belief, the dismantling of the Department will result in higher costs to attend institutions of higher education. Not only will federal funding for Pell grants, work-study programs and subsidized loans be at risk, but so too will the Department's administration of those programs, without which they cannot operate even if they were fully funded. Without these federal programs supporting students of higher education, the cost of pursuing higher education will increase and fewer students will have the opportunity to attend college. For many state university systems, disruption to or loss of Pell grants would be an existential threat, especially to their mission to serve first generation college students.

144.    On information and belief, the gutting of the Office of General Counsel that has resulted from the dismantling of the Department will have impacts throughout the Department's statutory and non-statutory functions. Without the now-eliminated Ethics Division, current Department employees are now deprived of the counseling regarding ethics matters that govern all manner of agency actions affecting Plaintiff States' participation in Department programs. The termination of all OGC attorneys specializing in K–12 grants, IDEA grants, and equity grants will necessarily impede the Department's ability to award and administer those grants to Plaintiff States.

145.    On information and belief, the RIF's effective elimination of the Office of Elementary and Secondary Education's State and Grantee Relations Team signifies the Plaintiff States' loss of a critical partner in identifying and developing the resources and relationships needed to support and educate students.

146.    On information and belief, the RIF's impacts on the implementation of the Federal Student Aid program will be monumental. By terminating many of the Department's employees in the School Eligibility and Oversight Services Group, the Department has lost the tool responsible for administering a program of eligibility, certification, financial analysis, and oversight of schools participating in Federal Student Aid programs. Moreover, with the effective elimination of FSA's Vendor Oversight Division, which oversees and assists federal student loan servicers, Plaintiff States and their students lose tools to help ensure that loan servicers comply with their contractual requirements.

147.    On information and belief, in addition to these disruptions of the administration of Federal Student Aid generally is the disruption that will come to the administration of FAFSA applications specifically. With the destruction of these multiple aspects of the FSA program at the Department, the Department is deprived of the administrative systems necessary to administer and process the millions of FAFSA applications the Department receives. Indeed, the dismantling of the Department comes just as the college admissions and decisionmaking process is at its peak, with the FAFSA application deadline merely two and a half months from the RIF. The President's Directive and the Agency Defendants' implementation of it has resulted in mass uncertainty regarding whether and how FAFSA applications will be processed, and will result in delays and obstructions in the immediate future.

148.    On information and belief, without the Vendor Oversight Division's verification of compliance with the requirements of the Public Service Loan Forgiveness program and the Income-Based Repayment plan, Plaintiff States and their educational institutions are deprived of a system by which loan servicers receive instructions regarding the discharge of student debt under FSA programs.

**CAUSES OF ACTION**

**Count I**
**Violation of the Separation of Powers Doctrine – Usurping Legislative Authority**
**(Against All Defendants)**

149.    The States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

150.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress." U.S. Const. Art. I, Sec. 1.

151.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC*, 591 U.S. at 223 (quoting The Federalist No. 70, at 475 (A. Hamilton) and No. 51, at 350).

152.    Thus "'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L.Ed. 253 (1825)).

153.    The separation of powers doctrine thus represents a central tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *Seila Law LLC*, 591 U.S. at 227.

154.    Consistent with these principles, the Executive's powers are limited to those specifically conferred by the Constitution and federal statutes, and do not include any undefined residual or inherent power.

155.    Any instance where the President, by Executive Order or otherwise, directs an agency to take an action that runs afoul of a statute or the legislative intent of Congress, violates the Separation of Powers doctrine.

156.    Any instance where the President, by Executive Order or otherwise, directs that an agency authorized by Congress to perform statutory duties cease operations, effectively repeals the statutes that authorize that agency and thus violates the Separation of Powers doctrine.

157.    Here, where Congress has created the Department of Education, the Executive and his agencies cannot incapacitate it, absent Congressional action that directs them to do so. The Actions challenged herein thus violate Constitutional and statutory mandates, contravene Congressional intent, and are unlawful.

158.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579.

159.    Pursuant to 28 U.S.C. § 2201, the States are also entitled to a declaration that the President's Directive and the Department of Education's implementation of the Directive violates the constitutional separation of powers doctrine, and impermissibly arrogates to the executive power that is reserved to Congress.

**Count II**
**Violation of the Separation of Powers – Take Care Clause**
**(Against All Defendants)**

160.    The States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

161.    The Take Care Clause provides that the executive must "take Care that the Laws be faithfully executed . . . ." U.S. Const. Art. II, Sec. 3; *UARG v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them" (quotation and citation omitted)).

162.    The Executive violates the Take Care Clause where it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

163.    By issuing the Directive to dismantle an agency authorized by Congress, the President has failed to faithfully execute the laws enacted by Congress in violation of the Take Care Clause.

