# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, *et al.*;

      Plaintiffs,

      v.

LINDA McMAHON, *et al.*;

      Defendants.

C.A. No. 1:25-cv-10601-MJJ

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

   I.   The Statutes Governing the Department's Programs ............................................. 2

      A.   The Department's Essential Functions Supporting Higher Education. .......... 3

      B.   The Department's Support for Birth-to-Grade-12 Education. ...................... 5

      C.   The Department's Support for Vocational Education and Rehabilitation. ..................... 7

      D.   The Department's Enforcement of Civil Rights Laws in Education. ............................ 9

      E.   The Department's Responsibility to Study Education in the U.S. and Maintain Key Data that Supports the Department's and the States' Programs. ................................. 10

   II.   The Announcement and Initiation of the Dismantling of the Department ......................... 11

   III.   The Mass Termination Has Eliminated Staff Essential to the Department's Ability to Meet Its Statutory Obligations. ........................................................................... 15

      A.   The Damage to Higher Education from the Mass Termination and the Transfer of Student Loans to the SBA. ........................................................................... 15

      B.   Impacts on Offices That Support Birth-to-Grade 12 Educational Programs (OESE, OSERS, OELA, and OGC). ....................................................................... 18

      C.   Impacts on Support for Vocational Education and Rehabilitation Caused by Staff Reductions in OCTAE and OSERS ................................................................. 20

      D.   The Elimination of OCR Resources Needed to Enforce Civil Rights Laws. ............... 22

      E.   Elimination of Essential Educational Research Functions. ............................. 23

ARGUMENT ............................................................................................................. 24

   I.   Plaintiffs Are Likely to Succeed on the Merits. ................................................... 24

      A.   The Mass Termination Is Arbitrary and Capricious in Violation of the APA. .............. 24

      B.   The Mass Termination Is Contrary to Law in Violation of the APA ............................ 28

C.     The Mass Termination and the President's March 21 Directive Violate the Separation of Powers and the Take Care Clause. ........................................................ 30

D.     The Mass Termination and the President's March 21 Directive are *Ultra Vires*. ......... 32

II.    Plaintiffs Face Irreparable Harm Absent Injunctive Relief. ............................................... 33

A.     Financial Aid for Higher Education ............................................................. 34

B.     Cuts to Research, Data, Accreditation, and Compliance Services ............................... 36

C.     Delays and Uncertainty in Funding ............................................................. 38

III.   The Balance of the Equities and the Public Interest Favor a Preliminary Injunction. ....... 39

CONCLUSION ....................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Forest Rsch. Council v. United States*,
    77 F.4th 787 (D.C. Cir. 2023).............................................................32

*Amerijet Int'l, Inc. v. Pistole*,
    753 F.3d 1343 (D.C. Cir. 2014)...........................................................26

*Animal Welfare Inst. v. Martin*,
    588 F. Supp. 2d 70 (D. Me. 2008)........................................................33

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015)............................................................................32

*Bennett v. Spear*,
    520 U.S. 154 (1997)............................................................................25

*Burdue v. FAA*,
    774 F.3d 1076 (6th Cir. 2014).............................................................25

*Carroll v. Safford*,
    44 U.S. 441 (1845)..............................................................................32

*City & Cnty. of San Francisco. v. Trump*,
    897 F.3d 1225 (9th Cir. 2018)....................................................30-31, 33

*City of Providence v. Barr*,
    954 F.3d 23 (1st Cir. 2020).................................................................31

*Clinton v. City of New York*,
    524 U.S. 417 (1998)............................................................................31

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)......................................................................25, 27

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
    591 U.S. 1 (2020).......................................................................25-26, 28

*Doctors for Am. v. Off. of Personnel Mgmt.*,
    No. 25-cv-322, 2025 WL 452707 (D.D.C. Feb. 11, 2025)....................36

*Does 1-6 v. Mills*,
    16 F.4th 20 (1st Cir. 2021).................................................................39

*F.C.C. v. NextWave Pers. Commc'ns Inc.*,
    537 U.S. 293 (2003)......................................................................................28

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
    592 U.S. 414 (2021)......................................................................................26

*Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*,
    937 F.3d 764 (7th Cir. 2019) ......................................................................33

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ............................................................ 30-32

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949)......................................................................................32

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................. 39-40

*Maryland v. U.S. Dep't of Agric.*,
    No. 25-cv-0748, 2025 WL 800216 (D. Md. Mar. 13, 2025) ....................25

*Massachusetts v. Nat'l Insts. of Health*,
    No. 25-cv-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025) ...........25, 35, 38, 40

*Michigan v. E.P.A.*,
    576 U.S. 743 (2015)......................................................................................28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................. 25-27

*Myers v. United States*,
    272 U.S. 52 (1926)................................................................................. 31-32

*Nat'l Fed. of Indep. Bus. v. OSHA*,
    595 U.S. 109 (2022)......................................................................................32

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*,
    407 F. Supp. 2d 323 (D. Mass. 2005) .......................................................39

*Nken v. Holder*,
    556 U.S. 418 (2009)......................................................................................24

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996)..........................................................................33

*U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
    121 F.4th 339 (1st Cir. 2024).......................................................................24

*Vaquería Tres Monjitas, Inc. v. Irizarry,*
  587 F.3d 464 (1st Cir. 2009) ................................................................34

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ............................................................................25

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .......................................................................33, 35

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ............................................................................31

## Constitutions

U.S. Const.
  art. I, § 9 ..............................................................................................31
  art. II, § 3 .............................................................................................31

## Federal Statutes

5 U.S.C.
  § 551 ....................................................................................................25
  § 704 ....................................................................................................25
  § 706 ..............................................................................................24, 28

20 U.S.C.

 § 1018......................................................................................................3, 16
 § 1051...........................................................................................................5
 § 1070...........................................................................................................3
 § 1070a.........................................................................................................3
 § 1070b.........................................................................................................3
 § 1087...........................................................................................................3
 § 1092...........................................................................................................5
 § 1094...........................................................................................................4
 § 1098e.........................................................................................................4
 § 1099b.........................................................................................................5
 § 1099c.........................................................................................................4
 § 1101...........................................................................................................5
 § 1400......................................................................................................6, 21
 § 1412...........................................................................................................6
 § 1432...........................................................................................................6
 § 1681...........................................................................................................9
 § 2301...........................................................................................................8
 § 3271...........................................................................................................8
 § 3401......................................................................................................2, 30
 § 3402...........................................................................................................3
 § 3411.....................................................................................................30, 32
 § 3413...........................................................................................................9
 § 3416...........................................................................................................7
 § 3417......................................................................................................7, 9
 § 3419.........................................................................................................10
 § 3473.........................................................................................................28
 § 6301...................................................................................................6-8, 20
 § 9511.........................................................................................................10
 § 9531.........................................................................................................10
 § 9541.........................................................................................................10
 § 9543.........................................................................................................10
 § 9561.........................................................................................................10
 § 9567.........................................................................................................10

29 U.S.C.

 § 794.............................................................................................................9
 § 3275...........................................................................................................8

42 U.S.C.

 § 2000d.........................................................................................................9

Higher Education Act of 1965, Pub. L. 89-329, 79 Stat. 1219 (1965) ............................3

The Rehabilitation Act, Pub. L. 93-112 (1973) ....................................................8

Department of Education Organization Act, Pub. L. 96-88, 93 Stat. 668 (1979)...............2, 30, 32

**Federal Regulations**

34 C.F.R.

Part 602 ................................................................................................................5
Part 668 ..............................................................................................................16
§ 86.1 ....................................................................................................................5
§ 361.1 ..................................................................................................................8
§ 363.1 ..................................................................................................................8
§ 463.130 ............................................................................................................21
§ 463.160 ............................................................................................................21
§ 668.14 ................................................................................................................4
§ 668.46 ................................................................................................................5

# INTRODUCTION

The Executive Branch is unilaterally and unlawfully gutting the Department of Education (the "Department"). On March 11, 2025, the Department announced a reduction of its staff by nearly 50%, a massive cut largely achieved through abolishing dozens of organizational units, including the positions of more than a thousand Department employees (the "Mass Termination"). These employees were terminated under the guise of a reduction in force ("RIF"), but were almost immediately placed on administrative leave, and thus barred from performing their work duties. Since then, the scale and severity of the Mass Termination has become clear: the Mass Termination eliminated personnel critical to the Department's ability to meet its statutory obligations across numerous programs—student aid for college students, administering funding for K–12 education, services for students with disabilities, civil rights enforcement, vocational training, and more—causing grave harm to Plaintiffs. Further compounding the fallout, on March 21, President Trump directed the immediate transfer of core statutory functions to other agencies, including the transfer of student loans to the Small Business Administration (which itself announced a 40% reduction the same day), and the transfer of unspecified special needs and nutritional programs to the Department of Health and Human Services (the "March 21 Directive").

Notice of the Mass Termination was not accompanied by any explanation of why these employees—and indeed, some whole teams—were eliminated. Nor did the President explain in his March 21 Directive any concrete reasoning behind the order to transfer functions out of the Department. The true motivation for these actions, however, could not be more explicit: President Trump would like the Department gone—as confirmed by his March 20 Executive Order—and has directed the Secretary of Education, Linda McMahon, to dismantle it.

But as a creation of Congress, the Department cannot be abolished or incapacitated by the Executive. Plaintiffs are thus likely to succeed on the merits of their claims that the Mass Termination violates the Administrative Procedure Act (APA), and that both the Mass Termination and implementation of the March 21 Directive are unconstitutional and *ultra vires*. Plaintiffs will also suffer irreparable harm absent an injunction because Defendants' actions jeopardize critical statutory functions essential to the administration of Plaintiffs' educational programs. And on that same basis, the balance of the equities and the public interest weigh sharply in Plaintiffs' favor. Plaintiffs therefore respectfully request that this Court enter a preliminary injunction as to the Department's Mass Termination and implementation of the March 21 Directive.

## BACKGROUND

The Department, created by Congress in 1979, does not operate or control school systems. Instead, the Department provides financial, administrative, technical, investigatory, and empirical support to the state and local governments that do operate and control those school systems.[1] The Mass Termination has impaired the Department's ability to perform its essential functions, including statutory mandates for higher education, birth-to-grade-12 education, vocational education and rehabilitation, civil rights enforcement, and complex data analysis. *See* Ex. 46[2] (Duncan Decl.) ¶ 9 (Former Education Secretary stating, "[p]ut simply, the Department cannot meet its statutory obligations at the levels of staffing proposed by the Defendants").

I. **The Statutes Governing the Department's Programs.**

The Department was created by statute in 1979 by the Department of Education Organization Act. Pub. L. 96-88, 93 Stat. 668 (1979) (codified as amended at 20 U.S.C. §§ 3401–

---

[1] Much of the Department's duties consist of the administration of federal funds—more than 25% of its total spending—to state and local governments. *See* USAFacts, "What does the Department of Education do?," available at https://perma.cc/S65L-C3YB.

[2] Citations herein to "Ex. __" are to the Declaration of Nathaniel J. Hyman, unless otherwise indicated.

3510)). The Department's specific components and obligations, however, have been codified in various statutes enacted over time.

