# EXHIBIT 13

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>　Plaintiffs,<br><br>　　　v.<br><br>LINDA McMAHON, *et al.*,<br><br>　Defendants. | C.A. No. 1:25-cv-10601<br><br>**DECLARATION OF TONY THURMOND** |

## DECLARATION OF TONY THURMOND

I, Tony Thurmond, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.     I am the Superintendent of Public Instruction for the State of California. I have served in this role since January 2019. As the Superintendent of Public Instruction, I am the state official who oversees the California Department of Education (CDE), which provides leadership, assistance, oversight, and resources.

3.     As the Superintendent of Public Instruction, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff.

4.     I hold dual master's degrees in Law and Social Policy and Social Work from Bryn Mawr College. Prior to becoming Superintendent of Public Instruction, I was an educator, social worker, and elected official. From 2008-2012, I served on the West Contra Costa School Board, where, among other things, I helped build new schools, increase funding for counseling, after-

1

school, music, and athletic programs, reduce school suspensions by 27%, and bring nutrition and wellness programs to our schools. In the State Assembly, I championed legislation to, among other things, expand free school lunch programs, improve access for families for early education and childcare, and shift millions of dollars directly from prisons to schools.

5.      I am providing this declaration in connection with the announcement by the Department of Education ("the Department") on March 11, 2025, that it would be reducing its staff by nearly 50% as part of the Department's "final mission." *U.S. Department of Education Initiates Reduction in Force*, Press Release, Department of Education (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("March 11 Press Release").

6.      I understand from reviewing the March 11 Press Release that the Department initiated a reduction in force (RIF) impacting nearly 50% of the Department's workforce; that the RIF affected all divisions within the Department, with some divisions undergoing significant reorganization; and that impacted Department staff will be placed on administrative leave beginning Friday, March 21, 2025.

7.      I understand that the Department confirmed the RIF in a letter the CDE received on March 14, 2025, from the Principal Deputy Assistant Secretary and Acting Assistant Secretary from the Department's Office of Elementary and Secondary Education (OESE) (March 14 Letter) and have reviewed this letter. It is my understanding that while the Department makes assurances in the letter that "critical functions for elementary and secondary education will not be impacted by these cuts," it also confirms several cuts that would cause substantial harm to elementary and secondary education in the State and simply omits several others.

8.    I submit this declaration to explain more generally the harms to the State that are or might be caused by the March 11 RIF.

### Background on California's Educational System

9.    As the Superintendent of Public Instruction, I provide education policy direction and oversight to the largest common school system of public schools in the nation, which includes 1,019 school districts, 11,278 schools, and 5,837,690 students.  Of these students, 2.6 million are in grades K-5; 1.3 million are in grades 6-8; and nearly two million are in grades 9-12.  In 2018-2019, 48.6 percent of California students were female and 51.4 percent of those students were male.

10.    All California public schools receive federal funds from the Department of Education. As a result, California public schools are subject to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., the Every Student Succeeds Act (ESSA), 23 U.S.C. § 6301, and other federal and state education-related laws.

11.    California, the CDE, and the Local Education Agencies (LEAs) within the State also receive guidance and technical assistance from the Department, including on topics related to funding requirements and disbursements, program implementation, civil rights matters, and policies aimed at improving academic achievement. They also engage in data- and information-sharing with the Department.

12.    The CDE's mission is to innovate and collaborate with educators, schools, parents, districts, and community partners to ensure that all of California's 5.8 million public school students—across more than 9,000 schools—have access to a world-class education. Our aim is to prepare students to live, work, and thrive in a multicultural, multilingual, and highly connected world.

13.     Consistent with federal and state laws, LEAs within the State serve all school-age children, regardless of their race, nationality, ethnic origin, sex, gender, religion, disability, or immigration status. An LEA—such as a school district—is a public authority legally constituted by the State as an administrative agency to provide control of and direction for kindergarten through grade twelve public educational institutions.

14.     As described below, it is my understanding that any impacts to the Department's administration of federal funding, programs, and services because of the RIF—which eliminates nearly 50% of the Department's workforce—would inflict significant harm upon the CDE's efforts to provide public education to all children in California.

