# EXHIBIT 46

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>  Plaintiffs,<br><br>    v.<br><br>LINDA McMAHON, *et al.*,<br><br>  Defendants. | C.A. No. 1:25-cv-10601<br><br>**DECLARATION** |

### DECLARATION OF ARNE DUNCAN

I, Arne Duncan, declare as follows:

1.  I am a resident of the State of Illinois. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.  I served as the United States Secretary of Education from January 21, 2009 through January 1, 2016. During that time, I worked extensively on all aspects of the United States education system, from pre-kindergarten through higher education. I assisted in securing congressional support for increased investments in education, including funding for additional teacher jobs; increases in Pell grants; reform efforts such as Race to the Top and Investing in Innovation; and interventions in low-performing schools. I oversaw interventions to avoid teacher layoffs and fund expanded early learning programs. Under my leadership, the Department invested billions of dollars to transform struggling schools. I also worked to advance initiatives related to college access and affordability, including by securing increases in the Pell grant program and enhancements in student loan income-based repayment programs.

1

3. Prior to becoming Secretary of Education, I served as the Chief Executive Officer of the Chicago Public Schools from June 2001 through December 2008. During my tenure, I advanced critical initiatives to improve services for students, including opening more than 100 new schools; expanding after-school and summer learning programs; closing down underperforming schools; increasing early childhood and college access; dramatically boosting the caliber of teachers; and building public-private partnerships around a variety of education initiatives. During my tenure, the districts saw significant increases in student performance on national and state tests, increasing graduation rates and the numbers of students taking Advanced Placement courses, and recruitment efforts for bringing top teaching talent into the city's classrooms.

4. As a former Secretary of Education, I have personal knowledge of the matters set forth below. This includes, among others, a unique and specific understanding of both the extensive statutory mandates that the Department of Education ("the Department") oversees and implements as well as the operational and personnel needs that are necessary to fulfill them.

5. I submit this declaration in connection with the announcement by the Department on March 11, 2025 that it would be reducing its staff by around 50% ("reduction in force") and that this was only the "first step" to a "total shutdown" of the Department, *U.S. Department of Education Initiates Reduction in Force*, Press Release, Department of Education (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("March 11 Press Release"), and the subsequent executive order signed by President Trump on March 20, 2025, titled "Improving Education Outcomes by Empowering Parents, States, and Communities" (the "Executive Order") which orders the Secretary of Education to "take all necessary steps to facilitate the closure of the Department of Education and return authority over

education to the States and local communities while ensuring the effective and uninterrupted delivery of services, programs, and benefits on which Americans rely."

6. Every Cabinet Secretary must swear to defend our Constitution and our democracy "from all enemies, domestic and foreign." To me, fealty to this oath required maximizing the Department's specialized expertise and resources to ensure that every American had access to the best possible educational opportunities. From a national security perspective, the best defense is a strong military. A strong education is the best offense. The United States of America has a strong offense, in large part because of the Department's work. It is not an exaggeration to say that every American who has attended a school in America – at any level – has benefited from the Department's work.

7. The Department has three overarching functions: equity, excellence, and innovation. During my tenure, the Department accomplished historic feats to support these functions, directly increasing America's competitiveness in the global economy. For example, more than 30 states increased their investment in early childhood education. Nearly every state in America raised standards for teaching and learning, and high school graduation rate reached an all-time high. The Department's work helped millions more families afford college, and more Americans graduated from college than ever before.

8. A significant portion of the Department's work is determined by federal statutory mandates. Several vital Department offices are tasked with statutory mandates, including the Office of Federal Student Aid ("FSA"), the Office for Civil Rights ("OCR"), the Office of Postsecondary Education, the Institute of Education Sciences (including the National Center for Education Statistics), and the Office of General Counsel. Having led the Department of the

Education for seven years (the second longest tenure of any Secretary of Education), I know the minimum personnel necessary to comply with these statutory mandates.

9. Put simply, the Department cannot meet its statutory obligations at the levels of staffing proposed by the Defendants; and the result of this nearly 50% reduction in Department staff will be catastrophic for the American people and its students. Even before the reduction in force, and in spite of its extraordinary mission, the Department already had the smallest staff of the 15 Cabinet agencies, even though its discretionary budget alone is the third largest in the federal government.

10. FSA, for example, administers trillions of dollars in grant money that benefit millions of students; they cannot fulfill their legal duties with the proposed reduction in force. The American public will bear the brunt of this disastrous decision as loans will be delayed, time sensitive questions from the States will remain unanswered, and innocent Americans will have their educational dreams delayed or denied.

11. The risk of noncompliance with federal mandates due to the dismantling of the Department is extremely high. Splitting the Department's statutory mandate between other agencies will create a nightmare for state and local governments. In my opinion, the Department's level of expertise and efficiency cannot be duplicated by another federal agency or the States because they do not have the requisite skills and training to handle the Department's many specialized functions.

