# EXHIBIT 52

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>LINDA McMAHON, *et al.*,<br><br>    Defendants. | C.A. No. 1:25-cv-10601<br><br>**DECLARATION OF CHRIS MILLER** |

### DECLARATION OF CHRIS MILLER

Pursuant to 28 U.S.C. § 1746, I, Chris Miller, declare as follows:

1. I am a resident of Georgia. I am over the age of 18 and have personal knowledge of all the facts stated herein, either through personal experience, documents I have reviewed, or conversations with my colleagues. If called as a witness, I could and would testify competently to the matters set forth below.

2. This declaration is submitted in support of the States' Request for a Preliminary Injunction.

3. I am the Section Chief of the Atlanta School Participation and Analysis Section (which until recently was called a "Division"), which is part of the Office of Institutions of Higher Education (IHE) Oversight & Enforcement, a subdivision of the Federal Student Aid (FSA) office in the U.S. Department of Education (the Department). The IHE Oversight subdivision was called the School Eligibility and Oversight Service Group (SEOSG) before it was renamed as part of a reorganization that took place in February 2025. I have worked for FSA for almost 30 years and served in a managerial role for about 25 years.

4. IHE Oversight is responsible for administering eligibility certification, financial analysis, and oversight of schools participating in FSA programs under Title IV of the Higher Education Act of 1965 (Title IV), including the Federal Pell Grant program, the Federal Direct Loan program, the Federal Supplemental Educational Opportunity Grant (FSEOG), and the Federal Work-Study program. IHE Oversight is divided into School Participation Sections (SPSs) (previously called divisions or SPDs) that specialize in the business processes necessary for managing accountability in campus administration of the Federal student financial aid programs. There are eight School Participation Sections: Atlanta School Participation & Financial Analysis Section, New York/Boston SPS, Philadelphia SPS, Chicago/Denver SPS, Kansas City SPS, San Francisco/Seattle SPS, Dallas School Participation & Critical Response Section, and the Multi-regional & Foreign Schools Participation Section.

5. Each of these sections have the following responsibilities for the schools that are assigned to their region ("SPS Responsibilities"):

  a. Examine, analyze, and make determinations on the initial and renewal eligibility applications submitted by schools for participation in Title IV programs;

  b. Collaborate with the Partner Participation and Oversight (PPO) a subdivision of FSA and the Office of General Counsel (OGC) regarding decisions to place schools that are under review or investigation on heightened cash monitoring or to impose other necessary restrictions on their participation in FSA programs;

  c. Collaborate and assist with school closures and disaster responses;

d. Process and maintain records of schools' Program Participation Agreements (PPAs) and notices of eligibility to participate in Title IV programs;

e. Monitor schools and their agents through on-site and off-site reviews and analysis of various reports to provide early warning of program compliance problems and take appropriate actions;

f. Conduct heightened cash monitoring actions and monitor schools' method of payment;

g. Manage and monitor missing/late audits and financial submissions;

h. Schedule and conduct risk assessment reviews, as needed;

i. Perform audit resolution;

j. Identify closed, bankrupt, and troubled schools and notify appropriate Department offices;

k. Work with state agencies and accrediting agencies on closed schools and other issues;

l. Identify requirements for tuition recovery programs and coordinate the fulfillment of these requirements;

m. Evaluate and act upon the findings, conclusions, and recommendations produced by other FSA units, such as negative cash and compliance referrals;

n. Determine liabilities owed by schools and/or recommend administrative actions against schools as necessary;

    o. Work closely with and/or refer matters to the Office of Inspector General, the PPO Partner Enforcement and Consumer Protection Directorate, and other offices; and

    p. Review and update pertinent databases.

6. My section within IHE Oversight & Enforcement, the Atlanta School Participation & Financial Analysis Section, has the following additional responsibilities ("the Financial Analysis Responsibilities"):

    a. Assess the financial responsibility of schools through financial analysis;

    b. Complete detailed analysis of schools' 90/10 reporting, as required under 34 C.F.R. § 668.28;

    c. Coordinate consistent review of schools' financial responsibilities for all other SPSs; and

    d. Coordinate analysis outcomes with IHE Oversight & Enforcement's decision-making framework.

7. I oversee all of the responsibilities described above for the Atlanta School Participation & Financial Analysis Section, which includes the Financial Analysis Responsibilities for all SPSs, as well as the SPS Responsibilities for the schools in the Southeast region. About three years ago, there was a reorganization that put all financial analysts under my oversight, as a certified public accountant (CPA), to ensure consistency and accuracy throughout the SEOSG. Sixteen (16) financial analysts and 1 forensic accountant reported to me as of January 20, 2025. Only five of these financial analysts are not located within the Atlanta School Participation & Financial Analysis Section, though management had planned a reorganization to place them in my section.

