# EXHIBIT 58

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>  Plaintiffs,<br><br>     v.<br><br>LINDA McMAHON, *et al.*,<br><br>  Defendants. | C.A. No. 1:25-cv-10601<br><br>**DECLARATION OF DOE DECLARANT 6** |

### **DECLARATION OF DOE DECLARANT 6**

I, DOE DECLARANT 6, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a management and program analyst at the Office of the Ombudsman Federal Student Aid ("Ombudsman") of the United States Department of Education ("the Department"). I work for the Department's headquarters in Washington D.C. and have been in this position for just under two years.

2. The Ombudsman is a final resource for student loan borrowers after they have exhausted other resources. 20 U.S.C. § 1018 (f) directs the creation of the "Student Loan Ombudsman to provide timely assistance" to borrowers and as a management and program analyst, I "receive, review and attempt to resolve informally complaints from borrowers" 20 U.S.C. § 1018 (f)(3)(A). I am also responsible for outreach and community engagement to educate borrowers on repayment and relief options.

3. I hold a bachelor's degree and an executive master's degree in public administration. Before becoming management and program analyst at the U.S. Department of Education, I worked for three and a half years as a student loan advocate, where I helped borrowers resolve

1

student loan related complaints. Before that, I worked as a financial aid specialist for a year and a half at a post-secondary education institution. Before that, I worked for three years at a small non-profit that helped people build financial health by providing credit and financial coaching, including management of their student loans.

4. I am providing this declaration in connection with the announcement by the Department on March 11, 2025 that it would be reducing its staff by 50% and that this was a "significant step" towards a total shutdown of the Department. *U.S. Department of Education Initiates Reduction in Force*, Press Release, Department of Education (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("March 11 Press Release"). The Department initiated a reduction in force ("RIF") impacting nearly 50% of the Department's workforce, who were placed on administrative leave beginning Friday, March 21, 2025.

5. I received an email on March 11, 2025, informing me that my position was eliminated and that I had until March 20, 2025 to close out my job. I was locked out on Wednesday, March 12, 2025 at 11:50 pm. After Wednesday, I could only send emails internally from my Department email account.

6. I am providing this declaration to explain certain immediate and irreparable harms resulting from the RIF.

7. Student loan borrowers lodge complaints with the Ombudsman if they cannot resolve problems with their student loans, if, for example, their student loan servicer or their college's financial aid office is unresponsive or has made a mistake. Most of our complaints were about student loan repayment and sometimes about student aid disbursement issues.

8. For example, I resolved complaints in which students attested that they hadn't received their student loan disbursement yet but were told by the university that they had. I would call the college or university, collect information about the last disbursement and any missing documentation. If the school made a mistake, I would have them correct it. Or if the student didn't understand how the process works, I would explain the process of what they needed to do to access the money. If the complaint was that the student had emailed the financial aid office five times and the office was unresponsive, I would email the financial aid office on behalf of the student and ask them to respond and copy me.

9. I also received and resolved complaints about the student loan repayment process. For example, I regularly received complaints about loan servicers with incorrect borrower data and would help the borrower correct those mistakes.

10. I also regularly received and resolved complaints about discharging loans, including due to identity theft pursuant to 20 U.S.C. § 1087 (c) and total and permanent disability pursuant to 20 U.S.C. § 1087 (a)(1).

11. My work is particularly necessary under the latter circumstances, as I often collect information directly from the borrower to help them complete the application because they struggle to fill it out themselves due to their disability.

12. For example, before I was terminated, I had been working on the complaint of a borrower that I met in person. This woman's total and permanent disability discharge application was approved over a year ago. But when I looked up her loan, it still showed a balance. I contacted their loan processor and asked them why the servicer had not discharged her loans. The processor said that they had sent the discharge notice to the servicer three times, but for unknown reasons, the servicer still had not discharged the loan. Before I was terminated, I was

going back and forth between the servicer and the processor to try and resolve this issue. I couldn't finish helping this woman before I was terminated, and now I am afraid that she might be stuck between the processor and the servicer forever.

