# EXHIBIT 66

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, *et al.*,

  Plaintiffs,

      v.

LINDA McMAHON, *et al.*,

  Defendants.

C.A. No. 1:25-cv-10601

**DECLARATION OF DOE DECLARANT 14**

## DECLARATION OF DOE DECLARANT 14

Pursuant to 28 U.S.C. § 1746, I, DOE Declarant 14, declare as follows:

1. I am over the age of 18 and have personal knowledge of all the facts stated herein through personal experience and through conversations with my colleagues. If called as a witness, I could and would testify competently to the matters set forth below.

2. This declaration is submitted in support of the States' Request for a Preliminary Injunction.

3. I am an attorney with the Office of General Counsel within the Department of Education ("the Department"). I have worked at the Office of General Counsel for more than 10 years and have knowledge about the structure and function of the office.

4. The Office of General Counsel ("OGC") is divided into seven divisions[1]: the Division of Educational Equity ("DEE"), the Division of Elementary, Secondary, Adult, and Vocational Education ("DESAVE"), the Division of Regulatory Services ("DRS"), the Division of Legislative Counsel ("DLC"), the Division of Business and Administrative Law ("DBAL"),

---

[1] At the time of signature, I am unaware of any formal actions the Department has taken to structurally eliminate any of the divisions within OGC.

1

the Division of Postsecondary Education ("DPE"), and the Ethics Division. The Office of General Counsel also has a front office that included three Deputy General Counsel who oversee the different divisions and manage specific subject areas. The front office has attorneys who specialize in cyber security, government oversight, and a few other specialized areas related to the functions and mission of the Department.

5.  OGC had approximately 124 active employees including approximately 107 attorneys prior to the RIF and the buyouts.

6.  I was notified by an email sent out on March 11, 2025, that my organizational unit was being abolished along with all positions within the unit, including my own. The email did not identify the referenced organizational unit. Based on publicly available information and conversations with my colleagues, I understand that the OGC was significantly impacted by the RIF. Specifically, all of the attorneys in six of the seven divisions were subject to the RIF, including the division leadership, as was one of two career Deputy General Counsels. DPE attorneys, the Deputy General Counsel currently acting in the role of overseeing DPE, and two cybersecurity attorneys in the front office are still employed.

7.  It is my opinion that, with the 83% reduction in capacity in OGC, and the resulting loss of legal expertise and institutional knowledge, the Department will be unable to meet its statutory obligations.

8.  **Ethics Division**: The Ethics Divisions served as the Department's exclusive source of legal support for all Department program offices regarding intake for new employees, including conducting conflict of interest reviews, and clearing financial disclosures for legal sufficiency as required by law. The Ethics Division ran conflict of interest checks for career employees for any outside activities (such as sitting on the board of nonprofit organizations,

participating in their child's school's PTA, and any outside unrelated employment) to ensure that it complied with all relevant statutory, regulatory, and other legal requirements. The Ethics Department also briefed separating Department employees regarding their legal obligations (for example, restrictions on post-separation employment and "cooling off" periods) and ensured that employees' departures were conducted consistent with the relevant legal authorities. The elimination of the Ethics Division is particularly problematic for the dozens of incoming political appointees and for all the recently RIF'd employees who are now looking for outside employment and concerned about potential conflicts.

9. **DRS**: DRS handled the statutorily mandated negotiated rulemaking calendar, a complex legal process involving significant stakeholder engagement. DRS also handled all other regulatory and deregulatory matters. DRS attorneys were advising Department officials on, among other things, a number of recent Executive Orders that call for rescinding regulations and requiring that a certain number of regulations be rescinded before any new one could be issued. In addition, ongoing litigation in a number of areas may result in certain regulations being found invalid, requiring re-regulation in those areas. Without DRS, the Department will not be able to do this work.

10. **DLC**: DLC drafted statutory language for the Department's legislative priorities and provided technical assistance to legislators on education-related legislation. DLC allowed the Department to participate as a stakeholder in Congressional negotiations to discuss what the implementation of certain legislation would look like and what the legislators' priory objectives were. DLC attorneys often helped come up with a way to align legislators' priorities with approaches that could be implemented effectively and efficiently by the Department. Without

DLC, the Department no longer has a link to the legislature and will be absent from technical negotiations over education-related legislation.

