# EXHIBIT 69

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>  Plaintiffs,<br><br>       v.<br><br>LINDA McMAHON, *et al.*,<br><br>  Defendants. | C.A. No. 1:25-cv-10601<br><br>**DECLARATION OF COLLEEN CAMPBELL** |

**DECLARATION OF COLLEEN CAMPBELL**

Pursuant to 28 U.S.C. § 1746, I, Colleen Campbell, hereby declare as follows:

1. I am a resident of Maryland. I am over the age of 18 and have personal knowledge of all the facts stated herein, though personal experience, documents and records I have reviewed, and conversations with my colleagues. If called as a witness, I could and would testify competently to the matters set forth below.

2. This declaration is submitted in support of the States' Request for a Preliminary Injunction.

3. I am the Executive Director of the Office of Loan Portfolio Management at the Department of Education's Office of Federal Student Aid (FSA), a position I officially took in February 2025, when this unit was first created due to a reorganization. I have worked for the Department since November 2019. I began as a supervisory public affairs specialist in FSA in a unit called the Next Gen Program Office, an initiative to rebuild FSA's technology infrastructure, including loan servicing. Since December 2021, I have served as a program manager responsible for procuring and implementing new loan servicing contracts.

4. The Office of Loan Portfolio Management oversees four divisions:

   a. The Program Implementation Division, which facilitates the management of several program benefits available to student loan borrowers, oversees audits of servicing and collections, and a group of Contracting Office Representatives (CORs) who manage the administrative aspects of servicing and collections contracts;

   b. The Loan Operations Division, which manages day-to-day administration of student loan servicers and the debt collection system;

   c. The Borrower Processing Division, which performs hands-on management work related to student loan accounts, including inherently governmental functions like validating eligibility for forgiveness and discharge, and responding to escalated cases; and

   d. The Vendor Performance Division, an oversight function of all of student loan servicing and collections, responsible for validating servicer data reporting, measuring service-level agreements and ensuring compliance with federal and state law and federal contract requirements.

5. On February 28, 2025, I received an email from the Department of Education ("the Department") offering a Voluntary Incentive Separation Payment (VSIP), a payment to voluntarily leave the Department. I decided to take the VSIP offer on March 3, 2025. However, on March 4, 2025, members of the leadership team at FSA and ED approached me and convinced me to rescind the VSIP offer.

6. One week later, on March 11, 2025, the Department announced large scale reductions-in-force (RIFs) of the Department ("the RIF Announcement"), including the entire

Vendor Performance Division. After I was vocally critical of the approach the leadership team was taking, leadership at FSA asked if I wanted to be placed back on the VSIP list. I said yes. I made this decision because I did not feel that it was possible to be successful in fulfilling our mission and providing adequate service to loan borrowers based on the significant reductions made to FSA's civil servant staff.

7. Despite my role in leadership in FSA, I only received notice of the RIF Announcement in a meeting that started at 5:50pm, 10 minutes before announcements were sent out to staff. I only learned which of my staff were cut through word of mouth that night. I did not learn which divisions across FSA were subject to the RIF until the next day, March 12, when the list of divisions that were cut were shown during a senior leadership team meeting.

8. Aside from the Vendor Performance Division, the three other divisions that report to me did not face RIFs. However, we had lost substantial numbers of employes due to the various incentives that the Department offered to voluntarily leave, including VSIP, the Deferred Resignation Program, and Voluntary Early Retirement Authority (VERA) (collectively, "Voluntary Incentive Offers"). In January 2025, I had about 200 employees who reported to me when I officially started my role in early February 2025. As of March 19, 2025, that number has reduced by half, down to about 110 employees. Fifty out of 90 of employees have been cut from the RIF, while others left because of the Voluntary Inventive Offers.

9. Based on my knowledge and experience, it is not feasible for other units in the Department to take over the work of the Vendor Performance Division, which was entirely eliminated by the RIF Announcement.

10. Since we had just reorganized, it had been challenging to ensure adequate transfer of institutional knowledge to the newly formed Office of Loan Portfolio Management prior to the

RIF Announcement. The same night as the RIF Announcement, the Department removed staff's ability to access shared documents, the Microsoft Teams application that we use to conduct meetings and communicate with one another, and ability to send emails outside of the Department. By disabling staff's ability to meaningfully participate in their work prior to administrative leave, which was scheduled to begin on March 21, 2025, transfer of knowledge was extremely difficult.

11. Since the Trump administration took office, leadership in the Department has repeatedly said that we need to "do less with less." They have also said we need to "stop offering customers the Cadillac and give them the Toyota instead." I understand this to mean that leadership has embraced the ethos of the Department of Governmental Efficiency (DOGE) and believe that the government's work should be confined to only what is statutorily required. These directives reflect a fundamental misunderstanding of the complexity of the work that FSA performs to administer and oversee aid to students and schools.

12. Prior to the RIF Announcement, I was involved in several drills in which the Department discussed cuts to major contracts according to the edicts of DOGE. We were asked to make substantial cuts to specific vendors that it seemed DOGE had specifically targeted, without legitimate justification of which I was aware. We also looked at cutting FSA's call centers, including those managed by loan servicers.

13. Based on my knowledge and experience, it is impossible that FSA will be able to comply with its statutory obligations after the RIF Announcement. It had already been difficult for us to fulfill our obligations before the announcement FSA has been nearly flat funded since fiscal year 2022. In addition to statutory functions, FSA is also responsible for complying with a variety of court orders, and challenges in having to transition that work quickly due to Voluntary

Incentive Offers puts that work at risk. This includes work on the *Sweet v Trump* settlement and the injunction on the Saving for a Valuable Education (SAVE) plan.

14.  Last year, the Department needed to pause PSLF processing because we were transitioning the administration of PSLF from the servicer Mohela into FSA's systems. We were delayed in this transfer because our servicers were late in implementing the Income Driven Repayment (IDR) Account Adjustment, which required servicers to provide information on if each month of repayment history that a borrower made in the past was eligible or ineligible for both IDR forgiveness and Public Service Loan Forgiveness (PSLF) and Temporary Expanded PSLF (TEPSLF). It took FSA several months of validating and having servicers re-report data before we felt confident borrowers' payment counts were accurate and consistent. Going forward, servicers are responsible for reporting borrowers' monthly payment data correctly, and the majority of people who implemented this policy and performed verification of servicer data have largely left the department either voluntarily or through the RIF.

15.  Additionally, the team that performed oversight of borrower account transfers between servicers was subject to the RIF. Going forward, the onus will largely be on student, parents, borrowers, and schools to identify and advocate for resolution of their issues, rather than FSA finding and fixing them proactively. It was stated in a senior leadership meeting that "oversight and audit" areas of the organization were eliminated via the RIF, which introduces risk not only for the 43 million student loan borrowers managed by FSA, but the entirety of the aid system, including oversight of contractors managing other mission critical systems.

16.  As another example of units that were cut without understanding of the impact, three units within the Chief Technology Office of FSA were originally cut entirely in the RIF Announcement. As a result, the staff who were responsible for overseeing the complex network

of technology infrastructure used by FSA and FSA vendors were gone. When leadership realized this was a problem, they started to reinstate some, but not all, of the staff in these areas who were subject to the RIF.

17. I expect we will see issues wherein these complex, intertwined technology systems cannot be adequately managed because so many of the people experienced in identifying and resolving incidents will have left the Department. This puts critical functions, like the FAFSA, aid disbursement, and loan repayment at risk.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on March 24, 2025.

                                                                _____/s/ Colleen Campbell_____
                                                                     COLLEEN CAMPBELL