# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF NEW YORK, *et al.* | |
| *Plaintiffs,* | Civil Action No. 1:25-cv-10601 |
| v. | |
| SECRETARY LINDA McMAHON, *et al.* | |
| *Defendants.* | |

## PROPOSED BRIEF OF THE STATES OF MONTANA AND 20 STATES AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

INTERESTS OF AMICI CURIAE...................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.  The Separation of Powers Support Defendants, Not Plaintiffs............................. 2

   A. The Article II Branch Manages the Department's
      Workforce. ..................................................................................................... 3

   B.  The  Article  I  Branch  Has  Created  a  Separate  Process  for  Federal
      Employment Issues. ....................................................................................... 7

   C.  The  Article  III  Branch  Should  Avoid  Infringing  the   Separation  of
      Powers. ......................................................................................................... 12

II. Plaintiffs Have Failed to Show Irreparable Harm. ............................................ 14

   A. Plaintiffs Have Failed to Show a "Genuinely Extraordinary" Situation. ...... 14

   B. Plaintiffs Have Failed to Present Sufficient Facts of Irreparable Harm....... 16

III. The Equities Favor the Defendants.................................................................... 20

CONCLUSION ................................................................................................................ 24

ADDITIONAL COUNSEL.............................................................................................. 25

CERTIFICATE OF COMPLIANCE……………………………………………………………26

# TABLE OF AUTHORITIES

**Cases**

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
576 U.S. 787 (2015) ............................................................................... 23

*Arnett v. Kennedy,*
416 U.S. 134 (1974) ............................................................................... 14

*Ass'n of Admin. L. Judges v. Colvin,*
777 F.3d 402 (7th Cir. 2015) ................................................................. 8

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan,*
501 U.S. 1301 (1991) ............................................................................. 20

*Berrios v. Dep't of Army,*
884 F.2d 28 (1st Cir. 1989) ................................................................... 9

*Billops v. Dep't of Air Force, Little Rock Air Force Base,*
725 F.2d 1160 (8th Cir. 1984) ............................................................... 8

*Block v. Cmty. Nutrition Inst.,*
467 U.S. 340 (1984) ............................................................................... 10

*Bowsher v. Synar,*
478 U.S. 714 (1986) ............................................................................... 13

*Broadway v. Block,*
694 F.2d 979 (5th Cir. 1982) ................................................................. 8

*Clinton v. City of N.Y.,*
524 U.S. 417 (1998) (Kennedy, J., concurring) ................................... 13

*Collins v. Yellen,*
594 U.S. 220 (2021) ....................................................................... 4, 5, 6

*DeNovellis v. Shalala,*
135 F.3d 58 (1st Cir. 1998) ......................................................... 14, 15, 16

*Dep't of Educ. v. California,*
No. 24A910, 2025 WL 1008354 (U.S. Apr. 4, 2025) ...................... 21, 22

*Does 1-6 v. Mills,*
16 F.4th 20 (1st Cir. 2021) ......................................................... 15, 16, 18

*Does 1-26 v. Musk,*
No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025) .............. 21, 24

*Elgin v. U.S. Dep't of Treasury,*
    567 U.S. 1 (2012) ........................................................................ 7, 9, 10

*Elgin v. U.S. Dep't of Treasury,*
    641 F.3d 6 (1st Cir. 2011) ....................................................... 9

*Engquist v. Or. Dep't of Agric.,*
    553 U.S. 591 (2008) ................................................................. 6

*Filebark v. U.S. DOT,*
    555 F.3d 1009 (D.C. Cir. 2009) ............................................... 8, 10

*Fornaro v. James,*
    416 F.3d 63 (D.C. Cir. 2005) ................................................... 10

*Free Enter. Fund v. Pub. Co. Acctg. Oversight Bd.,*
    561 U.S. 477 (2010) ............................................................ 3, 4, 5, 6

*Gandola v. F.T.C.,*
    773 F.2d 308 (Fed. Cir. 1985) ................................................. 14

*Graham v. Ashcroft,*
    358 F.3d 931 (D.C. Cir. 2004) ................................................. 10

*Grosdidier v. Chairman, Broad. Bd. of Governors,*
    560 F.3d 495 (D.C. Cir. 2009) ................................................. 8, 9-10

*In re Aiken Cnty.,*
    645 F.3d 428 (D.C. Cir. 2011) (Kavanaugh, J., concurring) ................. 13

*INS v. Chadha,*
    462 U.S. 919 (1983) ................................................................. 12

*Kilbourn v. Thompson,*
    103 U.S. 168 (1880) ................................................................. 12

*Lindahl v. Off. of Pers. Mgmt.,*
    470 U.S. 768 (1985) ................................................................. 7

*Mahoney v. Donovan,*
    721 F.3d 633 (D.C. Cir. 2013) ................................................. 9

*Maryland v. United States Dep't of Agric.,*
    No. 1:25-cv-00748, 2025 WL 973159 (D. Md. Apr. 1, 2025) ................. 11

*Morrison v. Olson,*
    487 U.S. 654 (1988) (Scalia, J., dissenting) ............................... 12

*Myers v. United States,*
    272 U.S. 52 (1926) ................................................... 21

*Nat'l Aeronautics & Space Admin. v. Nelson,*
    562 U.S. 134 (2011) ................................................. 16

*New State Ice Co. v. Liebmann,*
    285 U.S. 262 (1932) (Brandeis, J., dissenting) ................... 23

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................. 20

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ................................................... 3

*Pinar v. Dole,*
    747 F.2d 899 (4th Cir. 1984) ......................................... 8

