## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, *et al.*;

     Plaintiffs,

        v.

LINDA McMAHON, *et al.*;

     Defendants.

C.A. No. 1:25-cv-10601-MJJ

## PLAINTIFF STATES' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

# <u>TABLE OF CONTENTS</u>

I.      The Unrebutted Factual Record Demonstrates that the Mass Termination and March 21 Directive Interfere with the Department's Statutory Obligations. ...................................... 1

II.     Since Their Initial Submission, Plaintiffs Have Only Gathered More Evidence Confirming the Harms Caused by Defendants' Actions. ..................................................... 3

III.    Plaintiffs Have Standing to Challenge the Department's Failure to Meet Its Statutory Obligations. ................................................................................................................... 6

IV.    The CSRA Does Not Require Plaintiffs' Claims to Be Channeled through an Administrative Process. ........................................................................................................ 7

V.     Plaintiffs' Claims are Ripe. ........................................................................................ 7

VI.    Plaintiffs are Likely to Succeed on their APA claims. ........................................................ 9

        A.     Plaintiffs Challenge Discrete Final Agency Actions. ............................................... 9

        B.     Defendants' Actions are Not Committed to Agency Discretion. .......................... 10

VII.   Plaintiffs are Likely to Succeed on their Constitutional Claims.**........................................**11

        A.     *Dalton* does not Preclude Plaintiffs' Constitutional Claims. ................................11

        B.     Plaintiffs' Claims Regarding the Dismantling of OCR Do Not Challenge the Executive's Enforcement Discretion under *Heckler*. ............................................ 13

VIII.  Defendants Wholly Fail to Rebut Plaintiffs' Declarations Attesting to Irreparable Harm and How the Equities Strongly Favor Plaintiffs. ............................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner*, 387 U.S. 136 (1967) .................................................................... 8

*Amerijet Intern., Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ................................... 10

*Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70 (D. Me. 2008) ............................... 14

*Bennett v. Spear*, 520 U.S. 154 (1997) .................................................................................. 9

*City of New York v. United States Dep't of Def.*, 913 F.3d 423 (4th Cir. 2019) ............................ 8

*Cobell v. Kempthorne*, 455 F.3d 301 (D.C. Cir. 2006) ........................................................ 9

*Dalton v. Specter*, 511 U.S. 462 (1994) ............................................................................... 12

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ................................................................ 10

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020) ...................................... 10

*Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530 (1st Cir. 1995) ............................. 8

*F.T.C. v. Standard Oil Co. of California*, 449 U.S. 232 (1980) ........................................... 8

*Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019) ........................ 12

*Heckler v. Chaney,* 470 U.S. 821 (1985) ............................................................................. 13

*Int'l Assoc. of Machinists and Aerospace Workers v.
Eastern Airlines*, 925 F.2d 6 (1st Cir. 1991) ..................................................................... 15

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ........................................ 15

*Maine v. United States Dep't of Agric.*, No. 1:25-CV-00131-JAW,
2025 WL 1088946 (D. Me. Apr. 11, 2025) ...................................................................... 15

*Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003) ........................................................ 8

*Maryland v. U.S. Dep't of Ag.*, No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025)............... 7

*Massachusetts v. Nat'l Insts. of Health*, No. 25-cv-10338,
2025 WL 702163 (D. Mass. Mar. 5, 2025) ....................................................................... 11

*McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63 (1st Cir. 2003) .................................... 8

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
No. CV 25-239 (LLA), 2025 WL 597959 (D.D.C. Feb. 25, 2025) ......................... 15

*Nat'l Treasury Emps. Union v. Vought*, -- F. Supp. 3d --, 2025 WL 942772,
(D.D.C. Mar. 28, 2025), *appeal pending* No. 25-5091 (D.C. Cir.)...................................... 7, 10

*New York v. Trump*, 133 F.4th 51 (1st Cir. 2025) ............................................ 9

*New York v. Trump*, No. 25-cv-39, — F. Supp. 3d —,
2025 WL 357368 (D.R.I. Jan. 31, 2025)................................................................ 15

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004)............................ 9

*Printz v. United States*, 521 U.S. 898 (1997) ............................................... 13

*Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43 (1993)......................................... 8

*Roman Catholic Bishop of Springfield v. City of Springfield*,
724 F.3d 78 (1st Cir. 2013) ............................................................... 8

*Sierra Club v. Trump*, 963 F.3d 874 (9th Cir. 2020) ..................................... 12

*United States v. Fausto*, 484 U.S. 439 (1988)............................................ 7

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9 (2018)........................11

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)........................ 14

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ........................... 12, 13

**Statutes**

20 U.S.C. § 3413.................................................................... 13

Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction suffers from two chief flaws. First, Defendants dramatically mischaracterize the Mass Termination and March 21 Directive as minor changes with no impact on statutory obligations, despite the extensive and unrebutted factual record to the contrary. Second, Defendants misread the relevant statutory and constitutional law to provide the Executive remarkable and unprecedented authority to hollow out congressionally established agencies.[1]

## I. The Unrebutted Factual Record Demonstrates that the Mass Termination and March 21 Directive Interfere with the Department's Statutory Obligations.

