# EXHIBIT 72



UNITED STATES DEPARTMENT OF EDUCATION

THE UNDER SECRETARY

January 13, 2025

**To:**       Denise Carter
              Delegated the Functions and Duties of the Chief Operating Officer, Federal Student Aid

**From:**     James Kvaal
              Under Secretary

Digitally signed by JAMES KVAAL
Date: 2025.01.13 18:01:37 -05'00'

**Subject:**  Policy Direction on Preventing Student Loan Default

In 2025, for the first time in five years, federal student loan borrowers will face penalties and other consequences for missed payments, including forced collection of defaulted loans. This memorandum summarizes the agency's key initiatives to help borrowers claim loan forgiveness or other benefits for which they are eligible, make affordable loan payments, and avoid entering default. It is critical to continue the initiatives and fully implement the actions outlined in this memo, as the Department plans to resume default penalties and mandatory collections later this year.

Borrowers who fail to make payments can experience challenges throughout the student loan system that make it more difficult to repay their loans and deny them benefits intended by Congress. These barriers include inadequate communications and obstacles to enrolling and remaining in income-driven repayment (IDR) plans and accessing other loan benefits, including forgiveness. A borrower becomes delinquent after missing a payment and defaults after not making payments for nine months. This multi-month window is a critical period during which effective default prevention measures can be implemented to support borrowers in exiting delinquency and repaying their loans.

When borrowers enter default, they face substantial penalties and mandatory collections, including the seizure of wages, tax refunds, Social Security, and other federal benefits, often beyond what they can afford and what would be collected in repayment. They have a limited set of options to return their loans to good standing and thereby end these default consequences. Their debts are immediately due in full, and they lose access to important repayment tools like the ability to defer their payments, the ability to access the range of affordable payment plans available to those not in default, and pathways to forgiveness.

The actions described in this memo are designed to help borrowers remain current on their loans throughout their repayment journeys by addressing obstacles within the student loan system that can push borrowers off track, preventing missed payments, and helping borrowers who get behind manage and avoid the consequences of default and return their loans to good standing.

In recent years, to build a stronger student loan system, the Department has taken on multiple complex challenges while managing the largest return to repayment in history, as mandated by Congress. In early 2024, prior to the court order halting the SAVE plan, more borrowers were making payments on their loans than were before the payment pause. The number of borrowers in default is 30 percent lower than it was before the pandemic. These approximately 5.5 million borrowers represent the smallest number of federally managed loans in default in at least eight years.

But this work to fix the student loan system is not yet done. An unprecedented number of borrowers entered repayment in late 2023 after the end of pandemic-related payment pause. Until October 2024, the Department provided these borrowers an on-ramp period to protect them from the worst consequences of missed payments and get borrowers back on their feet. As a result of these steps, no borrowers have entered default in almost five years. That on-ramp has now ended, and borrowers will experience the full consequences from missed payments in 2025.

To support borrowers in repayment and address the challenges facing borrowers and the student loan system, the Department has focused on three principles.

1. **Preventing default by improving repayment programs, ensuring borrowers can access relief they are entitled to, and strengthening servicing accountability tied to borrower outcomes.**

2. **Providing affordable pathways for borrowers in default to successfully repay their loans.**

3. **Ensuring all borrowers can easily understand their repayment options, including IDR plans, forgiveness, and pathways out of default.**

The sections below outline a critical set of actions that will support borrowers as they repay their loans.

**Preventing default by improving repayment programs, ensuring borrowers can access relief they are entitled to, and strengthening servicing accountability tied to borrower outcomes.**

Utilizing the Fostering Undergraduate Talent by Unlocking Resources for Education Act (FUTURE Act) authority provided by Congress, FSA launched a new, simpler way of applying for IDR plans in 2023. The Department improved the implementation of longstanding student loan forgiveness programs, provided a pathway for borrowers to exit default during the pandemic, and reformed the process for seeking loan discharges through bankruptcy. As part of our accountability efforts, we implemented new servicing contracts that strengthen vendor oversight and include financial disincentives when vendors do not adequately support borrowers.

To help more borrowers avoid delinquency and default, access established federal benefits, and stay on track to repay their loans, FSA is directed to continue this work, including:

<u>Making it easier to enroll and remain in an IDR plan</u>: When applying for an IDR plan, borrowers can authorize the Department to obtain their federal tax information (FTI) from the Internal Revenue Service to calculate payments for IDR plans, recertify for an IDR plan annually, and be automatically enrolled in an IDR plan if they become 75 days delinquent on their loans. The ability for borrowers to consent to this FTI sharing has begun. The resulting automation of IDR enrollment is particularly valuable for low-income borrowers who policymakers have already determined cannot afford to make any monthly student loan payments and who could be protected from delinquency and default by successful implementation of these policies. This work will move forward by:

- Ensuring that borrowers have opportunities to consent to share FTI in places that they interact with the student loan and higher education systems beyond the IDR application. These include the Master Promissory Note, entrance and exit counseling, StudentAid.gov and additional Department webpages, and student loan-related email communications.

