# EXHIBIT 80

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>  Plaintiffs,<br><br>    v.<br><br>LINDA McMAHON, *et al.*,<br><br>  Defendants. | C.A. No. 1:25-cv-10601<br><br>**DECLARATION OF LISA TESSITORE** |

### DECLARATION OF LISA TESSITORE

Pursuant to 28 U.S.C. § 1746, I, Lisa Tessitore, hereby declare as follows:

1.  I am a resident of Florida. I am over the age of 18 and have personal knowledge of all the facts stated herein, though personal experience, documents and records I have reviewed, and conversations with my colleagues. If called as a witness, I could and would testify competently to the matters set forth below.

2.  This declaration is submitted in support of the States' Request for a Preliminary Injunction.

3.  Until recently, I was Director of the Vendor Oversight Division at the Department of Education's Federal Student Aid (FSA) office in the Department of Education ("the Department"), a position I held since February 2025, when this unit was first created due to a reorganization. Between January 2020 and February 2025, I was Director of the Vendor Oversight Group, which was then split into three units, including the Vendor Oversight Division. I have worked at FSA since November 2011, serving in supervisory roles since 2013. Prior to

working at FSA, I worked in the private sector with guarantors, lenders and servicers to enhance and build products and services for borrowers and schools.

4. Before February 2025, the Vendor Oversight Group managed FSA's contracts with student loan servicers and vendors, ensuring compliance with statutory and contractual obligations for Title IV federal student aid. Denise Carter, appointed Acting Chief Operating Officer of FSA in July 2024, initiated a reorganization of FSA. This reorganization was completed in late January 2025 and took effect in February. Previously, all contractual oversight was handled by the Vendor Oversight Group; post-reorganization, this work was divided into three parts:

    a. The Vendor Performance Division, which is under the Office of Loan Portfolio Management, kept the bulk of employees and was responsible for monitoring Service Level Agreements (SLAs) in our contracts.

    b. The Program Management Division, also under the Office of Loan Portfolio Management, absorbed a smaller group of employees who were responsible for ensuring that vendors' internal controls complied with federal agency obligations under Office of Management and Budget (OMB) Circular A-123.

    c. My team, the Vendor Oversight Division, was placed under the umbrella of the Office of Strategic Acquisitions Planning, which was created during the reorganization in February 2025 to include staff responsible for contract acquisitions, such as the Contracting Operations Division comprised of the contracting officers responsible for and held accountable for FSA's contracts with vendors, and the Business Requirements

>Management Division, which included the business analysts responsible for all change requirements to the contracts. My division was tasked with holistically monitoring our portfolio of vendors, servicers, Business Process Operations (BPO), and the National Student Loan Data System (NDLDS), to make sure these groups were meeting their contractual and regulatory requirements.

5. After the Trump administration took office in January 2025, Denise Carter was appointed as Acting Secretary of Education, in addition to her Acting as Chief Operating Officer of FSA. She placed her Principal Deputy Chief Operating Officer, Phillip Juengst, in charge of planning for a Reduction-in-Force (RIF) shortly after the reorganization took effect. We in the Department were also aware that President Trump and Linda McMahon were making public statements to the press about their intention to shut down the Department altogether. In late February, FSA directors were asked to submit lists to our supervisors describing which of our functions are statutorily required, which we understood was being considered in the planning for a RIF. However, after we provided a preliminary list, I recall that the final list of statutory functions was not in fact due to upper management until March 13, 2025, two days *after* the RIF was announced on March 11th. To the best of my recollection, the entire process of identifying these statutory functions for review had taken place over the course of about two weeks.

6. Even though I had never received a mission statement for the Vendor Oversight Division, which had only just been created in the reorganization, I worked with my director, Calvin Mitchell, on multiple drafts of this list, which the duties of my division to the oversight functions in the Higher Education Act (HEA), as amended, Part D, and associated regulations. I also assisted the Office of Loan Portfolio Management with a list of statutory duties for the

divisions that had been under my oversight before the reorganization. I had felt confident that because these divisions performed vital oversight work mandated by statute, we would be safe from the RIF.