164.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co.*, 103 F. Supp. at 576, *aff'd*, 343 U.S. 579.

165.    Pursuant to 28 U.S.C. § 2201, the States are also entitled to a declaration that the Directive and the Department of Education's implementation violates the constitutional separation of powers doctrine, and impermissibly arrogates to the executive power that is reserved to Congress.

### Count III
### *Ultra Vires* – Conduct Outside the Scope of
### Statutory Authority Conferred on the Executive
### (Against All Defendants)

166.     The States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

167.     Neither the President nor an agency can take any action that exceeds the scope of their constitutional and/or statutory authority.

168.     Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

169.     Defendants' conduct in issuing the Directive and the Department of Education's implementation of it is contrary to law and outside of Defendants' authority.

170.     Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Directive and the Department of Education's implementation of it is contrary to law and outside of Defendants' authority.

171.     Plaintiff States are further entitled to a preliminary and permanent injunction preventing Agency Defendants from implementing the Directive.

### Count IV
### Violation of the Administrative Procedure Act – Contrary to Law
### (Against Agency Defendants)

172.     Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

173.     Agency Defendants are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

174.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C).

175.    Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). In *Loper Bright*, the Supreme Court clarified that historical principles of "respect" did not equate to deference, and that "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 392 (emphasis in original). Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

176.    An agency may not take any action that exceeds the scope of its constitutional or statutory authority.

177.    No constitutional or statutory authority authorizes the Department of Education to refrain from fulfilling its statutory duties, or to violate federal law.

178.    An agency likewise may not violate its own regulations. When a federal agency promulgates "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954). "It is an abecedarian principle of administrative law that agencies must comply with their own regulations." *Manguriu v. Lynch*, 794 F.3d 119, 122 (1st Cir. 2015) (citation omitted). An agency's action may be set aside pursuant to the APA if the action violates the agency's own

procedures, particularly if that error prejudices the interest of a person before the agency. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–46 (6th Cir. 2004); *see also Town of Weymouth, Mass. v. Mass. Dep't of Env't Prot.*, 961 F.3d 34, 47 (1st Cir. 2020), *on reh'g*, 973 F.3d 143 (1st Cir. 2020) ("[A]n agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" (quoting *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014)).

179.    The Agency Defendants lack authority to implement the Directive as it calls for actions that are not authorized by statute, and are in direct contravention of statutory authority governing the creation and operation of the Department of Education. The Agency Defendants also lack authority to use a RIF to override the limitations on their own power to dismantle statutorily-mandated agency functions. These agency actions are unauthorized, unprecedented, and not entitled to deference by this Court.

180.    In enacting the Directive, the Agency Defendants have acted contrary to the applicable regulations governing the administration of Department functions.

181.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Agency Defendants lack legal authority to implement the Directive, contrary to congressional directive and intent, and have, in so doing, acted contrary to law, outside of statutory authority, and in violation of the APA.

182.    Plaintiff States are also entitled to vacatur of the Department of Education's implementation of the Directive, and a preliminary and permanent injunction preventing the Agency Defendants from implementing the Directive.

**Count V**
**Violation of the Administrative Procedure Act –**
**Arbitrary & Capricious and an Abuse of Discretion**
**(Against Agency Defendants)**

183.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

184.    Defendants include "agenc[ies]" under the APA 5 U.S.C. § 551(1).

185.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

186.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

187.    That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

188.    An action is also arbitrary and capricious if the agency "failed to consider . . . important aspect[s] of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

189.    The Department's mass RIF is arbitrary and capricious because the Department provided no reasoned basis or explanation for its mass RIF.

190.    The Department's RIF is arbitrary and capricious because the Agency Defendants failed to consider the consequences of their actions.

191.    The Department's RIF is arbitrary and capricious because the Department's stated reasons for the RIF—to promote "efficiency" and "accountability" —are pretext for the President and Secretary McMahon's stated goal of dismantling the Department from within.

192.    The Department's RIF is arbitrary and capricious because the Agency Defendants' actions impede their ability to perform the Department's functions, both those that are required by statute and those that are not.

193.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Agency Defendants' actions implementing the Directive violate the APA because they are arbitrary and capricious.

194.    Plaintiff States are also entitled to vacatur of the Agency Defendants' implementation of the Directive pursuant to 5 U.S.C. § 706, and a preliminary and permanent injunction preventing Agency Defendants from implementing the Directive.