A.    **The Department's Essential Functions Supporting Higher Education.**

The Department plays a vital role in higher education in the United States, helping to ensure equal access to quality opportunities. The Department performs this role in numerous ways, including by administering and overseeing the federal student aid system and federal grants to institutions of higher education, facilitating large-scale data collection, and enforcing laws related to higher education and campus safety. These functions are generally governed by the Higher Education Act of 1965 (HEA), Pub. L. 89-329 (as amended), reauthorized by the Higher Education Opportunity Act of 2008.

i.    *Federal Student Aid*

A cornerstone of the higher education system in the United States is the administration of federal student aid, which serves Congress's goal of "ensuring access to equal educational opportunity for every individual." 20 U.S.C. § 3402. Title IV of the HEA authorizes and allocates funds for financial aid programs that assist students with postsecondary education expenses, providing access to higher education. 20 U.S.C. §§ 1070–1099d. These programs include the Federal Pell Grant program, the William D. Ford Federal Direct Loan program, the Federal Work-Study Programs, and the Federal Supplemental Educational Opportunity Grant. 20 U.S.C. §§ 1070a, 1087a–j, 1087-51–58, 1070b–1070b-4.

The Department's Office of Federal Student Aid (FSA) manages the federal student loan system, Higher Education Amendments of 1998, Pub. L. 105-481, § 131 (codified as amended at 20 U.S.C. § 1018), which provides grants, loans, and work-study assistance to nearly 12.9 million

students through approximately 6,100 postsecondary institutions.[3] FSA has a loan portfolio that exceeds $1.6 trillion as of Q4 of 2024.[4] The administration of the student loan portfolio is exceedingly complex and requires the Department to offer students various repayment options and forgiveness programs that take into consideration their individual circumstances. *See, e.g.*, 20 U.S.C. § 1098e. Among the many statutes that authorize and govern federal student aid, no statute permits the President to immediately and unilaterally transfer the student loan portfolio to another agency.

As part of managing the federal student aid system, FSA oversees the Free Application for Federal Student Aid (FAFSA) form, which students must complete to apply for federal aid and which determines the amounts and types of aid that students receive.[5] More than 17.6 million FAFSA forms are processed each year. *See id.*; *see* Ex. 61 (Doe 9 Decl.) ¶ 7.

Plaintiffs' public colleges and universities receive funding directly through the process administered by FSA. To participate, universities and colleges must apply, receive approval, and enter into Program Participation Agreements in which they agree, among other things, to comply with the laws, regulations, and policies governing Title IV programs. 20 U.S.C. § 1094; 34 C.F.R. § 668.14; *see* Ex. 63 (Doe 11 Decl.) ¶ 8(b). The Department continuously reviews institutions' recertifications and other compliance reports, including on their financial responsibility and administrative capability. *See* 20 U.S.C. § 1099c(c)-(d); Ex. 52 (Miller Decl.) ¶¶ 4–10; Ex. 63 (Doe 11 Decl.) ¶¶ 5–9.

In 2020, FSA undertook a workforce review, assessing workloads and staffing needs. Ex. 2 (Aug. 19, 2021 GAO Letter), at 7. The 2020 assessment found that FSA was understaffed in

---

[3] *See* U.S. Dep't of Ed., Federal Student Aid Functional Statements, https://perma.cc/TW2N-CNYR, also available at https://studentaid.gov/data-center/student/portfolio.
[4] *See* Federal Student Aid Portfolio Summary, https://perma.cc/CHE8-AVJE.
[5] *See* FSA Fiscal Year 2024 Annual Report, at 15, https://perma.cc/4LVP-3NZS.

many of its operational and mission support offices, resulting in backlogs, reduced work quality, delays, and failure to complete almost 20 percent of its workload. *Id.* at 3.

### ii.    *Direct Funding*

The HEA also authorizes federal support directly to institutions of higher education through Title III and Title V, which together help strengthen the educational quality of institutions with high concentrations of racial and ethnic minorities, Hispanic students, and financially disadvantaged students. 20 U.S.C. §§ 1051–1068h; 20 U.S.C. §§ 1101–1103g.

### iii.    *Programming and Technical Support*

The Department is responsible for vital aspects of higher education oversight. For instance, under the HEA, the Department "recognize[s]" (*i.e.*, approves) accrediting agencies that the Secretary determines to be reliable authorities as to the quality of education or training provided by institutions of higher education. 20 U.S.C. § 1099b; 34 C.F.R., part 602.

The Department also manages large-scale data collection, which would not be possible on a state-by-state basis. For instance, the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act requires colleges and universities to disclose certain crimes via an annual report. 20 U.S.C. § 1092; 34 C.F.R. § 668.46; *see also* Ex. 26 (Barton Decl.) ¶ 37; Ex. 30 (Gower Decl.) ¶ 20; Ex. 39 (Bailey Decl.) ¶ 20. Similar reports are collected for drug and alcohol use, 34 C.F.R. §§ 86.1–7, as well as sexual and domestic violence and harassment. 34 C.F.R. § 668.46.

### B.    The Department's Support for Birth-to-Grade-12 Education.

Supporting state and local education authorities' educational services for children through grade 12, both with funding and programming, is another essential function of the Department.

### i.     *Direct Funding*

The two largest sources of federal funds for public schools are Title I of the Elementary and Secondary Education Act, 20 U.S.C. §§ 6301–6577, and the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1482. Title I provides around $18 billion per year to school districts to support educational services to children from low-income families.[6] Over 60% of schools are eligible to receive Title I funds[7] for supplemental reading instruction, teaching assistants and teacher aids, after-school care, pre-K programs, and classroom materials. Title I funds are administered by the Office of Elementary and Secondary Education (OESE). Ex. 24 (Gable Decl.) ¶ 7.

Plaintiffs rely heavily on the Department's award of special education grants under the IDEA through the Office of Special Education Programs (OSEP), which is housed in the Office of Special Education and Rehabilitative Services (OSERS). Ex. 14 (Acon Decl.) ¶ 16. In fiscal year 2024, the Department provided over $15 billion in IDEA funding to the States to support students with disabilities attending public schools.[8] IDEA Part B grants are intended to allow states to make public education available to students with disabilities, while Part C grants support early intervention services for infants and toddlers with disabilities. 20 U.S.C. §§ 1412, 1432. These special education grants help the States meet the costs of providing special education and related services to children with disabilities, including direct services, technical assistance, personnel preparation, and improving the use of assistive technology in the classroom. *See* Ex. 13 (Thurmond

---

[6] National Center for Education Statistics, *Fast Facts: Title I*, https://perma.cc/95L2-Z6GS.
[7] *Id.*
[8] Congressional Research Service, *The Individuals with Disabilities Education Act (IDEA), Part B: Key Statutory and Regulatory Provisions* (Aug. 20, 2024), *available at* https://www.congress.gov/crs-product/R41833.

Decl.) ¶¶ 30, 32; Ex. 42 (Kelly Decl.) ¶ 15.[9] No provision in the IDEA's complex statutory scheme permits the transfer of special education functions out of the Department.

### ii.     Programming and Technical Support

The Department provides specialized guidance and technical assistance to ensure proper implementation of the various funding programs the Department administers. For example, OSERS provides such guidance and assistance on special education requirements under the IDEA. 20 U.S.C § 3417; Ex. 13 (Thurmond Decl.) ¶¶ 11, 34, 38, 65, 66; Ex. 14 (Acon Decl.) ¶ 21; Ex. 21 (Higashi Decl.) ¶¶ 8, 10; Ex. 24 (Gable Decl.) ¶ 10; Ex. 42 (Kelly Decl.) ¶ 19. The Department's Office of General Counsel (OGC) also provides technical assistance and legal guidance to state and local grantees that receive Title I and IDEA funds, among other duties. Ex. 66 (Doe 14 Decl.) ¶¶ 11, 12.

### C.     The Department's Support for Vocational Education and Rehabilitation.

### i.     Direct Funding

The Department provides funding to Plaintiffs for vocational education and rehabilitation through OSERS and the Office of Career, Technical, and Adult Education (OCTAE). Ex. 36 (Echelson Decl.) ¶¶ 25, 26; Ex. 42 (Kelly Decl.) ¶ 19. Both OCTAE and OSERS are created and mandated by statute. 20 U.S.C. § 3416; 20 U.S.C. § 3417.

---

[9] *See also* U.S. Dep't of Ed., *Special Education — Grants to States*, https://perma.cc/HN67-E9BX. In addition to Title I and the IDEA, the Department administers several other grants to Plaintiffs that help fill vitally important funding gaps. These include grants for disaster relief and preparations, for English learners, and for early childhood education. *See* U.S. Dep't of Ed., *Disaster Recovery Unit*, https://perma.cc/5MG7-86UJ; U.S. Dep't of Ed., *Student Support and Academic Enrichment Program (Title IV, Part A)*, https://perma.cc/KCK2-2D3G; U.S. Dep't of Ed., *Office of English Language Acquisition*, https://perma.cc/6GXJ-R4C9; U.S. Dep't of Ed., *Preschool Development Grant - Birth through Five,* https://perma.cc/4MPC-E5XN; U.S. Dep't of Ed.*, Impact Aid Program Overview*, https://perma.cc/A9XK-YG8M; *see also* Ex. 13 (Thurmond Decl.) ¶¶ 23, 24, 42; Ex. 21 (Higashi Decl.) ¶ 7; Ex. 60 (Doe 8 Decl.) ¶¶ 5–9.

The Division of Academic and Technical Education (DATE), within OCTAE, administers formula and discretionary grant programs to states under the Carl D. Perkins Career and Technical Education Act (Perkins V), 20 U.S.C. §§ 2301–2414, which is the primary source of federal funding for career and technical education (CTE) and programs of study for secondary and post-secondary education students.[10] Congress appropriates roughly $1.4 billion dollars in state formula grant funds under Title I (Basic State Grants) annually.[11] The Division of Adult Education and Literacy (DAEL), also within OCTAE, administers formula grant programs to states under the Adult Education and Family Literacy Act (AEFLA), Title II of the Workforce Innovation and Opportunity Act, 29 U.S.C. §§ 3271–3333, for basic adult education and English language proficiency.[12] Ex. 54 (Doe 2 Decl.) ¶ 5. Congress appropriates roughly $600 million dollars in AEFLA formula grants annually. *See, e.g.*, 29 U.S.C. § 3275.