**The Department's Federal Funding for Public Education in California**

15.     California relies on federal funding from the Department of Education to provide public education to millions of preschool and school-age children.

16.      The Department provides about $7.9 billion annually in support of California's public education system. This includes funding for Title I to support low-income families, IDEA for students with disabilities, school lunch programs, services to families living on military bases, Indian reservations and post-secondary financial aid.

ESSA Funding and Programs

17.     California receives federal funds under various parts of the ESSA to support many critical aspects of education programming. For example, the ESSA requires state educational agencies, such as the California Department of Education (CDE), to determine school eligibility for Comprehensive Support and Improvement ("CSI").  LEAs with schools that are eligible for CSI must partner with stakeholders to develop and implement a school plan for the school to improve student outcomes.  The federal government provides states with grant funding each year

4

to support these activities.  For the 2024-2025 Fiscal Year, the State has been allocated approximately $144 million in ESSA federal grants.

18.     Title I, Part A of the ESSA is a federal categorical program designed to ensure that all children have a fair and equal opportunity to obtain a high-quality education and reach, at a minimum, proficiency in the state content standards and assessments.  This funding is intended to meet the educational needs of low-achieving students enrolled in the highest poverty schools. California has been apportioned more than $2 billion to meet the needs of some of its most vulnerable students under Title I, Part A for the 2024-2025 fiscal year.

19.     Under Title I, Part B of the ESSA, State Assessment Formula Grants, California has been apportioned almost $27 million for the 2024-2025 fiscal year.

20.     Under Title I, Part C of the ESSA, Education of Migratory Children, California has been apportioned over $120 million of the 2024-2025 fiscal year.

21.     Title I, Part D, Subpart 2 of the ESSA, also called "The Prevention and Intervention Programs for Children and Youth Who Are Neglected, Delinquent, or At-Risk" is a federal categorical program that provides financial assistance to LEAs' programs that serve students who are neglected, delinquent, or at-risk.  California has been apportioned almost $17 million under Title I, Part D, Subpart 2 for the 2024-2025 fiscal year.

22.     Title II, Part A of the ESSA, referred to as "Supporting Effective Instruction," is a federal categorical program that provides supplemental activities that strengthen the quality and effectiveness of teachers, principals, and other school leaders to increase student achievement consistent with challenging state academic standards.  California has been apportioned more than $232 million to support effective instruction under Title II, Part A, during the 2024-2025 fiscal year.

23.     Under Title III, Part A of the ESSA, referred to as English Language Acquisition, Language Enhancement, and Academic Achievement, California has been apportioned more than $157 million for the 2024-2025 fiscal year.

24.     Title IV, Part A of the ESSA, referred to as the "Student Support and Academic Enrichment Program" is a federal categorical program that provides funds to increase the capacity of LEAs to provide a well-rounded education, improve school conditions for student learning, and improve the use of technology in order to improve the academic achievement and digital literacy of all students.  California has been apportioned more than $152 million to meet these goals under Title IV, Part A during the 2024-2025 fiscal year.

25.     Title IV, Part A of the ESSA is referred to as the 21st Century Community Learning Centers.  The purpose of the program as described in federal statute is to provide opportunities for communities to establish or expand activities that focus on improved academic achievement; enrichment services that reinforce and complement the academic program; and family literacy and related educational development services.  California has been apportioned more than $146 million under Title IV, Part B for the 2024-2025 fiscal year.

26.     Title V, Part B, Subpart 2 of the ESSA is referred to as the Rural and Low-income School Program.  California has been apportioned more than $5 million under this program for the 2024-2025 fiscal year.

27.     Under the McKinney-Vento Education for Homeless Children and Youth program, California has been apportioned more than $15 million for the 2024-2025 school year.

28.     In the Department's Office of Migrant Education, there is now a delay in preliminary grant projections that programs within California rely upon to plan their services for the upcoming fiscal year to avoid interruptions in services. By this time of the year annually,

programs should have already been offered two to three estimates for the next fiscal year, allowing for the state educational agency and LEAs (migrant regions) to plan for staff size, initiate contracts, and prepare for direct supports to students and families, including upcoming summer programs. The RIF thus interrupts critical services to support high quality and comprehensive educational programs for U.S.-born and immigrant migratory children designed to help reduce the educational disruption and other issues resulting from repeated moves as families migrate for work in the agriculture, dairy, lumber, and fishing industries.