12. The Department has been in existence in some form since 1867. During the intervening 158 years, the Department has been steadfast in supporting the American people through the toughest of times – from overseeing the original land grant colleges under President Lincoln to the administration of the GI Bill (which sent 8 million WWII heroes to school) to

providing loans to students during the Cold War to keep America competitive with the former Soviet Union. The Department has evolved to serve America's most critical educational needs and with the appropriate staff it will continue to do so.

13. When Congress first created the Department as a cabinet-level agency in 1979 with bipartisan support, it declared the following purposes:

    a. to strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual;

    b. to supplement and complement the efforts of States, the local school systems and other instrumentalities of the States, the private sector, public and private educational institutions, public and private nonprofit educational research institutions, community-based organizations, parents, and students to improve the quality of education;

    c. to encourage the increased involvement of the public, parents, and students in Federal education programs;

    d. to promote improvements in the quality and usefulness of education through federally supported research, evaluation, and sharing of information;

    e. to improve the coordination of Federal education programs;

    f. to improve the management and efficiency of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds, as well as the reduction of unnecessary and duplicative burdens and constraints, including unnecessary paperwork, on the recipients of Federal funds;

       g. and to increase the accountability of Federal education programs to the President, the Congress and the public. (Section 102, Public Law 96-88).

14. The legislative history dating back to the creation of the Department makes clear that these goals were paramount, and that the majority of legislators from all political parties understood that a stand-alone Department of Education was in our national interest.

       a. Rep. Thomas P. O'Neill (D-Mass): "I think we should take education out of HEW and give the priority it requires as an independent Cabinet office. Educational needs must be placed under one management, a single management responsive to the school districts at home, responsive to the parents and to the Congress. I believe that is what is needed to correct the faults and problems of education which I have seen along the line. We must be ever mindful in this day and age, that the greatest asset to America has been its educational system and the development of its young people. Let us not let that development falter. Let us improve upon it, and let us get back to the standards of educational excellence of which this Nation is capable. We need a special Department of Education. We are doing it in the best interests of ourselves, of our children, and of our Nation's educational future." 125 Cong. Rec. 26535 (1979) (statement of Rep. Thomas P. O'Neill).

       b. Rep. Thomas A. Daschle (D-SD): "I truly believe that an education department with an effective administrator could resolve these organizational problems by simply placing them within the jurisdiction of a separate office. In effect, the Secretary would be accountable for these

programs. Presently, education officials are submerged by layers of bureaucrats and consequently immune to public scrutiny. In addition to these reasons there is a third reason that I feel needs to be mentioned. This is probably the most important one as well, at least to thousands of skeptical State and local school administrators and the like who feel that with this new Department, they will suffer a corresponding loss of influence on how the multitude of Federal programs are administered. On the contrary, I feel that there will result better understanding and responsiveness for local initiatives and concerns. This will be so because of the fact these people will now have a direct line to a Cabinet-level contract with the Federal Government." 125 Cong. Rec. 10349 (1979) (statement of Rep. Thomas A. Daschle).

c. Sen. Charles H. Percy (R-Ill): "The operation of the Department, from the top on through to the middle levels, simply does not provide for adequate time to education. Certainly if there were a Cabinet-level official whose responsibility it would be to focus attention on the educational needs of the future citizens of this country, I think we, as a country and a Government, would place greater priority upon education." 125 Cong. Rec. 8907 (1979) (statement of Sen. Charles H. Percy).

d. Sen. Robert Byrd (D-WVa): "Creation of a new Department of Education should help alleviate the problems' State and local education agencies encounter when trying to administer often duplicative and complicated Federal regulations. Consolidating the numerous Federal education

programs into one department should provide more effective management and coordination of these programs. . . . Our commitment to insuring that quality education will be accessible to all must remain strong. The continued health and strength of our country depend on it. As Thomas Jefferson said almost two centuries ago: The Commonwealth requires the Education of her people as the safeguard of order and liberty . . . Above all things, I hope the education of the common people will be attended to: Convinced that on this good sense we may rely with the most security for the preservation of a due degree of liberty . . ." S. 210, passed by the Senate yesterday 73 to 21, reflects the sentiment voiced by Thomas Jefferson. It is a good bill and should go far toward improving the quality of Federal assistance to State and local education efforts." 125 Cong. Rec. 9151-9152 (1979) (statement of Sen. Robert C. Byrd).

15. The actions announced in the March 11 Press Release, followed by the directives in the March 20 Executive Order to "take all necessary steps to facilitate the closure of the Department of Education," run counter to the express purpose of Congress in creating a cabinet-level agency to manage and coordinate all Federal education programs and activities. As envisioned by Congress – and as I experienced first-hand as Secretary of Education – a crucial feature of the Department is to support the states. During my tenure, the Department served as a one-stop-shop for school districts, States, teachers, and parents. These stakeholders currently have a single place to reach out to for guidance and help; a single set of relationships to manage. Federal workers from other agencies do not have the specialized skill sets in the Education field needed to perform these functions. If the Department is eliminated or core functions reassigned to other

8

agencies, the expertise and institutional knowledge that has been developed over decades will essentially disappear.