8.      The work that the Atlanta School Participation & Financial Analysis Section performs is required under statute and regulation, including 20 U.S.C. § 1018(c)(4) and 34 C.F.R. Part 668 Subpart L.

9.      Financial responsibility is the bedrock of the work that my team oversees. The Higher Education Act and regulations require that schools must meet certain numeric tests and have audited financial statements to begin and continue participation in Title IV programs. At its heart, the Financial Analysis Responsibilities ensure that these highly complex calculations are completed correctly, which requires staff who are highly skilled and trained in accounting and auditing. Our work ensures that schools are financially sound and responsible, which is correlated to the quality of the education they provide. Schools that cannot make their payroll often cannot retain qualified and talented instructors, and if students are not receiving quality education, they are likely not able to repay their loans. Public schools are exempt from some of the financial responsibility evaluations that we conduct, but only if they can provide documentation that they have full faith and credit backing of a government entity and are not further subject to a condition of past performance under 34 CFR § 668.174 or an automatic mandatory or discretionary triggering event under § 668.171(c) or (d).

10.     My team conducts a comprehensive review every time a school first completes the eligibility process for Title IV programs and then again when they are recertified every one to six years. We also look closely when schools add new programs or locations, or change ownership. We also resolve compliance audit findings of noncompliance by either requiring they improve their internal controls or repay any ineligible funds. Periodically, we will send staff on-site at schools to conduct comprehensive program reviews, which test a variety of metrics, including institutional eligibility requirements for aid. We also determine if an institution's

method of payment needs to be changed from Advance to Heightened Cash Monitoring (HCM) based upon risk analysis. HCM places additional restrictions on institution's ability to draw their own funds. Whenever schools go through consolidations or mergers, which often happens with public schools, they must go through us as well for approval.

11. On March 11, 2025 around 6:30 PM, I received an email from the Chief Human Capital Officer, Jacqueline Clay, stating, "your organizational unit is being abolished along with all positions within the unit—including yours." The email further informed me that I will be placed on administrative leave beginning March 21, 2025 and that I will receive an "official RIF notice" no earlier than 30 days after March 11, 2025. As a result of this notice, I understand that my entire unit, the Atlanta School Participation & Financial Analysis Section, is being abolished and no one will be assigned to perform the duties I have been responsible for.

12. I understand that every SPS within IHE Oversight is also being abolished except for the Chicago/Denver SPS and the Philadelphia SPS. This includes every financial analyst trained in the Financial Analysis Responsibilities described above except for one financial analyst who is located within the Denver SPS. I have spoken to the Philadelphia SPS and understand that they have no plan to ensure that the Financial Analysis Responsibilities are accomplished in our absence.

13. Since March 11, 2025, I have been locked out of my work systems and documents. I can see emails that come into my work email account, but I cannot send any emails externally. I was instructed that anything in my inbox that is unresolved should be forwarded to a "case teams" email address, so myself and my section have forwarded a couple hundred emails to that inbox, because there is nothing else we can do to respond to them or resolve any necessary work.

14. In my opinion, it is not possible for the few remaining staff to perform the statutory duties of the IHE Oversight, and especially the Financial Responsibilities that my team oversaw. Due to inadequate staffing, we already had a backlog of over 800 financial reviews before these cuts took place.

15. The impact of these cuts will be severe. When schools have an issue with their account or need to draw down funds and have trouble, there is practically no one left to assist them. The FAFSA system and the Treasury Department systems that distribute funding to schools interface with FSA's Partner Connect databases to make sure that schools have met eligibility requirements. Because of the interplay of these systems, schools could face issues in accessing their funds when there is no staff to oversee the eligibility procedures. This also impacts programs that are not administered by the Department, including the National Council of State Authorization Reciprocity Agreements (NC-SARA) programs, which approve additional funding for students in cooperation with states. NC-SARA relies on the composite score that my team was responsible for, so schools are now saying that they cannot get funding until we finish their financial responsibility analysis.

16. Another impact will be that no one is identifying schools that are failing financially and mitigating the risk to Department funds by ensuring financial protection is in place, including heightened cash monitoring, providing an irrevocable letter of credit, putting cash in escrow accounts, or limiting their ability to draw down funds from the Treasury Department. For example, if a school is financially insolvent and closes, the Department may be liable for providing students with Closed School Discharges and unpaid refunds of Title IV funds. Some schools may take advantage of the lack of accountability and not resolve the issues

we identified. Other schools that may now pass our financial analysis may not be unable to exit monitoring or have their funds returned.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on March 23, 2025.

_____
CHRIS MILLER