13. If no one advocates for the servicer to fix its mistake, and this woman, who is totally and permanently disabled, continues to hold a balance on her loan without making payments that she should not have to make, her student loan may end up in default. Based on my experience throughout my career counseling student loan borrowers, I know that this can have devastating consequences for her financial wellbeing, including harmful impacts on her credit score, garnishment of wages and social security, and the withholding of tax refunds.

14. My work requires a lot of subject matter expertise. It requires that I understand all of the processes, rules and requirements for all federal student loan repayment, relief, deferment, forbearance, default, and consolidations. The job also required me to understand how these programs interact with each other in order to advise borrowers of their options. I also have expertise in federal financial aid, including on how to apply for financial aid, what documentation is required, and the process for appealing financial aid decisions.

15. I translate these extremely complicated processes into plain language, individualized advice and advocacy for borrowers. That is not something that our website will ever be able to do. That is not something that artificial intelligence can do right now.

16. Based on my experience reviewing complaints, often that is not even something that the borrower's loan servicer can do. I regularly reviewed cases where a borrower called a loan servicer, and was directed to a call center staffed by individuals who did not have the education and expertise that I do. I often see cases in which the loan servicer call center gave borrowers

incorrect information, and borrowers did not have access to correct information until they contacted the Ombudsman.

17. Before January 20, 2025, the Ombudsman had approximately 25 analysts in two teams. As of March 14, 2025, the Ombudsman is handling 16,000 complaints, including complaints against institutions of higher education, and complaints related to student loans.

18. I carried a caseload of approximately 150 cases. I did my best to actively work on all of them, but it was impossible to move all of them forward at the same time. I estimate that on average it took me between three to six months to resolve a case. I have seen cases in which a borrower has been struggling with their issues for years before I began working on it.

19. The RIF terminated my position along with my entire team. In addition, a number of positions had already been terminated in our office in February 2025.

20. After the RIF, based on conversations with my colleagues, I estimate that there are only 10 analysts remaining in the U.S. Department of Education Ombudsman's office to resolve complaints for the entire country of approximately 42 million student loan borrowers.

21. Someone at the Ombudsman's office will have to reallocate all my unresolved cases. As of March 13, 2025 no one had reallocated any cases from the layoffs in February.

22. Before I left, I did my best to turn over the cases that I was most concerned about to other analysts who were not terminated. Based on my knowledge of how the Ombudsman operates, and the remaining number of analysts, it will likely be months before anyone gets my cases. I fear that most of my cases will end up languishing until someone redistributes them.

23. Without us, harm will come to real human beings. For example, I had been working for over a year on four cases were the borrowers each got their loans discharged, but their accounts were completely wrong. Their loan servicer should have returned more money to the

borrowers. For one woman, the loan servicer owed her over $2,000. That is a lot of money if you're trying to make ends meet.

24.   As another example, before my termination, I was working on cases of the class members in the *Sweet v. Cardona* legal settlement. *Sweet* was a lawsuit brought by borrowers, who had been defrauded by for-profit colleges, to discharge their federal student loans due to their schools' misconduct. The Ombudsman was designated by the court in *Sweet* as the official point of contact as the Department discharged loans and issued refunds and decisions under the terms of the approved settlement. Before the RIF, the Department had already been having a very difficult time meeting settlement requirements. Now that my entire team has been eliminated, there are even fewer analysts to work on these cases.

25.   My position is created and required by federal statute. 20 U.S.C. § 1018 (f) directs the Ombudsman "to provide timely assistance." Based on my knowledge of the remaining resources at the Ombudsman, the complexity of the complaints, the amount of time and effort needed to resolve these complaints, I do not know how the office will be able to provide "timely assistance" to borrowers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed March 21, 2025, in the state of Washington.

/s/   DOE Declarant 6
_____
DOE DECLARANT 6