11. **DESAVE**: DESAVE provided legal advice on preschool, elementary, secondary, adult, and career and technical education programs authorized by statutes such as the Elementary and Secondary Education Act of 1965 ("ESEA"), the Perkins Career and Technical Education Act ("Perkins"), and the McKinney-Vento Homeless Assistance Act. These programs included grants under Title I of the ESEA (approximately $18.4 billion in fiscal year 2024) and Perkins (approximately $1.4 billion in fiscal year 2024). Without DESAVE attorneys, there is a significant risk that grantees will misallocate funds or use funds for unallowable purposes. This harms not only the students served by these funds, but can be costly to the grantee and may result in funds being clawed back from the federal government during an audit. Grantees had regular contact with attorneys, particularly new grantees or grantees with new or complicated grants. For example, DESAVE attorneys often had weekly phone calls with grantees during the initial roll out of COVID-19 related grants. This technical support from DESAVE attorneys is no longer available to grantees. Recently, some grants have been frozen because of executive action, and then courts have reversed those actions, making funds available to the states. This has been very chaotic for grantees, and they have relied on advice from DESAVE attorneys on how to proceed. Without DESAVE attorneys providing accurate and centralized guidance, states will be left on their own to navigate this complicated legal landscape and may end up not using funds to which they are entitled.

12. **DEE**: DEE attorneys handled legal issues related to civil rights statutes such as Title IX, Title VI, and Section 504, as well as grant programs under the Individuals with Disabilities Education Act ("IDEA") and the Rehabilitation Act of 1973 ("Rehab Act"). While

the Department's Office for Civil Rights handles complaints from individuals, DEE worked with DOJ attorneys on Amicus briefs, statements of interest, defensive litigation brought against the Department, and advising on regulations related to applicable civil rights statutes. DEE attorneys advised on the administration of state formula grants, including the IDEA Part B Grants to States Program and Preschool Grants to States, IDEA Part C Grants for Infants and Families Program, and the State Vocational Rehabilitation Service Program. DEE also supported numerous discretionary grant programs under the IDEA, Rehab Act, and ESEA that are awarded to state entities, including SEAs and IHEs. Combined, these programs awarded approximately $20 billion in fiscal year 2024. Specific DEE activities included: reviewing annual grant applications, required state policies, and annual performance report (APR) determinations; monitoring findings and resolving audits and other program determinations; and statewide audits and grant programs. DEE attorneys also provided technical assistance to state and local grantees. The loss of this partnership between the Department and grantees will have real and immediate impacts. For example, under the IDEA, states submit their annual performance reports in February, and submit annual award applications in the spring, with the Department issuing APR determinations and awards by July 1. The Department no longer has any attorneys with experience in administering these programs, resulting in a significant risk that the Department's decisions will be delayed or inconsistent with legal requirements, which would directly impact the states' abilities to access and utilize program funds and adversely impact their residents with disabilities.

      13.     DBAL: Through legal support, clearance, and representation in administrative and judicial proceedings, DBAL ensured that the Department met its legal obligations in dozens of practice areas related to business and administrative law. These areas included labor and

employment law and personnel actions, government contracts and acquisitions, the Freedom of Information Act, issues relating to student privacy and the protection of highly sensitive personal and financial data, Department and Executive reorganizations, the Vacancies Act, delegations of authority, the Federal Torts Claims Act, overpayments, appropriations, and the Anti-Deficiency Act.

14. **DPE**: DPE handles all matters relating to higher education and financial aid, including the FAFSA and all HEA title IV financial assistance, and a large amount of student borrower-related litigation. The DPE attorneys have been asked to take on the different work left behind by colleagues. Due to long-standing staffing shortages which have been exacerbated by recent and planned retirements, DPE is already at the limit of the work and caseload they can handle with their current areas of responsibility and, given the Administration's recent actions and stated objectives, they anticipate a significant increase in their workload in the near future. In addition, they do not have the capacity, legal experience, familiarity with particular Department policies and procedures, institutional knowledge, or the client relationships to successfully complete the work of 107 attorneys in wildly disparate practice areas, nor do they have any access to meaningful training or guidance. They are brilliant, dedicated, and capable attorneys, but the necessary resources and expertise would take any attorney years to develop, and the volume of work required to ensure statutory compliance far outstrips the capacity of any similarly-sized group of attorneys.

15. **Oversight**: Oversight counsel provided legal information and advice to the Department on responding to Office of Inspector General internal and external audits and U.S. Government Accountability Office engagements. At any given time, there were between 50-75 GAO engagements, and 20-40 OIG audits, many of which involve requests for highly sensitive

data and information. Oversight counsel provided advice to program staff and negotiated terms of release with the GAO and OIG to ensure that this data remained protected. Now the Department will not have legal advice on how to respond and what information to provide.

16. OGC operated as a single unit despite its different divisions. Attorneys regularly worked cross-divisionally to meet the mission-critical, complex, and time-sensitive needs of the Department. In addition to ensuring compliance with statutory obligations, as discussed above, their legal expertise and institutional knowledge is a vital resource to the Department's program offices as they satisfy their own requirements and initiatives. The decimation of OGC has resulted in a huge loss of education-law-related institutional knowledge and eliminates crucial relationships between the Department and the states. Even if people are brought in to cover the bare minimum of the work done by OGC, this will greatly decrease the value and quality of services provided to grantees and the Department as a whole.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on March 23, 2025.

/s/ DOE Declarant 14

DOE Declarant 14