*Rodriguez v. United States,*
    852 F.3d 67 (1st Cir. 2017) .......................................... 8

*Roth v. United States,*
    952 F.2d 611 (1st Cir. 1991) ......................................... 7

*Ryon v. O'Neill,*
    894 F.2d 199 (6th Cir. 1990) ......................................... 8

*Sampson v. Murray,*
    415 U.S. 61 (1974) .................................................. 16

*Seila Law L.L.C. v. Consumer Fin. Prot. Bureau,*
    591 U.S. 197 (2020) ............................................... 3, 4

*Springer v. Gov't of Philippine Islands,*
    277 U.S. 189 (1928) ................................................ 12

*Stephens v. Dep't of Health & Hum. Servs.,*
    901 F.2d 1571 (11th Cir. 1990) ....................................... 8

*Stern v. Marshall,*
    564 U.S. 462 (2011) ................................................ 13

*Tiltti v. Weise,*
    155 F.3d 596 (2d Cir. 1998) .......................................... 8

*Together Emps. v. Mass Gen. Brigham Inc.,*
    19 F.4th 1 (1st Cir. 2021) ........................................ 14-15

*Together Emps. v. Mass Gen. Brigham Inc.*,
    32 F.4th 82 (1st Cir. 2022) ...................................................................... 16

*Trump v. United States*,
    603 U.S. 593 (2024) ............................................................................ 4

*Trump v. Vance*,
    591 U.S. 786 (2020) ............................................................................ 4

*United States v. Fausto*,
    484 U.S. 439 (1988) ................................................................... 7, 8, 11

*United States v. Lopez*,
    514 U.S. 549 (1995) (Kennedy, J., concurring) ..................................... 1

*Veit v. Heckler*,
    746 F.2d 508 (9th Cir. 1984) ............................................................. 8

*Weatherford v. Dole*,
    763 F.2d 392 (10th Cir. 1985) ...................................................... 8, 14

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................. 15

*Yu v. U.S. Dep't of Veterans Affairs*,
    528 F. App'x 181 (3d Cir. 2013) ....................................................... 8

**Other**

90 Fed. Reg. 8853 (Feb. 3, 2025) ............................................................. 19

90 Fed. Reg. 9279 (Feb. 11, 2025) ........................................................... 18

U.S. Const. art. II, § 1, cl. 1, § 3 ............................................................. 3

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are the 21 States of Montana, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Nebraska, Ohio, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia which submit this brief in support of Defendants ("Amici States"). The Supreme Court has recognized that the States have a unique role in preserving the vitality of the Constitution's structural guarantees of liberty. *See, e.g.,* U*nited States v. Lopez,* 514 U.S. 549, 575-77 (1995) (Kennedy, J., concurring). Because Plaintiffs seek to turn the separation of powers on its head and diminish the President's authority under Article II of the Constitution, the Amici States have a direct and substantial interest in this case.

Amici States also have an interest in the education of children in their states. Because the Amici States agree with President Trump and Secretary McMahon that education is fundamentally a State responsibility, the Amici States have an interest in actions that empower the Amici States.

## SUMMARY OF ARGUMENT

Plaintiffs seek a preliminary injunction to force the Department of Education (the "Department") to reinstate employees that the Department placed on administrative leave before an anticipated reduction-in-force. Plaintiffs' request should be denied.

Plaintiffs are not likely to succeed on the merits. The separation of powers supports the Defendants, not Plaintiffs, because Article II empowers the President to

manage Executive Branch employees.  In addition, Congress created a separate, comprehensive process for federal employment issues, which guts Plaintiffs' Administrative Procedure Act claims.  And the Court should be cautious before interfering with the President's Article II power to manage the federal workforce or Congress' intent to resolve claims through a carefully defined statutory process.

Plaintiffs also fail to show irreparable harm.  The Supreme Court and the First Circuit apply a heightened standard that requires Plaintiffs to show a genuinely extraordinary situation before a government agency can be enjoined from terminating employees.  Plaintiffs have failed to make this showing.  For example, Plaintiffs rely on speculation relating to a program that experienced "extraordinary disruption" last year, but which is achieving substantially better results this year.  Plaintiffs also allege that they will not receive essential Title IX and anti-discrimination guidance, even though they cite no statute requiring such guidance and are currently disregarding essential Title IX and anti-discrimination guidance provided by President Trump and the Department.

Finally, the balance of the equities favors Defendants.  The President will suffer irreparable harm by being unable to exercise his Article II powers.  The public is interested in better education outcomes and returning control of education to the States, some of which are realizing improved test scores as "laboratories of democracy."

For these reasons, the Court should deny Plaintiffs' request for a preliminary injunction.

## ARGUMENT

## I.    The Separation of Powers Supports Defendants, Not Plaintiffs.

Plaintiffs' challenge to Executive Branch personnel actions—administrative leave and reductions in force—seeks to upend the separation of powers by restricting a core executive power, ignoring a statutory scheme created by Congress, and inserting the judicial branch into executive branch decision-making.  The Court should deny that relief, which would cause a severe breach of the separation of powers.

### A.    The Article II Branch Manages the Department's Workforce.

1.  "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'"  *Seila Law L.L.C. v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1, § 3).  "[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws."  *Free Enter. Fund v. Pub. Co. Acctg. Oversight Bd.*, 561 U.S. 477, 492 (2010) (quoting 1 *Annals of Cong.* 463 (1789) (J. Madison)).  "Article II confers on the President the general administrative control of those executing the laws."  *Id.* (quotation omitted). "This grant of authority establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity," including the "management of the Executive Branch."  *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982).