Defendants repeatedly insist that the Mass Termination and the March 21 Directive are merely a "reorganization" or "restructuring" of the Department, Doc No. 95 at 2-4, but that is belied by the entirely unrebutted factual record Plaintiffs submitted in support of their Motion. Defendants' complaints about an insufficient link between the challenged actions and the impairment of statutory functions, Doc No. 95 at 1, are meritless, as demonstrated by the following unrebutted evidence highlighting just some[2] of the offices whose abolishment imperils the statutory functions for which they are responsible:

- **Office for Civil Rights (OCR)**: Seven of the twelve regional offices—Boston, Dallas, New York, Chicago, Cleveland, San Francisco, and Philadelphia—responsible for investigating and enforcing complaints related to federal civil rights laws, including Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, Title II of the Americans with Disabilities Act of 1990, and the Boy Scouts of America Equal Access Act, have been completely eliminated. Doc No. 71-48 at 7; Doc No. 71-53; Doc No. 71-55; Doc No. 71-49; Doc No. 71-59; Ex. 81 (Coleman Decl.) ¶¶ 25–26; Ex. 76 (Branson Decl.) ¶¶ 5–7.

---

[1] Citations to "Ex. __" are to the Supplemental Declaration of Nathaniel J. Hyman, unless otherwise indicated.

[2] Identifying every statutory function impacted by the Mass Termination and March 21 Directive is likely an impossible task—as demonstrated by Defendants' own statement that they do not understand how the Mass Termination and March 21 Directive will impact those functions. Ex. 81 (Coleman Decl.), Ex. 1. It is clear, however, that Departmental management noted that certain functions were statutory mandates, and those functions were eliminated anyway. Ex. 77 (Doe 17 Decl.) ¶¶ 44–45; Ex. 80 (Tessitore Decl.) ¶ 5.

- **Office of Career and Technical Adult Education**: The Monitoring and Administration Branch, which was responsible for monitoring state compliance with Title II of the Workforce Innovation and Opportunity Act, is gone. Doc No. 71-54 at 2.
- **Office of Postsecondary Education**: The International and Foreign Language Education Division, which administered four programs under the Fulbright-Hays Act of 1961 and eight programs under Title VI of the Higher Education Act of 1965, has been abolished. ECF 71-56 at 2.
- **Federal Student Aid (FSA)**:
  - The Community Support Division within the Office of the Ombudsman, which resolved student loan borrower complaints, consulted with stakeholders, ensured compliance with the Stop Student Debt Relief Scams Act of 2019 ("STOP Act") and other statutory provisions, and managed suspected fraud from FSA's servicing vendors, has been demolished. Doc No. 71-50 at 1–4.
  - Six out of eight School Participation Sections within the Institution of Higher Education, which performed eligibility, certification, financial analysis, and oversight of all schools that administer federal student aid programs as required under Title IV of the Higher Education Act, including 20 U.S.C. §§ 1011, 1018(c)(4), 1094, 1099c, 1099c-1, and 34 C.F.R. Part 668, were terminated, including the section responsible for assessing schools' financial responsibility. Doc No. 71-63 at 3–7; Doc No. 71-52 at 3–7; Doc No. 71-51 at 3.
  - The Vendor Oversight and Vendor Performance Divisions, which provided oversight of Title IV loan agencies, vendors, and servicers, as required by the Higher Education Act, 18 U.S.C. § 1018(a)–(b), 20 U.S.C. Part B and 34 C.F.R. 682 and 685, were eliminated. Ex. 80 (Tessitore Decl.) ¶¶ 4, 7–10; Ex. 77 (Doe 17 Decl.) ¶ 45; Doc No. 71-62 at 2; Doc No. 71-68 at 2; Doc No. 71-69 at 3–4.
  - Defendants decided to transfer management of the entire federal student loan portfolio to the unqualified Small Business Administration (SBA), which itself just underwent a massive RIF. Doc No. 70 at 14–15; Doc Nos. 71-8, 71-46 at ¶¶ 19, 20.
- **Office of English Language Acquisition**: The entire statutorily mandated office, *see* 20 U.S.C. § 3420, which manages Title III English Language Acquisition State Grants, the National Professional Development Program, and the Native American and Alaska Native Children in School Program, was abolished. Doc No. 71-60 at 1–4.
- **Institution of Education Sciences**: Only five total employees remain across the National Center for Education and Statistics, the National Center for Education Research, and the National Center for Education and Evaluation, which perform work mandated under the Education Sciences Reform Act, reducing the entire Institution's staff from 200 to 20. Doc No. 71-64 at 3–5; Ex. 81 (Coleman Decl.) ¶ 21; Ex. 78 (Doe 18 Decl.) ¶ 13.
- **Office of the General Counsel**: The Division of Educational Equity; the Division of Elementary, Secondary, Adult, and Vocational Education; the Division of Regulatory Services; the Division of Legislative Counsel; the Division of Business and Administrative Law; and the Ethics Division are all gone, resulting in an 83% reduction in staff. Doc No. 71-66 at 1–2.
- **Office of Special Education and Rehabilitative Services:** Employees engaged in policy, operations, and administrative functions were terminated, impacting the division's ability to provide oversight and technical assistance in the proper implementation of the Individuals with Disabilities Education Act (IDEA) part C programs. Doc No. 70 at 27;

Doc No. 71-14 at 6–11. On March 21, 2025, President Trump also stated "special needs" must be transferred to the Department of Health and Human Services. Doc No. 70 at 22–23.