- Building on the work the Department recently did to encourage schools and other partners to highlight the importance of FTI sharing (Dear Colleague Letter GEN-24-149). While these entities cannot collect consent on behalf of the Department, they can incorporate information about providing consent into existing communications with students about paying for college such as student financial aid offers, email campaigns and other regular communications to students and borrowers, and student financial aid portals.

Automating relief before borrowers default by:

- Continuing to implement regulations that automatically place borrowers who provide consent for FTI sharing in an IDR plan once they become 75 days delinquent.

- Continuing to create or expand data matching agreements with other agencies, including the Office of Personnel Management and the Department of Defense, to make it easier to identify borrowers eligible for Public Service Loan Forgiveness and the Social Security Administration to include additional categories of borrowers eligible for a total and permanent disability discharge.

- Ensuring borrowers are screened for other forgiveness opportunities before they formally default, including assessing their eligibility for closed school discharge, and developing data sharing partnerships with additional partners.

Making it easier to repay by:

- Ensuring borrowers understand the benefits of and can access available IDR plans by updating the loan simulator and relaunching the full online IDR application.

- Resuming automatic recertifications for IDR plans to ensure borrowers who have consented to FTI sharing remain enrolled in IDR.

- Communicating clear recertification timelines to borrowers and clarifying the impacts of not recertifying by those timelines, including potentially receiving a higher monthly payment amount.

- Turning off auto-debit for anyone who misses their recertification deadline to ensure borrowers do not have a much larger amount of funds taken from their accounts that they are not expecting and may not be able to afford.

- Exploring options to increase the interest incentive (currently 0.25%) provided to borrowers who sign up to have their payments auto debited from their bank accounts to further encourage enrollment; exploring options for easier ways for borrowers to make payments, including offering more payment vehicles like Google and Apple Pay; and working with servicers to explore options for automatic weekly payments to satisfy monthly bills. These efforts should be accompanied by targeted communication to encourage borrowers to sign up for auto debit, where appropriate.

Continuing to strengthen student loan servicing by:

- Providing public transparency around servicer performance. FSA will continue releasing, at least quarterly, updated information on customer satisfaction, call center responsiveness, and contract incentive performance by servicers to ensure borrowers and stakeholders understand the performance of those supporting borrowers in their repayment journeys. FSA should continue to leverage available data to monitor the status of the loan portfolio and the contact center, including ensuring vendor accountability for adequately managing loan accounts and supporting borrowers.

- Developing a multi-year, evidence-based strategy for utilizing servicing incentives to improve borrower outcomes. The "at-risk" incentive is an important new feature of servicing contracts. It incents servicers to keep borrowers current on their loans. FSA should continue to explore ways to make this initiative more effective in identifying promising practices for supporting borrowers in successfully repaying their loans, proving guidance and support to borrowers to assist them with staying out of delinquency and default, and ensuring borrowers have access to the relief programs for which they are eligible.

    - For example, via the "at-risk" incentive, the Department could direct servicers to engage in more innovative approaches to outreach, conduct targeted outreach for specific populations, and engage an external program evaluator.

    - The Department could also use lessons learned from its evaluation of targeted outreach to borrowers which revealed that reminders can help encourage borrowers to take beneficial actions, such as making a payment or signing up for an IDR plan; providing multiple options for borrower engagement can be more effective than providing a single option; and repayment plan-related benefits framed in percentage terms are more effective for encouraging take-up than when the same benefits are framed in dollar terms (Office of the Chief Economist Working Paper OCE2024-003).

**Providing affordable pathways for borrowers in default to successfully repay their loans.**

Later this year, for the first time, borrowers in default will be able to enroll in the Income-Based Repayment (IBR) plan and have a pathway to forgiveness. Additionally, borrowers will be able to provide the Department their incomes to determine their payments based on an IBR formula—ensuring they are not subject to collections that can vastly exceed the amounts due if they were in good standing on their loans. The Department has also eliminated most collection fees, ensuring a larger portion of borrowers' payments goes toward paying down their balances.

In early 2024, we took steps to ensure that, in the coming months, borrowers receiving Social Security will be able to protect a reasonable and appropriate amount of their benefits from offset—$1,883 a month in most states (150% of the federal poverty guideline, which mirrors the formula used for IBR), an increase from the $750 protection in place today—to avoid extreme financial hardship. This protection will update annually based on the federal poverty guideline. FSA will use data in its possession to determine whether borrowers would face financial hardship and apply this protection as appropriate. Available data suggest that these actions will effectively halt Social Security offsets for more than half of affected borrowers and reduce the offset amount for many others. As a result, many who receive Social Security, including older Americans and those receiving disability benefits, will be able to make ends meet while still being responsible for repaying their student loan debt.