7. For example, the HEA requires a "Performance-Based Organization (hereafter referred to as the 'PBO') which shall be a discrete management unit responsible for managing the administrative and oversight functions supporting the programs authorized under" Title IV. 18 U.S.C. § 1018(a)(1). The Vendor Oversight Division and Vendor Performance Division served to fulfill the statutory purposes of the PBO, including:

   a. "to improve service to students and other participants in the student financial assistance programs authorized under subchapter IV, including making those programs more understandable to students and their parents," § 1018(a)(2)(A);

   b. "to reduce the costs of administering those programs," § 1018(a)(2)(B);

   c. "to increase the accountability of the officials responsible for administering the operational aspects of these programs," § 1018 (a)(2)(C);

   d. "to provide greater flexibility in the management and administration of the Federal student financial assistance programs," § 1018(a)(2)(D); and

   e. "to develop and maintain a student financial assistance system that contains complete, accurate, and timely data to ensure program integrity." 18 U.S.C. § 1018(a)(2)(G).

8. The HEA also requires that a PBO serve several "administrative, accounting, and financial management functions for the Federal student financial assistance programs," including:

    a. "the collection, processing, and transmission of data to students, institutions, lenders, State agencies, and other authorized parties;" 10 U.S.C. § 1018(b)(2)(A)(i);

    b. "all aspects of contracting for the information and financial systems supporting the Federal student financial assistance programs authorized under subchapter IV;" § 1018(b)(2)(A)(iii);

    c. "providing all customer service, training, and user support related to the administration of the Federal student financial assistance programs authorized under subchapter IV," § 1018(b)(2)(A)(v); and

    d. "ensuring the integrity of the Federal student financial assistance programs authorized under subchapter IV." § 1018(b)(2)(A)(vi).

Both the Vendor Oversight Division and the Vendor Performance Division fulfilled these statutory functions.

9. Despite having identified the statutory functions for which these divisions were responsible, I learned on March 11, 2025, that both the Vendor Oversight Division and the Vendor Performance Division were abolished in the RIF. That day, I received an email from the Department's Chief Human Capital Officer, Jacqueline Clay, stating, "your organizational unit is being abolished along with all positions within the unit—including yours."

10. Every staff person in the Vendor Oversight Division and the Vendor Performance Division received the same email informing them that their unit was being abolished. However,

the Organizational Charts that the Department provided AFGE Local 252 to identify the units within the Department that were subject to the RIF (Exhibit 49 to ECF No. 70, Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction, at Exhibit 2 to the Sheria Smith Declaration, page 17), fails to include the Vendor Oversight Division or misidentifies it as "the Office of Strategic Acquisition Planning."

11. I am aware of two individuals who were moved from their units just days before the RIF was announced on March 11th – one who benefited from the move, and one who was harmed by it. One individual was moved out of the Vendor Performance Division into the Loan Operations Division, and thereby saved from the RIF, even though they were far less qualified for that position than other individuals subject to the RIF. Conversely, another staff person was moved from the Borrower Processing Division into the Vendor Performance Division, even though they were over-qualified for that position, and therefore was subjected to the RIF when they otherwise would have remained employed.

12. Following the March 11th RIF email, I was immediately incapacitated from completing my work functions. My work cell phone was shut down, I had no ability to send emails outside of the Department, and I could no longer access Microsoft Teams which we used for staff meetings or Sharepoint which we used to save and share documents. I needed to call into meetings using my personal cell phone. At that point, we did not know who had been subject to the RIF and who remained, so I had no way of knowing to whom to transfer my work, if anyone. I asked how I should transition my work and did not receive a response before March 21, 2025, when I was placed on administrative leave.