195.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States pray that this Court:

i.    Issue a judicial declaration that President Trump's Directive to dismantle the Department of Education, and the Department of Education's implementation of the Directive are unlawful because they violate the United States Constitution and the Administrative Procedure Act;

ii.   Pursuant to 5 U.S.C. § 706, vacate Agency Defendants' actions implementing President Trump's Directive to dismantle the Department of Education;

iii.  Preliminarily and permanently enjoin the Agency Defendants from implementing President Trump's Directive to dismantle the Department of Education, including through ordering a reduction in force;

iv.   Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

v.    Grant other such relief as this Court may deem proper.

Dated: March 13, 2025

Respectfully submitted,

**ANDREA JOY CAMPBELL**
Attorney General for the Commonwealth
of Massachusetts

By: */s/ Katherine Dirks*
Katherine Dirks (BBO No. 673674)
  Chief State Trial Counsel
Yael Shavit (BBO No. 695333)
  Chief, Consumer Protection Division
Elizabeth Carnes-Flynn (BBO No. 687708)
Nathaniel Hyman (BBO No. 698506)
  Assistant Attorneys General
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
yael.shavit@mass.gov
elizabeth.carnes-flynn@mass.gov
nathaniel.j.hyman@mass.gov

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
Molly Thomas-Jensen*
Gina Bull*
Special Counsel
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
molly.thomas-jensen@ag.ny.gov
gina.bull@ag.ny.gov

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

By: */s/ Kaliko'onālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kaliko'onālani D. Fernandes*
Solicitor General
Ewan C. Rayner*
Deputy Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov
ewan.rayner@hawaii.gov

**ROB BONTA**
Attorney General for the State of California

By: */s/ Lucia Choi*
Lucia Choi*
Deputy Attorney General
Michael L. Newman*
Senior Assistant Attorney General
Srividya Panchalam*
James E. Stanley*
Supervising Deputy Attorneys General
Natasha A. Reyes*
Deputy Attorney General
California Attorney General's Office
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6364
Lucia.Choi@doj.ca.gov
Michael.Newman@doj.ca.gov
Srividya.Panchalam@doj.ca.gov
James.Stanley@doj.ca.gov
Natasha.Reyes@doj.ca.gov

**PHIL WEISER**
Attorney General for the State of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
Deputy Solicitor General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov


**KATHLEEN JENNINGS**
Attorney General for the State of Delaware

By: */s/ Ian R. Liston*
Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov


**BRIAN L. SCHWALB**
Attorney General for the District of
Columbia

By: */s/ Andrew Mendrala*
Andrew Mendrala*
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.Mendrala@dc.gov


**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Hayleigh S. Crawford*
Hayleigh S. Crawford*
Deputy Solicitor General
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov
ACL@azag.gov


**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Patrick Ring*
Patrick Ring*
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808 5020
Patrick.ring@ct.gov


**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Karyn L. Bass Ehler*
Karyn L. Bass Ehler*
Assistant Chief Deputy Attorney General
Katharine P. Roberts*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-4985
karyn.bassehler@ilag.gov
katharine.roberts@ilag.gov

**AARON M. FREY**
Attorney General for the State of
Maine

By: */s/ Sean D. Magenis*
Sean D. Magenis*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
(207) 626-8800
sean.d.magenis@maine.gov

**DANA NESSEL**
Attorney General for the People of
Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Kathleen Halloran*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
HalloranK1@michigan.gov

**AARON D. FORD**
Attorney General for the State of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney
General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Keith M. Jamieson*
Keith M. Jamieson*
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6960
kjamieson@oag.state.md.us

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Liz Kramer*
Liz Kramer*
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, MN, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

**MATTHEW J. PLATKIN**
Attorney General for the State of New Jersey

By: */s/ Jessica L. Palmer*
Jessica L. Palmer*
*Deputy Attorney General*
25 Market Street
Trenton, NJ 08625-0093
(609) 696-4607
Jessica.Palmer@law.njoag.gov

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Elleanor H. Chin*
Elleanor H. Chin*
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
elleanor.chin@doj.oregon.gov


**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 793-1646
Jonathan.rose@vermont.gov

**JOSHUA L. KAUL**
Attorney General for the State of
Wisconsin

By: */s/ Charlotte Gibson*
Charlotte Gibson*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 957-5218
gibsoncj@doj.state.wi.us


**PETER F. NERONHA**
Attorney General for the State of Rhode
Island

By: */s/ Kathryn T. Gradowski*
Kathryn T. Gradowski*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2810
kgradowski@riag.ri.gov


**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: */s/ Spencer W. Coates*
Spencer W. Coates*
Assistant Attorney General
Cristina Sepe*
Deputy Solicitor General
Office of the Washington State Attorney
General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
spencer.coates@atg.wa.gov
cristina.sepe@atg.wa.gov


*Pro Hac Vice* Applications Forthcoming