The Department's Rehabilitation and Services Administration provides formula grants to Plaintiffs under the Rehabilitation Act for vocational rehabilitation services for persons with disabilities through the State Vocational Rehabilitation (VR) Services Program, and for Supported Employment (SE) services for persons with the most significant disabilities. Pub. L. 93-112 (1973), as amended; 34 C.F.R. § 363.1; Ex. 12 (Mackey Decl.) ¶ 6; Ex. 31 (Morton-Bentley Decl.) ¶ 6; Ex. 38 (Merolla-Brito Decl.) ¶ 2. These grants are integral for Plaintiffs to provide services that help persons with disabilities prepare for and engage in employment. 34 C.F.R. § 361.1; Ex. 31 (Morton-Bentley Decl.) ¶ 6; Ex. 23 (Losasso Decl.) ¶¶ 7-9. Congress appropriates state formula

---

[10] U.S. Dep't of Ed., *Career and Technical Education*, https://www.ed.gov/adult-education-and-services/career-and-technical-education (accessed Mar. 24, 2025).
[11] Office of Career, Technical, and Adult Education, Perkins Collaborative Resource Network, *State Formula Grants*, *available at* https://cte.ed.gov/grants/state-formula-grants (accessed March 24, 2025).
[12] U.S. Dep't of Ed., *Adult Education and Literacy,* available at https://perma.cc/R4TS-R96N.

grant funds for the vocational rehabilitation and supported employment programs annually.[13]

        ***ii.        Programming and Technical Support***

OCTAE provides programming and technical support for vocational education. For example, Plaintiffs rely on OCTAE staff for help with grant, accountability, and reporting requirements under the Perkins V Act. Ex. 13 (Thurmond Decl.) ¶ 38; Ex. 36 (Echelson Decl.) ¶¶ 29, 30; Ex. 42 (Kelly Decl.) ¶ 19. OSERS, through OSEP, provides guidance, technical assistance, and oversight of special education requirements under the IDEA, including provision of vocational education in compliance with IDEA Part, B. 20 U.S.C § 3417. In addition, the Rehabilitation and Services Administration works closely with Plaintiffs to conduct regularly scheduled grant monitoring; it also provides guidelines for proper management of federal funds and guidance on programs supporting vocational rehabilitation, including formula grants for vocational rehabilitation and supported employment. Ex. 23 (Losasso Decl.) ¶ 12; Ex. 38 (Merolla-Brito Decl.) ¶ 2.

        **D.        The Department's Enforcement of Civil Rights Laws in Education.**

Congress created the Department's Office for Civil Rights (OCR) to provide equal access to education and to enforce civil rights as a means of promoting educational excellence. 20 U.S.C. § 3413.[14] OCR is charged with enforcing federal civil rights laws, including Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681–1689; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. In January 2025, OCR conducted its operations with a full-time staff of approximately 600

---

[13] U.S. Dep't of Ed., Rehabilitation Services Administration, *SE Formula Grant Awards*, *available at* https://perma.cc/8V7K-3AFU.
[14] *See also* U.S. Dep't of Educ., OCR (Jan. 19, 2025), https://perma.cc/4KQH-HRYW.

employees. Ex. 48 (Lhamon Decl.) ¶ 3. Most OCR activities have historically been conducted by twelve regional offices. Ex. 47 (Gonzales Decl.) ¶ 9.

OCR's enforcement responsibilities involve investigation of "every case within its jurisdiction that is timely filed." Ex. 48 (Lhamon Decl.) ¶ 38; *see also* Ex. 53 (Doe 1 Decl.) ¶ 5. OCR safeguards the civil rights of more than 49 million students in pre-kindergarten through grade 12 schools and more than 19 million students in colleges and universities across the country.[15] OCR issues dozens of essential policy resources and drafts regulations related to the laws it enforces.[16]

### E. The Department's Responsibility to Study Education in the U.S. and Maintain Key Data that Supports the Department's and the States' Programs.

In 2002, Congress created the Institute of Education Sciences and its four centers to provide empirical and technical support to educators. 20 U.S.C. §§ 3419, 9511(a). The Institute of Education Sciences is required by statute to "compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need (including in technology areas) that are supported by Federal funds appropriated to the Institute." 20 U.S.C. § 9511(b)(2).

Of the four centers within the Institute of Education Sciences,[17] the National Center for Education Statistics (NCES) is particularly critical. NCES is required by statute, among other responsibilities, to "collect, report, analyze, and disseminate statistical data related to education in the United States," including data on "State and local" education covering an array of needs. 20

---

[15] *Protecting Civil Rights: Highlights of Activities, Office for Civil Rights (2021-2025)*, U.S. Dep't of Educ. (Jan. 2025), *available at* https://perma.cc/G8RW-VSPT.
[16] *Id.*
[17] The National Center for Educational Research, National Center for Education Statistics, National Center for Education Evaluation and Regional Assistance, and National Center for Special Education Research. 20 U.S.C. §§ 9531(a), 9541(a), 9561(a), 9567(a).

U.S.C. § 9543(a). Plaintiffs rely on NCES for this data and technical assistance, for instance, in the generation of the "Nation's Report Card" to evaluate relative performance in math, reading and other subjects. Ex. 36 (Echelson Decl.) ¶¶ 41–49. Further, the Department relies on this data to assess the long- and short-term outcomes from the Department's programs, making it integral to the administration of essential grant programs. Ex. 57 (Doe 5 Decl.) ¶ 16.

## II. The Announcement and Initiation of the Dismantling of the Department.

On February 12, 2025, President Trump said of the Department, "I'd like it to be closed immediately."[18] Two weeks later, on her first day in office, Secretary McMahon distributed a missive describing "Our Department's Final Mission." Ex. 3 (Mar. 3 Letter). In that email, Secretary McMahon announced a "restoration" of the "rightful role of state oversight in education" that "will profoundly impact staff, budgets, and agency operations here at the Department." *Id*.

Two days later, on March 5, the Wall Street Journal and other news sources reported that a draft Executive Order directed the Secretary of Education to facilitate the closure of the Department. Ex. 4 (WSJ Article). The next day, Secretary McMahon confirmed that the plan was to abolish the Department of Education:

> Ainsley Earhardt: Do you know for sure he's [President Trump] definitely going to abolish the Department of Education?
>
> McMahon: He's been very clear about that. I mean he couldn't be any more clear when he said he wanted me to put myself out of a job….

Fox News Channel, Mar. 7, 2025, https://www.foxnews.com/video/6369719995112 (televised interview).

---

[18] Nandita Bose & Kanishka Singh, "Trump says he wants Education Department to be closed immediately," Reuters (Feb. 13, 2025), https://www.reuters.com/world/us/trump-says-he-wants-education-department-be-closed-immediately-2025-02-12/ (accessed Mar. 24, 2025).

On March 11, the Department announced that "[a]s part of" its "final mission," it had "initiated a reduction in force (RIF) impacting nearly 50% of the Department's workforce." Ex. 5 (Press Release). In combination with 600 employees who took buy-out offers, the Mass Termination would reduce the Department's workforce to "roughly 2,183 workers" from 4,133 "[w]hen President Trump was inaugurated." *Id*. Although the Department's March 11 Press Release says that the Department "will continue to deliver on all statutory programs that fall under the agency's purview," *id.*, it does not explain how that is possible following the Mass Termination.

Between March 11 and 12, the Department's communications to employees subject to the Mass Termination included an email (the "Mass Termination Email") stating, "your organization unit is being abolished, along with all positions within the unit—including yours."[19] The Mass Termination Email informed employees that they would be placed on administrative leave beginning March 21, 2025 and that they would receive an "official RIF notice" no earlier than 30 days after March 11, 2025.[20] Immediately after the Mass Termination Email was sent out, staff found that they could not access most systems and platforms used to store and share documents and to meet with each other, and that their email systems were further limited so that they could not send emails external to the Department. Ex. 51 (Hamlin Decl.) ¶ 7; Ex. 52 (Miller Decl.) ¶ 13; Ex. 61 (Doe 9 Decl.) ¶ 11; Ex. 67 (Doe 15 Decl.) ¶ 6. Because staff could not access essential work systems and information, they were unable to close out or transition their work product effectively prior to being placed on administrative leave. Ex. 51 (Hamlin Decl.) ¶ 7; Ex. 52 (Miller Decl.)

---

[19] Ex. 68 (Doe 16 Decl.) at Ex. 1; Ex. 47 (Gonzales Decl.) ¶ 6; Ex. 49 (Smith Decl.) ¶¶ 5-6, Ex. 3; Ex. 50 (Gittleman Decl.) ¶ 2; Ex. 51 (Hamlin Decl.) ¶ 6; Ex. 53 (Doe 1 Decl.) at Ex. 1; Ex. 54 (Doe 2 Decl.) ¶ 12, Ex. 1; Ex. 55 (Doe 3 Decl.) ¶ 14; Ex. 56 (Doe 4 Decl.) ¶ 10; Ex. 57 (Doe 5 Decl.) ¶ 7; Ex. 58 (Doe 6 Decl.) ¶ 5; Ex. 59 (Doe 7 Decl.) ¶ 10; Ex. 60 (Doe 8 Decl.) at Ex. 2; Ex. 61 (Doe 9 Decl.) at Ex. 1; Ex. 62 (Doe 10 Decl.) ¶ 6; Ex. 63 (Doe 11 Decl.) at Ex. 1; Ex. 64 (Doe 12 Decl.) at Ex. 1;Ex. 66 (Doe 14 Decl.) ¶ 6); Ex. 67 (Doe 15 Decl.) at Ex. 1.

[20] *Id.*

¶ 13; Ex. 61 (Doe 9 Decl.) ¶ 11; Ex. 67 (Doe 15 Decl.) ¶ 6. Thus, even though the Mass Termination Email sent to employees purported *not* to be an "official RIF notice," the Department acted to immediately incapacitate the work of the emails' recipients.

AFGE Local 252, the union that represents non-supervisors, non-managers, and non-politically appointed employees in the Department, received from the Department's Human Resources (HR) office a formal notice of the Department's "intent to implement a department-wide reduction-in-force (RIF)" less than two hours before the Mass Termination Email was received by staff. Ex. 49 (Smith Decl.) ¶¶ 5–6, Ex. 1. The HR office also shared with AFGE Local 252 a spreadsheet listing all employees impacted by the planned Mass Termination who were part of the union's bargaining unit, revealing that 970 staff excluding supervisors, managers, and politically appointees—or 35 percent of the bargaining unit—were being terminated. *Id.* ¶¶ 5–11, Ex. 1. The HR office also provided the union with an organizational chart showing an array of eliminated units within the Department. *Id.*, ¶¶ 5, 11, Ex. 2. For example, the chart shows that all of the Office of English Language Acquisition (OELA) division, 24 different divisions within FSA, and six of OCR's 11 offices were eliminated. *Id.*, Ex. 2, at 5, 12, 17–18.

In an interview that same day, Secretary McMahon confirmed that the Mass Termination was an attempt to start abolishing the Department of Education:

Laura Ingraham:    Now, is this the first step on the road to a total shutdown?

McMahon:    Yes, actually it is, because that was the President's mandate. His directive to me, clearly, is to shut down the Department of Education, which we know we'll have to work with Congress, you know, to get that accomplished. But what we did today was to take the first step of eliminating what I think is bureaucratic bloat.

Fox News Channel, Mar. 11, 2025, https://www.foxnews.com/video/6369901522112 (televised interview). McMahon also confirmed that the Department's buildings would be closed and that

employees of the Department had been told the day before to take home their computers and phones. *Id*.

On March 14, Hayley B. Sanon, the Principal Deputy Assistant Secretary and Acting Assistant Secretary, sent a "Dear Education Stakeholders" letter to State education departments describing the Mass Termination as "strategic cuts to offices and programs that will not directly impact students and families but rather empower states and localities." Ex. 6 (Sanon Letter). The letter described cuts to OESE, OELA, and OSERS, but provided little detail. Also on March 14, Acting Under Secretary James Bergeron sent a "Dear Education Stakeholders" letter discussing changes that would affect institutions of higher education. Ex. 7 (March 14 Bergeron Letter), but again, with little detail.

On March 20, President Trump issued an Executive Order publicly memorializing the same directive previously conveyed to Secretary McMahon: to close the Department of Education. Ex. 1 (Education EO). The Executive Order states that "[t]he Secretary of Education shall, to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities while ensuring the effective and uninterrupted delivery of services, programs, and benefits on which Americans rely." *Id.*

On March 21, President Trump orally directed at a press conference that "I've decided that the SBA, the Small Business Administration … will handle … all of the student loan portfolio," and that the Health and Human Services Department will be handling "special needs and all the

nutrition programs and everything else."[21, 22] Around the same time, the SBA announced that it would be terminating more than 40% of its staff. Ex. 8 (Mar. 21 Press Release).