29.     The grants and programs described above are an illustrative, rather than exhaustive list, of the types of federal funds from the Department under the ESSA that currently support the education of children in grades K-12 in California. Proper administration of grants and programs is critical to allow for services for students to continue, without disruption to their learning and academic environment.

Special Education Funding and Programs

30.     California also receives federal funds from the Department under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 et seq., which provides that schools are responsible for providing a free appropriate public education to students with disabilities. 20 U.S.C. § 1412(a). This includes special education and related services. *Id.*

31.     The CDE's Special Education Division oversees special education programs and services for students with disabilities in California.

32.     Funding for special education is meant to cover the additional costs that are associated with educating students with disabilities due to their disability. In California, there are three main sources of special education funding: (1) the federal government, as part of the IDEA; (2) the State; and (3) school district and charter school LEAs. For the school year 2024-25,

California received $1.5 billion in special education funding from the federal government. The State allocated $4.8 billion for special education, and LEAs, using unrestricted funds, covered the remaining approximately $8 billion in special education costs.

33.     The CDE receives funding under three provisions of the IDEA: Part B, Section 611 (Grants to States Program); Part B, Section 619 (Preschool Grants Program); and Part C (Grants for Infants and Families Program). Approximately $34 million of the 2024-25 IDEA, Part B, Section 619, Federal Preschool Grant funding is specifically allocated for special education and services to children with disabilities for preschool children ages three, four, and five.

34.     The reduction in workforce at the Department could significantly impact access to funds and services for special education students and programs in California. Fewer staff members could lead to delays in processing grants, distributing funds, and providing technical assistance, making it harder for states to implement and maintain essential programs under the IDEA. Any delays in receiving IDEA funding because of the RIF would significantly impact the CDE's Special Education Division, which relies on these funds to support essential operations.

35.     Without these funds, there would be disruption to educational services provided to students with disabilities, loss of related services (such as physical therapy, speech therapy, occupational therapy, and services for deaf or blind students), and delayed or reduced payments to staff and potential layoffs. Compliance monitoring and oversight may also weaken, increasing the risk of misallocated resources or gaps in services for students with disabilities.

36.     Additionally, reduced staffing could limit the Department's ability to support state agencies with guidance, policy updates, and professional development, potentially hindering efforts to improve educational outcomes. Ultimately, these challenges may create barriers to

timely and equitable access to special education funding and services, impacting the quality of education for students with disabilities nationwide.

Perkins V Funding and Programs

37.    In addition to ESSA funding and IDEA funding, the State receives federal financial assistance under Perkins V, the Carl D. Perkins Career and Technical Education Act of 2006, as amended by the Strengthening Career and Technical Education for the 21st Century Act. California has been apportioned approximately $141 million for vocational education for the 2024-2025 fiscal year.

38.    The Department's Office of Career Technical and Adult Education (OCTAE) provides technical assistance to the CDE on matters in relation to Perkins V Act and the Workforce Innovation and Opportunity Act, Title II AEFLA Act.  Staff at OCTAE assist California with grant and reporting requirements within the two acts overseen by their office and provide critical training and assistance as needed.

COVID Relief Funds

39.    In 2021, Congress passed the American Rescue Plan Act (hereinafter "ARP"), and thereby provided federal stimulus funding for schools impacted by the COVID-19 pandemic. As part of its ARP stimulus package for schools, Congress set aside $2.75 billion for the Emergency Assistance to Non-Public Schools program (hereinafter "ARP EANS").  Under the ARP EANS, Congress has made available funds for states "to provide services or assistance to non-public schools that enroll a significant percentage of low-income students and are most impacted by the [COVID-19] emergency."  ARP EANS funds are to be used, for example, for the improvement of ventilation systems; the purchase of supplies to sanitize, disinfect, and clean

school facilities; and the development of instructional plans to address learning loss in consequence to the pandemic.