16. The federal student loan programs administered by the Department under Title IV of the Higher Education Act of 1965, as amended, are vitally important for the operation of the Department and the reduction in force will place those programs in peril. The FSA administers Pell Grants, work-study programs, handles loan disbursement, servicing and borrower assistance for students and prospective students nationwide.

17. The FSA also develops the Free Application for Federal Student Aid (FAFSA) form and processes students' FAFSA submissions. Students enrolling in institutions of higher education generally must complete the FAFSA prior to their first year of enrollment and then resubmit the FAFSA each subsequent year of schooling. The deadline for applicants to submit their FAFSA forms for the 2025-2026 school year is June 30, 2025, and many students choose to submit their FAFSA forms earlier because their understanding of what, if any, financial aid they qualify for informs their decision about whether they can afford to attend college and, if so, which college.

18. As a result of the March 11 Press Release, 326 positions were eliminated in FSA.

19. In addition, on March 21, 2025, President Trump announced that he was "immediately" transferring the handling of federal student loans to the Small Business Administration (SBA). On that same day, he announced a 40 percent cut to the SBA workforce.

20. The consequences of these actions will be ruinous for America's students and the national security of our nation. When I was Secretary, I always felt that the highest risk portfolio was FSA, based on the sheer number of individuals who rely on those services and the billions of dollars being managed. This is a challenging portfolio under the best of circumstances, and these moves will effectively gut these services. The Department of Education federal workers who are

being let go had years, even decades, of accumulated content area expertise. The amount of work, and the complexity of the work, will not go away. The current administration is attempting to take a massive, high-risk portfolio; lay off the specialized workers who know how to do the work; and transfer it to an agency without specific knowledge of this work and that is also seeing massive layoffs. The risk is exponential that this will break down, and they are taking on risk that no CEO would in good conscience take on, unless the goal is total dismantling and destruction. Again, the potential harm to the people who rely on these services is extraordinary.

21.    I am also deeply troubled by the cuts to the Office for Civil Rights (OCR). From my time in the Department, I know this office to serve a critical function when there is trauma or abuse and no redress at the State or local level. I recall one case in particular that stands out. Without giving any identifying detail, a young girl was raped in band class. The school district ended up suspending the young girl for lewd behavior and she found no relief from the local level or at the State level. Ultimately, OCR, the entity that backstops all federal civil rights enforcement in education, stepped in as a last resort to ensure that this injustice was corrected.

22.    Students need to have an independent option like OCR as such a last resort, a last recourse. This work requires highly skilled, highly trained civil rights lawyers who understand the education system and can intervene appropriately. Again, this is not a portfolio where you can fire all the highly trained workforce, transfer it to another agency, and expect it to function in any meaningful way. If this reduction in force is not stopped, this refuge for wronged students will effectively cease to exist and cause real injury to students and families.

23.    Consistent with OCR's work, one of the Department's vital missions is to protect America's most vulnerable students. The Department is often the last refuge for these students, and without the Department's knowledge, oversight, and intervention, there is a significant risk

that they will lose access to critical educational opportunities. The Trump Administration's decision to move special education programming, including the administration of the Individuals with Disabilities Act (IDEA), to the Department of Health and Human Services (HHS) is myopic. Children with disabilities will bear the brunt of the operational dysfunction and loss of accountability that will almost assuredly result from this decision. This move indicates to me that the administration does not understand the fundamental purpose of IDEA, which is to ensure that children with disabilities have the ability to receive an educational benefit. This is an educational program, and the objective and entitlement is to a free, appropriate public education, and meaningful access to benefit from and make progress towards the general curriculum. Without proper systemic oversight, there will be no accountability to ensure that required services are being provided to students. This is a specialized educational function that will get lost in HHS, and our most vulnerable children – and their parents – will be the victims.

24.     The cuts to the data and research arms of the Department will also cause deep, deep harm – both now and in the future. The Institute of Education Sciences, the National Center for Educational Research, the National Center for Education Statistics, National Center for Education Evaluation and Regional Assistance, National Center for Special Education Research – all of these offices contribute to the greater understanding and knowledge of what is working – or not working - in our educational system. We all want accountability for public funding and accountability for outcomes. We also want to be able to scale up what works and make improvements across the educational system, at every level. We need a highly skilled workforce to continue to compete in the world, and where we do not have an educational strategy that we are advancing as a country, using the best available information and resources, we will fail. Congress spoke clearly in creating this Department, and as a former Secretary, I feel confident in saying that the actions referenced

above will have the practical effect of dismantling and destroying the Department without further action by Congress.

25.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on March 24, 2025, at Chicago, Illinois.

/s/ Arne Duncan
ARNE DUNCAN