3

The President has supervised the federal workforce under Article II since the Founding. "Since 1789, the Constitution has been understood to empower the President to keep these officers accountable—by removing them from office, if necessary." *Free Enter. Fund*, 561 U.S. at 483. "The President's power to remove—and thus supervise—those who wield executive power on his behalf follows from the text of Article II, was settled by the First Congress, and was confirmed in the landmark decision *Myers v. United States*, . . ." *Seila Law L.L.C.*, 591 U.S. at 204 (citation omitted). "The removal power helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to ensure that these subordinates serve the people effectively and in accordance with the policies that the people presumably elected the President to promote." *Collins v. Yellen*, 594 U.S. 220, 252 (2021).

The power to supervise and manage the federal workforce is a critical power and responsibility entrusted to the President. "The President 'occupies a unique position in the constitutional scheme,' as 'the only person who alone composes a branch of government.'" *Trump v. United States*, 603 U.S. 593, 610 (2024) (citations omitted). Indeed, "[t]he President's duties are of 'unrivaled gravity and breadth.'" *Id.* at 607 (quoting *Trump v. Vance*, 591 U.S. 786, 800 (2020)). The Founders believed that a "vigorous" and "energetic" Executive was needed "to ensure 'good government,' for a 'feeble executive implies a feeble execution of the government.'" *Id.* at 610 (quoting *The Federalist No. 70* 471-72 (J. Cooke ed., 1961)) (A. Hamilton).

4

Article II provides the President with broad authority to manage the federal workforce.  The Founders confirmed this authority, and the courts have recognized it for more than two centuries except in limited circumstances not relevant here.  *See Trump*, 603 U.S. at 608 ("noting only 'two exceptions to the President's unrestricted removal power'") (citation omitted).  Restricting the President's ability to place administrative employees on leave or implement reductions in force will cripple both the President and the ability to ensure good government.

2.  The President's power to supervise also provides important accountability to the people.  The American people do not vote for individual federal employees, but "instead look to the President to guide the 'assistants or deputies ... subject to his superintendence.'"  *Free Enter. Fund*, 561 U.S. at 497–98 (quoting *The Federalist No. 72* 487 (J. Cooke ed., 1961)) (A. Hamilton).  "Because the President, unlike agency officials, is elected, this control [over subordinates] is essential to subject Executive Branch actions to a degree of electoral accountability."  *Collins*, 594 U.S. at 252 (citation omitted).  "That is why the Framers sought to ensure that 'those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.'"  *Free Enter. Fund*, 561 U.S. at 498 (quoting 1 Annals of Cong., at 499 (J. Madison)).

"The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so," *Free Enter. Fund*, 561 U.S. at 513, including the power to make personnel decisions.  "The President must be able

to remove not just officers who disobey his commands but also those he finds 'negligent and inefficient,' those who exercise their discretion in a way that is not 'intelligen[t] or wis[e],' those who have 'different views of policy,' those who come 'from a competing political party who is dead set against [the President's] agenda,' and those in whom he has simply lost confidence." *Collins*, 594 U.S. at 256 (internal citations omitted).  "Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enter. Fund*, 561 U.S. at 514.  Indeed, "[s]uch diffusion of authority 'would greatly diminish the intended and necessary responsibility of the chief magistrate himself.'" *Id.* (quoting The Federalist No. 70, at 478).

Restricting the President's ability to manage federal employees "subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts." *Id.* at 498.  By reducing the number of Department employees and returning education authority to the States, President Trump is honoring commitments he made to the American people on the campaign trail.  *See, e.g.*, Kate Sullivan and Katie Lobosco, *Trump wants to close the Department of Education, joining calls by GOP rivals*, CNN (Sept. 13, 2023).[1]

* * *

Plaintiffs seek to undermine the President's Article II authority by injecting this Court into federal workforce decisions made by President Trump and Secretary

---

[1] *Available at* https://www.cnn.com/2023/09/13/politics/trump-department-of-education-states-2024/index.html.

McMahon.  "The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 609 (2008) (citation omitted).  The relief sought by Plaintiffs is thus "incompatible with the Constitution's separation of powers." *Free Enter. Fund*, 561 U.S. at 498.  The Court can avoid infringing the separation of powers by leaving federal workforce management to the President and Department.

### B.    The Article I Branch Has Created a Separate Process for Federal Employment Issues.

More than 40 years ago, Congress passed the Civil Service Reform Act of 1978 ("CSRA"), which "comprehensively overhauled the civil service system." *Lindahl v. Off. of Pers. Mgmt.*, 470 U.S. 768, 773 (1985).  "A leading purpose of the CSRA was to replace the haphazard arrangements for administrative and judicial review of personnel action, part of the 'outdated patchwork of statutes and rules built up over almost a century' that was the civil service system." *United States v. Fausto*, 484 U.S. 439, 444 (1988) (citation omitted).  "Congress responded to this situation by enacting the CSRA, which replaced the patchwork system with an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration."  *Id.* at 445.  "In general, a federal employee whose position comes within CSRA's reach may seek redress for the untoward effects of a prohibited personnel practice only through the panoply of remedies that CSRA itself affords." *Roth v. United States*, 952 F.2d 611, 616 (1st Cir. 1991).  For example, employee appeals of certain agency personnel actions are heard by the Merit Systems

Protection Board ("MSPB") and the United States Court of Appeals for the Federal Circuit, which "has 'exclusive jurisdiction' over appeals from a final decision of the MSPB." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 6 (2012) (statutory citations omitted).