In summary, while Defendants claim, without evidence, that "[a]fter the overhaul, the Department 'will continue to deliver on all statutory programs that fall under the agency's purview,'" Doc No. 95 at 2, experienced employees with decades of collective institutional knowledge have stated in sworn declarations that the Department will be unable to meet its myriad statutory obligations as a result of the challenged actions. *See* Doc Nos. 71-47 – 71-69; Ex. 80 (Tessitore Decl.) ¶ 16; Ex. 78 (Doe 18 Decl.) ¶ 13; Ex. 82 (Downey Decl.) ¶ 20.

## II.    Since Their Initial Submission, Plaintiffs Have Only Gathered More Evidence Confirming the Harms Caused by Defendants' Actions.

Over the past several weeks, Defendants have pushed forward with their plans to dismantle the Department. On March 21, 2025, Secretary McMahon published an opinion editorial on Fox News entitled "LINDA MCMAHON: My vision for eliminating the Department of Education," in which she noted: "Trump . . . has directed me to dismantle this ineffective bureaucracy and restore control over education to states and parents."[3] McMahon also confirmed that she anticipates additional terminations within the Department, and that she is following the President's directive to move the student loan portfolio for more than 40 million people to the Small Business Administration.[4] On April 10, 2025 the Department sent identical "official" RIF notices to the employees who had been subject to the Mass Termination in March, pushing forward with their plan to eliminate entire offices responsible for vital statutory functions within the Department. *See* Ex. 83 (Hamlin Supp. Decl.), Ex. 1; Ex. 80 (Tessitore Decl.), Ex. 2; Ex. 81 (Coleman Decl.) ¶¶ 8–

---

[3] Linda McMahon, "My vision for eliminating the Department of Education," Foxnews.com (Mar. 21, 2025) (Ex. 70).
[4] Arthur Jones II, "McMahon hijacks House Democrats' presser after closed-door meeting outside Department of Education," ABC News (Apr. 2, 2025) (Ex. 75).

26, Ex. 2. The resulting harms are becoming even more apparent. On April 14, the Washington Post published a lengthy report of significant disruptions to the federal financial aid apparatus following the Mass Termination.[5] Cuts to the Department's Office for Civil Rights have resulted in stalled investigations and further burden on states.[6] Ex. 76 (Branson Decl.) ¶¶ 7–8.

Additional declarations gathered by Plaintiffs indicate that even before the RIF was announced, senior Department leadership had begun to warp longstanding components of the Department to fit the administration's new priorities, re-assigning significant portions of the Department's Office of Grants Management to reviewing all of the Department's policies and regulations for "wokeness" and "DEI," rather than performing their statutory duties. Ex. 82 (Downey Decl.) ¶ 15.[7] Other declarations indicate that senior Department leadership likely disregarded express internal guidance evidencing that terminated Department employees performed important statutory functions. Ex. 77 (Doe 17 Decl.) ¶¶ 44–45; Ex. 80 (Tessitore Decl.) ¶¶ 5–6. And incredibly, the Department has now effectively conceded—in writing—that it does not know how the Mass Termination will impact its ability to perform its statutory obligations or who (if anyone) will perform those obligations moving forward. In its written responses to union officials' questions about the Department's statutory obligations, the Department made a remarkable admission:

---

[5] Danielle Douglas-Gabrielle, "College financial aid hit with glitches, delays due to federal staffing cuts," Washington Post (April 14, 2025) (Ex. 71).

[6] *See* Dylan Peers McCoy, "Families say school civil rights investigations have stalled after federal cuts," NPR.com (Apr. 16, 2025), https://www.npr.org/2025/04/16/nx-s1-5338830/trump-federal-cuts-civil-rights-education-investigations (Ex. 73); *see also* Sanders, Bernie, United States Senate Health, Education, Labor, and Pensions Committee, *President Trump's Decision to Gut the Office for Civil Rights has Left Over 46 Million Students Without Protection from Discrimination* (Mar. 27, 2025) at 2 (Ex. 74); Ex. 76 (Branson Decl.) ¶¶ 7–8.

[7] Because Departmental leadership failed to provide definitions of "DEI" or "wokeness," the review team was forced to flag everything that could conceivably relate to those terms. Ex. 82 (Downey Decl.) ¶ 15.

> Question: The transfer of statutorily mandated functions, how is this being carried out when employees who were doing this work were RIF'ed?

> Response: A determination has not yet been made regarding any transfer of statutorily mandated functions.

Ex. 81 (Coleman Decl.), Ex. 1. Further, in meetings with union officials representing approximately 1,000 of the terminated Department employees, the Department could not explain (1) who was being terminated versus retained; (2) who had been involved in the decision-making behind the terminations; or (3) what considerations or criteria were used for determining whether an office or division was eliminated. Ex. 81 (Coleman Decl.) ¶¶ 12–14.