To ensure millions of borrowers with defaulted debts can successfully repay their loans, to prevent collections from driving borrowers into poverty, and to ensure borrowers continue to receive fair treatment under the law, FSA is directed to continue this work, including:

Improving collections by:

- Strengthening the Department's ability to track and collect unpaid debts. Work has begun to build connections to the Department of Health and Human Services' (HHS) National Directory of New Hires (NDNH). Use of NDNH would improve information on borrower employment, reduce errors in garnishment, and expand the number of borrowers reached. FSA has previously estimated that this match would greatly reduce the costs of garnishment to the government and help FSA quickly start and end garnishment orders.

- Ensuring borrowers continue to receive fair treatment under the law by ensuring contractors are licensed as third-party debt collectors and adhere to collection laws, train agents on collection laws, monitor and resolve complaints, and analyze complaint data to make servicing improvements.

- Enhancing self-service capabilities for borrowers in default that allow borrowers to check their loan balance and transaction history; make voluntary payments; apply for IDR, rehabilitation, and consolidation to the extent allowed under the policy and regulations; and submit documentation to avoid or mitigate collections.

**Ensuring all borrowers can easily understand their repayment options, including IDR plans, forgiveness, and pathways out of default.**

As we supported millions of borrowers returning to repayment, FSA took steps to communicate with borrowers, including strategic outreach through emails, texts, social media, the StudentAid.gov website, and coordination with servicers. This combination of engagement ensured millions of borrowers were well-informed about affordable repayment options during this unprecedented transition.

To better reach and inform at-risk borrowers, we updated our standard communications, including legal notices, to borrowers in delinquency and default to ensure they contain understandable, accurate, and actionable information. Our teams also worked with outside researchers to develop targeted outreach strategies informed by behavioral science research. Our emphasis on the user experience through consumer testing, plain language, and feedback loops for continuous improvement has resulted in positive outcomes for millions.

In addition, we took action to monitor and mitigate debt relief scams, including promoting educational materials, referring borrower complaints about scams to state law enforcement, and monitoring web activity for ad buys and other content that may mislead borrowers pursuing relief. Leveraging internal data and analysis, our teams have identified borrowers believed to be victims of third-party debt relief scams and reached out to them to help recover their accounts and get them back on track before their loans default.

FSA is directed to continue the work to ensure borrowers are aware of and able to access available repayment tools, including:

Strengthening communications by:

- Conducting an independent review of FSA and vendor communications plans, including a focus on content, timelines, and mediums, for at least the following topics: (1) the benefits of and options for IDR, (2) resources for delinquent borrowers, especially those likely to be at risk of default, and (3) information about IDR recertifications and other key borrower milestones.

- Engaging stakeholders to ensure communication plans sufficiently address key moments on borrowers' journeys and share actionable information appropriate for each touch point. For example, FSA should ensure that the final demand letter from servicers to borrowers (the last communication before borrowers default) better articulates the consequences and implications of default.

- Ensuring that the communications FSA sends to students and borrowers are coordinated with those being sent by vendors to improve the borrower experience.

- Ensuring that FSA and contractor communications are consumer tested, including making sure that standard disclosures are easily understandable.

- For borrowers in default, creating a resource that outlines the pathway through repayment and default and highlights options for borrowers.

- Clearly communicating changes to the current timelines below for various consequences of default, including as collections begin for those who are in default and will enter default over the next year. FSA has shared the operational timelines in Table 1 with my office.

Developing partnerships by:

- Identifying and building partnerships with other agencies and partners who engage with those likely to be in or at-risk for default to help provide information to borrowers. This could occur via organizations that provide public benefits or in locations like public libraries.

- Continuing to work with other federal and state agencies to monitor for and report scams and support borrowers who have been misled.

| Table 1: 2025 Key Return to Repayment Actions | |
|---|---|
| **Action** | **Earliest Impact Date** |
| Credit reporting | Borrowers currently in default: December 30, 2024<br>New Delinquencies: January 2025 |
| Treasury offset | Legal notices sent to borrowers: April 2025<br>Earliest dollars collected: July 2025 *(Social Security offsets happen 1-2 months later)* |
| Wage garnishment | October 2025 |
| New defaults | October 2025 |
| New defaults consequences | October – November 2025 |

The Department has made important progress on default prevention and ensuring borrowers who are behind on their payments have the resources they need to successfully repay their loans. Continuing this work by providing borrowers with information, support, and easy access to repayment tools and relief will help borrowers stay on track over the coming year, avoid the consequences of default, and ensure they are fully benefitting from their investment in higher education.