13. Despite the fact that I was never able to complete the process of transitioning my work, after I was placed on administrative leave, an automatic reply was set up for my work

email address that falsely claimed, "Tessitore, Lisa is currently engaged in closing out their work activities and responsibilities as part of a planned transition. They are working to ensure a smooth handover of key matters." I received this message when I emailed my work email address from my personal one on April 1, 2025. A true and accurate copy of this automatic reply is annexed hereto as **Exhibit 1.** Because I regularly speak to my colleagues who were also subject to the RIF, I understand that the same automatic reply message was applied to their work email addresses as well.

14. On April 10, 2025, I received an "official reduction in force (RIF) notice" to my personal email address. A true and accurate copy of this email and its attachments is annexed hereto as **Exhibit 2**. This official RIF notice confirmed that I was subject to the RIF and my final "separation from the Federal service" will take effect on June 10, 2025. Because the notice identifies my competitive area as the "Vendor Audit Division" (ENSA), which I believe is another name for the Vendor Oversight Division, it states that I "do not have an assignment right to another position in [my] competitive area."

15. Because the RIF was administered by eliminating entire units within the Department as competitive areas, there was no opportunity for staff with longer tenure, higher performance ratings, or Veteran status to compete for retention rights as required under RIF procedures and regulations. As a result, the Department has lost critical institutional knowledge for ensuring proper oversight of Title IV programs.

16. I do not believe it is possible for the Department to fulfill its statutory oversight functions after having abolished the Vendor Oversight Division and the Vendor Performance Divisions and eliminated staff across FSA. Furthermore, because they have lost all individuals with knowledge and experience in performing these duties and failed to transition our work, I

doubt that FSA is equipped to even access the 90 systems that we use to monitor vendors and servicers. Nor do they have the capacity, in skills or size, to maintain the rigorous pace of oversight needed.

17.     Even prior to the RIF, the Vendor Oversight Group had been long understaffed. When we had insufficient capacity, in an effort to do more with less, we would need to reduce the number of reviews at each vendor we could complete. We also would need to increase the margin of error of our reviews by either reducing our sample size or increasing our margin of error. Before the reorganization, the Vendor Oversight Group had a team of about 60 employees. Only 13 employees were moved into the Vendor Oversight Division during the reorganization to complete the same oversight work, with even more vendors. In prior planning and staffing exercises conducted across FSA with the Boston Consulting Group, it was calculated that we needed 90-100 staff to attain stronger oversight, so we were already operating from a disadvantage with 60 employees. Furthermore, even before the RIF, we lost many employees who took advantage of voluntary incentive offers to leave the Department, including the "Fork-in-the-Road" email, the Voluntary Separation Incentive Payment (VSIP), the Voluntary Early Retirement Authority (VERA), and the Deferred Resignation Program, further hampering our ability to complete our functions.

18.     I am concerned that without the Vendor Oversight Division and Vendor Performance Division, borrowers and taxpayers will be harmed either because servicers are not following requirements or regulations, or because FSA may implement or misinform servicers to do something incorrectly. In 2024, we implemented Unified Servicing and Data Solution (USDS) contracts with our vendors which provide for a direct mechanism for the Department to reduce payments to servicers if they fail to meet requirements in the SLAs, which themselves are

designed to achieve better outcomes on performance. It makes no sense to eliminate divisions which serve directly to save the government millions of dollars in the name of waste, when our work saved money rather than spend it. We have uncovered—and thereby saved—millions of dollars of improper billing and other statutory and required functions in our oversight of vendors. As just one example, we identified one of our servicers who had conducted improper FSA invoicing because a vendor had charged too much per item, amounting to over $12 million in overcharges.

19. In other cases, our oversight work has uncovered vendors that improperly billed consumers, sent improper notices or incorrect dollar amounts, set up accounts for automatic withdrawal when they should not have, put borrowers in the wrong repayment programs, or simply never notified a borrower of information as required. When we found these errors, we set up corrective action plans and worked with the contracting officer to stop payments for improper services under the SLA and USDS Contract. We also monitored contracts to ensure that they were meeting their benchmark timeframes for completing conditions in their SLAs. If errors are not caught quickly, it costs more to correct the problem down the road, as the error grows in both number of impacted borrowers and loans, as well as time to unwind the errors and reset the loans. Without this work, borrowers will be left to fend for themselves, and no one is left to enforce the terms of our contracts.