## III. The Mass Termination Has Eliminated Staff Essential to the Department's Ability to Meet Its Statutory Obligations.

State officials agree: the Mass Termination will likely make it impossible for federal officials to meet several of the Department's current obligations under federal law.[23] Specifically, the Mass Termination has severely impacted the functions of the following offices within the Department: the office responsible for overseeing federal student aid (FSA); four offices that are critical to support education through grade 12 (OESE, OSERS, OELA, and OGC); two offices critical to vocational education and rehabilitation (OCTAE and OSERS); the office that is central to all aspects of the Department's enforcement of federal civil rights laws (OCR); and multiple units within the Institute of Education Sciences, which is charged with providing empirical and technical support to educational systems. *See* Ex. 49 (Smith Decl.), Ex. 2.

### A. The Damage to Higher Education from the Mass Termination and the Transfer of Student Loans to the SBA.

Declarations of current and former employees paint a picture of an FSA that has been gutted. Six of eight School Participation Sections (SPSs) within the Office of Institutions of Higher Education (IHE) Oversight & Enforcement have been abolished in their entirety, including all but one financial analyst responsible for assessing the financial responsibility of institutions receiving

---

[21] Lexi Lonas Cochran, *Trump says student loans moving to SBA 'special needs to HHS*, The Hill (Mar. 21, 2025), https://thehill.com/homenews/education/5207597-trump-student-loans-sba-special-needs-disabled-students-hhs-mcmahon-kennedy.

[22] Federal school nutrition programs are administered by the U.S. Department of Agriculture. *See* U.S. Dep't of Agriculture, *FNS Nutrition Programs*, https://www.fns.usda.gov/programs (accessed Mar. 24, 2025).

[23] *See, e.g.*, Ex. 15 (Paccione Decl.) ¶¶ 6, 9; Ex. 20 (Gardner Decl.) ¶ 7; Ex. 21 (Higashi Decl.) ¶ 22; Ex. 22 (Sanders Decl.) ¶ 6; Ex. 23 (Losasso Decl.) ¶ 6; Ex. 27 (Rice Decl.) ¶ 9; Ex. 29 (Ehling Decl.) ¶ 7; Ex. 30 (Gower Decl.) ¶ 6; Ex. 33 (Boeckenstedt Decl.) ¶ 6; Ex. 34 (Nazarov Decl.) ¶ 7; Ex. 35 (Libutti Decl.) ¶ 6; Ex. 36 (Echelson Decl.) ¶ 7; Ex. 45 (Britz Decl.) ¶ 6.

Title IV aid. Ex. 63 (Doe 11 Decl.) ¶¶ 12, 13; Ex. 52 (Miller Decl.) ¶¶ 6–7, 12–16. FSA's Vendor Performance Division was also abolished entirely. Ex. 68 (Doe 16 Decl.) ¶¶ 7-9); Ex. 69 (Campbell Decl.) ¶¶ 6, 9–10, 13–16. FSA's Product Management Division was also abolished, but the Department was later forced to reinstate key employees, which speaks to the haste and carelessness with which these cuts were made. Ex. 61 (Doe 9 Decl.) ¶¶ 10, 12; Ex. 69 (Campbell Decl.) ¶ 16. The Human Capital Management Division has been completely abolished. Ex. 67 (Doe 15 Decl.), ¶ 5. The Office of the Ombudsman Federal Student Aid was also heavily impacted by the Mass Termination. Ex. 58 (Doe 6 Decl.) 6, ¶¶ 19, 20.

The impact that these losses will have on Plaintiffs is significant. IHE Oversight & Enforcement is responsible for administering eligibility, certification, financial analysis, and oversight of schools participating in federal student aid programs—in other words, determining which institutions of higher education are eligible to receive federal student aid and verifying that they continue to meet the statutory and regulatory requirements to receive aid. Ex. 51 (Hamlin Decl.) ¶ 4; Ex. 52 (Miller Decl.) ¶¶ 4–6; Ex. 63 (Doe 11 Decl.) ¶¶ 5–9. IHE Oversight & Enforcement plays a critical gatekeeping role to protect taxpayers and students alike. The group is responsible for, inter alia, "monitor[ing] schools and their agents through on-site and off-site reviews and analysis of various reports to provide early warning of program compliance problems and take appropriate actions," which may include "plac[ing] schools that are under review or investigation on heightened cash monitoring or ... impos[ing] other necessary participation restrictions." Ex. 52 (Miller Decl.) ¶ 5(b), (e). These functions are critical for the success of schools, the protection of students, and the safeguarding of taxpayer funds—and they are required by statute and regulation. *See* 20 U.S.C. § 1018(c)(4); 34 C.F.R. Part 668 Subpart L; *see also* Ex.

52 (Miller Decl.) ¶¶ 6–10. Gutting the divisions that carry out these critical functions imperils the sustainability of the Title IV program and the stream of funding institutions rely on.

The Mass Termination has exacerbated delays that institutions were already experiencing in the pace of certification and other approvals for Title IV Program Participation Agreements.[24] Consider, for instance, Clover Park, a small, public technical college in Tacoma, Washington. Last year, Clover Park began to expand its educational offerings and open an additional technical training site to provide students with training in high-wage fields. Ex. 43 (Loveday Decl.) ¶ 6. Clover Park submitted a request to the Department for certification to be eligible to receive federal student aid under Title IV—a vitally important step for Clover Park, where approximately 50% of the student population receives need-based financial assistance. *Id.* ¶ 5. On March 13, 2025, Clover Park emailed FSA inquiring about the status of its application and it received a response directly from James Bergeron, the Acting Under Secretary for the Department. *Id.* ¶¶ 9-10 Bergeron demanded to know why Clover Park had sent its inquiry to specific recipients. *Id.* Clover Park has received no further communications from FSA and may need to give up on its plans. *Id.* ¶ 11.

More trouble is on the horizon. The Mass Termination has eliminated FSA's Vendor Performance Division, which oversaw federal student loan servicers and played a key role in identifying and correcting errors that servicers create in the data undergirding the federal student loan system. Ex. 68 (Doe 16 Decl.) ¶¶ 3–8; Ex. 69 (Campbell Decl.) ¶¶ 4(d), 6; Ex. 62 (Doe 10 Decl.) ¶¶ 5, 6. The Vendor Performance Division was also responsible for ensuring that loan servicers fulfill their contractual requirements with FSA, including meeting standards for customer service and complying with state and federal law. Ex. 68 (Doe 16 Decl.) ¶¶ 3, 4; Ex. 62 (Doe 10 Decl.) ¶ 5. When requirements were not met or errors were identified, the Vendor Performance

---

[24] Ex. 40 (Carmichael Decl.) ¶ 6; Ex. 43 (Loveday Decl.) ¶¶ 6-8; *see also* Ex. 52 (Miller Decl.) ¶ 14 (the office had a backlog of over 800 financial reviews before the Mass Termination was announced).

Division worked with servicers to ensure appropriate corrective action was taken. Ex. 68 (Doe 16 Decl.) ¶¶ 3–6. The Vendor Performance Division also played a key role in validating federal student loan data, including the data used to determine how close borrowers were to loan forgiveness under income-driven repayment plans and the Public Service Loan Forgiveness (PSLF) Program. Ex. 68 (Doe 16 Decl.) ¶ 6; Ex. 69 (Campbell Decl.) ¶¶ 13–15. Stated plainly, those entrusted with guarding the largest source of debt for tens of millions of Americans have been terminated.

And on top of all of this, the President's March 21 Directive that the student loan portfolio be moved entirely to SBA, which itself is losing around 43% of its staff, places the entire portfolio—and Plaintiffs' institutions, which depend on the effective administration of federal student aid—at risk. Ex. 46 (Duncan Decl.) ¶ 20. There is no authority that permits the President to immediately transfer a statutory function of the Department in this way.

**B.      Impacts on Offices That Support Birth-to-Grade 12 Educational Programs (OESE, OSERS, OELA, and OGC).**

The Department's Mass Termination will impact nearly every aspect of K-12 education for Plaintiffs. Despite being responsible for statutory functions central to educational programs through grade 12, *see supra* at 5–7, the following four offices, at a minimum, have been meaningfully affected by the Mass Termination: OESE, OSERS, OELA, and OGC.[25]

OESE is tasked with "empower[ing] States, districts, and other organizations to meet the diverse needs of every student by providing leadership, technical assistance, and financial support."[26] Without OESE's grant support programs, Plaintiffs would be without centralized support and technical assistance in grant and program management, Ex. 13 (Thurmond Decl.) ¶ 65,

---

[25] Ex. 6 (Sanon Letter); Ex. 13 (Thurmond Decl.) ¶¶ 66 (OELA), 67 (OGC); Ex. 24 (Gable Decl.) ¶ 8 (OSERS); Ex. 60 (Doe 8 Decl.) ¶ 9.
[26] U.S. Dep't of Ed., *OESE Mission & Responsibilities*, https://perma.cc/ASB4-7MY9.

and without assistance in implementing Title IA and Title ID programs, *see* Ex. 18 (Wilkinson Decl.) ¶ 7. The Mass Termination, for instance, eliminated OESE employees who oversaw COVID-19 Relief Funds. Ex. 13 (Thurmond Decl.) ¶¶ 40–42. While the last day to obligate those funds was September 30, 2024, state educational agencies had the opportunity to submit a late liquidation request on behalf of local school districts. *Id.* ¶ 40. California received an extension until March 31, 2026, to continue implementing critical initiatives that promote academic recovery for students impacted by the pandemic. *Id.* ¶ 41. Because of the confusion over who it should communicate with, California has already experienced a delay in disbursement. *Id.* ¶¶ 44, 45.

OSERS, which provides guidance, technical assistance, and oversight of special education requirements under the IDEA, has also been affected by the Mass Termination. Ex. 14 (Acon Decl.) ¶ 23. Employees impacted by the Mass Termination were engaged in policy, operations, and administrative functions. Ex. 6 (Sanon Letter). Without the policy office's subject matter experts, there is a risk of inconsistency in monitoring states for compliance with federal laws and regulations. Ex. 14 (Acon Decl.) ¶ 23. The Mass Termination has adversely impacted Plaintiffs' ability to seek guidance from OSEP technical assistance centers. *See, e.g.*, Ex. 14 (Acon Decl.) ¶¶ 27, 28. OSERS's inability to provide adequate oversight and technical assistance because of the Mass Termination may create uncertainty in the proper implementation of IDEA part C programs. *Id.* ¶ 20. The decision to move special education programs, which include IDEA administration, out of the Department will compound these problems and further incapacitate services for students with disabilities. Ex. 46 (Duncan Decl.) ¶ 23.