40.    While the last day to obligate COVID-19 Relief Funding was September 30, 2024, State Educational Agencies had the opportunity to submit a late liquidation request on behalf of LEAs.  On December 9, 2024, the CDE requested an extension to the ARP Elementary and Secondary School Emergency Relief (ESSER) fund liquidation for all funds and obligations in the amount of $152,450,001.72. On February 11, 2025, California amended its approved liquidation extension request to reflect the additional funds from the Expanded Learning Division that required a liquidation extension in the amount of $29,949,690.41, which increased the total to $182,399,692.13. The Department subsequently approved the amendment on February 12, 2025.  The extension was necessary to ensure that LEAs can continue implementing critical initiatives that promote the academic recovery of students, allowing these efforts to be fully achieved and sustained over time. The Department approved the CDE's application.

41.    The obligations made by LEAs with ARP ESSER funds directly support the academic recovery of students throughout the state who have been impacted by the pandemic. Many of these investments are focused on strategies addressing learning gaps, re-engaging students, and supporting long-term academic growth. The additional liquidation time enables LEAs to continue to enhance instruction, and refine curriculum to further support students, and ultimately strengthen the academic trajectory of students across our state. This extension allows LEAs to liquidate the funds until March 31, 2026.

42.    Because of this extension of time, the CDE will make numerous funding drawdown requests to the Department over time until 2026, so it is very important to continue to

maintain constant and consistent communication with the Department. I understand that the RIF

has eliminated employees from the Office of Elementary School and Secondary Education

(OESE) who oversaw COVID pandemic relief funds.

43.     On February 19, 2025, Acting Secretary Carter issued a Program Memorandum

that effectively changed disbursement from the "advancement method" to the "standard

reimbursement method" used by the Department as to other grants and expenditures.  The

Department adopted this change with immediate effect, without prior notice to the CDE.  This

updated guidance related to all future payments related to the Coronavirus Aid, Relief, and

Economic Security (CARES) Act, the Coronavirus Response and Relief Supplemental

Appropriations (CRRSA) Act, and the American Rescue Plan (ARP) Act programs shifting to

the Department's standard reimbursement payment structure along with subsequent payment

Liquidation Payment Request Instructions issued on February 25, 2025. The CDE cash

management system operates consistent with the requirements established in Title 2, Code of

Federal Regulations, Part 200 (Uniform Guidance), Section 305 for advance payments.  The

CDE worked closely with the Department of Education as a valued partner over several years to

successfully design and implement a comprehensive department-wide cash management system

for federal funds. (See also Cash Management Improvement Act Agreement between the State of

California and the Secretary of the Treasury, U.S. Department of the Treasury).  The Policy

Change would effectively force the CDE to alter its own budget unexpectedly to accommodate

the Policy Change's reimbursement structure, and to incur additional costs associated with

implementing internal policies and schemes that can appropriately follow that reimbursement

structure without jeopardizing the CDE's access to ARP EANS funds.  For the CDE to be able to

aid students in the manner intended by the COVID relief funds, and specifically the EANS

funds, it must be able to effectively communicate and work with the staff at the Department who are familiar with the CDE's programs operations.

44.     The RIF has led to an inability to communicate, at least efficiently, with the Department.  For example, the CDE was advised on March 12, 2025, to contact Adam Honeysett, Director, State and Local Engagement, Office of Communications and Outreach and Hayley Sanon, Principal Deputy Assistant Secretary and Acting Assistant Secretary in the Office of Elementary and Secondary Education regarding the EANS (COVID-relief funds) drawdown payments.  However, on March 17, 2025, upon sending an email to Adam Honeysett and Hayley Sanon to obtain an update on outstanding EANS drawdowns, as it understood it was meant to do, the CDE received a response from the Department's Office of Communications and Outreach (Adam Honeysett), saying: "Thank you for reaching out to the U.S. Department of Education.  All correspondence related to the Elementary and Secondary School Emergency Relief (ESSER) Fund should now be directed to ESSERF@ed.gov.  If you sent anything related to ESSER since March 11, 2025, please resend it to ESSERF@ed.gov for proper handling."