The CSRA's comprehensive scheme prevents employees from pursuing statutory claims in federal district court that arose from adverse employment actions. *See Fausto*, 484 U.S. at 455. In fact, with respect to employee claims under the Administrative Procedure Act, circuit courts "have long held that federal employees may not use the Administrative Procedure Act to challenge agency employment actions." *Filebark v. U.S. Dep't of Transp., 555 F.3d* 1009, 1010 (D.C. Cir. 2009) (citing cases); *see also Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (Kavanaugh, J.). This view is shared across the circuits. *See Rodriguez v. United States*, 852 F.3d 67, 82 (1st Cir. 2017) ("A federal employee generally may not pursue alternative routes of judicial review, such as by filing a civil action in district court under the APA."); *Yu v. U.S. Dep't of Veterans Affairs*, 528 F. App'x 181, 184-85 (3d Cir. 2013); *Tiltti v. Weise*, 155 F.3d 596, 601 (2d Cir. 1998); *Ryon v. O'Neill*, 894 F.2d 199, 203 (6th Cir. 1990); *Stephens v. Dep't of Health & Hum. Servs.*, 901 F.2d 1571, 1575 (11th Cir. 1990); *Weatherford v. Dole*, 763 F.2d 392, 394 (10th Cir. 1985); *Pinar v. Dole*, 747 F.2d 899, 912-13 (4th Cir. 1984); *Billops v. Dep't of Air Force, Little Rock Air Force Base*, 725 F.2d 1160, 1163 (8th Cir. 1984); *Veit v. Heckler*, 746 F.2d 508, 511 (9th Cir. 1984); *Broadway v. Block*, 694 F.2d 979, 986 (5th Cir. 1982); *see also Ass'n of Admin. L. Judges v. Colvin*, 777 F.3d 402, 405 (7th Cir. 2015). Significantly, the CSRA "precludes suit under the Administrative Procedure

Act even when the claim concerns 'a *type* of personnel action' the [CSRA] does not cover—that is, even when the [CSRA] provides no relief for the complained-of employment action." *Mahoney v. Donovan*, 721 F.3d 633, 636 (D.C. Cir. 2013) (citation omitted).

Constitutional claims are no different. The CSRA's comprehensive scheme prevents employees from pursuing constitutional claims in federal district court that arose from adverse employment actions. *See Elgin*, 567 U.S. at 23. When a "plaintiff's constitutional claims amount to a federal law challenge to an adverse personnel action, they are preempted by the CSRA … ." *Berrios v. Dep't of Army*, 884 F.2d 28, 31 (1st Cir. 1989). In *Berrios*, the First Circuit affirmed dismissal of constitutional claims arising from a federal employee's removal. *Id.*

Requiring review pursuant to the CSRA, rather than through APA or constitutional claims in federal district court, advances Congress' intent. "Congress intended the scheme—at least where it applies and provides a mechanism for administrative and judicial review and relief—to be exclusive of ordinary district court actions to challenge a removal." *Elgin v. U.S. Dep't of Treasury*, 641 F.3d 6, 8–9 (1st Cir. 2011), *aff'd sub nom. Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012). "The CSRA's objective of creating an integrated scheme of review would be seriously undermined if … a covered employee could challenge a covered employment action first in a district court, and then again in one of the courts of appeals, simply by alleging that the statutory authorization for such action is unconstitutional." *Elgin*, 567 U.S. at 14; *see also Grosdidier*, 560 F.3d at 497 ("Allowing employees to end-run

the CSRA would undermine Congress's efforts to foster a 'unitary and consistent Executive Branch position on matters involving personnel action.'") (citation omitted). "Such suits would reintroduce the very potential for inconsistent decisionmaking and duplicative judicial review that the CSRA was designed to avoid." *Elgin*, 567 U.S. at 14. "In sum, so far as review of determinations under the CSRA is concerned, what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.).

Because any Department employee affected by the actions challenged by Plaintiffs would need to pursue relief in accordance with the CSRA, Plaintiffs cannot bring statutory and constitutional claims in federal district court in their stead. "Congress had no intention of providing claimants like these—unmentioned in the CSRA—with a level of access to the courts unavailable to almost any other federal employees, including those that the CSRA identifies as most worthy of procedural protection." *Filebark v. U.S. DOT*, 555 F.3d 1009, 1014 (D.C. Cir. 2009). Providing judicial review for Plaintiffs' claims "would give [them] greater rights than the CSRA affords for major adverse actions." *Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.). In *Fausto*, the Supreme Court recognized the "comprehensive nature of the CSRA." 484 U.S. at 448. In doing so, the Court stated that it was applying the "same type of analysis" as an earlier decision that barred third-party claims when a statutory scheme provided the exclusive review procedures for affected parties: "In [*Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345-48 (1984),] we observed that, under the Agricultural Marketing Agreement Act of 1937, the omission of review

procedures for consumers affected by milk market orders, coupled with the provision of such procedures for milk handlers so affected, was strong evidence that Congress intended to preclude consumers from obtaining judicial review." *Fausto*, 484 U.S. at 447-48.