Plaintiffs have also gathered additional evidence about the effects of the Mass Termination and March 21 Directive. By eliminating virtually all National Center for Education Statistics (NCES) staff, the Department has undermined its ability to collect accurate data for use when calculating Title I grants. Ex. 79 (Doe 19 Decl.) ¶ 10. These cuts also mean that it will not be able to complete the National Assessment of Education Progress. Ex. 78 (Doe 18 Decl.) ¶¶ 14, 18–19. In the short term, the Mass Termination will result in an immediate halt of statutorily mandated oversight and compliance work within FSA, *see* 20 U.S.C. § 1018, potentially costing taxpayers millions. *See* Ex. 77 (Doe 17 Decl.) ¶¶ 50, 51. In the medium term, the dramatic cuts to FSA are likely to undermine FSA's ability to monitor and fix existing and new servicing issues. *Id.* ¶ 52. And in the longer term, "FSA is now like a house of cards" incapable of withstanding "any coming shocks to the federal student loan system." *Id.* ¶ 53. This will likely catastrophically materialize by October 2025,[8] when approximately 9.5 million borrowers will be deemed to have defaulted on their student loans. *Id.* ¶ 54. Because the Mass Termination guarantees that FSA will not be able to fully oversee and supervise its debt collection vendors, millions could be subjected to illegal

---

[8] *See* Ex. 72 at 6.

debt collection practices violative of state and federal law. *Id.* ¶¶ 57–65. These short- and long-term impacts will likely be tremendously amplified if the portfolio is transferred to SBA. Doc No. 70 at 18; Doc No. 71-46 at ¶¶ 19–20.

### III.   Plaintiffs Have Standing to Challenge the Department's Failure to Meet Its Statutory Obligations.

Defendants contend that Plaintiffs lack standing because the harm they face is too speculative, but that ignores Plaintiffs' current and imminent prospective harms—none of which are speculative. To take just one example of current harm, the cuts at FSA have resulted in a public college in Washington State—Evergreen State College—receiving no substantive response to its application for re-certification of its Program Participation Agreement with the Department, putting its continued receipt of federal student aid at risk. Doc No. 71-40.[9] Additionally, with the termination of key FSA personnel, "state student loan ombudsman offices, state regulators, state attorneys general, and state higher education offices" no longer can access information the Department is required to provide under the STOP Act. Doc No. 71-50 at ¶ 8. In the K-12 arena, several Plaintiffs have already seen delays and disruptions in funding. Doc No. 70 at 38–40. And more generally, the uncertainty and chaos stemming from Defendants' actions are already harming State Education Agencies, Local Education Agencies, colleges, and universities by making it extraordinarily difficult to plan, budget, and hire. *Id.* Defendants suggest that Plaintiffs' standing rests on a "highly attenuated chain of possibilities" unconnected to statutory violations, Doc No. 95 at 10, but that is flatly inconsistent with the uncontroverted facts in the record. *See supra* at 1–3.

---

[9] On April 15, 2025, Clover Park Technical College, which was profiled in Plaintiffs' Motion, *see* Doc No. 70-43, finally learned that its application had been approved after 18.5 weeks of uncertainty. *Id.* ¶ 7.

IV.    **The CSRA Does Not Require Plaintiffs' Claims to Be Channeled through an Administrative Process.**

Defendants argue that the Civil Service Reform Act (CSRA) requires Plaintiffs to bring their claims before either the Merit Systems Protection Board or the Federal Labor Relations Authority, but this is incorrect. Doc No. 95 at 10–13. Plaintiffs are sovereign States.[10] They are not current or former employees of the Department, nor are they labor unions. And they do not, through this lawsuit, challenge specific employment decisions. Under these facts, it is plain that the CSRA, which provides an administrative procedure specifically for employees and unions to challenge adverse employment decisions, does not apply here.[11] To hold otherwise would effectively deny Plaintiff States a forum entirely.[12]

V.    **Plaintiffs' Claims Are Ripe.**

Defendants' ripeness objections to Plaintiffs' constitutional and *ultra vires* claims[13] rest entirely on the contention that the Department "is not closed." Doc No. 95 at 14. Although Defendants insist that the Department may not be closed absent Congressional action, the record makes plain that Defendants intend to dismantle the Department—and effectively close it—

---

[10] Defendants suggest that *United States v. Fausto*, 484 U.S. 439 (1988), provides that "employees, labor unions, *and other interested parties*" are required to "raise challenges to final, non-discrimination-related, adverse employment actions" via the CRSA. Doc No. 95. at 11 (emphasis added). But *Fausto*—a case brought by a former employee—does not so hold. Nor is Defendants' passing reference to *Maryland v. U.S. Dep't of Ag.*, No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025), availing, as that one brief order from a divided panel of another circuit contains no analysis or explanation, and in any event, the facts at issue in that case (a challenge to *procedures* used in laying off probationary employees) are not analogous to the instant case.

[11] Defendants also made this argument in *National Treasury Employees Union v. Vought*, a case which actually did involve federal employees and unions, *see* Defs.' Opp. to Pls.' Mot. for Prelim. Inj., Docket No. 31, *National Treasury Employees Union v. Vought*, No. 1:25-cv-00381 (filed Feb. 24, 2025), but the court was unpersuaded even in that context. *See Nat'l Treasury Emps. Union v. Vought*, — F. Supp. 3d —, 2025 WL 942772, at **6–7 (D.D.C. Mar. 28, 2025), *appeal pending* No. 25-5091 (D.C. Cir.).

[12] *See* Pls.-Appellees' Pet. Rehearing En Banc, Docket No. 51 at 11-14, *Maryland v. U.S. Dep't of Ag.*, No. 25-1248 (filed Apr. 10, 2025).

[13] Defendants have not argued that Plaintiffs' APA claims are not ripe.

*without* Congressional authorization. *See* Doc No. 70. at 11, 26–27. And even more telling, Defendants have not countered a single declaration showing how their actions have already or will prevent the Department from performing statutorily-required functions. *See* Doc No. 95. Plaintiffs thus meet both prongs of the ripeness test—their claims are fit for resolution, and they face severe hardship if resolution is delayed. *Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003) (citation omitted).