20. The Vendor Oversight Division was also responsible for overseeing the NSLDS, which is the main database through which critical data about borrowers' loans are kept, including data from schools and servicers that control new award amounts, loan balances, and repayment information, and used to perform various functions for the FAFSA, loan processing, payment plan eligibility, Public Service Loan Forgiveness (PSLF) and Income Driven Repayment (IDR)

forgiveness. NSLDS is used by the Department, auditors, schools, and servicers for administering enrollment, grants, and eligibility. We have found incorrect data in NSLDS, which could be a result of errors from the vendor reporting information to NSLDS or the vendor interpreting that information. We bridged the gap in identifying who has the correct data to prevent problems for servicers and borrowers. If this oversight is not completed, for example, it could result in an incorrect balance being listed, potentially preventing a consumer from borrowing more loans; or if loans are not properly canceled and payments counts credited, it could affect the consumers' credit reports, could prevent them receiving refunds due to them, or could mean they won't receive credit for payments made.

 I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

 Executed on April 17, 2025.

*Lisa Tessitore*
_____
LISA TESSITORE

# EXHIBIT 1

## Automatic reply: Transition

**Tessitore, Lisa** <Lisa.Tessitore@ed.gov>
To: Lisa Tessitore

4/1/2025

Tessitore, Lisa is currently engaged in closing out their work activities and responsibilities as part of a planned transition. They are working to ensure a smooth handover of key matters. To ensure continuity, please direct any related inquires to FSA-Transition@ed.gov

# EXHIBIT 2

**From:** CHCO-Info <<workforcereshaping@ed.gov>>
**Sent:** Thursday, April 10, 2025 3:37:04 PM
**To:**
**Subject:** Official RIF notice

Dear ED Colleague,

Please see attached official reduction in force (RIF) notice and associated documents. Additional information is forthcoming on career transition assistance sessions.

With Regard,
Jacqueline Clay
Chief Human Capital Officer



UNITED STATES DEPARTMENT OF EDUCATION

April 10, 2025

**MEMORANDUM**

TO:       Tessitore, Lisa A.
          SUPV MANAGEMENT AND PROGRA, AD-343-00
          FSA, VENDOR AUDIT DIVISION

FROM:     Jacqueline Clay
          Deputy Assistant Secretary
          Chief Human Capital Officer
          Office of Human Resources
          Office of Finance and Operations

SUBJECT:  Notice of Separation Due to Reduction in Force

In accordance with the Executive Order titled *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative*, dated February 11, 2025, it is with great regret that I must inform you that your position of SUPV MANAGEMENT AND PROGRA, AD-343-00 is being abolished and you have been reached for reduction in force (RIF) action. This memorandum constitutes a specific RIF notice.

Effective June 10, 2025, ED will conduct a RIF within your competitive area. This action is a result of the abolishment of your position in FSA, VENDOR AUDIT DIVISION.

This RIF is in accordance with current law and regulations, which include Chapter 35 of Title 5, United States Code, 5 Code of Federal Regulations, Part 351, internal U.S. Department of Education (ED) policy, and where applicable, the governing collective bargaining agreement between AFGE and ED. In accordance with these provisions, ED will release you from your competitive level, and you do not have an assignment right to another position in your competitive area. As a result, your separation from the Federal service by RIF on June 10, 2025.