The functional elimination of OELA, which provides national leadership and support to state and local school systems to ensure that English Language Learners become proficient in English and which administers three grant programs, significantly impacts Plaintiffs' ability to

effectively educate English Learners and immigrant students. OELA. Ex. 60 (Doe 8 Decl.) ¶¶ 4, 11, 12. The Deputy Assistant Secretary, as the only remaining employee, will now have to perform all statutorily required duties for which OELA is responsible. *Id*. ¶ 9. Even if OELA's duties were transferred to another department, those employees would not have the necessary knowledge, training, or experience to fulfill OELA's statutory duties. *Id.* ¶¶ 9, 10. Additionally, delays in the disbursement of funds to States are a near certainty, impacting the nearly 5 million students who receive necessary support funded from Title III formula grants. *Id*. ¶ 12.

With respect to OGC, all of its attorneys specializing in K-12 grants, IDEA grants, and equity grants have been terminated. Ex. 49 (Smith Decl.) at Ex. 2. OGC attorneys focused on privacy issues have also been terminated. Ex. 66 (Doe 14 Decl.) ¶¶ 6, 7, 13. Attorneys at OGC play a vital role in ensuring that the Department and its grantees comply with statutory mandates. *Id.* ¶¶ 11, 12. They are also instrumental in fulfilling the Department's statutory enforcement duties. *Id.* ¶¶ 7, 8. For instance, California had regular monthly phone calls with three attorneys from OGC regarding compliance with Title I of the Elementary and Secondary Education Act. Ex. 13 (Thurmond Decl.) ¶ 67. All three of the attorneys are subject to the Mass Termination. *Id.*

Indeed, the Mass Termination has made communicating with the Department difficult or impossible, with requests for information resulting in confusing emails or responses stating that the Department cannot provide answers. *Id.* ¶¶ 44, 45, 75; Ex. 29 (Ehling Decl.) ¶¶ 9–17, 21.

### C.    Impacts on Support for Vocational Education and Rehabilitation Caused by Staff Reductions in OCTAE and OSERS.

The Mass Termination eliminated staff essential to OCTAE and OSERS, in some cases eliminating entire teams. Ex. 6 (Sanon Letter); Ex. 54 (Doe 2 Decl.) ¶ 12. Without this staff, the Department cannot meet its statutory duties to provide direct funding, programming, and/or technical assistance concerning vocational education and rehabilitation.

For example, the Mass Termination cut DAEL's entire Monitoring and Administration branch, which is responsible for reviewing and approving mandatory AEFLA state plans, reports, and assessment policies that measure performance. 34 C.F.R. §§ 463.160–170; Ex. 54 (Doe 2 Decl.) ¶¶ 6, 12, 14. Without this branch, the Department cannot conduct the level of monitoring and review required within the requisite time period. Ex. 54 (Doe 2 Decl.) ¶¶ 15, 16; *see also* 34 C.F.R. § 463.130(h) (requiring Department to review and approve all United States Plans within 90 days). For example, the branch provides daily support and technical assistance to states about grant implementation, including how to determine allowable expenses and allocations of money. Ex. 54 (Doe 2 Decl.) ¶¶ 8, 15. With decreased staff, states cannot get timely responses to their questions and may incorrectly allocate funds, resulting in a tremendous loss of resources for states. *Id.* ¶ 16. But with timely technical assistance, states can avoid mistakes and the ensuing fallout. *Id.*

As noted above, the Mass Termination also eliminated OSERS staff in operations and administrative functions. Ex. 6 (Sanon Letter). Cuts to these functions will impede the effective administration of grants, programs, and/or technical assistance for vocational education under IDEA Part, B, and vocational rehabilitation and supported employment under the Rehabilitation Act.

For example, timely administration of IDEA funds is critical in ensuring that Plaintiffs provide services to students with disabilities, including those with vocational education included in their Individualized Education Program. Ex. 22 (Sanders Decl.) ¶¶ 11, 13; Ex. 36 (Echelson Decl.) ¶¶ 21, 22; 20 U.S.C. § 1400(d)(l)(A). A reduction in staffing at OSEP will heavily impact the administration and processing of special education grants, and in turn, impede Plaintiffs' implementation of the IDEA. Ex. 31 (Morton-Bentley Decl.) ¶ 10; Ex. 42 (Kelly Decl.) ¶ 15.

For vocational rehabilitation and supported employment services, any reductions to Rehabilitation and Services Administration personnel would result in less support, guidance, and slower responses to Plaintiffs, negatively impacting students with disabilities in the States who need vocational rehabilitation services to be economically sufficient and integrate into the workforce. Ex. 12 (Mackey Decl.) ¶ 9; Ex. 23 (Losasso Decl.) ¶ 12.

### D. The Elimination of OCR Resources Needed to Enforce Civil Rights Laws.

The Mass Termination eliminated more than half of OCR's regional offices, terminating employees and closing offices in Boston, Dallas, New York, Chicago, Cleveland, San Francisco and Philadelphia.[27] Even before the Mass Termination, OCR needed hundreds more staff to effectively address civil rights concerns presented to the Department.[28] Cutting half of the regional offices and 55% of OCR investigators will make it significantly more difficult for OCR to investigate its cases and bring complaints to final disposition. Ex. 59 (Doe 7 Decl.) ¶¶ 17–19; Ex. 46 (Duncan Decl.) ¶¶ 21–22.

Prior to the Mass Termination, average caseloads across all regional offices were already high: 50 cases per OCR investigator, with the investigators in the Dallas office carrying caseloads of 50-80. Ex. 47 (Gonzales Decl.) ¶ 25; Ex. 48 (Lhamon Decl.) ¶¶ 25–27. With fewer people and the resulting higher caseloads, OCR will be unable to perform its statutory duties.[29] Because of the suddenness of the Mass Termination, employees cannot respond to emails to provide notice of

---

[27] Juan Perez, Jr. & Rebecca Carballo, *Education Department Documents Detail Massive Scope of Agency Worker Terminations*, Politico (Mar. 12, 2025), https://www.politico.com/news/2025/03/12/education-department-documents-detail-agency-worker-terminations-00226222.

[28] U.S. Dep't of Educ., *Protecting Civil Rights: Highlights of Activities, Office for Civil Rights (2021-2025)*, (Jan. 2025), https://perma.cc/G8RW-VSPT (describing President Biden's yearly budget requests to increase OCR enforcement staff).

[29] Ex. 13 (Thurmond Decl.) ¶ 63; Ex. 15 (Paccione Decl.) ¶ 18; Ex. 17 (Marten Decl.) ¶ 7; Ex. 27 (Rice Decl.) ¶ 17; Ex. 29 (Ehling Decl.) ¶¶ 20-23; Ex. 42 (Kelly Decl.) ¶ 20; Ex. 47 (Gonzales Decl.) ¶¶ 18, 19, 21, 23; Ex. 49 (Smith Decl.) ¶ 14; Ex. 53 (Doe 1 Decl.) ¶¶ 15, 23-25; Ex. 55 (Doe 3 Decl.) ¶¶ 15, 16; Ex. 59 (Doe 7 Decl.) ¶ 16.

changes, and entities under pending agreements and monitoring have been left without clarity or contacts. Ex. 53 (Doe 1 Decl.) ¶¶ 17–20; Ex. 55 (Doe 3 Decl.) ¶¶ 14, 20; *see also* Ex. 36 (Echelson Decl.) ¶¶ 63–65. With the closure of seven regional offices, OCR not only loses staff, but also their expertise and local knowledge, impeding OCR's ability to conduct on-site inspections and local interviews. Ex. 13 (Thurmond Decl.) ¶ 60; Ex. 47 (Gonzales Decl.) ¶¶ 14, 20, 23; Ex. 48 (Lhamon Decl.) ¶¶ 32–37; Ex. 53 (Doe 1 Decl.) ¶ 22. The staffing deficit will also reduce capacity to issue policy guidance and offer training and technical assistance, leaving recipients of federal funds with less guidance on their legal obligations. Ex. 47 (Gonzales Decl.) ¶ 30; Ex. 53 (Doe 1 Decl.) ¶ 23. The Illinois State Board of Education has already experienced an increase in technical assistance calls because of the Mass Termination of OCR employees. Ex. 22 (Sanders Decl.) ¶ 15.

The impact of this Mass Termination will be felt particularly acutely by states that rely on OCR to investigate and charge discrimination in education. In Rhode Island, for instance, the Rhode Island Department of Education lacks authority to investigate discrimination claims, and has historically referred them to the OCR office in Boston, MA—which was closed as part of the Mass Termination. Ex. 36 (Echelson Decl.) ¶¶ 55–61; *see also* Ex. 29 (Ehling Decl.) ¶ 19 (describing a similar problem for the New Jersey Department of Education).

### E.    Elimination of Essential Educational Research Functions.

Despite their critical, statutorily mandated functions and the important role they play in Plaintiffs' educational services, *see supra* at 10–11, the Mass Termination has significantly impacted three of the four research centers in the Institute of Education Sciences. Ex. 64 (Doe 12 Decl.) ¶ 12; Ex. 57 (Doe 5 Decl.) ¶ 16. For instance, the Mass Termination included the manager of a large-scale, sixty-year-old database of education research (including research not published in journals, but gathered from schools and other institutions in the U.S.). Ex. 64 (Doe 12 Decl.) ¶ 8.

It also included the IT director, who ensures that personally identifiable student information remained confidential. *Id.* ¶ 12(e).

## ARGUMENT

Plaintiffs have satisfied each of the elements for issuance of a preliminary injunction. Under that standard, "[t]he district court must consider the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest." *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (cleaned up). The final two factors—the balance of hardships and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## I. Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on the merits for several reasons, each independently sufficient for an injunction. *First*, the Mass Termination is arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2)(A). *Second*, the Mass Termination is contrary to law, in violation of the APA, 5 U.S.C. § 706(2)(A). *Third*, the Mass Termination and the President's March 21 Directive violate the separation of powers and are unconstitutional. *Fourth*, the Mass Termination and the President's March 21 Directive are *ultra vires*. No constitutional or statutory authority allows the President or the Secretary to take actions that effectively incapacitate or transfer the Department's core statutory functions.

### A. The Mass Termination Is Arbitrary and Capricious in Violation of the APA.

The APA requires that a court "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A);

*see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Department's Mass Termination is arbitrary and capricious for multiple reasons.[30]

*First*, the Agency Defendants failed to provide *any* reasoned basis or explanation for the Department's Mass Termination. This violates a "'fundamental requirement of administrative law'" that "'an agency set forth its reasons for decision.'" *Massachusetts v. Nat'l Insts. of Health*, No. 25-cv-10338, 2025 WL 702163, at *16 (D. Mass. Mar. 5, 2025) (quoting *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014)); *see also Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (an agency is required to "articulate[] a satisfactory explanation for [its] decision" (cleaned up)). The only explanation the March 11 press release provided was a quote from Secretary McMahon that the Mass Termination "reflects the Department of Education's commitment to efficiency, accountability, and ensuring that resources are directed where they matter most: to students, parents, and teachers," and that the Mass Termination is "a significant step toward restoring the greatness of the United States education system." Ex. 5 (Mar. 11 Press Release). That is plainly insufficient. The APA requires agencies "to engage in reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 16 (2020)

---

[30] The Mass Termination is a "final agency action" subject to review under the APA, 5 U.S.C. § 704, because it: (1) "mark[s] the consummation" of agency decision-making and (2) determines "rights or obligations ... from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). "Agency action" is not confined to prototypical regulations, but includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13), which "cover[s] comprehensively every manner in which an agency may exercise its power," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). The Mass Termination of more than a thousand employees is a consummation of the agency's decision-making on how to reduce the staff. *See Bennett*, 520 U.S. at 177. Also, the Mass Termination determines rights and obligations from which legal consequences will flow by impacting employees and incapacitating key functions of the Department that provide funding and services to Plaintiffs. *Id.* at 178; *see, e.g., Burdue v. FAA*, 774 F.3d 1076, 1080 (6th Cir. 2014) (finding employee's termination is a "final agency action"); *Maryland v. U.S. Dep't of Agric.*, No. 25-cv-0748, 2025 WL 800216, at *11 (D. Md. Mar. 13, 2025), *appeal docketed*, No. 25-1248 (4th Cir. Mar. 17, 2025) (finding, in reviewing agencies' large-scale RIFs, that "any agency's decision to dismiss an employee effects self-evident legal consequences for both parties and plainly marks the end of the agency's decisionmaking with respect to the employee involved").