45.     To add more to the confusion, on March 17, 2025 at 4:56 p.m., the CDE received an email from Mark Washington, Deputy Assistant Secretary, Office of Elementary and Secondary Education titled, "COVID PAYMENT APPROVAL PROCESS – California Approved for Route Payment" addressing the CDE specifically to state the following: "Per your U.S. Treasury-State agreement, your Education Stabilization Fund and American Rescue Plan Act payments spent on allowable expenditures may be drawn down through route payment approval process."  This email did not define the next steps, so the CDE's Accounting Office proceeded to investigate the status of the drawdowns through the G5 system on March 18, 2025, on the recently-requested drawdowns totaling $7.1 million, and the CDE confirmed that the

payment was submitted and the drawdown is identified as routed for payment, but to my knowledge the CDE has not yet received the requested funds. These delays and mixed messages potentially adversely affect California's LEAs and may cause irreparable harm to our students, staff, and families.

46.     In the few weeks since its adoption, the Department's Policy Change (changing disbursement from the "advancement method" to the "standard reimbursement method") has already had a significant detrimental impact on the CDE's access to ARP EANS funds. The CDE has incurred costs with vendors and third parties that it expected to receive ARP EANS funding coverage for, but for which it is now being blocked from receiving. In accordance with the ARP Act, the CDE obligated EANS funds through contractual agreements with vendors to provide services to non-public schools and relied on the vendors' invoices as the documentation to support accessing and drawing down the federal funding. However, the Department suddenly departed from the established procedures and the CDE can no longer draw down federal ARP EANS funds without first paying the vendors/third parties using their own general fund, which the CDE does not have sufficient funding to support. Since the change in policy late last month, the CDE has had an ARP EANS drawdown effectively denied by the Department (totaling approximately $2.5 million), and another EANS drawdown for $4.5 million appears to have been frozen or otherwise delayed/denied. Additionally, the CDE expects to have the need very shortly for an additional EANS drawdown. The new policy has forced the CDE into a catch-22 situation, and the reduction of staff at the Department has rendered it difficult to work with the Department to resolve this problem.

**Other Resources Provided by the Department of Education**

13

47. The Department of Education provides several other critical resources to the State.

48. In addition to providing financial assistance, the Department provides support to state educational agencies like the CDE through research, evaluation, sharing of information, and technical assistance.

49. This support includes technical assistance in grant and program management, so that the State can meet all requirements to receive federal funding, such as submitting all the necessary reports to the Department. The Department also creates resources to support California educators and school districts in meeting academic standards, providing education to children who are English language learners, addressing school safety, bullying, and chronic absenteeism, and other important topics. The Department usually provides resources and references on their website, sends frequent email communications, or offers webinars to help states walk through reporting requirements. Unfortunately, a significant amount of information related to grants has been removed from the Department's website, making it very challenging to locate information that was pertinent to the daily workload.

<u>Institute of Educational Sciences</u>

50. The Institute of Education Sciences (IES) is the statistics, research, and evaluation arm of the U.S. Department of Education. Its mission is to provide scientific evidence on which to ground education practice and policy and to share this information in formats that are useful and accessible to educators, parents, policymakers, researchers, and the public. I understand that the IES was significantly affected in the RIF.

51. Without the information, data, and research that the IES provides, the State would not be able to measure outcomes or overall impacts of programs to students, and these measures

are what inform the State's actions to effectively deliver education and services to the State's students and improve academic achievement.

52.    For example, the National Center for Education Statistics within the IES conducts research, collect and analyze data, and provide technical assistance to state policymakers on a range of topics aimed at improving academic achievement for all children and ensuring the effectiveness of educational programs. The National Center for Education Statistics also implements the National Forum on Education Statistics (the Forum) which "is a voluntary, democratic, participative group that is committed to improving the quality, comparability, and usefulness of elementary and secondary education data while remaining sensitive to data burden concerns. The mission of the Forum is to plan, recommend, and develop education data resources that will support local, state, and national efforts to improve public and private education throughout the United States." National Center for Education Statistics, *National Forum on Education Statistics,* https://nces.ed.gov/forum/. The Forum provides one of the few opportunities for State Educational Agencies to collaborate, innovate, and engage on critical data issues impacting states.