A recent reduction-in-force ("RIF") decision involving 19 of the Plaintiffs here is not to the contrary. Unlike here, plaintiffs alleged they "were not given statutorily required notice of the Government's RIFs." *Maryland v. United States Dep't of Agric.*, No. 1:25-cv-00748, 2025 WL 800216, at *7 (D. Md. Mar. 13, 2025) (temporary restraining order). The alleged lack of notice was the "central injury" in the case, and the plaintiffs' alleged harms "are most naturally understood not as standalone injuries, but as harms flowing from the lack of notice." *Id.* "After all," reasoned the District of Maryland, "had notice been provided, those other injuries—at least as the States describe them—would not have materialized." *Id.*; *see also Maryland v. United States Dep't of Agric.*, No. 1:25-cv-00748, 2025 WL 973159, at *31 (D. Md. Apr. 1, 2025) (preliminary injunction). Plaintiffs here do not allege any deficiencies in a RIF notice. *See* Doc. 1.

Under well-settled law, federal employees who are affected by an agency decision on administrative leave or reduction-in-force must pursue any relief under the CSRA. As numerous courts have found, Congress' careful and comprehensive scheme in the CSRA would be disrupted if federal employees could file statutory or constitutional claims directly in federal district court. And if federal employees cannot directly file these claims, Plaintiffs cannot seek the same relief. At bottom,

Plaintiffs seek to "reinstate federal employees whose employment was terminated or otherwise eliminated on or after January 20, 2025, as part of the mass terminations announced on March 11, 2025," and to enjoin the Defendants "from carrying out the mass termination announced on March 11, 2025." Doc. 69, Ex. A, at 2. The Court can avoid interfering with the separation of powers by leaving federal employee appeals to the appropriate CSRA procedure.

### C. The Article III Branch Should Avoid Infringing the Separation of Powers.

Our Constitution carefully delineates power between the branches. As the Supreme Court observed almost a century ago, it is "a general rule inherent in the American constitutional system, that, unless otherwise expressly provided or incidental to the powers conferred, the Legislature cannot exercise either executive or judicial power; the executive cannot exercise either legislative or judicial power; the judiciary cannot exercise either executive or legislative power." *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 201–02 (1928). "It is also essential to the successful working of this system that the persons intrusted [*sic*] with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other." *Kilbourn v. Thompson*, 103 U.S. 168, 191 (1880). "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." *INS v. Chadha*, 462 U.S. 919, 951 (1983).

The Founders "viewed the principle of separation of powers as the absolutely central guarantee of a just Government." *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).  They "considered it essential that 'the judiciary remain[ ] truly distinct from both the legislature and the executive.'" *Stern v. Marshall*, 564 U.S. 462, 483 (2011) (The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton)).  "As Hamilton put it, quoting Montesquieu, 'there is no liberty if the power of judging be not separated from the legislative and executive powers.'" *Id.*

The separation of powers is critical to the core constitutional values of liberty and democratic accountability.  "The Framers were particularly cognizant . . . of the link between accountability of officials in the Legislative and Executive Branches and individual liberty." *In re Aiken Cnty.*, 645 F.3d 428, 440 (D.C. Cir. 2011) (Kavanaugh, J., concurring).  "The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).  For example, "[t]he President is dependent on the people for election and re-election, but the officers of agencies in the Executive Branch are not." *In re Aiken Cnty.*, 645 F.3d at 440 (Kavanaugh, J., concurring). "Presidential control of those agencies thus helps maintain democratic accountability and thereby ensure the people's liberty." *Id.*  For this reason, any encroachment on the separation of powers necessarily implicates a threat to individual liberty. "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton v. City of N.Y.*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring).

A court should act cautiously before invading the President's well-settled authority to supervise and manage the federal workforce. "Federal agencies must have a certain latitude to make personnel decisions in order to enhance efficiency and discipline in the workplace." *Weatherford*, 763 F.2d at 392 (citing *Arnett v. Kennedy,* 416 U.S. 134, 168 (1974) (Powell, J., concurring in part)). Indeed, "[a]n agency has wide discretion in conducting a reduction in force," and the Federal Circuit—the proper judicial venue for review of such actions—"will not disturb a reduction in force absent a clear abuse of discretion or a substantial departure from applicable procedures." *Gandola v. F.T.C.*, 773 F.2d 308, 313 (Fed. Cir. 1985) (citations omitted). An agency's "decision on the composition and structure of the work force reflects the kind of managerial judgment that is the essence of agency discretion, and is not meet for judicial reevaluation." *Id.* at 311.

Given these considerations, "if [agency] discretion is to be limited, such limitation is better suited for Congress than the courts, for it is Congress which is better able to evaluate the relevant concerns." *Weatherford*, 763 F.2d at 394. Congress created the CSRA to handle federal employee appeals of personnel decisions. The Court can avoid interfering with the separation of powers by leaving federal employee management to the Article II branch and employee appeals to the design by the Article I branch.

## II. Plaintiffs Have Failed to Show Irreparable Harm.

### A. Plaintiffs Have Failed to Show a "Genuinely Extraordinary" Situation.

To obtain a preliminary injunction, Plaintiffs must demonstrate irreparable harm that is "genuinely extraordinary." *DeNovellis v. Shalala*, 135 F.3d 58, 62 (1st Cir. 1998). If Plaintiffs cannot demonstrate irreparable harm, the Court "need not discuss the other factors." *Together Emps. v. Mass Gen. Brigham Inc.*, 19 F.4th 1, 7 (1st Cir. 2021) ("Together Employees I"). Plaintiffs have failed to establish irreparable harm, let alone harm that is genuinely extraordinary.