Defendants have not claimed that "further administrative proceedings are contemplated" to effectuate these actions, and thus there is no risk of "premature adjudication" of "abstract disagreements over administrative policies" or interference with an "administrative decision" that has not "been formalized." *Abbott Labs v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Each case Defendants cite holds only that actions are not ripe where there is a "lengthy chain of speculation as to what the future has in store." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 538 (1st Cir. 1995) (plaintiffs' claims depended on "a long string of contingencies," including that a third party must be found liable to another party, resulting in a type of settlement that would harm plaintiffs); *see also Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 59 (1993); *McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 72 (1st Cir. 2003).[14]

*Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 90–91 (1st Cir. 2013), is particularly instructive. In that case, the First Circuit concluded that some of the plaintiffs' claims were ripe where the "enactment of [an] Ordinance itself" was alleged to be unconstitutional,

---

[14] Defendants also cite two cases as evidencing "pragmatic issues" relating to ripeness, but those cases relate to whether a particular agency action is final and discrete under the APA. *F.T.C. v. Standard Oil Co. of California*, 449 U.S. 232, 242 (1980); *City of New York v. United States Dep't of Def.*, 913 F.3d 423, 433 (4th Cir. 2019). The actions challenged here are final and discrete under the APA, as described *infra* at 8–9.

and there was "no doubt that" defendants intended to follow through on enforcing that ordinance, which threatened "practical effects . . . including financial burdens." *Id*. Under those circumstances, similar to those here, there was a live case or controversy.

## VI.    Plaintiffs Are Likely to Succeed on their APA claims.

### A.    Plaintiffs Challenge Discrete Final Agency Actions.

Defendants' argument that their actions are unreviewable because they are not "discrete," Doc No. 95 at 15, relies on the same baseless mischaracterization of the record. Plaintiffs are challenging two discrete agency actions—the Mass Termination and the implementation of the March 21 Directive. These are "final agency actions" under the APA because they (1) "mark the consummation" of agency decision-making and (2) determine "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted).

Defendants' only response is to repeatedly characterize Plaintiffs' claims as a "wholesale challenge" to "management of the Department," raising "generalized complaints about agency behavior" that "would require the Court to supervise all of the agency's activities." Doc No. 95 at 15–18 (citation omitted). That is plainly wrong. Again, Plaintiffs challenge two specific actions— the Mass Termination and the implementation of the March 21 Directive—not "all of the agency's activities." Contrary to Defendants' assertions, this case bears no resemblance to *Lujan*. As the First Circuit has explained, "the 'broad programmatic attack' at issue in *Lujan* was an attempt to seek 'wholesale' 'programmatic improvements' 'by court decree' by 'couch[ing]' '[the Bureau of Land Management's] land withdrawal review program' as an 'unlawful agency 'action.'" *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (quoting *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004)); *see also Cobell v. Kempthorne*, 455 F.3d 301, 305–06 (D.C. Cir. 2006) (disapproving of suit where plaintiffs sought a "plan" encompassing "all-purpose

supervision of the defendants' compliance with . . . sixteen general fiduciary duties"). There is nothing "impossible to litigate" about whether these two actions are unlawful under the APA. Doc No. 95 at 17.[15]

Defendants appear to suggest that the Mass Termination and implementation of the March 21 Directive can escape APA review because Defendants have chosen to dismantle the Department in steps and more destruction is presumably to come. Doc No. 95 at 18. But that there may be future efforts to further gut the Department is irrelevant to whether Plaintiffs can challenge final agency actions. *See, e.g.*, *Vought*, 2025 WL 942772, at *12 (rejecting arguments like Defendants' and finding that a stop work order to CFPB staff constituted reviewable final agency action where plaintiffs challenged the stop work order as being part of "the wholesale cessation of activities" and "decision to shut down the agency completely"); *id.* at *10 ("[CFPB] stop work order marked the end of whatever decision-making process the Acting Director found to be necessary, and . . . it had immediate, concrete legal consequences.").

## B.    Defendants' Actions Are Not Committed to Agency Discretion.

Defendants admit that they failed to provide any reasoned basis for the Mass Termination. Doc No. 95 at 25 (admitting that "the letter from Secretary McMahon includes only a cursory explanation"). That violates the APA. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 16 (2020); *Amerijet Intern., Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do"). Requiring Defendants to "articulate[] a satisfactory explanation for [their] decision," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), is not "'dictat[ing] to the agency the methods[] [and] procedures' it uses to complete its statutory obligations," Doc No. 95 at 24. It is simply demanding compliance with a "fundamental

---

[15] Defendants also suggest that Plaintiffs' claims make it impossible to produce an administrative record, though none of the cases they cite stand for that proposition. *See* Doc No. 95 at 17.

requirement of administrative law"—that "an agency set forth its reasons for decision." *Massachusetts v. Nat'l Insts. of Health*, No. 25-cv-10338, 2025 WL 702163, at *16 (D. Mass. Mar. 5, 2025). Nor have Defendants meaningfully countered Plaintiffs' arguments that the challenged actions are contrary to law. *See* Doc No. 70 at 28–30.

Defendants' only answer appears to be that their actions are "unreviewable," Doc No. 95 at 25, because they are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). That is wrong. Because of the APA's "basic presumption of judicial review," the exception Defendants invoke must be read "quite narrowly." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22–23 (2018) (citation omitted). It is confined only to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 23 (citation omitted).