To conduct the RIF, the Office of Human Resources (OHR) prepared retention registers which listed employees in retention standing order based on civil service tenure, veterans' preference, length of Federal service and performance ratings. We used the following information to determine your retention standing as of the RIF effective date:

**Competitive Area:** ENSA
**Service Type:** Excepted
**Position Title, Pay Plan, Series and Grade:** SUPV MANAGEMENT AND PROGRA, AD-343-00
**Competitive Level:** NWP

**Tenure Group:** 1, CAREER APPT OR EXC (NOT ON TRIAL PD & W/O TIME LIMIT)
**Retention Tenure/ Subgroup:** 1B
**Service Computation Date (SCD):** November 21, 2011
**Latest Three Performance Evaluations:**
Rating Performance and Pattern FY24: 5
Rating Performance and Pattern FY23: 5
Rating Performance and Pattern FY22: 5
**SCD adjusted by latest three performance ratings:** November 21, 1991

Attached to this letter is an Employee Guide to RIF Benefits which contains information regarding leave and other benefits available to employees separated by RIF, as well as information on the ED Career Transition Assistance Plan. In addition, you may authorize OHR to release your qualification information to Federal, state, and private sector agencies and organizations by completing the attached release authorization. Information regarding benefits available under the Workforce Investment Act of 1998 Program, including unemployment insurance is located at http://www.doleta.gov/usworkforce/WIA/planstatus.cfm.

You may be eligible to receive severance pay. If you are eligible for severance, we will process payment upon separation. If you think you may be eligible for discontinued service or regular retirement, please see the Employee Guide to RIF Benefits for more information or contact benefits@ed.gov. **Note:** You are not eligible for severance pay if you are eligible for an immediate annuity under Minimum Retirement Age (MRA) +10, optional or discontinued service retirement.

If you resign on or before the RIF effective date of June 10, 2025, ED will still consider your separation involuntary. Please be advised that you may affect your appeal rights if you resign. You are strongly encouraged to contact OHR for information if you are considering resigning during this specific notice period.

OHR staff are available to assist you by explaining this proposed action and will provide you with copies of pertinent regulations, benefits information, or other material related to this action that you may wish to review. Title 5 of the Code of Federal Regulations Part 351 contain the RIF regulations. OHR will provide a copy to you upon request. You may also inspect the appropriate retention register through the OHR. You may obtain any information in writing by sending your request to the ED RIF Team, email: WorkforceReshaping@ed.gov.

You may have the right to appeal this action to the Merit Systems Protection Board (MSPB). Should you elect to appeal to the MSPB, your appeal must be in writing and submitted no later than 30 calendar days after the effective date of the reduction in force action. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office (see attached). However, if you are a bargaining unit employee, you must use the negotiated grievance procedures and may not appeal to the MSPB unless you allege that the RIF action was based upon discrimination.

Alternatively, you may file an electronic appeal at https://e-appeal.mspb.gov/. See *How to File an Appeal* at http://www.mspb.gov/appeals/appeals.htm. If you file an appeal the MSPB must serve an acknowledgement order to the following address:

Office of the General Counsel,
U.S. Department of Education
400 Maryland Ave, SW
Washington, DC  20202

If you believe this action is because of a prohibited personnel practice other than discrimination based on your race, color, religion, sex, national origin, age, disability, marital status, or political affiliation, you may seek corrective action with the Office of the Special Counsel (OSC). Your decision to file an MSPB appeal or to seek corrective action from the OSC is exclusive and irrevocable. See Prohibited Personnel Practices Overview for more information about seeking corrective action.

If you believe this action is because of race, color, religion, sex (including pregnancy), national origin, physical disability, genetic information, or age, you may file a complaint with Office of Equal Employment Opportunity Services by email at ODS_OEEOS@ed.gov. To initiate a complaint, you must contact an ED Equal Employment Opportunity Counselor within 45 days of the effective date of this action.

This RIF action is not a reflection upon your performance or conduct. It is solely due to the reduction in the number of positions as described earlier in this letter. ED appreciates the service you have rendered. We deeply regret that this decision affects you, and we recognize the difficulty of the moment.

**Attachments:**
RIF Information Sheet
Employee Guide to RIF Benefits
ED Placement Programs
Reemployment Priority List Registration Form
Authorization to Release Qualifications Information
Severance Pay Information
MSPB Appeal Offices Locations

Sent by email to: ▮

No hard copy to follow