(cleaned up), and "conclusory statements will not do; an agency's statement must be one of *reasoning*." *Amerijet*, 753 F.3d at 1350 (emphasis in original) (cleaned up); *see also Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."). Here, there is no reasoning whatsoever; all the Agency Defendants provided were two conclusory statements about what Secretary McMahon thinks the Mass Termination "reflects" and what the Mass Termination is "a significant step towards," without any explanation of how the Agency Defendants even determined that cutting the Department's workforce virtually in half would further the overly-general purported goals of "ensuring that resources are directed where they matter most" and "restoring the greatness of the United States education system." Ex. 5 (Mar. 11 Press Release).[31] This is a far cry from "examin[ing] the relevant data and articulat[ing] a satisfactory explanation for [agency] action[,] including a rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43 (cleaned up), as required by the APA to ensure that agencies are "'accountable to the public and their actions subject to review by the courts,'" *Regents*, 591 U.S. at 16 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).

*Second*, to the extent the Agency Defendants offered any coherent rationale for the Department's Mass Termination, that rationale is clearly pretextual. President Trump and Secretary McMahon have made no secret that their true goal is to eliminate the Department of Education by any means available. President Trump, for example, called the Department "a big con job" and declared that he would "like to close it immediately."[32] He also stated that he would like Secretary

---

[31] Nor can the Agency Defendants make up for this clear deficiency through post-hoc rationalizations. *See*, *e.g.*, *Regents*, 591 U.S. at 20 ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action.") (cleaned up).

[32] Michael C. Bender, *Trump Is Said to Be Preparing Order That Aims to Eliminate Education Dept.*, The New York Times (Mar. 6, 2025) (Ex. 9).

McMahon to put herself "out of a job."[33] When asked for her top priority, Secretary McMahon said that President Trump "has given a clear directive that he would like to look in totality at the Department of Education and believes that the bureaucracy of it should be closed."[34] That directive is now memorialized in the Executive Order. Ex. 1. Any purported commitment to "efficiency" and "accountability" is merely pretext for this goal of destruction. *See New York*, 588 U.S. at 784–85 (agencies must "offer genuine justifications for important decisions" and cannot rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process"). Courts are "'not required to exhibit a naiveté from which ordinary citizens are free.'" *Id.* at 785 (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)).

*Third*, the Department's Mass Termination is arbitrary and capricious because the Agency Defendants "failed to consider ... important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. The Mass Termination announcement—on top of failing to provide any actual reasoning—entirely failed to grapple with the potential disruption to operations and interference with statutory and non-statutory functions a sudden elimination of nearly 50% of the Department's entire workforce would cause.[35] *See supra* at 11–23. Nor is there any indication that the substantial harms and

---

[33] Zachary B. Wolf, *Trump and Musk are moving to smother these three pieces of the government*, CNN (Feb. 5, 2025) (Ex. 10); *see also* Ex. 11 (Musk Post on X (Mar. 20, 2025)).

[34] Lexi Lonas Cochran, *Linda McMahon vows to work with Congress, including to shutter Education Department*, The Hill (Feb. 13, 2025) https://thehill.com/homenews/education/5143374-linda-mcmahon-trump-education-department-cassidy/; *see also* Lexi Lonas Cochran, *McMahon says she 'wholeheartedly' agrees with Trump plan to abolish Education Department*, The Hill (Feb. 25, 2025) https://thehill.com/homenews/education/5162816-mcmahon-abolish-education-department-trump/.

[35] The most the March 11 press release offers is a conclusory statement that "[t]he Department of Education will continue to deliver on all statutory programs that fall under the agency's purview, including formula funding, student loans, Pell Grants, funding for special needs students, and competitive grantmaking." Ex. 5 (Mar. 11 Press Release). There are several reasons why this is insufficient: First, there is *zero* explanation of how the Department can possibly do that after a 50% cut in staffing. Second, the very next sentence in the March 11 press release immediately draws that representation into question. *Id.* ("All divisions within the Department are impacted by the reduction, with some divisions requiring significant reorganization[.]").

reliance interests for students, educational institutions, Plaintiffs, and others, *see supra* at 15–23, were at all considered. Turning a blind eye to the severe costs of the Department's Mass Termination, and failing to engage in any meaningful weighing of potential costs and benefits, is plainly arbitrary and capricious. *See Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." (emphasis in original)); *Regents*, 591 U.S. at 30 ("When an agency changes course, ... it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.") (cleaned up); *id.* at 33 ("[B]ecause [the agency] was not writing on a blank slate ... it was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." (cleaned up)).

### B.     The Mass Termination Is Contrary to Law in Violation of the APA.

Plaintiffs are also likely to succeed on the merits of their claim that the Department's Mass Termination is contrary to law because multiple federal statutes impose obligations on the Department that the Mass Termination makes functionally impossible. Under the APA, a court must "hold unlawful and set aside" agencies actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A); *see also F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (contrary to law "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering") (emphasis in original).

As an initial matter, the Agency Defendants' actions are contrary to law because the Mass Termination amounts to a wholesale reorganization and reduction in the size and scope of the Department in violation of 20 U.S.C. § 3473. While the Secretary has some limited authority to

---

And third, the record in this case plainly discredits the assertion that no statutory programs will be affected, *see supra* at 15–24.

reorganize functions within the Department, those changes must be "necessary or appropriate." 20 U.S.C. § 3473(a). Here, the Secretary's elimination of nearly 50% of the staff, decimating no fewer than eight major offices at the Department, was neither "necessary" nor "appropriate"—for the same reasons that the actions were arbitrary and capricious. *See supra* at 24–28.

Moreover, the Agency Defendants' actions are contrary to multiple, specific federal statutes that impose obligations on the Department that the Mass Termination makes impossible to carry out. First, the Mass Termination will result in the Department violating its obligations to perform mandated core functions in educational programs through grade 12. *Supra* at 18–20. This has included delays in the disbursement of funds and a failure to provide needed technical assistance. *Id.* Second, the Mass Termination threatens the Department's implementation of higher education and student loan programs, which are required by Title IV of the HEA. *See supra* at 15–18. For instance, the Mass Termination eliminated the office that was responsible for ensuring that loan servicers fulfill their contractual requirements with FSA. *Id.* Third, the Mass Termination makes it impossible for the Department to fulfill its statutory function in implementing vocational education and rehabilitation programs. *See supra* at 20–22. For instance, the Mass Termination eliminates staff necessary for the administration of grants and programs for vocational rehabilitation for persons with disabilities. *Id.* Fourth, the Mass Termination decimates the Department's ability to fulfill its obligation to enforce civil rights laws in education. *See supra* at 22–23; Ex. 48 (Lhamon Decl.) ¶ 43. And fifth, the Mass Termination vitiates the essential, and often mandatory, data collection and analysis functions of NCES. *See supra* at 23–24.

On top of all of that, the Mass Termination is contrary to Congress's authorization for the creation of the Department itself. The Mass Termination implements the President's directive, memorialized in the Executive Order, to shut down the Department. By reducing its workforce by

nearly 50%, and furthering the President's Executive Order "to facilitate the closure" of the Department, *see supra* at 11–15, the Agency Defendants have acted in defiance of Congress's establishment of the Department, and many of its offices, in 1979. *See* Department of Education Organization Act, Pub. L. 96-88, 93 Stat. 668 (1979) (codified as amended at 20 U.S.C. §§ 3401–3510)); *see also* 20 U.S.C. §§ 3411–3427 (offices); *id.* §§ 3401–3402 (findings and purpose).

The Agency Defendants may not "decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.); *accord City & Cnty. of San Francisco. v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018). Whether the Agency Defendants maintain that the Department should or should not have a different mission, size, or scope is irrelevant to their obligations to comply with Congress's statutory mandates. Simply put, Agency Defendants do not have the statutory authority to pick and choose which acts of Congress they wish to comply with—but that is exactly what the Mass Termination functionally does.

### C. The Mass Termination and the President's March 21 Directive Violate the Separation of Powers and the Take Care Clause.

The Mass Termination deprives the Department of personnel sufficient to fulfill statutory mandates, with a cascade of harms to Plaintiffs. The Executive Branch cannot abolish the Department or any of its statutorily mandated components by eliminating the staff required to meet Congress's requirements. Similarly, the President has no power to unilaterally and immediately transfer functions Congress assigned to the Department by statute. These actions are a violation of the separation of powers in at least two ways—the Executive Branch is usurping Congress's exclusive authority to create agencies and define their role, and it is failing in its constitutional obligation to "take care" that the law is faithfully executed.

Article I allows only Congress to create and define executive agencies, as it did in 1979 when it authorized the Department, and then in later years as it enacted additional statutes adding to the Department's functions and duties. *See Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction, the prescribing of reasonable and relevant qualifications and rules of eligibility of appointees, and the fixing of the term for which they are to be appointed and their compensation—all except as otherwise provided by the Constitution."); *see supra* at 5–7. The Constitution also "exclusively grants the power of the purse to Congress, not the President." *San Francisco*, 897 F.3d at 1231 (citing U.S. Const. art. I, § 9, cl. 7). Congress has enacted numerous statutes that require the Department to administer federal funding programs, many of which provide critical funding to the States. *See supra* at 2–11. "[S]ettled, bedrock principles of constitutional law" require the Executive to expend the funds that Congress duly authorizes and appropriates. *In re Aiken Cnty.*, 725 F.3d at 259. This is particularly clear when a grant program is formulaic and non-discretionary, as many of the Department's decimated programs are. *See City of Providence v. Barr*, 954 F.3d 23, 42 (1st Cir. 2020); *see also supra* at 2–11.

The Executive, on the other hand, has no power "to enact, to amend, or to repeal statutes," *Clinton v. City of New York*, 524 U.S. 417, 438 (1998), but that is precisely what it has done by implementing a Mass Termination so severe that it incapacitates statutorily mandated functions of the Department, *see supra* at 15–24, and by unilaterally and "immediately" attempting to transfer the student loan portfolio and special education functions out of the Department.[36]

For the same reasons, the Executive has failed to "take care" that the laws creating the Department and its duties are "faithfully executed." U.S. Const. art. II, § 3. "In the framework of

---

[36] Plaintiffs do not understand school nutrition programs, also referenced in the March 21 press conference, to be administered by the Department, but to the degree they are, they should not be transferred to HHS.

our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). "[T]he President may not ... decline to follow a statutory mandate ... simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d at 259.