53.    The IES also contracts with a vendor that operates the ED*Facts* initiative. Data are submitted by states under the ED*Facts* initiative. Foundational to ED*Facts* is the Common Core of Data (CCD) collection. Through this collection, states report standard directory information from every school and district in the country, data on full-time equivalent teachers and staff, data on the number of students eligible for free or reduced priced meals under the national school lunch program (NSLP), and fiscal data including revenues and expenditures. Additionally, through ED*Facts*, states report important programmatic and accountability information, including outcomes and measures related to IDEA, ESSA, and all of the Title

15

programs. This critical information is used to apply for federal grant funding and submit Congressionally mandated annual reports. This information is also used for cross-state and national research "at the core of decision and policymaking in education." U.S. Department of Education, *The EDFacts Initiative,* https://www.ed.gov/data/edfacts-initiative. The ED*Facts* Data Collection allows the CDE to place California's data story within a broader context of the United States as a whole. The Department uses these data for a variety of purposes. The data are used for research, policy, and decision making. They are also used for program compliance and the federal budgeting process, as well as used for continuous process improvement. These data are valuable data sets, allowing researchers and policymakers to conduct cross-state, longitudinal research and analyses. Federal and state policymakers can similarly use these data to inform legislative efforts to develop, implement, and monitor education policies and laws.

<u>Office for Civil Rights</u>

54.    The Department's Office for Civil Rights (OCR) enforces and investigates alleged violations of various federal civil rights laws that protect students against discrimination, including Title VI of the Civil Rights Act of 1964("Title VI"), Title IX of the Education Amendments of 1972, as amended ("Title IX"), Section 504 of the Rehabilitation Act of 1973, as amended ("Section 504"), and Title II of the Americans with Disabilities Act ("Title II") and their implementing regulations.

55.    The OCR provides the following critical functions as it interrelates with the CDE:

a.    Oversees the Methods of Administration (MOA) program, which requires each state to conduct civil rights compliance reviews of schools with active career and technical education (CTE) programs. Through this program, OCR works to ensure that all students—regardless of race, color,

national origin, sex, or disability—have equal access to high-quality CTE

programs that prepare them for academic and professional success.

b. Enforces the Boy Scouts of America Equal Access Act, ensuring that

public schools provide equal access to the use of their facilities for

designated youth groups.

c. Provides technical assistance to local educational agencies, families and

students, and state agencies on civil rights matters, including issues related

to discrimination or harassment based on race, color, national origin, sex,

disability, and age.

56.     OCR provides the following guidance and services to assist the CDE's Office of

Equal Opportunity:

a. Provides best practices and guidance for conducting the civil rights review

process. Gives practical guidance and samples/templates on the

components of a review, which includes data analysis; a review of

publications, policies, and procedures; website review; interviews; and a

facilities review.

b. Collects Letters of Findings (LOFs) issued to school sites after the

compliance reviews for biennium feedback.

c. Provides monitoring and accountability for voluntary compliance plans

(VCPs) that include implementation of required corrective actions to be

taken by the LEA. VCPs are submitted to OCR each biennium and are

continuously monitored by OCR until it a VCP is resolved.

    d.   Provides feedback on reports including praise for notable practices and improvements or flagging significant legal concerns at issue in LEAs, providing informal guidance to the field on compliance.

57.    OCR also conducts an annual training conference for MOA Coordinators and State CTE Directors and provides ongoing MOA technical assistance daily. OCR provides in-depth, hands-on training to MOA Coordinators and other state agency representatives on specific civil rights issues along with techniques for all areas of the MOA process such as targeting specific subrecipients, conducting on-site reviews, writing Letters of Findings (LOFs) and VCPs, monitoring, and writing reports to OCR.

58.    OCR provides an important avenue for persons to file complaints about, and achieve resolution of, alleged discrimination in local educational agencies. OCR also often investigates resource-intensive complaints of "systemic" discrimination in local educational agencies.

59.    I understand that the Department has eliminated the majority of OCR offices and staff through the RIF, including the San Francisco regional office that serves California.