Plaintiffs argue the traditional standard for irreparable harm that they are "likely to suffer irreparable harm in the absence of preliminary relief." Doc. 70, at 33 (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). But Plaintiffs' requested relief—to "reinstate federal employees whose employment was terminated or otherwise eliminated on or after January 20, 2025, as part of the mass terminations announced on March 11, 2025," Doc. 69, Ex. A, at 2—requires the Court to apply a higher standard governing federal employment actions.

For more than a quarter-century, the First Circuit has required employment actions against the federal government to show "genuinely extraordinary" irreparable harm before an injunction may issue. *See DeNovellis*, 135 F.3d at 62. "[B]efore enjoining a government agency from dismissing a civil service employee who has not exhausted her administrative remedies, a court must find that the facts underlying the employee's allegations of irreparable harm are genuinely extraordinary."[2] *Id.*

---

[2] Plaintiffs do not allege that any Department employee has exhausted administrative remedies relating to the administrative leave and reduction-in-force decisions. *See* Doc. 1. The "failure to exhaust does not put [Plaintiffs] in a better position to seek extraordinary relief." *Does 1-6 v. Mills*, 16 F.4th 20, 36 (1st Cir. 2021).

15

(citing cases). Meeting this standard "requires a very strong showing of irreparable injury." *Id.*

As already discussed, the Plaintiffs should be subject to the same legal requirements as the Department employees subject to the administrative leave and reduction-in-force decisions. *See* § I.B, *supra*. "It is black-letter law that 'money damages ordinarily provide an appropriate remedy' for unlawful termination of employment." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 86 (1st Cir. 2022) ("Together Employees II") (citation omitted). "To obtain an injunction, therefore, the [Plaintiffs] must show a 'genuinely extraordinary situation.'" *Does 1-6 v. Mills*, 16 F.4th 20, 36 (1st Cir. 2021) (citation omitted).

The First Circuit's "genuinely extraordinary" standard is based on the "well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs." *DeNovellis*, 135 F.3d at 62 (quoting *Sampson v. Murray*, 415 U.S. 61, 83 (1974)). "Time and again" over the years, the Supreme Court has "recognized that the Government has a much freer hand in dealing 'with citizen employees than it does when it brings its sovereign power to bear on citizens at large.'" *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 148 (2011) (citations omitted).

## B. Plaintiffs Have Failed to Present Sufficient Facts of Irreparable Harm.

Because Plaintiffs "have not shown a constitutional or statutory violation, they have not shown that [the Department's actions] would cause them any legally cognizable harm." *Doe v. Mills*, 16 F.4th 20. Based on this fact alone, the Court can

16

find that Plaintiffs have not shown irreparable injury and thus are not entitled to a preliminary injunction.

Recent history also demonstrates that Plaintiffs do not allege genuinely extraordinary harm. Plaintiffs' lead irreparable harm argument relates to "Financial Aid for Higher Education." Doc. 70, at 34-36. Plaintiffs argue that "[t]he cuts to FSA staff are very likely to cause delays in processing FAFSA forms, which will irreparably harm Plaintiffs 'in the absence of preliminary relief.'" *Id.* at 35 (citation omitted). But as Plaintiffs' declarations concede, just last year, under the previous administration, there was an "extraordinary disruption brought about by technology glitches in the newly revised FAFSA." Doc. 71-33 (Boeckenstedt Decl.), ¶ 12. Last year, the FAFSA form "effectively opened three-to-four months behind schedule, … [and] there were many students who were left unable to fill out electronic forms due to family status issues and continuing technology bugs." *Id.*; *see also* Doc. 71-16 (Fuerst Decl.), ¶ 9 (discussing "recent complications associated with accurate and timely transmission of FAFSA results to higher education institutions in 2024 via the FAFSA Simplification initiative"). Still, Plaintiffs appear to have avoided irreparable harm last year despite this "extraordinary disruption." *See, e.g.*, Ashley A. Smith, *California's universities navigate unprecedented FAFSA mistakes and delays*, EDSOURCE (Apr. 16, 2024).[3] And Plaintiffs do not allege or provide any supporting evidence that any decisions by the current Department will cause the amount of

---

[3] *Available at* https://edsource.org/2024/californias-universities-navigate-unprecedented-fafsa-mistakes-and-delays/709889.

disruption experienced just last year.  To the contrary, the Department recently announced a 50% increase in the number of applications successfully submitted and processed over the same time last year, along with other user improvements.  *U.S. Department of Education Announces More Than 8 Million FAFSA® Forms Complete and Additional Form Improvements*, Mar. 17, 2025.[4]

Plaintiffs also claim irreparable harm because they "rely on the Department for guidance and technical assistance about legal compliance."  Doc. 70, at 37.  Plaintiffs cite no statutory requirement that the Department provide them with guidance.  Nor do Plaintiffs present sufficient evidence that the Department will be unable to provide them with guidance.

Plaintiffs' cries that they will suffer irreparable harm by not receiving guidance ring hollow since they are currently rejecting the guidance that they receive from the Department.  For example, Plaintiffs argue that technical assistance on issues like "Title IX compliance" is "essential to the functioning of their education systems," and the Department's actions place it "in jeopardy."  *Id.*  But President Trump and the Department recently provided important Title IX guidance: Women and girls must be provided fair athletic opportunities under Title IX, and they are deprived of these opportunities when biological males are allowed to compete in sports against women and girls.  *See, e.g.*, Executive Order 14201 of Feb. 5, 2025, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 11, 2025); *U.S. Department of Education to*

---

[4] *Available at* https://www.ed.gov/about/news/press-release/us-department-of-education-announces-more-8-million-fafsar-forms-complete-and-additional-form-improvements.