That is not the case here, and Defendants devote little energy to proving the contrary. Plaintiffs' motion outlines the constitutional and statutory standards against which Defendants' actions can be judged. And despite Defendants' effort to recast the Mass Termination and March 21 directive as mere "staffing" and "managerial decisions," Doc No. 95 at 24–25, Plaintiffs have compiled extensive evidence demonstrating that Defendants have eliminated entire offices within the Department, without a plan to ensure that the agency can continue to meet its statutory obligations, and without any effort to transition the work or knowledge of the employees who were terminated. *See* Doc No. 70 at 15–24; Doc No. 71-49 ¶¶ 5–11 & Ex. 1; Ex. 81 (Coleman Decl.) ¶¶ 7–27.

## VII.    Plaintiffs Are Likely to Succeed on their Constitutional Claims.

### A.    *Dalton* Does Not Preclude Plaintiffs' Constitutional Claims.

Defendants' assertion that Plaintiffs' constitutional claims are actually statutory claims, Doc No. 95 at 19–20, is meritless. Plaintiffs invoke fundamental constitutional principles in

11

arguing that, by effectively dismantling the Department, Defendants have usurped Congress's exclusive role in creating and eliminating agencies, and have neglected their own constitutional obligation to take care that the laws are faithfully executed.[16] *See* Doc No. 70 at 30–32.

Defendants cite a single case, *Dalton v. Specter*, 511 U.S. 462 (1994), as support for construing Plaintiffs' claims as statutory, but *Dalton* does not support that proposition. *Dalton* holds only that the federal government does not "*necessarily* violate[] the Constitution" when it exceeds the bounds of its statutory authority. 511 U.S. at 473 (emphasis added). That does not mean that action outside the scope of statutory authority can *never* give rise to a constitutional violation. *Accord Sierra Club v. Trump*, 963 F.3d 874, 889 (9th Cir. 2020) ("*Dalton* suggests that some actions in excess of statutory authority may be constitutional violations, while others may not"), *vacated and remanded as moot sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021). Critically, in *Dalton*, the Court distinguished the question before it—whether the President exceeded his authority under a statute—from the facts of *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), where *no* statutory authority supported the President's actions. *Dalton*, 511 U.S. at 473.

Here, Plaintiffs' constitutional claims mirror *Youngstown* rather than *Dalton*. In hobbling the Department, Defendants acted both without any supporting statutory authority and directly

---

[16] Defendants argue that "insofar as" Plaintiffs "are challenging the President's Executive Order," that Order is rendered lawful by a savings clause. *See* Doc No. 95 at 22. Plaintiffs' Motion does not seek to enjoin President Trump's Executive Order, and thus this argument is irrelevant. Neither the March 11 press release regarding the Mass Termination nor the March 21 Directive include any such "savings" language, other than baseless claims that statutory mandates will be met, despite all evidence to the contrary. Even if they had, the "Supreme Court has long instructed that acts 'cannot be held to destroy [themselves]' through saving clauses." *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 775 (7th Cir. 2019) (citation omitted). The Mass Termination and the March 21 Directive prevent the Department from meeting its statutory mandates, and thus no savings clause could rehabilitate them.

contrary to congressional intent. Their constitutional power was thus "at its lowest ebb." *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring).[17]

### B.    Plaintiffs' Claims Regarding the Dismantling of OCR Do Not Challenge the Executive's Enforcement Discretion under *Heckler*.

Contrary to Defendants' assertion, Doc No. 95 at 20, *Heckler v. Chaney,* 470 U.S. 821 (1985), does not allow Defendants to shutter seven regional OCR offices and terminate all employees within them. *Heckler* held that an agency's decision not to take a specific enforcement action was not subject to judicial review under the APA. *Heckler*, 470 U.S. at 837–38. But unlike in *Heckler*, Plaintiffs do not challenge a specific decision by Defendants regarding whether to pursue an enforcement action, or which enforcement actions to pursue. Rather, Plaintiffs argue that Defendants' actions to reduce OCR staff amount to an incapacitation of the Department's ability to meet its statutory obligations to begin with. The Department cannot, on its own, decide to render OCR incapable of performing the duties Congress established. 20 U.S.C. § 3413.

Indeed, Plaintiffs have shown, and Defendants have not rebutted, that the shuttering of seven regional offices and the termination of all employees there has destroyed OCR's ability to perform its statutory enforcement and compliance activities. Doc No. 70 at 22–23. With significantly fewer staff handling a much higher caseload, OCR cannot meaningfully investigate and resolve cases. *Id.* The loss of regional expertise and knowledge, now gone with seven regional offices, prevents OCR from conducting on-site inspections and local interviews to assess compliance with the law. *Id.* at 23. The uncertainty with pending cases, including those where

---

[17] Defendants' brief argument that Plaintiffs' Take Care Clause claim is unlikely to succeed on the merits (Doc No. 95 at 22) is equally unpersuasive. Defendants assert that the Take Care Clause does not "provide a basis to review the actions of subordinate Executive Branch officials," *id.*, but none of the cases they cite states that proposition. Indeed, one of the cited cases, *Printz v. United States*, 521 U.S. 898 (1997), suggests the very opposite. *See id.* at 922 (the Constitution provides that the President "'shall take Care that the Laws be faithfully executed,' Art. II, § 3, personally *and through officers whom he appoints*" (emphasis added)).