### D. The Mass Termination and the March 21 Directive are *Ultra Vires*.

Defendants' actions in instituting the Mass Termination and the President's March 21 Directive are *ultra vires* of their authority granted by the Department of Education Organization Act. 20 U.S.C. § 3411 *et seq*. Federal courts have the authority to "prevent an injurious act by a public officer." *Carroll v. Safford*, 44 U.S. 441, 441 (1845). The power to grant this type of injunctive relief applies to "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 27 (2015) (citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110–11 (1902) (granting injunction to prohibit Postmaster General's further withholding of mail)). The Supreme Court has long established that equitable relief is permissible against federal officers who act beyond federal statutory limitations. Courts have also established that this rule applies to the President's actions, such that the implementation of executive action can be enjoined. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949); *Am. Forest Rsch. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 1110 (2024).

No constitutional or statutory authority allows the President or the head of an agency to take actions that incapacitate core statutory functions of an agency that Congress created, or to transfer statutory duties to other agencies. During the First Congress, James Madison outlined that the Executive may choose an individual to lead a federal agency, but it is Congress that "'creates the office, defines the powers, limits its duration, and annexes a compensation.'" *Myers*, 272 U.S. at 128–29 (quoting 1 Annals of Congress, 581, 582). Thus, "Congress under its legislative power is given the establishment of offices [and] the determination of their functions and jurisdiction."

*Myers*, 272 U.S. at 129. Put another way, administrative agencies "are creatures of statute." *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). The Department's Mass Termination and March 21 Directive are part and parcel of the President's directive to shut down the Department, which exceeds his executive authority. That directive has been expressed by the President and the Secretary numerous times in public statements, *supra* at 11–15, and is now memorialized in the Executive Order.[37] Ex. 1. Indeed, the letters sent to employees about their terminations announced that some departments, including the National Center for Education and Evaluation, multiple units of FSA, and the International and Foreign Language Education Office, were being "abolished."[38] Because the Mass Termination and the March 21 Directive stem from no lawful authority, Defendants have acted *ultra vires*.

## II.    Plaintiffs Face Irreparable Harm Absent Injunctive Relief.

The Court should enter a preliminary injunction because Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). A movant need not "demonstrate definitive harm." *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 101 (D. Me. 2008). Rather, a

---

[37] Defendants may contend that they have *stated* at various points that their actions only go so far as the law allows, but the reality belies these statements. The Department is simply no longer equipped as a matter of fact to meet all of its statutory obligations. No "savings" language can render that outcome lawful. "The Supreme Court has long instructed that acts cannot be held to destroy themselves through saving clauses." *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 775 (7th Cir. 2019) (cleaned up) (collecting cases). Such statements must be "read in their context," and "cannot be given effect when" to do so "would override" directives that are "clear and specific." *San Francisco*, 897 F.3d at 1239.

[38] Ex. 68 (Doe 16 Decl.) at Ex. 1; Ex. 47 (Gonzales Decl.) ¶ 6; Ex. 49 (Smith Decl.) ¶¶ 5-6, Ex. 3; Ex. 50 (Gittleman Decl.) ¶ 2; Ex. 51 (Hamlin Decl.) ¶ 6; Ex. 53 (Doe 1 Decl.) at Ex. 1; Ex. 54 (Doe 2 Decl.) ¶ 12, Ex. 1; Ex. 55 (Doe 3 Decl.) ¶ 14; Ex. 56 (Doe 4 Decl.) ¶ 10; Ex. 57 (Doe 5 Decl.) ¶ 7; Ex. 58 (Doe 6 Decl.) ¶ 5; Ex. 59 (Doe 7 Decl.) ¶ 10; Ex. 60 (Doe 8 Decl.) at Ex. 2; Ex. 61 (Doe 9 Decl.) at Ex. 1; Ex. 62 (Doe 10 Decl.) ¶ 6; Ex. 63 (Doe 11 Decl.) at Ex. 1; Ex. 64 (Doe 12 Decl.) at Ex. 1; Ex. 66 (Doe 14 Decl) ¶ 6); Ex. 67 (Doe 15 Decl.) at Ex. 1.

showing that "irreparable injury is *likely*" will suffice. *Winter*, 555 U.S. at 22 (emphasis in original). And while "traditional economic damages" are not amenable to injunctive relief, "some economic losses can be deemed irreparable," including "where the potential economic loss is so great as to threaten the existence of the movant's business." *Vaquería Tres Monjitas*, *Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (cleaned up).

Here, Defendants actions have already begun to harm Plaintiffs—by increasing the likelihood of delays and other problems in processing FAFSA applications that imperil the spring financial aid process for colleges and universities; by depriving K-12 and higher education institutions of new research and data, as well as accreditation and assistance in complying with federal education and anti-discrimination laws; and by imposing new delays and casting uncertainty over essential streams of funding that Plaintiffs rely on to provide education and related services to students of all ages. The harm will be immensely compounded if the Department implements President Trump's March 21 Directive to transfer student loan management and special education functions outside of the Department.

## A. Financial Aid for Higher Education

The devastating cuts to staff in the Federal Student Aid office places the student loan, grant, and work-study programs at risk. *See*, *e.g.*, Ex. 16 (Fuerst) ¶¶ 7–10; Ex. 19 (Halbert) ¶¶ 6–8, Ex. 25 (Ortega) ¶¶ 9–10; Ex. 30 (Gowers) ¶¶ 6–11; Ex. 33 (Boekenstedt) ¶¶ 7-10; Ex. 35 (Libutti) ¶¶ 8–15; Ex. 44 (Reid) ¶¶ 8–10; Ex. 45 (Britz) ¶ 8-9. The same is true for transfer of the Department's loan portfolio to the Small Business Administration. Ex. 26 (Barton) ¶¶ 15–19. Without a robust and functional system of federal financial aid administered by the Department, Plaintiffs' universities face an existential threat. Ex. 16 (Fuerst) ¶ 10; Ex. 33 (Boekenstedt) ¶ 10; Ex. 35 (Libutti) ¶ 15; Ex. 45 (Britz) ¶¶ 8–9. Even disruption solely to the work-study program

would have irreparable impacts on Plaintiffs, as they would lose the services that students in those positions provide to their campuses. Ex. 19 (Halbert) ¶ 7; Ex. 26 (Barton) ¶¶ 20–26, 31, 35.

These risks are illustrated by the complexity of the federal loan programs, which have unique statutorily mandated components, including requirements regarding the availability of distinct repayment plans and forgiveness options that have been historically difficult to administer. *See supra* at 4. The consequences to borrowers, higher education institutions, and taxpayers alike of transferring these loans to an agency lacking the Department's unique expertise could be grave.

Additionally, the Department's actions imperil the FAFSA system, on which federal student aid and Plaintiffs' public universities rely. Ex. 32 (King Decl.) ¶¶ 18–19. The cuts to FSA staff are very likely to cause delays in processing FAFSA forms, which will irreparably harm Plaintiffs "in the absence of preliminary relief." *Winter*, 555 U.S. at 20; *see also Nat'l Insts. Of Health*, 2025 WL 702163, at *30 (describing harm that arises from "the uncertainty around the ability" to sustain future obligations). The Department is cutting more than 300 employees from FSA during the peak time of the year for processing FAFSA forms, close on the heels of a massive disruption in the FAFSA process. Ex. 32 (King Decl.) ¶ 19; *see also* Ex. 16 (Fuerst Decl.) ¶ 9; Ex. 33 (Boeckenstedt Decl.) ¶ 12; Ex. 61 (Doe 9 Decl.) ¶¶ 7, 12–14; *see supra* at 34. FAFSA delays will have cascading effects, including: (1) increased errors in the forms; (2) increases in students dropping courses because they did not receive financial aid in time to buy books and supplies; (3) loss of work-study income; (4) late disbursements, leading to late drawdowns; (5) the need to push back deadlines for enrollment; (6) reputational harm; and (7) ultimately, loss in tuition dollars. Delays or losses of funds would be particularly devastating for public universities, which do not have large endowments with which they could fund financial aid offers while waiting for FAFSA problems

to resolve.[39] All of these harms will be compounded if student loan functions are somehow transferred to another agency with no experience in administering such a program.

## B.  Cuts to Research, Data, Accreditation, and Compliance Services

Plaintiffs rely on the Department for a range of research, data collection and analysis, accreditation and approval of applications, technical assistance, and compliance services to administer their K-12, adult, technical, vocational, and higher education systems. Ex. 38 (Merolla-Brito Decl.) ¶¶ 14–17 (noting that access to a federal resource, which is relied on to comply with federal consent decree, is likely to end as a result of Mass Termination). The lack of access to information, guidance, and up-to-date statistics that allows Plaintiffs' education systems to "work effectively" is precisely the sort of injury that cannot be remedied by later relief. *Doctors for Am. v. Off. of Personnel Mgmt.*, No. 25-cv-322, 2025 WL 452707, at *9 (D.D.C. Feb. 11, 2025).

The cuts to the IES and NCES, *see supra* at 23–24, will impact Plaintiffs' ability to meet the educational needs of their students. Plaintiffs rely on data gathered and analyzed by the IES and NCES on educational practices, student outcomes, and teaching strategies. This includes reliance on NCES's generation of the "Nation's Report Card" to evaluate relative performance in math, reading, and other subjects. Plaintiffs also rely on data gathered and maintained by FSA about campus safety incidents in higher education, and rely on the Department for guidance about what incidents they must report and how to report them.[40]

Plaintiffs rely on the Department to review and act on requests, including those related to the eligibility of institutions of higher education to participate in the Title IV program. As detailed

---

[39] Ex. 16 (Fuerst Decl.) ¶ 10; Ex. 30 (Gower Decl.) ¶¶ 11, 17; Ex. 35 (Libutti Decl.) ¶¶ 9, 15; Ex. 39 (Bailey Decl.) ¶¶ 14, 16, 19; Ex. 44 (Reid Decl.) ¶ 12; Ex. 45 (Britz Decl.) ¶ 11.

[40] Ex. 13 (Thurmond Decl.) ¶¶ 50–53; Ex. 15 (Paccione Decl.) ¶ 16; Ex. 19 (Halbert Decl.) ¶¶ 16–17; Ex. 30 (Gower Decl.) ¶¶ 20–23; Ex. 31 (Morton-Bentley Decl.) ¶ 8; Ex. 32 (King Decl.) ¶¶ 22, 29–31; Ex. 33 (Boeckenstedt Decl.) ¶ 13; Ex. 35 (Libutti Decl.) ¶¶ 16–17; Ex. 36 (Echelson Decl.) ¶¶ 41–49; Ex. 39 (Bailey Decl.) ¶¶ 20, 22; Ex. 42 (Kelly Decl.) ¶ 21; Ex. 44 (Reid Decl.) ¶ 13; Ex. 45 (Britz Decl.) ¶ 12.

*supra,* at 15–18, in recent weeks, the pace of approval of critical requests to the Department to recertify or change Program Participation Agreements has slowed for colleges and universities. In one instance, the slow response time means that a community college, which needed approval of a change to its Agreement so that it could offer classes at a new site, has lost students and may need to cancel its lease for the new site.[41]

Plaintiffs rely on the Department for guidance and technical assistance about legal compliance. Ex. 12 (Mackey Decl.) ¶ 11; Ex. 22 (Sanders Decl.) ¶ 13; Ex. 27 (Rice Decl.) ¶ 13; Ex. 28 (Walker-Griffea Decl.) ¶ 12; Ex. 31 (Morton-Bentley Decl.) ¶ 8. The Department provides a wide range of technical assistance to Plaintiffs—from Title IX compliance, Ex. 32 (King Decl.) ¶ 23, to guidance on special education data collection and State Performance Plans, Ex. 22 (Sanders Decl.) ¶ 13, to assisting state agencies with grant monitoring, Ex. 23 (Losasso Decl.) ¶ 12—that is essential to the functioning of their education systems, and that is now in jeopardy given the Mass Termination.