60.    Without the assistance of OCR, LEAs will be left to interpret federal law inconsistently as the trainings and guidance provided by OCR have been instrumental in providing a consistent basis from which LEAs can adhere to the provisions of the statutory and regulatory framework. The burden will fall to individual state education authorities such as the CDE to fill those gaps and to address the increasing number of complaints because there is no federal agency to provide guidance, enforcement, and education on compliance with the federal laws and regulations.

61.     Eliminating a majority of offices and staff in the Department's Office for Civil Rights will burden the State's resources. The closure of the regional office in San Francisco specifically will have a huge impact because potential complainants will have to access other resources. As noted above, this will strain the resources of the CDE's The Office of Equal Opportunity, which ensures compliance with state and federal civil rights laws and regulations in the delivery of education services.

62.     Also, if complainants cannot as a practical matter go to OCR, there will be an increased burden on the CDE's Uniform Complaint Procedure system, in which local educational agencies investigate complaints of discrimination based on a protected characteristic, and complainants dissatisfied with the result can appeal to the CDE. (The CDE also has discretionary authority to directly investigate.) By placing a workload on the CDE that is beyond its current capacity and requires additional resources (including for more complex "systemic" cases), the RIF will place a strain on the state budget. Also, school districts in California, already dealing with budget deficits and staffing shortages, would struggle to take on additional investigations.

63.     Ultimately, a major reduction in force will impact students' equitable access to programs and result in decreased enforcement of and accountability for federal civil rights laws in the State. It could lead to unresolved discrimination issues and consequently noncompliance with state and federal civil rights laws and regulations.

<u>McKinney-Vento Guidance</u>

64.     The CDE also receives guidance from the Department relating to the education rights of students who are homeless under the McKinney-Vento Homeless Assistance Act, 42 U.S.C. §§ 11301–11481.

<u>Office of Elementary and Secondary Education's State and Grantee Relations Team</u>

65.    The CDE receives support from the Department's Office of Elementary and Secondary Education's State and Grantee Relations Team by receiving technical assistance and information in grant and program management, so that the CDE can implement and maintain essential programs. An elimination of the office is significant. It was integral in overall communications for ESSER, Governor's Emergency Education Relief (GEER), and Emergency Assistance to Non-Public Schools (EANS) grants and working with the Department's staff when there was a need for further assistance.  The work continues for the State Education Agencies and LEAs and at least until the liquidation period ends in March 31, 2026 for ESSER III funding, so removing this office now seems counterintuitive and counterproductive.

<u>English Language Acquisition, Language Enhancement, and Academic Achievement</u>

66.    The Department's Office of English Language Acquisition, Language Enhancement and Academic Achievement for Limited English Proficient Students oversees the policy for the education needs of linguistically and culturally diverse students. The Office of English Language Acquisition, or OELA, supports the CDE in offering timely Title III guidance through responsive by-request meetings, webinars, and office hours, and both direct and mass email communication and updates; providing technical assistance to support program implementation; developing resources to implement programs supportive of English learner students including but not limited to dual language immersion programs, informing and engaging parents, and robust toolkits. The CDE's Multilingual Support Division and Language Policy and Leadership Office communicates with the Office of English Language Acquisition to offer clarity around program implementation requirements to support U.S.-born and immigrant

English learner students. The reduction in force will hamper the CDE's efforts to provide clear

guidance and support for local educational agencies, parents and students.

<u>Office of General Counsel</u>

67.     The CDE has connected with the Department's Office of General Counsel

regarding ESSA or IDEA grants and other matters. In particular, three attorneys from the Office

of General Counsel have participated for a number of years in a regular monthly meeting with

the CDE regarding Title I.  All of these attorneys are subject to the RIF.  These attorneys have

had significant involvement with the CDE in working through appeals and potential solutions on

cases involving equitable services for private schools under Title I. This will negatively impact

the CDE's ability to reach resolutions of Title I equitable services disputes that are acceptable to

all parties.  Understanding the legal basis underpinning the various complex methodologies for

calculating the apportionment by the LEAs has been invaluable to the CDE's ability to

effectively monitor and enforce the provisions of Title I to ensure compliance with the federal

laws and guidance.

**Substantial and Irreparable Harm**

68.     Cutting nearly half of the Department's workforce will cause irreparable harm

and jeopardize the education funding, programs, and services provided for millions for preschool

and school-age children in California. The RIF will cause delay, confusion, and uncertainty and

may impact the State's ability to access funding and critical information and support.