*Enforce 2020 Title IX Rule Protecting Women*, Jan. 31, 2025;[5] *U.S. Department of Education to Investigate Title IX Violations in Athletics*, Feb. 6, 2025.[6] Yet a number of Plaintiffs refuse to comply. *See, e.g.*, *U.S. Department of Education's Office for Civil Rights Issues Final Warning Letter to Maine on Title IX Compliance*, Mar. 31, 2025;[7] *U.S. Department of Education Launches Title IX Investigations into Two Athletic Associations*, Feb. 12, 2025 (announcing investigations into athletic associations in California and Minnesota).[8]

Likewise, Plaintiffs claim that they rely on the Department "for its 'direct and ongoing guidance' about anti-discrimination laws." Doc. 70, at 37 (citation omitted). But again President Trump and the Department recently provided important anti-discrimination guidance: educational institutions must end racial discrimination. *See, e.g.*, Executive Order 14190 of Jan. 29, 2025, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Feb. 3, 2025); *U.S. Department of Education Directs Schools to End Racial Preferences*, Feb. 15, 2025;[9] *U.S. Department of Education Releases Frequently Asked Questions on Dear Colleague Letter About*

---

[5] *Available at* https://www.ed.gov/about/news/press-release/us-department-of-education-enforce-2020-title-ix-rule-protecting-women.

[6] *Available at* https://www.ed.gov/about/news/press-release/us-department-of-education-investigate-title-ix-violations-athletics.

[7] *Available at* https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-issues-final-warning-letter-maine-title-ix-compliance.

[8] *Available at* https://www.ed.gov/about/news/press-release/us-department-of-education-launches-title-ix-investigations-two-athletic-associations.

[9] *Available at* https://www.ed.gov/about/news/press-release/us-department-of-education-directs-schools-end-racial-preferences.

*Racial Preferencing*, Mar. 1, 2025.[10]  Yet 14 Plaintiffs advised K-12 schools, colleges, and universities that they could disregard the Department's guidance.  *Attorney General James Issues Diversity, Equity, Inclusion, and Accessibility Guidance for Schools*, Mar. 5, 2025.[11]  Several Plaintiffs also have publicly announced that they will not comply with a Department directive to certify that they are in compliance with federal anti-discrimination law.  *See, e.g.*, Collin Binkley, *Democratic-led cities and states push back on threats to cut US school funding over DEI*, THE ASSOCIATED PRESS (Apr. 8, 2025);[12] Annabelle Timsit, *N.Y. tells Trump administration it won't comply with anti-DEI school order*, THE WASHINGTON POST (Apr. 6, 2025).[13]  Plaintiffs cannot demand reinstatement of employees to provide "essential" guidance upon which they claim to rely, while they are rejecting the essential guidance that is provided.

None of Plaintiffs' other irreparable harm arguments establish a genuinely extraordinary situation.  Instead, Plaintiffs speculate about levels of service and funding delays, which do not establish irreparable harm, let alone harm that is genuinely extraordinary.  Plaintiffs' request for a preliminary injunction should be denied because they have failed to establish irreparable harm.

---

[10] *Available at* https://www.ed.gov/about/news/press-release/us-department-of-education-releases-frequently-asked-questions-dear-colleague-letter-about-racial-preferencing.

[11] *Available at* https://ag.ny.gov/press-release/2025/attorney-general-james-issues-diversity-equity-inclusion-and-accessibility.

[12] *Available at* https://apnews.com/article/dei-trump-administration-certification-letter-b79551813a611ba6301f3f48252357ac.

[13] *Available at* https://www.washingtonpost.com/education/2025/04/06/new-york-schools-dei-trump/.

### III.    The Equities Favor the Defendants.

To complete the preliminary injunction analysis, "[i]t is ultimately necessary … 'to balance the equities—to explore the relative harms to applicant and respondent, as well as the interests of the public at large.'" *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) (citation and second quotation marks omitted).  These factors merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

While the Plaintiffs will not suffer irreparable harm without an injunction, *see* § II, *supra*, the Defendants will suffer irreparable harm with an injunction.  The President suffers harm when he is unable to exercise his Article II powers.  As the Supreme Court observed a century ago, "[i]n all such cases, the discretion to be exercised is that of the President in determining the national public interest and in directing the action to be taken by his executive subordinates to protect it." *Myers v. United States*, 272 U.S. 52, 134 (1926).  Accordingly, "[t]he moment that he loses confidence in the intelligence, ability, judgment, or loyalty of any one of them, he must have the power to remove him *without delay*." *Id.* (emphasis added).  Granting Plaintiffs' requested relief will irreparably harm the President by interfering with his Article II decisions and delaying his plans for the Department.  "Dictat[ing] and restrict[ing] a separate branch of government … truly is irreparable." *Does v. Musk*, No. 25-1273, 2025 U.S. App. LEXIS 8225, at *18 (4th Cir. Mar. 28, 2025) (Quattlebaum, J., concurring in stay).  In addition, the government is unlikely to

recover salary to employees once it is paid. *Cf. Dep't of Educ. v. California*, No. 24A910, 2025 WL 1008354, at *1 (U.S. Apr. 4, 2025) (granting stay pending appeal).