OCR is monitoring resolution agreements, caused in part by staff's inability to contact complainants, witnesses, and investigation targets, shows that OCR is unable to fulfill its duty to enforce discrimination laws. ECF 71-53.[18]

## VIII.    Defendants Wholly Fail to Rebut Plaintiffs' Declarations Attesting to Irreparable Harm and How the Equities Strongly Favor Plaintiffs.

A movant need not "demonstrate definitive harm" to support issuance of a preliminary injunction. *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 101 (D. Me. 2008). Rather, a showing that "irreparable injury is *likely*" will suffice. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). In support of their Motion, Plaintiffs submitted numerous declarations attesting that the Mass Termination and March 21 Directive will likely prevent the Department from performing statutorily-required functions, causing Plaintiffs irreparable harm. Aside from conclusory assertions to the contrary, Doc No. 95 at 25–26, Defendants have not presented any facts to contradict this ample record.[19]

With respect to the balance of equities and the public interest, Defendants' Opposition makes clear that they unequivocally intend to dismantle and abolish the Department, notwithstanding the fact that they have no authorization from Congress to do so. The second sentence of the Opposition confirms that "ultimately closing [the Department]" is the goal, Doc No. 95 at 1, even though Congress has not, and may never, authorize such a dismantling. This Court need go no further. Plaintiffs, and the American public, have a profound interest in the services Congress has statutorily required the Department to provide, *see supra* at 6, and in having the Government abide by controlling law. *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C.

---

[18] Ex. 74 at 1, 5 (confirming that there are 6,896 open cases handled by staff in the seven closed regional offices).

[19] Indeed, Defendants appear to concede that Plaintiffs have shown at least some instances of irreparable injuries that are likely to result from Defendants' actions. *See* Doc No. 95 at 26.

Cir. 2016) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (citation omitted)).

The primary interest identified by Defendants is that of the President in "tak[ing] decisive action when it comes to setting his policy priorities for the Department of Education." Doc No. 95 at 26. But that interest is greatly diminished where, as here, the proposed "decisive action" oversteps statutory bounds and usurps the power of Congress. The second interest Defendants cite is the financial cost of keeping the Department afloat—a cost for which Congress has already appropriated funding. To maintain the status quo at the Department, the Government "merely would have to disburse funds that Congress has appropriated." *Maine v. United States Dep't of Agric.*, No. 1:25-CV-00131-JAW, 2025 WL 1088946, at *29 (D. Me. Apr. 11, 2025); *see New York v. Trump*, No. 25-cv-39, — F. Supp. 3d —, 2025 WL 357368, at *4 (D.R.I. Jan. 31, 2025). The balance of equities and public interest therefore weigh heavily in favor of granting preliminary injunctive relief.[20]

***

For the foregoing reasons, Plaintiffs respectfully request that their Motion be granted.

---

[20] Plaintiffs request that the Court exercise its discretion to waive the requirement to post a bond under Rule 65(c). *See, e.g.*, *Int'l Assoc. of Machinists and Aerospace Workers v. Eastern Airlines*, 925 F.2d 6, 9 (1st Cir. 1991) (finding "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond" (citation omitted)). Notably, courts have found no security to be required in matters brought to enforce important federal rights or "public interests." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025). To the extent a bond is required, Plaintiffs request that the bond be nominal, consistent with the practice in this Circuit. *See Maine*, 2025 WL 1088946, at *29–30 (collecting cases).

Dated: April 18, 2025                          Respectfully submitted,

**ANDREA JOY CAMPBELL**
Attorney General for the Commonwealth
of Massachusetts

By: */s/ Nathaniel Hyman*
Katherine Dirks (BBO No. 673674)
  Chief State Trial Counsel
Yael Shavit (BBO No. 695333)
  Chief, Consumer Protection Division
Anna Lumelsky (BBO No. 677708)
  Deputy State Solicitor
Elizabeth Carnes Flynn (BBO No. 687708)
Nathaniel Hyman (BBO No. 698506)
Arjun Jaikumar (BBO No. 691311)
  Assistant Attorneys General
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
yael.shavit@mass.gov
elizabeth.carnes-flynn@mass.gov
nathaniel.j.hyman@mass.gov
anna.lumelsky@mass.gov
arjun.k.jaikumar@mass.gov

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
Molly Thomas-Jensen*
Special Counsel
Gina Bull*
Assistant Attorney General
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
molly.thomas-jensen@ag.ny.gov
gina.bull@ag.ny.gov

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

By: */s/ Kaliko'onālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kaliko'onālani D. Fernandes*
Solicitor General
Ewan C. Rayner*
Caitlyn B. Carpenter**
Deputy Solicitors General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov
ewan.rayner@hawaii.gov
caitlyn.b.carpenter@hawaii.gov

**ROB BONTA**
Attorney General for the State of California

By: */s/ Lucia Choi*
Lucia J. Choi*
Deputy Attorney General
Michael L. Newman**
Senior Assistant Attorney General
Srividya Panchalam*
James E. Stanley*
Supervising Deputy Attorneys General
Natasha A. Reyes*
Megan Rayburn**
Deputy Attorneys General
California Attorney General's Office
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6364
Lucia.Choi@doj.ca.gov