Plaintiffs rely on OCR to investigate civil rights complaints about educational institutions within their jurisdictions and to provide guidance about compliance with federal anti-discrimination laws. Ex. 48 (Lhamon Decl.) ¶ 7. The result of the Mass Termination will be "an increase in the need for state enforcement of civil rights protections," but it will not be easy for states to fill the void. Ex. 31 (Morton-Bentley Decl.) ¶ 9; *see also* Ex. 42 (Kelly Decl.) ¶ 20; Ex. 29 (Ehling Decl.) ¶ 20; Ex. 22 (Sanders Decl.) ¶ 15. Plaintiffs also rely on OCR for its "direct and ongoing guidance" about anti-discrimination laws. Ex. 32 (King Decl.) ¶ 23; Ex. 48 (Lhamon Decl.) ¶¶ 14–15; Ex. 36 (Echelson Decl.) ¶¶ 63–65. In an office like OCR, which has no extraneous functions, cutting OCR staff means cutting the nation's most concentrated civil rights expertise in

---

[41] Ex. 30 (Gower Decl.) ¶ 13; Ex. 40 (Carmichael Decl.) ¶ 6; Ex. 43 (Loveday Decl.) ¶¶ 6–8, ¶¶ 12, 13.

the education context. Ex. 48 (Lhamon Decl.) ¶ 33.

### C. Delays and Uncertainty in Funding

The Department is responsible for administering billions of dollars in funding for elementary and secondary education, services for children with disabilities, vocational education, adult education, and other crucial services. *See, e.g.*, Ex. 31 (Morton-Bentley Decl.) at Ex. A; Ex. 34 (Nazarov Decl.) ¶ 10 ("Approximately 30% of operating revenue for Oregon public elementary and secondary schools derives from federal sources."). In higher education, money from Pell Grants, Supplemental Educational Opportunity Grants, Federal Work-Study, and Direct Loans is essential to public universities' and colleges' operations; to take just one example, students at Rutgers University were awarded over $626 million in federal aid for the 2024–25 academic year to date. Ex. 30 (Gower Decl.) ¶¶ 8–11. Any interruption to these funds would cause immediate, irreparable harm, because it would jeopardize the ability of students to stay enrolled and the ability of universities to make payroll and continue to operate. *See Nat'l Insts. of Health*, 2025 WL 702163, at *30; Ex. 13 (Thurmond Decl.) ¶ 70; Ex. 30 (Gower Decl.) ¶ 11.

There are already signs that the Mass Termination and other changes made by the incoming administration are causing delays in funding. For instance, the New York State Education Department (NYSED) sought to drawdown $363 million in funding for Education Stabilization Fund reimbursements, but found that the Department had "implemented a requirement for additional [signoff] from USDOE program staff assigned to the [Education Stabilization Fund]," a group that had experienced "significant impact" from the Mass Termination. Ex. 31 (Morton-Bentley Decl.) ¶ 7. NYSED is still "waiting on additional guidance and instructions." *Id*. The New Jersey Department of Education (NJDOE) logged onto the Department's payment portal on March 18, 2025, where it received a notice from the payment portal that "[d]ue to severe staffing restraints, you can expect delays in connecting to a live help desk agent." Ex. 29 (Ehling Decl.)

¶ 25. The Illinois Board of Education has been unable to access certain categories of funding since March 1, 2025. Ex. 22 (Sanders Decl.) ¶ 12. And the Department's online system for submitting payment requests to the Department temporarily failed the day after the Mass Termination was announced. Ex. 27 (Rice Decl.) ¶ 12; Ex. 28 (Walker-Griffea Decl.) ¶ 11.

If these delays multiply, the effect will be devastating for Plaintiffs. *See, e.g.*, Ex. 13 (Thurmond Decl.) ¶¶ 34–35; Ex. 34 (Nazarov Decl.) ¶ 13. For Washington's public community and technical colleges, "[i]mproper administration or delays in distributing ... critical federal student aid funds would destabilize our colleges, leading to budget deficits, staff reductions, and cuts to academic and support programs." Ex. 39 (Bailey Decl.) ¶ 13. For Oregon's primary and secondary education systems, "[l]oss, delay, and reduction of ... [federal] funding sources would drastically impact the health and education of tens and thousands of Oregonians between the ages of 4 and 18." Ex. 34 (Nazarov Decl.) ¶ 13. And for Illinoisans with disabilities, a delay or disruption in funding for vocational rehabilitation services would interfere with their ability "to access education and competitive employment." Ex. 23 (Losasso Decl.) ¶ 11.

## III.    The Balance of the Equities and the Public Interest Favor a Preliminary Injunction.

The balance of the equities and the public interest strongly favor Plaintiffs. *See*, *e.g.*, *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (noting that the equities and the public interest "merge when the [g]overnment is the opposing party" (quoting *Nken*, 556 U.S. at 435)). "[T]he public has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of the Back Bay*, *Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006). And "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Because

Plaintiffs are likely to succeed on the merits of their claims that Defendants have acted unlawfully, *see supra* at 2–11, the equities and the public interest also demand relief.

Defendants' actions are also causing massive administrative burdens, uncertainty, and irreparable harms to Plaintiffs' economic interests—all of which ultimately harms the public. *See supra* at 15–24. Plaintiffs have detailed the devastating consequences of the Mass Termination and the March 21 Directive, and the many ways in which they will impair the functioning of public and higher education—essential governmental functions—in their states. *Id.* For these reasons, the public has a substantial interest in a functioning and effective Department. Yet this is impossible with nearly half of the Department's staff gone and key statutory duties being cast onto other agencies with no expertise.

On the other side of the scale, the federal government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Nat'l Insts. of Health*, 2025 WL 702163, at *32 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Defendants need only restore the status quo and allow the Department to resume the work Congress provided it.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Mass Termination and implementation of the President's March 21 Directive be preliminarily enjoined.

Dated: March 24, 2025

Respectfully submitted,

**ANDREA JOY CAMPBELL**
Attorney General for the Commonwealth
of Massachusetts

By: */s/ Katherine Dirks*
Katherine Dirks (BBO No. 673674)
  Chief State Trial Counsel
Yael Shavit (BBO No. 695333)
  Chief, Consumer Protection Division
Elizabeth Carnes Flynn (BBO No. 687708)
Nathaniel Hyman (BBO No. 698506)
  Assistant Attorneys General
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
yael.shavit@mass.gov
elizabeth.carnes-flynn@mass.gov
nathaniel.j.hyman@mass.gov

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
Solicitor General
Ewan C. Rayner*
Caitlyn B. Carpenter**
Deputy Solicitors General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov
ewan.rayner@hawaii.gov
caitlyn.b.carpenter@hawaii.gov

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
Molly Thomas-Jensen*
Special Counsel
Gina Bull*
Assistant Attorney General
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
molly.thomas-jensen@ag.ny.gov
gina.bull@ag.ny.gov

**ROB BONTA**
Attorney General for the State of California

By: */s/ Lucia Choi*
Lucia J. Choi*
Deputy Attorney General
Michael L. Newman**
Senior Assistant Attorney General
Srividya Panchalam*
James E. Stanley*
Supervising Deputy Attorneys General
Natasha A. Reyes*
Megan Rayburn**
Deputy Attorneys General
California Attorney General's Office
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6364
Lucia.Choi@doj.ca.gov
Michael.Newman@doj.ca.gov
Srividya.Panchalam@doj.ca.gov
James.Stanley@doj.ca.gov
Natasha.Reyes@doj.ca.gov
Megan.Rayburn@doj.ca.gov

**PHIL WEISER**
Attorney General for the State of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
Deputy Solicitor General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov


**KATHLEEN JENNINGS**
Attorney General for the State of Delaware

By: */s/ Ian R. Liston*
Ian R. Liston**
Director of Impact Litigation
Vanessa L. Kassab**
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov


**BRIAN L. SCHWALB**
Attorney General for the District of
Columbia

By: */s/ Andrew Mendrala*
Andrew Mendrala*
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.Mendrala@dc.gov


**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Clinten N. Garrett*
Clinten N. Garrett**
Senior Appellate Counsel
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov
ACL@azag.gov


**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Patrick Ring*
Patrick Ring*
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808 5020
Patrick.ring@ct.gov


**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Karyn L. Bass Ehler*
Karyn L. Bass Ehler*
Assistant Chief Deputy Attorney General
Katharine P. Roberts*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-4985
karyn.bassehler@ilag.gov
katharine.roberts@ilag.gov

**AARON M. FREY**
Attorney General for the State of
Maine

By: */s/ Sean D. Magenis*
Sean D. Magenis*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
(207) 626-8800
sean.d.magenis@maine.gov

**DANA NESSEL**
Attorney General for the People of
Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Kathleen Halloran*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
HalloranK1@michigan.gov

**AARON D. FORD**
Attorney General for the State of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney
General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Keith M. Jamieson*
Keith M. Jamieson*
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6960
kjamieson@oag.state.md.us

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Liz Kramer*
Liz Kramer*
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, MN, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

**MATTHEW J. PLATKIN**
Attorney General for the State of New Jersey

By: */s/ Jessica L. Palmer*
Jessica L. Palmer*
Andrew Simon*
*Deputy Attorney General*
25 Market Street
Trenton, NJ 08625-0093
(609) 696-4607
Jessica.Palmer@law.njoag.gov

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Elleanor H. Chin*
Elleanor H. Chin*
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
elleanor.chin@doj.oregon.gov


**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 793-1646
Jonathan.rose@vermont.gov


**JOSHUA L. KAUL**
Attorney General for the State of
Wisconsin

By: */s/ Charlotte Gibson*
Charlotte Gibson**
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 957-5218
gibsoncj@doj.state.wi.us


**PETER F. NERONHA**
Attorney General for the State of Rhode
Island

By: */s/ Kathryn T. Gradowski*
Kathryn T. Gradowski*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2810
kgradowski@riag.ri.gov


**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: */s/ Spencer W. Coates*
Spencer W. Coates*
Assistant Attorney General
Cristina Sepe*
Deputy Solicitor General
Office of the Washington State Attorney
General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
spencer.coates@atg.wa.gov
cristina.sepe@atg.wa.gov

*Admitted *Pro Hac Vice*
** Motion for *Pro Hac Vice* pending or
forthcoming

## CERTIFICATE OF SERVICE

I certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF), and will be provided to the following counsel for the defendants by email:

Brad Rosenberg
Special Counsel
Federal Programs Branch
U.S. Department of Justice
Brad.Rosenberg@usdoj.gov

Michael Bruns
Federal Programs Branch
U.S. Department of Justice
Michael.Bruns@usdoj.gov

Lee Reeves
Federal Programs Branch
U.S. Department of Justice
Lee.Reeves2@usdoj.gov

Michael Fitzgerald
Assistant United States Attorney
District of Massachusetts
Michael.Fitzgerald2@usdoj.gov

*/s/* Katherine Dirks
Katherine Dirks