69.     Any delay because of the RIF in either appropriations, administration, or

disbursement of federal funds will have an immediate and devastating impact on the CDE and

the State. Even if Department staff that oversee the funding programs were not impacted by the

RIF, any cuts in staff who handle other critical management of functions, such as administrative

and back-end capabilities, will impact the State's ability to receive and access the funds. Any delay in payments could cause layoffs or suspension of services to students in need and disruption to student learning.

70.    Untimely approvals and drawing of funds will significantly impact the State. Not only will that harm the State's LEAs and students, but it will impact State payroll. As described above, the State has already experienced challenges in accessing certain funds, such as the COVID-19 pandemic relief funds.

71.    Additionally, the CDE will not be able to timely reimburse vendors or LEAs, to whom the CDE has provided funds upfront for costs. This can in turn place extra strain on vendors who may have to stop providing services because they cannot afford to do so without payment. For example, we would not be able to reimburse grantees of the Comprehensive Literacy State Development Grant and the 21st Century School Leadership Programs for already expended funds.

72.    The RIF and other major disturbances in the Department of Education cause much chaos and uncertainty for agencies like the CDE. Aside from the March 14 letter to Chief State School Officers, there has been no information from the Department as to which staff specifically were part of the RIF.

73.    Uncertainty exists in current long-term projects. For example, an entity that contracts with the State that received funds through the Department's Institute of Education Sciences (IES) are currently in the midst of a 3-year study focusing on foster youth students and education stability. Research questions examine how state and federal mandates influence school mobility and how the COVID-19 pandemic affected the educational outcomes of students in foster care. In addition, it seeks to identify effective strategies to improve educational stability

and close the opportunity gaps for foster youth students. With the reduction of IES staff, the future of this study and other critical IES programs and services are uncertain.

74.     With the huge RIF, communication with the Department will be more difficult and delayed. As described above, the State relies on communicating with the Department to ensure that we are meeting all our requirements of the federal programs, such as providing all the necessary reports to the Department. Without anyone from the Department to provide guidance, the CDE will be left confused as to how to meet our obligations to keep receiving and disbursing federal funds. The CDE would have extreme difficulty providing our oversight role in ensuring that the funds awarded comply with the legislative intent of the awards or grants.

75.     I am concerned that communication with the Department will be delayed because of the RIF, especially with the loss of significant institutional knowledge from experienced staff. For example, before the RIF, the CDE received daily missives from the Department of Education, such as grantee communications. That daily communication stopped. Before the RIF, the CDE received weekly and almost daily missives from the Department of Education, detailing things like briefings on Administrative Budget Requests, reminders and notifications on behalf of the Secretary of Education or other senior executive leadership, key communications to State Superintendents regarding overall monitoring of Grant Financial Data in the Grants Management Systems, and press releases in real time. These communications are now less frequent and are inconsistent in relaying crucial information. Since the Office of State & Grantee Relations (SGR) under the Office of Elementary and Secondary Education was eliminated due to the RIF, this also impacts any kind of communications or concerns to SGR. For example, on a weekly basis, SGR sent out an electronic bulletin ("SGR Newsflash") which provided updates and communications to all grantees under Elementary and Secondary School Emergency Relief

23

(ESSER), Governor's Emergency Education Relief (GEER), and Emergency Assistance to Non-Public Schools (EANS). This bulletin would frequently provide deadlines and announcements, grantee resources, and other relevant information. This was often an opportunity for state educational agencies to locate information related to annual performance reporting deadlines and ask any questions to maintain a constant communication with the Department in order to maintain compliance. The last SGR Newsflash received by the Department was on January 13, 2025. This information discontinuation adds to the uncertainty and confusion created by the RIF.

76.    As outlined above, California relies on federal funding and resources from the Department of Education to provide public education to millions of preschool and school-age children. If federal funding is delayed or critical supports are discontinued due to the Department's RIF, it will do immeasurable harm to our schools and educators to rely on funding and resources to provide education to millions of children.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on March 19, 2025, at Honolulu, Hawaii.

_____
Tony Thurmond