The public interest supports President Trump and Secretary McMahon. According to the Governor of one of Plaintiff States, "By reducing the size, bureaucracy and power of the U.S. Department of Education, we can create more opportunities for parents to choose the best educational setting for their children." Gov. Joe Lombardo, *President Trump's education reforms rightfully return education back to states*, RENO GAZETTE JOURNAL (Mar. 21, 2025).[14] The decisions by the President and the Secretary "will empower states to deliver unprecedented opportunity for every child, regardless of household income or where a child lives." *Id.*

The public is deeply interested in obtaining better education outcomes for America's children. Test scores demonstrate that the current education system is broken. In 2023, "[m]ath and reading scores among America's 13-year-olds fell to their lowest levels in decades, with math scores plunging by the largest margin ever recorded." Collin Binkley, *Math and reading scores for American 13-year-olds plunge to lowest levels in decades*, THE ASSOCIATED PRESS (June 20, 2023).[15] Sadly, 13 Baltimore, Maryland high schools in 2023 did not have a single student test proficient on the state's math exam, a dire situation that an area nonprofit called "educational

---

[14] *Available at* https://www.rgj.com/story/opinion/2025/03/21/president-trumps-reforms-rightfully-return-education-back-to-states-lombardo/82590866007/.
[15] *Available at* https://apnews.com/article/math-reading-test-scores-pandemic-school-032eafd7d087227f42808052fe447d76.

homicide." Chris Papst, *At 13 Baltimore City high schools, zero students tested proficient on 2023 state math exam*, WBFF (Sept. 18, 2023).[16] In Chicago in 2022, "[t]here were 22 schools that had no students who could read at grade level; another 33 schools claimed that no students could perform math at grade level." Bailee Hill, *Chicago Democrat sounds alarm as 55 schools report no proficiency in math or reading: 'Very serious,'* FOX NEWS (Feb. 20, 2023).[17] In January 2025, 33% of American eighth graders and 40% of American fourth graders were "below basic" in reading skills, the largest in recorded history. Dana Goldstein, *American Children's Reading Skills Reach New Lows*, THE NEW YORK TIMES (Jan. 29, 2025).[18] Based on math tests taken by 15-year-olds around the world, America is ranked in the bottom-third of participating countries. Sarah Mervosh, *Math Scores Dropped Globally, but the U.S. Still Trails Other Countries*, THE NEW YORK TIMES (Dec. 5, 2023).[19] America and its children deserve better.

The Supreme Court has "long recognized the role of the States as laboratories for devising solutions to difficult legal problems." *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) (citations omitted). As Justice Brandeis remarked, "[i]t is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel

---

[16] *Available at* https://foxbaltimore.com/news/project-baltimore/at-13-baltimore-city-high-schools-zero-students-tested-proficient-on-2023-state-math-exam.

[17] *Available at* https://www.foxnews.com/media/chicago-democrat-sounds-alarm-55-schools-report-no-proficiency-math-reading-serious.

[18] *Available at* https://www.nytimes.com/2025/01/29/us/reading-skills-naep.html.

[19] *Available at* https://www.nytimes.com/2023/12/05/us/math-scores-pandemic-pisa.html.

social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). As they devise their own education policies, some States are experiencing success. *See, e.g.*, Jeremy Pittari, *Mississippi's 4th graders making huge gains in the classroom*, MAGNOLIA TRIBUNE (Jan. 29, 2025);[20] *National report shows drastic improvement in Louisiana reading, math scores*, WBRZ (Jan. 29, 2025).[21]

Returning education to the States is in the public interest because it is likely to lead to improved educational outcomes for America's students. Furthermore, "the public also has an interest in judges wielding power only when so authorized." *Does 1-26*, 2025 WL 1020995, at *6 (Quattlebaum, J., concurring in stay)..

## CONCLUSION

For these reasons, the Amici States respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

---

[20] *Available at* https://magnoliatribune.com/2025/01/29/mississippis-4th-graders-making-huge-gains-in-the-classroom/.
[21] *Available at* https://www.ktbs.com/news/national-report-shows-drastic-improvement-in-louisiana-reading-math-scores/article_6f1247a4-de86-11ef-b8d1-bb01543cc34c.html.

Dated: April 14, 2025.                    Respectfully submitted,

                                          /s/ *Patrick Strawbridge*

                                          Patrick Strawbridge BBO #678274
                                          CONSOVOY MCCARTHY PLLC
                                          Ten Post Office Square
                                          8th Floor South PMB #706
                                          Boston, MA 02109
                                          617.227.0548
                                          patrick@consovoymccarthy.com

                                          *Counsel for Amicus Curiae State of
                                          Montana*

25

## ADDITIONAL COUNSEL

AUSTIN KNUDSEN
Attorney General of Montana

STEVE MARSHALL
Attorney General of Alabama

TREG TAYLOR
Attorney General of Alaska

TIM GRIFFIN
Attorney General of Arkansas

JAMES UTHMEIER
Attorney General of Florida

CHRISTOPHER M. CARR
Attorney General of Georgia

RAÚL LABRADOR
Attorney General of Idaho

THEODORE E. ROKITA
Attorney General of Indiana

BRENNA BIRD
Attorney General of Iowa

KRIS KOBACH
Attorney General of Kansas

LIZ MURRILL
Attorney General of Louisiana

LYNN FITCH
Attorney General of Mississippi

ANDREW BAILEY
Attorney General of Missouri

MIKE HILGERS
Attorney General of Nebraska

DAVE YOST
Attorney General of Ohio

ALAN WILSON
Attorney General of South Carolina

MARTY JACKLEY
Attorney General of South Dakota

JONATHAN SKRMETTI
Attorney General of Tennessee

KEN PAXTON
Attorney General of Texas

DEREK BROWN
Attorney General of Utah

JOHN B. MCCUSKEY
Attorney General of West Virginia