16

Michael.Newman@doj.ca.gov
Srividya.Panchalam@doj.ca.gov
James.Stanley@doj.ca.gov
Natasha.Reyes@doj.ca.gov
Megan.Rayburn@doj.ca.gov

**PHIL WEISER**
Attorney General for the State of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
Deputy Solicitor General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

**KATHLEEN JENNINGS**
Attorney General for the State of Delaware

By: */s/ Ian R. Liston*
Ian R. Liston**
Director of Impact Litigation
Vanessa L. Kassab**
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Andrew Mendrala*
Andrew Mendrala*
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.Mendrala@dc.gov

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Clinten N. Garrett*
Clinten N. Garrett**
Senior Appellate Counsel
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Clinten.Garrett@azag.gov

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Patrick Ring*
Patrick Ring*
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808 5020
Patrick.ring@ct.gov

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Karyn L. Bass Ehler*
Karyn L. Bass Ehler*
Assistant Chief Deputy Attorney General
Katharine P. Roberts*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-4985
karyn.bassehler@ilag.gov
katharine.roberts@ilag.gov

**AARON M. FREY**
Attorney General for the State of
Maine

By: */s/ Sean D. Magenis*
Sean D. Magenis*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
(207) 626-8800
sean.d.magenis@maine.gov

**DANA NESSEL**
Attorney General for the People of
Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Kathleen Halloran*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
HalloranK1@michigan.gov

**AARON D. FORD**
Attorney General for the State of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney
General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Keith M. Jamieson*
Keith M. Jamieson*
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6960
kjamieson@oag.state.md.us

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Liz Kramer*
Liz Kramer*
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, MN, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

**MATTHEW J. PLATKIN**
Attorney General for the State of New Jersey

By: */s/ Jessica L. Palmer*
Jessica L. Palmer*
Andrew Simon*
*Deputy Attorney General*
25 Market Street
Trenton, NJ 08625-0093
(609) 696-4607
Jessica.Palmer@law.njoag.gov

18

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Elleanor H. Chin*
Elleanor H. Chin*
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
elleanor.chin@doj.oregon.gov


**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 793-1646
Jonathan.rose@vermont.gov


**JOSHUA L. KAUL**
Attorney General for the State of
Wisconsin

By: */s/ Charlotte Gibson*
Charlotte Gibson**
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 957-5218
gibsoncj@doj.state.wi.us


*Admitted *Pro Hac Vice*
** Motion for *Pro Hac Vice* pending or
forthcoming

**PETER F. NERONHA**
Attorney General for the State of Rhode
Island

By: */s/ Kathryn T. Gradowski*
Kathryn T. Gradowski*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2810
kgradowski@riag.ri.gov


**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: */s/ Spencer W. Coates*
Spencer W. Coates*
Assistant Attorney General
Cristina Sepe*
Deputy Solicitor General
Office of the Washington State Attorney
General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
spencer.coates@atg.wa.gov
cristina.sepe@atg.wa.gov

## **CERTIFICATE OF SERVICE**

I certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).

*/s/  Nathaniel J. Hyman*
Nathaniel J. Hyman

**ADDENDUM**

**TABLE OF COMMON ACRONYMS**

| Acronym | Definition |
|---------|------------|
| CARES | Coronavirus Aid, Relief, and Economic Security Act |
| CART | Collaborative Audit Resolution Team |
| CSRA | Civil Service Reform Act |
| DAEL | Division of Adult Education and Literacy |
| DATE | Division of Academic and Technical Education |
| FAFSA | Free Application for Federal Student Aid |
| FSA | Federal Student Aid |
| GSA | General Services Administration |
| GAO | Government Accountability Office |
| HEA | Higher Education Act |
| IDEA | Individuals with Disabilities Education Act |
| IDR | Income Drive Repayment |
| IES | Institute of Education Sciences |
| IHE | Institutions of Higher Education |
| IPEDS | Integrated Postsecondary Education Data System |
| LEA | Local Education Agency |
| MOHELA | Missouri Higher Education Loan Authority |
| MRFSPD | Multi-Regional and Foreign School Participation Division |
| NAEP | National Assessment of Education Progress ("Nation's Report Card") |
| NCEE | National Center for Education and Evaluation |
| NCER | National Center for Education Research |
| NCSER | National Center for Special Education Research |
| NCES | National Center for Education Statistics |
| NSLDS | National Student Loan Database System |
| OCTAE | Office of Career, Technical, and Adult Education |
| OCR | Office for Civil Rights |
| OESE | Office of Elementary and Secondary Education |
| OELA | Office of English Language Acquisition |
| OGC | Office of the General Counsel |
| OGM | Office of Grants Management |
| OMB | Office of Management and Budget |
| OSSS | Office of Safe and Supportive Schools |
| OSEP | Office of Special Education Programs |
| OSERS | Office of Special Education and Rehabilitative Services |
| PBO | Performance-Based Organization |
| PSLF | Public Service Loan Forgiveness |
| RIF | Reduction in Force |
| SBA | Small Business Administration |
| SEA | State Education Agency |
| SEAD | Office of Student Experience and Aid Delivery |

| Acronym | Definition |
|---------|------------|
| SLA | Service Level Agreements |
| USDS | Unified Servicing and Data Solution |
| VOG | Vendor Oversight Group |
| VERA | Voluntary Early Retirement Authority |
| VSIP | Voluntary Separation Incentive Payment |
| VOPA | Vendor Oversight and Program Accountability |