# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF NEW YORK, *et al.*, | Case No. 1:25-cv-10601-MJJ |
| Plaintiffs, |  |
| v. |  |
| LINDA McMAHON, in her official capacity as Secretary of Education, *et al.*, |  |
| Defendants. |  |

## BRIEF OF MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
## LEAVE TO FILE GRANTED ON APRIL 23, 2025

Steve W. Berman*
Breanna Van Engelen*
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
T: (206) 623-7292
F: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Raffi Melanson (BBO # 688650)
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
T: (617) 482-3700
F: (617) 482-3003
raffim@hbsslaw.com

*Pro hac vice* motion forthcoming
[Additional counsel on signature page]

*Counsel for Amici Curiae Members of Congress*

# TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ............................................................... VI

I.    INTRODUCTION ................................................................................... 1

II.    LEGISLATIVE HISTORY OF THE DEPARTMENT'S CREATION ......................... 3

III.    DEFENDANTS' EFFORTS TO DISMANTLE THE DEPARTMENT CONTRAVENE CONGRESS'S EXPRESS DIRECTIVES ....................................... 6

    A.    The Trump administration is engaged in a campaign to dismantle the Department, contrary to Congress's will. ........................................... 6

    B.    The Trump administration's actions to date have incapacitated the Department's functionality, contrary to Congress's will. ................................. 8

        1.    Defendants are preventing the Department from investigating civil rights and student privacy violations. ..................... 9

            a.    *Inadequate investigation of civil rights violations* ................... 9

            b.    *Inadequate investigation of privacy rights violations* ............................................... 13

        2.    Defendants have disrupted distribution of congressionally appropriated funding. ................................... 14

            a.    *Interruptions to special education funding* ............................. 15

            b.    *Interruptions to federal student aid* ........................................ 17

             c.    *Interruptions to funding for K-12 education* ........................... 21

        3.    Defendants have precluded the Department from offering technical assistance as mandated by Congress. .................................. 23

IV.    DEFENDANTS' ACTIONS ARE UNLAWFUL ....................................... 26

    A.    The Trump administration has usurped Congress's exclusive constitutional authority to create the Department of Education. ............................................. 27

    B.    The Trump administration has violated Congress's explicit statutory mandates regarding the Department's organizational structure. ...................... 30

    C.    The Trump administration has infringed on Congress's power of the purse. ... 34

V.    CONCLUSION .................................................................................. 40

APPENDIX A ..................................................................................................

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) ........................................................ 35, 37, 40

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ........................................................................ 34, 35

*Brown v. Board of Education*,
  347 U.S. 483 (1954) ............................................................................ 9

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024) ............................................................................ 34

*Clinton v. City of New York*,
  524 U.S. 417 (1998) .................................................................. 28, 34, 40

*Ctr. for Biological Diversity v. Zinke*,
  313 F. Supp. 3d 976 (D. Alaska 2018) .............................................. 31

*Doe v. Newton Pub. Sch.*,
  48 F.4th 42 (1st Cir. 2022) ................................................................ 16

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ............................................................................ 30

*Helvering v. Or. Mut. Life Ins. Co.*,
  311 U.S. 267 (1940) ............................................................................ 29

*INS v. Chadha*,
  462 U.S. 919 (1983) ............................................................................ 29

*Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*,
  580 U.S. 386 (2017) ...................................................................... 14, 15

*Kendall v. U.S. ex. rel. Stokes*,
  37 U.S. 524 (1838) ........................................................................ 29, 34

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ............................................................................ 30

*Medellin v. Texas*,
  552 U.S. 491 (2008) ............................................................................ 29

*United States v. Maurice*,
   26 F. Cas. 1211 (C.C.D. Va. 1823) ................................................................... 27

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................... 25, 27, 29

*Widakuswara v. Lake*, No.1:25-cv-1015-RCL, ECF No. 98
   (D.D.C. Apr. 22, 2025) ................................................................... 2, 7

### STATUTES

5 U.S.C. § 904 ................................................................... 28

29 U.S.C. § 794 ................................................................... 9

20 U.S.C. § 1018 ................................................................... 17, 20

20 U.S.C. § 1078(c)(3)(A) ................................................................... 19

20 U.S.C. § 1087h ................................................................... 18

20 U.S.C. § 1402 ................................................................... 33

20 U.S.C. § 1412(a)(1) ................................................................... 16

20 U.S.C. § 3402 ................................................................... 1, 3, 5, 33

20 U.S.C. § 3413 ................................................................... 9

20 U.S.C. § 3414 ................................................................... 21

20 U.S.C. § 3416 ................................................................... 26

20 U.S.C. § 3417 ................................................................... 5

20 U.S.C. § 3419 ................................................................... 23

20 U.S.C. § 3420 ................................................................... 24

20 U.S.C. § 3473 ................................................................... *passim*

20 U.S.C. §§ 1681–1689 ................................................................... 9

20 U.S.C. §§ 3413–3415 ................................................................... 5

20 U.S.C. §§ 3419–3420 ................................................................... 5

29 U.S.C. §§ 3101–3361 ........................................................................... 26

29 U.S.C. §§ 3271–3333 ........................................................................... 26

42 U.S.C. § 2000d .................................................................................... 9

Adult Education and Family Literacy Act, Pub. L. No. 113-128, 128 Stat.
    1608 (2014) ........................................................................................ 26

Department of Education Organization Act, Pub. L. No. 96-88, 93 Stat. 669
    (1979) .................................................................................................. 4

Education Sciences Reform Act, Pub. L. No. 107-279, 116 Stat. 1941
    (2002) .................................................................................................. 5

Elementary and Secondary Education Act, Pub. L. 89-10, 79 Stat. 27
    (1965) .............................................................................................. 4, 37

Every Student Succeeds Act, Pub. L. No. 114-95, 129 Stat. 1802 (2015) ........................ 37

FAFSA Simplification Act, Pub. L. No. 116-260, 134 Stat. 3137 (2020) ................. 18, 38

Family Educational Rights and Privacy Act, Pub. L. No. 90-247, 88 Stat.
    1896 (1974) ...................................................................................... 13, 14

Full-Year Continuing Appropriations Act 2025, Pub. L. No. 119-4, 139
    Stat. 11 (2025) .................................................................... 22, 35, 36, 38

Further Consolidated Appropriations Act 2024, Pub. L. No. 118-47, 138
    Stat. 681–684 (2024) ........................................................................ 22, 38

Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 (1965) .................. 4, 18

Improving America's Schools Act of 1994, Pub. L. No. 103-382, 108 Stat.
    3523 (1994) ........................................................................................ 5

Individuals with Disabilities Education Act, Pub. L. No. 108-446, 118 Stat.
    2647 (2004) ........................................................................................ 15

National Defense Education Act, Pub. L. 85-864, 72 Stat. 1580 (1958) ........................ 4

Workforce Innovation and Opportunity Act, Pub. L. 113-128, 128 Stat.
    1425 (2014) ........................................................................................ 26

## OTHER AUTHORITIES

U.S. CONST. art. I, § 1 ................................................................................................ 1, 28

U.S. CONST. art. I, § 8 ................................................................................................ 1, 30

U.S. CONST. art. II, § 2 ............................................................................................... 1, 27

### INTERESTS OF *AMICI CURIAE* [1]

Proposed *amici* are 192 members of Congress who are well-acquainted with the Department of Education (the "Department") and the legislative framework Congress has enacted to advance the federal legislature's educational priorities.[2] The proposed *amici* include members who serve or served on committees with jurisdiction over the Department. They thus have an interest in ensuring the Department is fulfilling its statutory requirements as well as its essential role in ensuring equal access to education.

The Trump administration's recent actions targeting the Department for closure[3]—including terminating nearly half of the agency's workforce and threatening to spin off the Department's mandatory responsibilities to other federal agencies—blatantly disregard Congress's express legislative directives. Stated simply, Defendants' actions violate the Constitution's separation of powers under which Congress holds the sole power to make laws and the Executive faithfully executes those laws.[4] Defendants' actions also impede the Department's ability to carry out its congressionally mandated missions: ensuring access to equal educational opportunity for every individual; supporting research to

---

[1]  Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than *amici curiae* or their counsel contributed money that was intended to fund preparing or submitting this brief.

[2]  A full list of *amici* appears in Appendix A.

[3]  Donald J. Trump, *Improving Education Outcomes by Empowering Parents, States, and Communities*, The White House (Mar. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/improving-education-outcomes-by-empowering-parents-states-and-communities (hereinafter the Trump Executive Order).

[4]  U.S. CONST. art. I; *id.* art. II, § 3.

promote improvements in the quality of education nationwide; disbursing federal education funds; and increasing the accountability of federal education programs.

*Amici* thus have a substantial interest in this case.

# I.    INTRODUCTION

The U.S. Department of Education—the federal agency representing the U.S. government's commitment to improving educational opportunity—administers and coordinates most federal education activities, ensuring that federal funding reaches its intended recipients and serves Congress's legally mandated goals. Congress created the Department over 46 years ago to "strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual" and "to improve the coordination of Federal education programs."[5] Defying Congress's clear mandate, President Trump and other Defendants have begun dismantling the Department part by part—not through legislation, but through executive fiat. This, they cannot do.

The Constitution explicitly reserves the authority to create and dismantle federal agencies to the legislative branch.[6] By taking steps to restructure, defund, and ultimately dismantle a federal agency that Congress created, the Trump administration has unlawfully overstepped the bounds of executive power. The administration's actions not only contravene congressional will, they strike at the heart of the separation of powers which serve as the foundation of our constitutional American democracy.

There can be no doubt as to the administration's intent. In opposing Plaintiffs' motion, Defendants recognize that "President Trump ran on the promise to close the Department of Education."[7] President Trump reiterated via Executive Order his desire to

---

[5]  20 U.S.C. § 3402.

[6]  U.S. CONST. art. I, §§ 1, 8; *id.* art. II, § 2.

[7]  Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, ECF No. 95, at 1 (hereinafter Opp.).

"clos[e] the Department of Education."[8] And now, Defendants are acting on President Trump's kingly proclamation. Since her appointment, Secretary of Education McMahon has terminated nearly **half** of the Department's employees. Further, she has dismantled entire offices within the agency, stripping away the personnel and other resources necessary for the Department to fulfill its statutory obligations.

Defendants' assertion that their actions to date have merely "reduce[d] the headcount at the Department" to "streamline its operations"[9] pays mere lip-service[10] to the rule—which Defendants themselves recognize—that only Congress can "ultimately shutter the Department."[11] In practice, while not dismantling the Department in one go, Defendants have rendered the Department unable to perform the functions required of it by Congress, including, among other functions, investigating allegations of discrimination in the education context,[12] timely distributing federal education grants,[13] and providing technical assistance to schools throughout the nation.[14]

Defendants' concrete steps to begin dismantling the Department violate the Constitution's fundamental principle of separation of powers because the Executive does

---

[8]   *See supra* note 3, Trump Executive Order.
[9]   Opp. at 11.
[10]  *See Widakuswara v. Lake*, No.1:25-cv-1015-RCL, ECF No. 98 (D.D.C. Apr. 22, 2025) at 5, 36 (granting preliminary injunction despite Executive Order ordering that agency functions "shall be eliminated to the maximum extent consistent with applicable law").
[11]  *Id.*
[12]  *See infra* Section III.B.1.
[13]  *See infra* Section III.B.2.
[14]  *See infra* Section III.B.3.

not have authority to negate Congress's legislative and spending decisions.[15] Each year, Congress specifically appropriates funds to the Department to perform its statutory functions.[16] And yet, the President and other Defendants improperly seek to accrue to themselves powers the Constitution reserves to Congress by dictating a new structure for the Department, restricting the Department's access to and use of appropriated funds, and initiating the piecemeal destruction of a bipartisan-created Cabinet-level agency.[17]

The Trump administration cannot be permitted to blatantly disregard congressional mandates. Upholding Congress's will and protecting students and their families requires, at a minimum: (i) restoring Department staff to levels consistent with Congressional appropriations and that Congress has determined are necessary for the Department to perform its statutory duties; (ii) requiring the Department to disburse congressionally allocated funds; and (iii) reestablishing the Department's organizational structure consistent with Congress's expressly stated intent. *Amici* respectfully urge this Court to grant Plaintiffs' motion for a preliminary injunction.

## II.    LEGISLATIVE HISTORY OF THE DEPARTMENT'S CREATION

Congress created the Department of Education in 1979 as a Cabinet-level agency to "ensure access to equal educational opportunity for every individual" and to "supplement and complement the efforts of States ... to improve the quality of education."[18] Congress

---

[15]    *See infra* Section IV.A–C.

[16]    *See infra* Section IV.C.

[17]    *See infra* Section III.

[18]    20 U.S.C. § 3402.

clearly believed that achieving these goals required a particular approach at the federal level.

From President Eisenhower's administration onward, Congress had dramatically increased federal investment in education, seeking to maintain American competitiveness while supporting equal educational opportunity throughout the nation.[19] The federal administrative apparatus, however, could not keep pace. As stated in the Department of Education Organization Act ("Organization Act"), Congress found a "need for improvement in the management and coordination of Federal education programs to support more effectively State, local, and private institutions, students, and parents in carrying out their educational responsibilities."[20] Congress was also concerned that "the dispersion of education programs across a large number of Federal agencies ha[d] led to fragmented, duplicative, and often inconsistent Federal policies relating to education."[21]

Congress thus passed the Organization Act to create a single institution that would "improve the coordination of Federal education programs."[22] As Representative Jack Brooks, a sponsor of the Organization Act, stated, "the basic purpose of the bill" was to "create[] a Cabinet-level Department of Education to provide more efficient administration

---

[19] *See, e.g.*, Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 (1965); Elementary and Secondary Education Act, Pub. L. No. 89-10, 79 Stat. 27 (1965); National Defense Education Act, Pub. L. No. 85-864, 72 Stat. 1580 (1958).

[20] Pub. L. No. 96-88, § 102, 93 Stat. 669 (1979) (codified at 20 U.S.C. §§ 3401-3510).

[21] *Id.* § 101.

[22] *Id.* § 102. The Act lists six additional purposes: "(1) ensuring equal access to educational opportunity; (2) improve the quality of education; (3) encourage involvement in federal education programs; (4) support research, evaluation, and sharing of information related to education; … (6) improve the management of federal education activities; and (7) increase the accountability of federal education programs." *Id.*

- 4 -

of the wide variety of education programs now scattered throughout the Federal Government."[23]

To that end, Congress created multiple offices within the Department to effectuate its stated goals.[24] These offices include, among others: the Office for Civil Rights, the Office of Elementary and Secondary Education, the Office of Postsecondary Education, the Office of Special Education and Rehabilitation Services, the Institute of Education Sciences, and the Office of English Language Acquisition.[25] Wielding its constitutional authority to reorganize federal agencies, Congress also transferred functions previously housed in other agencies to the newly created Department, with the stated aim of promoting better coordination of federal education programs.[26]

The Executive cannot undo Congress's statutory decisions, either by changing the scope of these offices' responsibilities or reassigning them to other federal agencies.[27]

---

[23]  *See* Legislative History (hereinafter Legislative History, Pub. L. No. 96-88), 125 Cong. Rec. H26520 (Sept. 27, 1979) (Remarks of Rep. Brooks).

[24]  20 U.S.C. §§ 3413–3415, 3417, 3419–3420.

[25]  *Id.* Congress has also assigned new or additional functions to these offices through subsequent laws. *See, e.g.*, Improving America's Schools Act of 1994, Pub. L. No. 103-382, 108 Stat. 3523 (1994) (codified at 20 U.S.C. §§ 6301-6577); Education Sciences Reform Act, Pub. L. No. 107-279, 116 Stat. 1941 (2002) (codified at 20 U.S.C. §§ 9501-9584).

[26]  20 U.S.C. §§ 3402, 3441–3446.

[27]  *See infra* Section III.B.

### III.    DEFENDANTS' EFFORTS TO DISMANTLE THE DEPARTMENT CONTRAVENE CONGRESS'S EXPRESS DIRECTIVES

**A.    The Trump administration is engaged in a campaign to dismantle the Department, contrary to Congress's will.**

Ignoring Congress's explicit statutory mandates, the Trump administration has taken concrete steps to abolish the Department and disperse its remnant functions piecemeal to other federal agencies.[28]

Even before taking office in January of 2025, President Trump championed the Department's abolition. In a September 2023 campaign video for example, President Trump vowed: "One thing I'll be doing very early in the administration is closing up the Department of Education in Washington, D.C."[29] After his inauguration, President Trump promised a "virtual closure of [the] Department of Education."[30] To that end, he directed Secretary McMahon to "put [her]self out of a job."[31] Secretary McMahon has openly embraced this directive, affirming that she "wholeheartedly support[s] and agree[s]" that "the bureaucracy in Washington should be abolished."[32]

---

[28]  The White House, *President Trump and Secretary of Defense Pete Hegseth Deliver Remarks*, YouTube (Mar. 21, 2025), https://www.youtube.com/watch?v= MVyVfkL7PwM (hereinafter *Trump and Hegseth Remarks*).

[29]  Graham Kates, *Can Trump Dismantle the Department of Education? It Won't Be Easy, Experts Say*, CBS News (Feb. 4, 2025), https://www.cbsnews.com/news/trump-dismantle-education-department.

[30]  Time Staff, *Read the Full Transcript of Donald Trump's 2024 Person of the Year Interview with TIME*, Time (Dec. 12, 2024), https://time.com/7201565/person-of-the-year-2024-donald-trump-transcript.

[31]  Ryan King, *Trump Says Education Secretary's Goal Will Be to 'Put Herself Out of a Job' As He Pushes to Abolish DOE*, New York Post (Feb. 4, 2025), https://nypost.com/2025/02/04/us-news/president-trump-lays-out-goal-for-education-secretary-i-want-her-to-put-herself-out-of-a-job.

[32]  Kara Arundel, *McMahon Confirmed as Education Secretary*, K-12 Dive (Mar. 3, 2025), https://www.k12dive.com/news/mcmahon-confirmed-as-education-secretary/741114.

Defendants have now acted in furtherance of their stated intent. On March 11, 2025, Secretary McMahon began terminating nearly 50% of the Department's work force.[33] This was part of the "final mission" for the Department, issued in response to the President's directive to "shut down the Department of Education."[34] Less than two weeks later, President Trump issued an Executive Order purporting to fully dismantle the Department.[35] By its plain terms, the Order directs the Secretary of Education to "take all necessary steps to facilitate the closure of the Department of Education."[36]

Although the March 11 Executive Order ostensibly limits its reach to only those actions "permitted by law" and instructs the Secretary to ensure "effective and uninterrupted delivery of services, programs, and benefits,"[37] these are meaningless platitudes.[38] The Secretary can in no way lawfully close the Department without congressional approval.[39] Defendants' actions to date in furtherance of the Executive Order exceed what is permitted by law.

As a primary example: On March 21, 2025, Defendants terminated nearly 1,300 Department employees.[40] The skeleton crew that remains cannot carry out the

---

[33] Press Release, Dep't of Educ., U.S. Department of Education Initiates Reduction in Force (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force (hereinafter Reduction in Force).

[34] *Id.*; Sareen Habeshian, *Education Secretary Says Mass Layoffs First Step Toward Shutting Down DoE*, Axios (Mar. 11, 2025), https://www.axios.com/2025/03/11/education-department-workforce-cuts.

[35] *Supra* note 3, Trump Executive Order.

[36] *Id.*

[37] *Id.*

[38] *Widakuswara*, No.1:25-cv-1015-RCL, at 5, 36.

[39] *See infra* Section IV.A.

[40] *Supra* note 33, Reduction in Force.

Department's statutorily required functions. What's more, President Trump has indicated that he will soon disband even this skeleton crew, and that he will reassign several remaining Department functionalities to other agencies. This includes the Department's "student loan portfolio," which he intends to reassign to the Small Business Administration, and the handling of "special needs," which he intends to reassign to the Department of Health and Human Services.[41]

**B.    The Trump administration's actions to date have incapacitated the Department's functionality, contrary to Congress's will.**

The Department has historically engaged in a wide variety of activities to meet its statutory obligations, including investigating allegations of civil rights and privacy violations, distributing federal funds, offering technical assistance for program administration, and supporting research regarding educational best practices.[42] Defendants' recent actions (as discussed below) have incapacitated the Department so that it no longer can discharge these required activities.[43] Stated bluntly, Defendants are dismantling the Department in all but name.

---

[41]    *Supra* note 28, *Trump and Hegseth Remarks*.

[42]    Many offices within the Department engage in more than one function. For example, the Special Education and Rehabilitation Services is charged both with distributing funds and providing technical assistance and support. *See OSEP Early Childhood IDEA Centers and the Network of Parent Centers*, Early Childhood Tech. Assistance Ctr. (updated Jan. 31, 2025), https://ectacenter.org/about/osep-ec-centers.asp. The examples below are illustrative of the ways in which Defendants have violated congressional mandates; they are not intended as an exhaustive list.

[43]    *See infra* Sections III.B.1–3.

1. **Defendants are preventing the Department from investigating civil rights and student privacy violations.**

   *a. Inadequate investigation of civil rights violations*

In forming the Department, Congress explicitly mandated the establishment of an Office for Civil Rights to protect all students from discrimination.[44] Congress created the Department in the wake of the Supreme Court's decision in *Brown v. Board of Education*,[45] a time when Congress recognized, from past experience, that "the enforcement of the civil rights laws" could face "an inhospitable climate" depending on the executive in power and the politics of the era.[46] Accordingly, Congress decided to "fortify the person charged with civil rights enforcement" with legislative protection so no statutory requirements could be "short-circuited by the Secretary [of Education]."[47] Congress created the Office for Civil Rights to be "independent" from the Secretary.[48] To this end, the Organization Act prohibits the Executive from eliminating the Office.[49]

But now, the Trump administration is engaging in precisely the "short-circuit[ing]" Congress worked to prevent.[50] Under President Trump's directive, Secretary McMahon

---

[44] 20 U.S.C. § 3413; *see* Legislative History, S. Rep. No. 96-49 at 68 (Mar. 27, 1979); Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1689; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

[45] 347 U.S. 483 (1954).

[46] *See* Legislative History, Pub. L. No. 96-88, 125 Cong. Rec. H14487 (June 12, 1979) (Remarks of Rep. Rosenthal) ("[T]he enforcement of the civil rights laws found an inhospitable climate both in HEW and very likely would find in this new Department ....").

[47] *Id.*

[48] *Id.*

[49] *See* 20 U.S.C. §§ 3473, 3413.

[50] *See* Legislative History, Pub. L. No. 96-88, 125 Cong. Rec. H14487 (June 12, 1979) (Remarks of Rep. Rosenthal).

has closed the Office's regional offices in Boston, Dallas, New York, Chicago, Cleveland, San Francisco, and Philadelphia.[51] Because of these closings, over 46 million students "in 27 States and territories have been left without dedicated civil rights investigators to protect their rights and investigate their complaints."[52] Further, nearly 43% of the Office for Civil Rights's total staff have been terminated.[53] Most of those terminated were attorneys charged with investigating complaints from parents and families who believe a school is discriminating against their child.[54] The laid-off investigators had been overseeing more than 6,800 civil rights cases, including "74 percent of the nation's open cases regarding national origin discrimination involving religion."[55]

Employees who remain at the Office have been left with an "untenable" workload.[56] Even before the staff cuts, caseloads for civil rights staff were reportedly far too high—42

---

[51]   *See* Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs.

[52]   Bernie Sanders, *President Trump's Decision to Gut the Office for Civil Rights Has Left Over 46 Million Students Without Protection from Discrimination*, Minority Staff Report (Mar. 27, 2025), https://www.sanders.senate.gov/wp-content/uploads/03.27.25-OCR-Report-Draft-v9.pdf; *see also* Naaz Moden, *Half of OCR Eliminated after Trump Education Department Layoffs*, Higher Ed Dive (Mar. 13, 2025), https://www.highereddive.com/news/half-of-ocr-fired-after-trump-education-department-layoffs/742384 (reporting the regional closures as "impacting nearly 60,000 public schools and over 30 million K-12 students").

[53]   *See* Cory Turner, *The Department of Education Is Being Cut in Half. Here's What's Being Lost*, NPR (Mar. 13, 2025), https://www.npr.org/2025/03/12/nx-s1-5325854/trump-education-department-layoffs-civil-rights-student-loans; *supra* note 52, Sanders.

[54]   *Id.*

[55]   U.S. Senate Committee on health, Education, Labor & Pensions, *New Report: Trump Leaves Over 46 Million Students Without Protection from Discrimination* (Mar. 27, 2025), https://www.help.senate.gov/dem/newsroom/press/new-report-trump-leaves-over-46-million-students-without-protection-from-discrimination.

[56]   *See* Catherine E. Lhamon Decl., ECF No. 71-48 ¶¶ 25–27.

cases per investigator.[57] The Office told Congress in its 2025 budget request that there has been an "alarming increase" in reports of discrimination and that "complaints to the Office for Civil Rights [] on these topics more than doubled."[58] This increase was not an anomaly, but rather part of a decade-long trend.[59] Now, given Defendant's actions, individual investigators' caseloads have ballooned by 206%.[60] It is simply implausible that the remaining investigators—whose job requires them to conduct time-intensive, on-site reviews that can require extensive travel[61]—will be able to adequately cover the geographic areas previously assigned to the now-closed seven regional offices.

On this point, Defendants' closure of the Office for Civil Rights's Cleveland section is instructive. Before the Cleveland office was shuttered, it handled all discrimination complaints across Ohio and Michigan.[62] Now, at least some of these discrimination cases

---

[57] *Supra* note 52, Sanders.

[58] *Fiscal Year 2025 Budget Proposal*, Dep't of Educ. Off. for Civ. Rights, https://www.ed.gov/media/document/ocr-fiscal-year-2025-budget-request-39373.pdf.

[59] *US Department of Education Office for Civil Rights Annual Report to the Secretary, the President, and the Congress Fiscal Year 2019* (July 2020) at 9 ("For instance, OCR received 6,936 complaints in FY 2010 compared to 9,990 complaints in FY 2019, which is a 44 percent increase in the number of annual complaints received."), https://www.ed.gov/sites/ed/files/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2019.pdf.

[60] *Supra* note 52, Sanders.

[61] Gonzales Decl., ECF No. 71-47 ¶ 20 ("Appropriately conducted investigations often require on-site inspections").

[62] *See, e.g.*, *Fiscal Year 2025 Budget Proposal*, Dep't of Educ. Off. for Civ. Rights, at 11, https://www.ed.gov/media/document/ocr-fiscal-year-2025-budget-request-39373.pdf (showing map of office regions before the Trump administration's closures); *see also* Carter Landis, *Complaints with Dept. of Education stuck in limbo after Offices of Civil Rights closes*, News Channel 3 (Mar. 13, 2025), https://wwmt.com/news/local/complaints-dept-of-education-stuck-limbo-offices-of-civil-rights-closes-michigan-cleveland-discrimination (discussing the impact of the Cleveland closure on Michigan students).

have been transferred to the Denver office—an office already burdened with overseeing complaints across Arizona, Colorado, New Mexico, Utah, and Wyoming.[63] Cases are now falling between the cracks. As reported by the BBC, one Michigan mother has received no updates about her son's discrimination complaint since learning her son's complaint was transferred to the Denver office.[64] Another Michigan parent of a child with seizures reported that after recent staff terminations, the Office for Civil Rights attorney who had been helping coordinate with the school "stopped responding to her emails."[65]

Similar instances have been reported across the country. Yet another mother, who was in contact with the Office for Civil Rights to investigate alleged discriminatory treatment her daughter experienced at school, has received no communication whatsoever from the Office since the attorney assigned to her case was terminated.[66] Other parents have also recently struggled to contact the Office, even those with "pending mediation hearing dates with their districts scheduled that have since passed."[67] And in Maine, local newspapers have reported that the Trump administration has been opening and closing

---

[63] *See, e.g.*, *Fiscal Year 2025 Budget Proposal*, Dep't of Educ. Off. for Civ. Rights, https://www.ed.gov/media/document/ocr-fiscal-year-2025-budget-request-39373.pdf (showing map of office regions before the Trump administration's closures).

[64] *See* Kayla Epstein, *'They're Playing Politics with My Little Boy': What Department of Education Cuts Mean for One Mum*, BBC News (20 March 2025), https://www.bbc.com/news/articles/cgl039j87x0o.

[65] Hannah Dellinger, *Michigan Parents of Students with Disabilities Feel 'Hopeless' as Civil Rights Cases Remain in Limbo*, Chalkbeat (Apr. 14, 2025), https://www.chalkbeat.org/detroit/2025/04/14/hundreds-of-michigan-civil-rights-cases-impacted-by-federal-cuts.

[66] *Id.*

[67] *Id.*

investigations within days, without interviewing any local school officials.[68] The state has argued these abnormal speeds suggest a sham.[69]

These are just a handful of examples of the many reports from around the country showing how the Administration's unconstitutional actions are already impacting students.[70] As current employees within the Office for Civil Rights confirm, it will now be "virtually impossible" for the Office to fulfill its statutory mandates.[71]

By slashing employee ranks at the Office, the Defendants have reduced the civil rights protections Congress statutorily mandated be afforded to all students.

### b. Inadequate investigation of privacy rights violations

In addition to requiring that the Department investigate civil rights violation allegations, Congress has also mandated that the Department investigate potential violations of the Family Educational Rights and Privacy Act ("FERPA")[72] and Pupil Privacy laws.[73] These laws protect the privacy of student education records and ensure

---

[68] *See* Kristian Moravec, *Maine's Battle with Trump over Title IX Could Have National Consequences*, THE MAINE MONITOR (Apr. 21, 2025), https://mainebeacon.com/maines-battle-with-trump-over-title-ix-could-have-national-consequences.

[69] *Id.*

[70] Dylan Peers McCoy, *Families Say School Civil Rights Investigations Have Stalled After Federal Cuts*, NPR (April 16, 2025), https://www.npr.org/2025/04/16/nx-s1-5338830/trump-federal-cuts-civil-rights-education-investigations.

[71] ProPublica, *Trump Guts the Department of Education, Making Discrimination Complaints 'Virtually Impossible' to Resolve*, Fast Co. (Feb. 11, 2025), https://www.fastcompany.com/91296794/trump-guts-the-department-of-education-making-discrimination-complaints-virtually-impossible-to-resolve.

[72] Family Educational Rights and Privacy Act, Pub. L. No. 90-247, 88 Stat. 1896 (1974) (codified at 20 U.S.C. § 1232(g)).

[73] *See* The Family Educational Rights and Privacy Act (FERPA): Legal Issues (2025), https://www.congress.gov/crs-product/R46799.

parental consent for certain data collection and use practices.[74] The office responsible for carrying out this function, the Student Privacy Policy Office, is the sole entity empowered by law to enforce FERPA.[75]

But now, Defendants have terminated nearly all attorneys employed by the Department who investigate student privacy violations.[76] Without these personnel, the Student Privacy Policy Office cannot feasibly fulfill its statutory obligations to investigate FERPA violations or enforce compliance with privacy laws. Further, because FERPA does not afford students "a private right of action to sue schools" who may invade their privacy,[77] students depend entirely on the Student Privacy Policy Office to secure their rights. By stripping the Office of the personnel needed to investigate allegations of FERPA violations, Defendants have left students without recourse, contrary to Congress's intent.

### 2. Defendants have disrupted distribution of congressionally appropriated funding.

One of the Department's core functions is to provide funding to support equal educational opportunities for all Americans. Congress has tasked the Department with supervising and distributing federal funds appropriated for education-related programs which collectively benefit millions of students.[78] To this end, Congress has established

---

[74] *Id.*

[75] *See* 20 U.S.C. § 1232g(g); U.S. Dept. of Educ., Student Privacy Policy Office, https://www.ed.gov/about/ed-offices/opepd/student-privacy-policy-office.

[76] Doe 14 Decl., ECF No. 71-66 ¶¶ 6, 7, 13.

[77] The Family Educational Rights and Privacy Act (FERPA): Legal Issues (2025), https://www.congress.gov/crs-product/R46799.

[78] *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 393–94, (2017) (holding that the IDEA "guarantees a substantively adequate program of education to all eligible children.")

multiple entities within the Department that focus on funding streams to support different student populations, including the Office of Special Education and Rehabilitative Services, the Office of Federal Student Aid, and the Office of Elementary and Secondary Education.[79]

As explained more fully below, Defendants' actions have compromised each of these offices' ability to timely distribute education-related funding as required by Congress. In doing so, the Trump administration has not only violated the Constitution by infringing on the separation of powers but has also threatened the continued receipt of benefits Congress has bestowed on millions of Americans and the education institutions that serve them.[80]

### a. *Interruptions to special education funding*

Congress charged the Office of Special Education and Rehabilitative Services with administering the Individuals with Disabilities Education Act,[81] enacted to provide states

---

[79] *See generally* U.S. Department of Education: Background and Statutorily Established Officers, Positions, and Offices (2025), https://www.congress.gov/crs-product/R48425. The Office of Vocational and Adult Education, which Congress created to "recognize the importance of vocational education as an equal partner with liberal arts education in American society," has been similarly impacted by staffing cuts. *See* Legislative History, Pub. L. No. 96-88, 125 Cong. Rec. S8818 (Apr. 26, 1979) (Remarks of Senator Pressler).

[80] *See Endrew*, 580 U.S. at 393–94.

[81] Individuals with Disabilities Education Act, Pub. L. No. 108-446, 118 Stat. 2647 (2004) (codified at 20 U.S.C. §§ 1400-1409); Kyrie E. Dragoo, *The Individuals with Disabilities Education Act (IDEA), Part B: Key Statutory and Regulatory Provisions*, Cong. Rsch. Serv. (Aug. 20, 2025), https://www.congress.gov/crs-product/R41833.

federal funds "in exchange for a commitment" to "furnish ... all children with certain physical or intellectual disabilities" with a free, appropriate public education.[82]

Although the Office of Special Education was originally created as part of the Department of Health and Welfare, Congress purposefully transferred this Office to the Department of Education in 1979 after concluding "the goal of helping to make handicapped individuals become productive, to live with the same independence and dignity of nonhandicapped individuals, is much more compatible with the concerns of education than it is with health and welfare."[83] To "protect this program more from attempts to consolidate it with general social services,"[84] Congress made the Office of Special Education and Rehabilitative Services a mandatory office within the Department,[85] and limited the Secretary of Education's discretion to transfer or abolish it.[86]

Yet, Secretary McMahon has terminated nearly "the entire career staff" within the main unit responsible for carrying out the Office of Special Education's functions, leaving ***one single employee*** to keep the entire Office running.[87] The Office of Special Education serves over 7.5 million students with disabilities—approximately 15% of all public-school

---

[82]  *Doe v. Newton Pub. Sch.*, 48 F.4th 42, 47–49 (1st Cir. 2022) (citing *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154 (2017)); 20 U.S.C. § 1412(a)(1).

[83]  *See* S. Rep. No. 96-49 at 45.

[84]  *See* Legislative History, Pub. L. No. 96-88, 124 Cong. Rec. S30289 (Sept. 20, 1978) (Remarks of Sen. Humphrey).

[85]  20 U.S.C. § 3473.

[86]  *Id.*

[87]  *See* Neas Decl., *Somerville Pub. Schs. v. Trump*, No. 1:25-cv-10677, ECF No. 27-8 ¶ 21 (D. Mass. Mar. 24, 2025) (noting terminations within the Office of the Assistant Secretary).

students—across the United States.[88] One person alone cannot do the work of a full team to fulfill Congress's mandate.

### b. Interruptions to federal student aid

The Trump administration has also gutted the Office of Federal Student Aid. The Office currently manages a portfolio of more than $1.6 trillion, roughly equal to the holdings of one of the nation's largest banks, Wells Fargo.[89] This Office, placed by statute within the Department, provides funding assistance to college students through the Free Application for Federal Student Aid ("FAFSA") program and the federal student loan system.[90] Compromising the Office's ability to function, the Secretary has drastically reduced the FAFSA team and the team that supervises contractors who collect student loan repayments.[91] Other sub-entities within the Office of Federal Student Aid have also been largely abolished: of an initial staff of 400, only 25 employees are left to run the unit within the Office that certifies schools as eligible to participate in the Federal Student Aid Program.[92] All attorneys who advise on contracts to manage FAFSA and loan servicers have been terminated.[93] These terminations also include full-time Office of Federal Student

---

[88]  Nat'l Ctr. For Educ. Stats. *Annual Reports*, https://nces.ed.gov/programs/coe/indicator/cgg/students-with-disabilities (noting the number of students aged 3-21 who received special education related services under IDEA was 7.5 million in 2022-2023).

[89]  *See supra* note 3*,* Trump Executive Order.

[90]  Higher Education Amendments of 1998, Pub. L. No. 105-481, § 131 (codified as amended at 20 U.S.C. § 1018).

[91]  *See supra* note 53*,* Turner.

[92]  *Id.*

[93]  *Id.*

Aid employees who, prior to Defendants' actions, worked in the Department's now-closed regional offices.[94]

The administration's attacks on the Office of Federal Student Aid have deprived the Office of much needed administrative capacity to process the millions of FAFSA applications received each year.[95] Since the staffing cuts, college and university aid officers have reported disruptions that are slowing their ability to calculate students' financial aid offers.[96] Student loan portals have been further "plagued with outages" during a period when millions of students are completing the financial aid forms that make their college enrollment possible.[97] Disbursement of federal student aid is not discretionary; Congress has created detailed formulas that the Office of Federal Student Aid is required to follow when dispersing the funds.[98] And Congress has explicitly required the Secretary to provide assistance to borrowers and grantees entitled to the funds.[99] Yet, Defendants' actions has placed the disbursal of aid in jeopardy.

---

[94] *See* Federal Student Aid Fiscal Year 2023 Annual Report at 9 (depicting FSA regional map), https://studentaid.gov/sites/default/files/fy2023-fsa-annual-report.pdf.

[95] Press Release, U.S. Department of Education Announces More Than 8 Million FAFSA Forms Complete and Additional Form Improvements (Mar. 17, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-announces-more-8-million-fafsar-forms-complete-and-additional-form-improvements.

[96] Danielle Douglas-Gabriel, *College Financial Aid Hit with Glitches, Delays Due to Federal Staffing Cuts*, Wash. Post (Apr. 14, 2025), https://www.washingtonpost.com/education/2025/04/14/student-loans-financial-aid-glitches-education-department-layoffs.

[97] *Id.*

[98] Higher Education Act of 1965, Pub. L. No. 89-329 § 480(d), 79 Stat. 1219 (1965) (codified at 20 U.S.C. §§ 1001-1019(d)); FAFSA Simplification Act, Pub. L. No. 116-260, 134 Stat. 3137 (2020); The FAFSA Simplification Act Summary, Congress.gov, https://www.congress.gov/crs-product/R46909 ("HEA establishes three ... formulas").

[99] 20 U.S.C. § 1087h. (the "Secretary shall provide institutions of higher education

Several of the Office's other key statutory functions are also at risk. For example, the Office operates a loan deferment and forbearance program,[100] an income-based repayment program,[101] and a loan forgiveness program[102]—programs which serve as crucial support systems for thousands of nurses, K-12 public school teachers, and other public servants across the country.[103] As a result of staffing cuts, up to 40 million borrowers risk languishing without adequate technical support to answer their questions about complicated loan repayment rules.[104] Disbursement of new loans may also be delayed,[105] contrary to congressional intent.

These complex programs require oversight of contractors who collect repayments, administer FAFSA, and certify institutions of higher education's eligibility to participate in student loan programs. By terminating many of the staff members who filled these oversight roles,[106] Defendants have limited the Office's ability to meet its statutory obligations.[107] The impact of even one federal loan servicer contractor being unable to

---

participating, or seeking to participate, in the loan programs under this part with technical assistance in establishing and administering such programs.").

[100] 20 U.S.C. § 1078(c)(3)(A).

[101] *Id.* § 1098e(b).

[102] *Id.* § 1087e(m)(1).

[103] *See, e.g.*, Wesley Wei et al*., In Debt: Student Loan Burdens Among Teachers, Learning Policy Institute* (Feb. 4, 2025), https://learningpolicyinstitute.org/product/student-loans-among-teachers-brief; Matthew Arrojas, *Student Loan Forgiveness for Nurses*, NurseJournal (Mar. 28, 2024), https://nursejournal.org/resources/student-loan-forgiveness-for-nurses.

[104] Ron Lieber, *What Happens to Student Loans if the Education Dept. Closes?*, N.Y. Times (Mar. 20, 2025), https://www.nytimes.com/2025/03/20/business/student-loans-education-department.html.

[105] *Id.*

[106] Campbell Decl., ECF No. 71-69.

[107] *Id.*

receive timely and effective technical assistance from remaining full-time Office staff could have a spiraling effect on taxpayers. In fiscal year 2024, borrower interest, principal, and net default collection payments under the Federal Direct Loan Program totaled $128.6 billion.[108] As such, even small failures of the Office's remaining, overstretched staff to supervise, manage, or service contractors could result in the Department forfeiting millions in missed payments from anxious borrowers.

Defendants' decision to terminate federal student loan staff could not come at a worse time for student loan borrowers needing assistance with their loan servicers, given the sharp rise in borrower complaints. Congress charged the Student Loan Ombudsman Office, situated within the Office of Federal Aid, with the duty to "receive, review, and attempt to resolve informally complaints from borrowers of [certain student] loans."[109] As reported by one employee in that Office, following the Administration's actions, the Ombudsman now has a backlog of 16,000 complaints from borrowers awaiting initial review and resolution.[110] Just like with the Office for Civil Rights, it is simply implausible that the Ombudsman can adequately discharge its increasing workload with such a reduced staff. Defendants' actions are thus preventing the Office from executing Congress's stated will.

---

[108] Office of Management and Budget, "Appendix: Budget of the U.S. Government, Fiscal Year 2025" (Washington, D.C. 2024), at 327, available at https://www.govinfo.gov/content/pkg/BUDGET-2025-APP/pdf/BUDGET-2025-APP.pdf.

[109] 20 U.S.C. § 1018(f)(3)(A).

[110] *See* Gittleman Decl., ECF No. 71-50 ¶ 3.

### c. Interruptions to funding for K-12 education

Congress established the Office of Elementary and Secondary Education to distribute billions in funds to states and other grant recipients to support K-12 education.[111] The Secretary has no discretion to eliminate this Office.[112] Nevertheless, Secretary McMahon has eliminated three of four units within the Office of Elementary and Secondary Education's administration division and the entire staff in the Office of State and Grantee Relations,[113] without which the wider Office is barely operational.[114]

Employees in these now-eliminated units had been responsible for dispersing billions of dollars per year to support 26 million students across nearly 90% of U.S. school districts.[115] These funds help support programs for students with disabilities, school districts with low-income students, early learning programs, and many other critical initiatives.[116] But as one former employee explained, disbursing these funds is "not as simple as writing a check."[117] Instead, staff must engage in pre-award, award, and post-award activities inherent in the grant-funding life cycle.[118] Without these employees, the

---

[111] *See* 20 U.S.C. § 3414.

[112] 20 U.S.C. § 3473; 20 U.S.C. § 3414.

[113] *See* Sanders Decl., ECF No. 71-22 ¶ 12; Thurmond Decl., ECF No. 71-13 ¶ 65.

[114] *See* Thurmond Decl., ECF No. 71-13 ¶ 65 ("An elimination of the [Office of Elementary and Secondary Education's State and Grantee Relations Team] is significant. It was integral ....").

[115] U.S. Dep't of Educ. Fiscal Year 2025 Budget Summary, at 14, https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/summary/25summary.pdf.

[116] *Id.*

[117] Sara Wilson, *Former Federal Workers Warn of Risks to Colorado Education Funding*, Colorado Newsline (Apr. 16, 2025), https://coloradonewsline.com/2025/04/16/former-federal-workers-risks-education-funding.

[118] *Id.*

Office of Elementary and Secondary Education will struggle to comply with Congress's explicit direction that it timely distribute more than $28 billion in congressionally appropriated taxpayer funds for the benefit of local schools and students.[119]

### *Figure A. Federal K-12 Education Funding for Certain States*[120]

| State | Title I grant received in FY 2024 | Total K-12 federal funding received in FY 2022 | Percent of K-12 budgets funded by federal government in FY 2022 | State | Title I grant received in FY 2024 | Total K-12 federal funding received in FY 2022 | Percent of K-12 budgets funded by federal government in FY 2022 |
|---|---|---|---|---|---|---|---|
| Alabama | $302.83M | $1.93B | 18% | Iowa | $110.59M | $1.13B | 14% |
| Alaska | $53.33M | $574.87M | 21% | Kansas | $125.13M | $772.76M | 10% |
| Arizona | $327.78M | $2.78B | 19% | Kentucky | $281.26M | $2.1B | 20% |
| Arkansas | $176.15M | $1.43B | 22% | Louisiana | $394.66M | $2.25B | 20% |
| California | $2.24B | $16.85B | 14% | Maine | $60.86M | $360.14M | 10% |
| Colorado | $182.94M | $1.52B | 11% | Maryland | $323.58M | $2.14B | 11% |
| Connecticut | $155.04M | $1.09B | 8% | Massachusetts | $285.43M | $2.14B | 10% |
| Delaware | $58.83M | $377.37M | 13% | Michigan | $559.43M | $3.73B | 15% |
| District of Columbia | $57.04M | $388.61M | 13% | Minnesota | $194.49M | $1.96B | 12% |
| Florida | $1B | $6.72B | 17% | Mississippi | $241.55M | $1.35B | 23% |
| Georgia | $610.21M | $4.57B | 16% | Missouri | $266.99M | $2.12B | 15% |
| Hawaii | $69.93M | $517.25M | 14% | Montana | $57.76M | $498.31M | 21% |
| Idaho | $65.12M | $660.82M | 18% | Nebraska | $90.47M | $663.68M | 12% |
| Illinois | $794.47M | $4.57B | 11% | Nevada | $161M | $1.09B | 16% |
| Indiana | $281.11M | $2.04B | 13% | New Hampshire | $47.05M | $323.49M | 9% |

---

[119] Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 681–684 (Mar. 23, 2024); Full-Year Continuing Appropriations Act, 2025, Pub. L. No. 119-4, 139 Stat. 11 (Mar. 15, 2025).

[120] This figure uses the years with the most recent available data. The full infographic listing all states is available at https://www.the74million.org/article/federal-education-cuts-and-trump-dei-demands-leave-states-teachers-in-limbo/.

### 3. Defendants have precluded the Department from offering technical assistance as mandated by Congress.

Defendants have also stifled the day-to-day services and assistance Congress has mandated the Department provide to schools and educators, including by dismantling the Institute for Education Sciences, the Office of English Language Acquisition, and the Office of Career and Technical Adult Education.

Congress created the Institute for Education Sciences to "provide national leadership in expanding fundamental knowledge and understanding of education."[121] The Institute is charged with "compiling statistics, conducting research and evaluations, and disseminating information in a manner that conforms to high standards of quality and objectivity."[122] Congress "considered several alternative ways of reorganizing these functions," and decided to "transfer[]" several programs "intact to the Office of Educational Research and Improvement" in the Department of Education.[123] Congress's intent—that the Institute exist within the Department of Education—is unmistakable.[124]

Despite Congress's clear directive, the Trump administration has terminated "almost the entire staff of the Institute of Education Sciences."[125] Defendants have virtually

---

[121] The Education Sciences Reform Act (ESRA): A Primer (2025), https://www.congress.gov/crs-product/R47481.

[122] *Id.*

[123] *See* S. Rep. No. 96-49 at 70 (emphasis added).

[124] 20 U.S.C. § 3419.

[125] Jill Barshay, *Chaos and Confusion as the Statistics Arm of the Education Department Is Reduced to a Skeletal Staff of 3*, The Hechinger Report, (Mar. 14, 2025), https://hechingerreport.org/proof-points-chaos-confusion-statistics-education (hereinafter Barshay).

- 23 -

abolished the Institute's four centers.[126] One center, the National Center for Education Statistics, previously employed roughly 100 employees; it now has three remaining employees.[127]

Data gathered by the National Center for Education Statistics has enabled researchers and policymakers to assess the state of American education and work to improve student outcomes.[128] Conversely, lack of access to this data hinders scientific advancement, as well as Congress's ability to assess funding levels and policy reform.[129] Further, Defendants have frozen more than $900 million in research funding previously allocated to the Institute.[130] Defendants' actions have thus significantly reduced the Office's ability to meet its statutory mandate.

Defendants have also targeted the Office of English Language Acquisition, which Congress has charged with "coordinat[ing] the administration of bilingual education

---

[126] *See* Doe 12 Decl., ECF No. 71-64 ¶ 12.

[127] *Supra* note 125, Barshay.

[128] NCES, *The National Center for Education Statistics: Who We Are*, https://nces.ed.gov/national-center-education-statistics-nces/about; Naaz Modan, *What Will NCES Layoffs Mean for the Nation's Report Card?*, K-12 Dive (Mar. 18, 2025), https://www.k12dive.com/news/Education-Department-nces-layoffs-leaves-naep-assessments-nations-report-card-barebones/742837; Thurmond Decl., ECF No. 71-13 ¶ 53 ("The data are used for research, policy, and decision making. They are also used for program compliance and the federal budgeting process ….").

[129] Linos Decl., *Somerville Pub. Schs. v. Trump*, No. 1:25-cv-10677, ECF No. 27-5 at 12 (D. Mass. Mar. 24, 2025) ("[T]he Department of Education plays a crucial role in collecting, analyzing, and disseminating data that reflect how the country is performing …. A reduction in in-house research and statistical expertise of the Department has the potential to reduce transparency in how public policies are performing and reduce the ability of American society to assess how well their government is functioning.").

[130] Jodi S. Cohen & Jennifer Smith Richards, *Elon Musk's Team Decimates Education Department Arm that Tracks National School Performance*, ProPublica (Feb. 11, 2025), https://www.propublica.org/article/department-of-education-institute-education-science-contracts-doge.

programs."[131] The Office of English Language Acquisition disseminates information about best educational research, practice, and policies for English learners.[132] Members of Congress considered the Office to be a "high priority" and demanded efforts to protect it from being "summarily disbanded."[133] As such, although the Secretary is authorized to terminate this Office, Congress requires that the Secretary first notify it of any intent to reorganize or dismantle the Office and then wait 90 days to allow Congress time to intervene.[134] In this, too, the administration has flouted congressional will.[135] Secretary McMahon has terminated all Office of English Language Acquisition employees except "the Deputy Assistant Secretary and one employee who plans to retire at the end of the month,"[136] and so has effectively shuttered the Office—all without providing the required 90-day notice.[137]

---

[131] 20 U.S.C. § 3420.

[132] U.S. Dept. of Educ., Office of English Language Acquisition, https://www.ed.gov/about/ed-offices/oela.

[133] *See* Legislative History, Pub. L. No. 96-88, 125 Cong. Rec. S8915 (Apr. 30, 1979) (Remarks of Senator Percy) ("[B]ecoming an integrated part of American life ... means being able to speak ... the English language. If we could have … legislative history established, that this office is important and is a matter of high priority, it should not be summarily disbanded, I think that might help ....").

[134] 20 U.S.C. § 3473(b)(1)(A); § 3473(b)(2).

[135] *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (When "the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb.") (Jackson, J., concurring).

[136] Doe 8 Decl., ECF No. 71-60 ¶ 9.

[137] Secretary McMahon was confirmed on March 3, 2025. Press Release, U.S. Senate Confirms Linda McMahon as 13th Secretary of Education (Mar. 3, 2025), https://www.ed.gov/about/news/press-release/us-senate-confirms-linda-mcmahon-13th-secretary-of-education-0. The administration shuttered the Office of English Language Acquisition 17 days later, on March 20, 2025. *Supra* note 3, Trump Executive Order. Even if Secretary McMahon had given Congress notice the very day she became Secretary, she could not have complied with the required 90-day notice period. *Cf.* 20 U.S.C. § 3473(b)(2).

Defendants have similarly gutted the Office of Career and Technical Adult Education,[138] which administers programs including grant programs under the Adult Education and Family Literacy Act and Title II of the Workforce Innovation and Opportunity Act.[139] Here, too, the Trump administration has disbanded key units, rendering this Office likely incapable of performing its statutory functions.[140]

## IV.    DEFENDANTS' ACTIONS ARE UNLAWFUL

Defendants' actions are unlawful because: (A) they encroach on Congress's exclusive legislative power to create and dismantle federal agencies; (B) they violate Congress's mandate that certain functions must remain within the Department and cannot be reassigned to other federal agencies; and (C) they interfere with Congress's power of the purse. Additionally, Defendants' actions are unlawfully depriving Americans and the education institutions they serve of the benefits that Congress has bestowed on them.[141]

---

[138] *See* Weade James & Veronica Goodman, *Department of Education Staff Cuts Will Harm America's Children and Schools*, Ctr. for American Progress (Mar. 14, 2025), https://www.americanprogress.org/article/department-of-education-staff-cuts-will-harm-americas-children-and-schools; 20 U.S.C. § 3416.

[139] Adult Education and Family Literacy Act, Pub. L. No. 113-128, 128 Stat. 1608 (2014) (codified at 29 U.S.C. §§ 3271–3333); Workforce Innovation and Opportunity Act, Pub. L. No. 113-128, 128 Stat. 1425 (2014) (codified at 29 U.S.C. §§ 3101–3361).

[140] *See* Doe 2 Decl., ECF No. 71-54 ¶¶ 15,16.

[141] *See, e.g.*, *supra* Section III.B; *see also generally* Plaintiffs States' Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction, ECF No. 70, and Plaintiff States' Reply Brief in Support of their Motion for a Preliminary Injunction, ECF No. 101.

**A.    The Trump administration has usurped Congress's exclusive constitutional authority to create the Department of Education.**

As Defendants themselves recognize,[142] Congress has exclusive power to create and dismantle federal agencies through Congress's enumerated legislative powers under Article I of the Constitution. The Executive, by contrast, has no power to unilaterally create or destroy a federal agency without prior congressional approval.

The Appointments Clause, which authorizes Congress to appoint "Officers" to positions "which shall be established by Law,"[143] is one of the clearest recognitions of that power. The term "by Law" is used throughout the Constitution to refer specifically to congressional legislation.[144] The Supreme Court has repeatedly affirmed this Founding Era understanding. For example, Justice Marshall, writing for the Court, noted "the general spirit of the constitution ... seems to have arranged the creation of office among legislative powers."[145]

The Supreme Court is clear on the limits of the Executive's authority. "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself."[146] As to the first potential source of power, no statute grants the Executive the authority to dismantle the Department because Congress has passed no

---

[142] Opp. at 1.

[143] U.S. CONST. art. II, § 2.

[144] *See, e.g.*, *id.* at art. I, § 2, cl. 3 ("as they [Congress] shall by Law direct"); Annals of Cong., 1st Cong., Vol. 1 (May 20, 1789) at 384 (1st Congress debated "how many departments there should be established").

[145] *United States v. Maurice*, 26 F. Cas. 1211, 1213 (C.C.D. Va. 1823) (Marshall, C.J.).

[146] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

"statute that expressly authorizes" the Executive to dissolve the Department or transfer its congressionally mandated responsibilities to other agencies.[147]

Nor is there any other "act of Congress to which our attention has been directed from which such a power can be fairly implied."[148] To the contrary, the relevant enacting legislation is unequivocal that any authority vested in the Secretary to reorganize or reallocate the Department's functions "***does not extend to*** ... the abolition of organizational entities established by [the Organization Act]."[149] And no other statute separately confers such authority.[150] Put simply, the Executive lacks any authorization from Congress to proceed with its destruction of the Department.

As to the second potential source of power, the Constitution, Defendants cite no theory or judicial precedent that stands for the proposition that the Constitution grants the executive inherent authority to override or change laws that Congress has enacted regarding the Department of Education. Article I vests "All legislative Powers" ***in Congress***, not the President.[151] And "no provision in the Constitution [] authorizes the President to enact, to amend, or to repeal statutes,"[152] including the statutes creating and

---

[147] *Id*. at 585.

[148] *Id.*

[149] 20 U.S.C. § 3473(a) (emphasis added).

[150] The Executive does not even have authority to restructure the Department pursuant to a Reorganization Act, which might have provided some justification for this dismantling: Congress let the last such act lapse over 40 years ago, in 1984. *The President's Reorganization Authority: Review and Analysis*, Cong. Rsch. Serv., 1, 4–9 (Mar. 8, 2001); 5 U.S.C. § 904 (1984).

[151] U.S. CONST. art. I, § 1.

[152] *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

funding the Department. Legislative power rests with Congress, and Congress alone.[153]

"As Madison explained in The Federalist No. 47, under our constitutional system of checks

and balances, 'the magistrate in whom the whole executive power resides cannot of himself

make a law.'"[154] To hold otherwise "would be clothing the President with a power entirely

to control the legislation of congress."[155]

There is consequently no legal basis for the Executive's actions. Without "an act of

Congress" or power "from the Constitution itself,"[156] both of which are wholly lacking

here, a President who disagrees with a law enacted by Congress is "limit[ed] ... to the

recommending of laws he thinks wise and the vetoing of laws he thinks bad."[157] Whatever

his personal preferences may be, President Trump (and by extension, Secretary McMahon)

is not free to ignore the law.

A past presidential attempt to dismantle the Department further reinforces that

Congress alone can create or dismantle federal agencies, whatever the Executive's goals.

Not long after the Department of Education was established, President Reagan indicated

his intention to abolish it.[158] After years of intense political effort, he relented, admitting

---

[153] *See INS v. Chadha*, 462 U.S. 919, 954 (1983) (The "repeal of statutes, no less than enactment, must conform with Art. I."); *Helvering v. Or. Mut. Life Ins. Co.*, 311 U.S. 267, 272 (1940) (concluding that "only Congress can take away" a particular right conferred by statute).

[154] *Medellin v. Texas*, 552 U.S. 491, 527–28 (2008).

[155] *Kendall v. U.S. ex. rel. Stokes*, 37 U.S. 524, 613 (1838).

[156] *Youngstown*, 343 U.S. at 585.

[157] *Id.* at 587.

[158] Ronald Reagan, *First State of the Union Address* (Jan. 26, 1982) ("The budget plan I submit to you on February 8th will realize major savings by dismantling the Departments of Energy and Education ....").

that he lacked congressional support to abolish the Department.[159] Here, too, without Congress's support—which this administration does not have[160]—Defendants' current attempt to eliminate the Department must similarly fail.

**B.    The Trump administration has violated Congress's explicit statutory mandates regarding the Department's organizational structure.**

Congress's powers are not limited to the creation or dismantling of an agency; Congress also has the power to regulate agencies and dictate their organizational structure pursuant to Article I of the Constitution and the Necessary and Proper Clause.[161] This Clause authorizes Congress to "make all laws which shall be necessary and proper for carrying into execution" not only Congress's own enumerated powers, but "all other Powers vested by this Constitution in the Government of the United States, ***or in any Department or Officer thereof***."[162] Though the Executive has some discretion in the Department's day-to-day functioning, "Congress has plenary control over the salary, duties, and even existence of executive offices."[163]

---

[159] Associated Press, *Reagan Says He Won't Seek End to Education Dept. Now*, N.Y. Times (Jan. 30, 1985), https://www.nytimes.com/1985/01/30/us/reagan-says-he-won-t-seek-end-to-education-dept-now.html.

[160] Sixty Republican members recently joined Democrats to overwhelmingly reject a proposal to abolish the Department of Education. *See* Roll Call 156, Bill Number: H.R. 5 (Mar. 24, 2023), https://clerk.house.gov/Votes/2023156.

[161] *See* U.S. CONST. art. I, § 8.

[162] *Id.* (emphasis added).

[163] *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010); *see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act ... unless and until Congress confers power upon it.").

Congress can generally enlarge, narrow, or alter the authority delegated to an agency at any time.[164] The President, on the other hand, has no way of altering an agency's authority without congressional approval. And, while Congress granted the Secretary "certain flexibility" with respect to administration of the Department, Congress was clear that this "limited authority *does not extend to the abolition of functions under any circumstances*."[165] Congress thus constrained the Executive's authority over the Department's structure and functioning.

The potential for executive overreach was a key issue throughout the legislative debate preceding the enactment of the Organization Act.[166] As one Representative noted at the time, "whether or not the Secretary will have authority to eliminate programs" is a "concern shared by many of us."[167] Representative Brooks, the bill's sponsor, reassured

---

[164] *See Ctr. for Biological Diversity v. Zinke*, 313 F. Supp. 3d 976, 989 (D. Alaska 2018) ("The authority of an executive agency comes from Congress and is subject to modification by Congress." (citing *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000))).

[165] *See* S. Rep. No. 96-49 at 84; 20 U.S.C. § 3473.

[166] *See* Legislative History, H.R. Rep. No. 96-459 at 54 ("The conference agreement grants general authority to the Secretary to effect internal reorganizations of the Department. It specifies that this authority does not extend to the abolition of entities established by this Act or the alteration of the delegation of functions under the Act to any specific organizational entities. In addition, the conference agreement adopts the approach of the special procedure contained in the Senate bill for reorganization of specified statutory entities. It lists such entities and allows the Secretary to alter, consolidate, or discontinue such entities or reallocate functions vested by statute in such entities, not less than 90 days after notification of the appropriate House and Senate committees."); *see* Legislative History, Pub. L. No. 96-88, 125 Cong. Rec. H26524 (Sept. 27, 1979) (Remarks of Rep. Rosenthal) ("I ask them to read ... section 413. In no uncertain terms they enunciate the hit list, and that is a hit list of programs that may be discontinued.").

[167] Legislative History, Pub. L. No. 96-88, 125 Cong. Rec. H26524 (Sept. 27, 1979) (Remarks of Rep. Ford).

his colleagues that neither "the House bill, the Senate bill, nor the conference has permitted the administrative elimination of programs."[168]

Reflecting these concerns, the language of the Organization Act unambiguously prohibits the Executive from unilaterally eliminating statutory offices in the Department: The Act authorized the Secretary to "reallocate functions" but unambiguously stated "the authority of the Secretary ... ***does not extend to***—(1) any office ... established by statute or any function vested by statute in such an entity or officer ... (2) the abolition of organizational entities established by this chapter; or (3) the alteration of the delegation of functions to any specific organizational entity required by this chapter."[169]

Further, to the extent the Secretary has any leeway to reorganize certain entities within the Department, this authority is circumscribed by an express statutory requirement in the Organization Act that the Secretary notify Congress at least 90 days before "alter[ing], consolidat[ing], or discontinu[ing] any organizational entity continued within the Department" or "reallocat[ing] any function vested by statute in such an entity."[170] Despite this clear directive, Secretary McMahon did not comply with the Organization Act's notice provision law.[171]

The Trump administration argues that it has not overstepped its bounds because key Department programs will continue their operations, just in new homes: the Small Business Administration for federal financial aid, and the Department of Health and Human Services

---

[168] *Id.* (Remarks of Rep. Brooks).
[169] 20 U.S.C. § 3473 (emphasis added).
[170] *Id.*
[171] *See supra* note 137.

for special education.[172] However, Congress has specifically required that these programs be housed in the Department of Education, declaring: "[t]here shall be, within the Office of Special Education and Rehabilitative Services in the Department of Education, an Office of Special Education Programs, which shall be the principal agency in the Department [of Education] for administering and carrying out this chapter and other programs and activities concerning the education of children with disabilities."[173]

Congress's express purpose has been to consolidate federal education activities in the Department of Education, not spread them elsewhere.[174] Indeed, the Organization Act transferred education-related functions from multiple other agencies to the Department, including from the Department of Health, Education, and Welfare;[175] the Department of Labor;[176] the National Science Foundation;[177] the Department of Justice;[178] and the Department of Housing and Urban Development.[179] Congress thereby rejected the idea of maintaining separate education programs in different departments and statutorily reorganized these mandatory offices and duties within the Department. The Trump administration's current attempt to unilaterally redistribute education programs across the

---

[172] *See supra* note 28, *Trump and Hegseth Remarks*.
[173] 20 U.S.C. § 1402.
[174] *Id.* § 3402.
[175] *Id.* § 3441.
[176] *Id.* § 3443.
[177] *Id*. § 3444.
[178] *Id.* § 3445.
[179] *Id.* § 3446.

federal government directly contravenes Congress's stated structure for education programs.

## C. The Trump administration has infringed on Congress's power of the purse.

Defendants insist that mass staff terminations are merely an "overhaul" to ensure "resources are directed where they matter most."[180] But it is Congress, not the Executive, that holds the power of the purse and decides where to direct resources.[181] The Constitution could not be clearer. Article I, Section 9, Clause 7 states: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." As the Supreme Court recently reiterated, one of "Congress's most important authorities is its control of the purse."[182] Congress holds this enormous responsibility because Congress—not the whims of one man—reflect the collective priorities of the American people.[183] And, once Congress has appropriated funds for federal salaries and operations, as it has for the

---

[180]  *See* Opp. at 3.

[181]  *Clinton*, 524 U.S. at 468 (1998) (Scalia, J., concurring) ("President Nixon ... asserted at a press conference in 1973 that his constitutional right to impound appropriated funds was 'absolutely clear.' Our decision two years later in *Train v. City of New York*, proved him wrong ....") (cleaned up); *Stokes*, 37 U.S. at 613 (rejecting Andrew Jackson's assertion of a "dispensing power" to spend less than Congress mandated at the Post Office).

[182]  *Biden v. Nebraska*, 600 U.S. 477, 505 (2023).

[183]  *See, e.g.*, *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 420 (2024) ("Throughout the Middle Ages, the King enjoyed near total fiscal independence. … [But eventually, t]he King's financial weakness, and Parliament's increasing assertiveness in appropriating extraordinary revenues, led to intragovernmental strife. The ensuing power struggle culminated in the Glorious Revolution, in which Parliament stripped away the remnants of the King's hereditary revenues and thereby secured supremacy in fiscal matters. … By the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement.").

Department of Education, it is not optional for the Executive Branch to spend them. It is a constitutional mandate.[184]

If Congress agreed with the Trump administration's claim that the Department should be "overhaul[ed]" to eliminate "bureaucratic bloat," congressional appropriations would reflect this policy preference.[185] But to the contrary, Congress recently passed, and the President signed into law, a full-year continuing appropriations act to fund the Department under the same "authority and conditions provided in applicable appropriations Acts for fiscal year 2024."[186] By maintaining these same funding levels in 2025, Congress signaled its intent to maintain the status quo, rather than "overhaul" any departments.[187] The Trump administration has promised that the Department "will continue to deliver ... formula funding, student loans, Pell Grants, funding for special needs students, and competitive grantmaking."[188] But this promise does not align with the reality of the scope and scale of terminations.

The Trump administration's mass layoffs in the Office for Civil Rights provide a stark example of Defendants' interference with Congress's power of the purse. In 2024, Congress expressly appropriated $140 million to the Office for Civil Rights so that the

---

[184] *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J).

[185] *See* Opp. at 2–3.

[186] *See* Full-Year Continuing Appropriations Act, 2025 (2025 Continuing Resolution), Div. A Pub. L. No. 119-4 §§ 1101(a), (a)(8).

[187] Such an overhaul would be "a question of deep 'economic and political significance'" that "'Congress would likely have intended for itself.'" Thus, the Supreme Court requires "the Secretary to 'point to "clear congressional authorization"' to justify the challenged program." *Nebraska*, 600 U.S. at 506.

[188] *See* Opp. at 23.

Office could continue its work protecting all Americans from unlawful discrimination based on race, color, national origin, or shared ancestry.[189] When Congress considered the Department's budget for 2025, it expressed alarm about rising reports of harassment and discrimination, noting "reports of increased discrimination on college campuses, including hate crimes motivated by anti-Semitic and anti-Muslim prejudice."[190] The Office for Civil Rights also alerted Congress that it was facing increasing caseloads due to an "alarming increase in reports of Antisemitic, Islamophobic, and anti-Arab and related forms of harassment in K-12 and higher education."[191] And so, Congress reaffirmed its commitment to civil rights enforcement within the Department by maintaining $140 million in funding for the Office for Civil Rights in 2025.[192] Congress maintained this funding to ensure the Office for Civil Rights would continue its vital work investigating civil rights complaints and protecting students across America.

Ignoring congressional intent, the Trump administration terminated 43% of employees in the Office for Civil Rights.[193] Given this drastically reduced workforce, it

---

[189] *See* 170 Cong. R. H2059 (2024).

[190] S. Rep. No. 118-207, Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriation Bill, 2025 (Aug. 1, 2024). https://www.appropriations.senate.gov/imo/media/doc/fy25_lhhs_senate_report7.pdf; *see also* Dep't of Educ. Office for Civil Rights Fiscal Year 2025 Budget Request, https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/dd-ocr.pdf.

[191] Dep't of Educ. Office for Civil Rights Fiscal Year 2025 Budget Request, https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/dd-ocr.pdf.

[192] *See* Full-Year Continuing Appropriations Act, 2025 (2025 Continuing Resolution), Div. A Pub. L. No. 119-4 §§ 1101(a), (a)(8).

[193] *See supra* notes 52, 53.

defies credulity to expect that the Office will spend the full $140 million appropriated to it by Congress, contrary to constitutional mandate.[194]

As another stark example, the Trump administration has entirely abolished the Office of English Language Acquisition and has fired all its staff.[195] This Office was responsible for the oversight and administration of Title III of the Elementary and Secondary Education Act, and Congress appropriated $890 million to this Office to, among other things, help ensure that English learners attain English proficiency and develop high levels of academic achievement in English in both this and next year.[196] As a consequence of Defendants' actions, no one is left in this Office to distribute the funds Congress has appropriated.

Other offices within the Department are similarly affected, including the Office of International and Foreign Education (responsible for the administration of National Resource Centers and Foreign Language and Area Studies Fellowships)[197] and the Office of Elementary and Secondary Education (responsible for distributing billions of dollars in

---

[194] *See In re Aiken Cnty.*, 725 F.3d at 261 n.1.

[195] *See supra* Section III.B.3.

[196] *See* 170 Cong. R. H2051 (2024) (Appropriations Act 2024, Dep't of Labor, Health and Human Servs., and Related Agencies, designating $890,000,000 "[f]or carrying out part A of title III of the ESEA"), Full-Year Continuing Appropriations and Extensions Act, 2025," Pub. L. No. 119-4, § 1101(a)(8), 139 Stat. 11 (describing funding that will be the core financing of the program beginning on July 1, 2025, which was intended to keep it operating at 2024 levels in 2025); Every Student Succeeds Act, Pub. L. No. 114-95, 129 Stat. 1802 (2015), https://www.congress.gov/114/plaws/publ95/PLAW-114publ95.pdf.

[197] Lydia Kiesling, *A Department of Education Office Changed My Life. Now It's Been Cut*, Time (Mar. 20, 2025), https://time.com/7269589/department-of-education-cuts-essay; *see also supra* Sec. III.B.2.

funds to elementary and secondary schools around the country).[198] Drastic staffing cuts to these and other offices have caused "deep[] concern[]" among officials in states dependent on these funds that the Department will be unable to "meet its obligations" to "properly administer" these programs.[199]

Further, Congress did not intend for the Department to issue funds with little or no oversight.[200] By firing the staff who have historically filled those stewardship roles, Defendants' actions have undermined the oversight mechanisms these offices would ordinarily provide.[201] For example, staff in the Office of English Language Acquisition helped ensure that all grant spending through that Office was done according to statute.[202] So too with staff in the Office of Elementary and Secondary Education,[203] the Office of Special Education and Rehabilitative Services,[204] and the Office of Federal Student Aid.[205]

---

[198] Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Mar. 23, 2024, 138 Stat. 681–684; Full-Year Continuing Appropriations Act, 2025, Pub. L. No. 119-4, Mar. 15, 2025, 139 Stat. 11.

[199] Wilkinson Decl., ECF No. 71-18 ¶ 7.

[200] *See* S. Rep. No. 96-49 at 9 ("the new department will … aid greatly in … auditing large education funding programs, such as the widely-known 'Title I' program.").

[201] *See* 170 Cong. R. H1896 (2024) (Appropriations Act 2024, Dep't of Labor, Health and Human Servs., and Related Agencies).

[202] Doe Decl., ECF No. 71-60 ¶¶ 11–12.

[203] *The Elementary and Secondary Education Act (ESEA), as Amended by the Every Student Succeeds Act (ESSA): A Primer* (2025), https://www.congress.gov/crs-product/R45977 ("Under Title I-A, the ESEA … continues to require states and public school systems to focus on educational accountability as a condition for the receipt of grant funds.").

[204] *The Individuals with Disabilities Education Act (IDEA), Part B: Key Statutory and Regulatory Provisions* (2025), https://www.congress.gov/crs-product/R41833 ("Under the IDEA, a series of conditions are attached to the receipt of grant funds.").

[205] The FAFSA Simplification Act (2025), https://www.congress.gov/crs-product/R46909 ("HEA establishes three ... formulas" to determine "eligibility for many federal student aid programs.").

Without proper staffing to allow these Offices to oversee fund distribution, rules intended to provide guardrails for federal funding may "go out the window."[206]

The Trump Administration's mass reduction in force also violates clear directives from Congress tied to Department funding. Before undertaking any "overhaul" likely to affect future spending, Congress required the Department to consult with it. In 2024, Congress explicitly instructed that the Department "consult with the Committees on any Department action expected to significantly increase or decrease current or future costs of programs it administers."[207] Nothing in the Full-Year Continuing Appropriations and Extensions Act, 2025, suggests Congress intended to change the status quo as to the Department's mission. Accordingly, before Secretary McMahon could initiate her so-called "overhaul" of the Department, she was obligated to consult Congress. She did not. And if the Trump administration wants to "overhaul" the Department to ensure "resources are directed where they matter most,"[208] then it must go through Congress. It has not.

If the Trump administration disagreed with Congress's budget appropriating the same amount of funds for the Department in 2025 as it had in prior years, its proper recourse was to send the budget back to Congress, not signing the budget into law. As Justice Kavanaugh once recognized, no matter the policy justification, "even the President does not have unilateral authority to refuse to spend the funds" appropriated by

---

[206] Doe Decl., ECF No. 71-60 ¶¶ 11–12.

[207] *See* 170 Cong. R. H1896 (2024).

[208] Opp. at 3; *supra* note 33, Reduction in Force.

Congress.[209] The Trump administration cannot now override that constitutional principle by slashing the Department's workforce.

## V.    CONCLUSION

For these reasons, the Court should take all necessary actions to prevent the Executive's unlawful usurpation of Congress's constitutional prerogatives, including by granting Plaintiffs' motion for preliminary injunctive relief.


DATED: April 23, 2025                    Respectfully submitted,


                                         */s/ Raffi Melanson*
                                         Raffi Melanson (BBO # 688650)
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         1 Faneuil Hall Square, 5th Floor
                                         Boston, Massachusetts 02109
                                         T: (617) 482-3700
                                         F: (617) 482-3003
                                         raffim@hbsslaw.com

                                         Steve W. Berman*
                                         Breanna Van Engelen*
                                         Stephanie A. Verdoia*
                                         Dana Abelson*
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         1301 Second Ave, Suite 2000
                                         Seattle, Washington 98101
                                         T: (206) 623-7292
                                         F: (206) 623-0594
                                         steve@hbsslaw.com
                                         breannav@hbsslaw.com
                                         stephaniev@hbsslaw.com
                                         dana.abelson@hbsslaw.com

---

[209] *In re Aiken Cnty.*, 725 F.3d at 261 n.1 ("[A] President sometimes has policy reasons for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds."); *Clinton*, 524 U.S. at 468.

Abigail D. Pershing*
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Street, Suite 920
Pasadena, California 91101
T: (213) 330-7150
F: (213) 330-7512
abigailp@hbsslaw.com

John Michael Grant*
HAGENS BERMAN SOBOL SHAPIRO LLP
594 Dean Street, Suite 24
Brooklyn, New York 11238
T: (212) 752-5455
F: (917) 210-3980
john.grant@hbsslaw.com

*Attorneys for Amici Members of Congress*

*\*Pro hac vice motion forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury under the laws of the United States that the foregoing document was electronically filed with the United States District Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: April 23, 2025                        _/s/ Raffi Melanson_____
                                                       RAFFI MELANSON

## APPENDIX A: LIST OF *AMICI CURIAE*

**Jamie Raskin**
    Representative of Maryland

**Robert C. "Bobby" Scott**
    Representative of Virginia

**Rosa L. DeLauro**
    Representative of Connecticut

**Hakeem Jeffries**
    Representative of New York

**Katherine Clark**
    Representative of Massachusetts

**Pete Aguilar**
    Representative of California

**Joe Neguse**
    Representative of Colorado

**Gerald E. Connolly**
    Representative of Virginia

**Alma S. Adams, Ph.D.**
    Representative of North Carolina

**Jake Auchincloss**
    Representative of Massachusetts

**Becca Balint**
    Representative of Vermont

**Nanette Barragán**
    Representative of California

**Joyce Beatty**
    Representative of Ohio

**Wesley Bell**
    Representative of Missouri

**Ami Bera, M.D.**
    Representative of California

**Donald S. Beyer Jr.**
    Representative of Virginia

**Suzanne Bonamici**
    Representative of Oregon

**Brendan F. Boyle**
    Representative of Pennsylvania

**Shontel Brown**
    Representative of Ohio

**Julia Brownley**
    Representative of California

**Nikki Budzinski**
    Representative of Illinois

**Janelle Bynum**
    Representative of Oregon

**Salud O. Carbajal**
    Representative of California

**André Carson**
    Representative of Indiana

**Troy A. Carter, Sr.**
    Representative of Louisiana

**Greg Casar**
    Representative of Texas

**Ed Case**
   Representative of Hawaii

**Sean Casten**
   Representative of Illinois

**Kathy Castor**
   Representative of Florida

**Joaquin Castro**
   Representative of Texas

**Sheila Cherfilus-McCormick**
   Representative of Florida

**Judy Chu**
   Representative of California

**Gilbert R. Cisneros, Jr.**
   Representative of California

**Yvette Clarke**
   Representative of New York

**Emanuel Cleaver, II**
   Representative of Missouri

**James E. Clyburn**
   Representative of South Carolina

**Steve Cohen**
   Representative of Tennessee

**Herbert C. Conaway, Jr.**
   Representative of New Jersey

**J. Luis Correa**
   Representative of California

**Jim Costa**
   Representative of California

**Joe Courtney**
   Representative of Connecticut

**Angie Craig**
   Representative of Minnesota

**Jasmine Crockett**
   Representative of Texas

**Jason Crow**
   Representative of Colorado

**Henry Cuellar**
   Representative of Texas

**Sharice L. Davids**
   Representative of Kansas

**Danny K. Davis**
   Representative of Illinois

**Madeleine Dean**
   Representative of Pennsylvania

**Diana DeGette**
   Representative of Colorado

**Suzan K. DelBene**
   Representative of Washington

**Chris Deluzio**
   Representative of Pennsylvania

**Mark DeSaulnier**
   Representative of California

**Maxine Dexter**
  Representative of Oregon

**Debbie Dingell**
  Representative of Michigan

**Lloyd Doggett**
  Representative of Texas

**Sarah Elfreth**
  Representative of Maryland

**Veronica Escobar**
  Representative of Texas

**Adriano Espaillat**
  Representative of New York

**Dwight Evans**
  Representative of Pennsylvania

**Cleo Fields**
  Representative of Louisiana

**Lizzie Fletcher**
  Representative of Texas

**Bill Foster**
  Representative of Illinois

**Lois Frankel**
  Representative of Florida

**Laura Friedman**
  Representative of California

**Maxwell Alejandro Frost**
  Representative of Florida

**John Garamendi**
  Representative of California

**Jesús G. "Chuy" García**
  Representative of Illinois

**Robert Garcia**
  Representative of California

**Sylvia Garcia**
  Representative of Texas

**Dan Goldman**
  Representative of New York

**Vicente Gonzalez**
  Representative of Texas

**Maggie Goodlander**
  Representative of New Hampshire

**Josh Gottheimer**
  Representative of New Jersey

**Al Green**
  Representative of Texas

**Jahana Hayes**
  Representative of Connecticut

**Pablo José Hernández**
  Representative of Puerto Rico

**Steven Horsford**
  Representative of Nevada

**Chrissy Houlahan**
  Representative of Pennsylvania

**Steny H. Hoyer**
  Representative of Maryland

**Jared Huffman**
  Representative of California

**Glenn F. Ivey**
  Representative of Maryland

**Jonathan L. Jackson**
  Representative of Illinois

**Sara Jacobs**
  Representative of California

**Pramila Jayapal**
  Representative of Washington

**Henry C. "Hank" Johnson, Jr.**
  Representative of Georgia

**Julie Johnson**
    Representative of Texas

**Sydney Kamlager-Dove**
  Representative of California

**Marcy Kaptur**
    Representative of Ohio

**William Keating**
  Representative of Massachusetts

**Timothy M. Kennedy**
  Representative of New York

**Ro Khanna**
  Representative of California

**Greg Landsman**
  Representative of Ohio

**John B. Larson**
  Representative of Connecticut

**George Latimer**
  Representative of New York

**Summer L. Lee**
  Representative of Pennsylvania

**Susie Lee**
  Representative of Nevada

**Teresa Leger Fernández**
  Representative of New Mexico

**Mike Levin**
  Representative of California

**Sam T. Liccardo**
  Representative of California

**Ted W. Lieu**
  Representative of California

**Zoe Lofgren**
  Representative of California

**Stephen F. Lynch**
  Representative of Massachusetts

**Seth Magaziner**
  Representative of Rhode Island

**John W. Mannion**
  Representative of New York

**Doris Matsui**
    Representative of California

**Lucy McBath**
    Representative of Georgia

**Sarah McBride**
    Representative of Delaware

**April McClain Delaney**
    Representative of Maryland

**Jennifer L. McClellan**
    Representative of Virginia

**Betty McCollum**
    Representative of Minnesota

**Kristen McDonald Rivet**
    Representative of Michigan

**James P. McGovern**
    Representative of Massachusetts

**LaMonica McIver**
    Representative of New Jersey

**Gregory W. Meeks**
    Representative of New York

**Robert J. Menendez**
    Representative of New Jersey

**Grace Meng**
    Representative of New York

**Kweisi Mfume**
    Representative of Maryland

**Dave Min**
    Representative of California

**Gwen S. Moore**
    Representative of Wisconsin

**Joseph D. Morelle**
    Representative of New York

**Kelly Morrison**
    Representative of Minnesota

**Jared Moskowitz**
    Representative of Florida

**Seth Moulton**
    Representative of Massachusetts

**Frank J. Mrvan**
    Representative of Indiana

**Kevin Mullin**
    Representative of California

**Jerrold Nadler**
    Representative of New York

**Richard E. Neal**
    Representative of Massachusetts

**Donald Norcross**
    Representative of New Jersey

**Eleanor Holmes Norton**
    Representative of the District of
    Columbia

**Johnny Olszewski**
    Representative of Maryland

**Ilhan Omar**
  Representative of Minnesota

**Frank Pallone, Jr.**
  Representative of New Jersey

**Jimmy Panetta**
  Representative of California

**Chris Pappas**
  Representative of New
  Hampshire

**Nancy Pelosi**
  Representative of California

**Scott H. Peters**
  Representative of California

**Brittany Pettersen**
  Representative of Colorado

**Chellie Pingree**
  Representative of Maine

**Stacey E. Plaskett**
  Representative of the Virgin
  Islands

**Mark Pocan**
  Representative of Wisconsin

**Nellie Pou**
  Representative of New Jersey

**Ayanna Pressley**
  Representative of Massachusetts

**Mike Quigley**
  Representative of Illinois

**Delia C. Ramirez**
  Representative of Illinois

**Emily Randall**
  Representative of Washington

**Luz M. Rivas**
  Representative of California

**Deborah K. Ross**
  Representative of North
  Carolina

**Raul Ruiz**
  Representative of California

**Andrea Salinas**
  Representative of Oregon

**Linda T. Sánchez**
  Representative of California

**Mary Gay Scanlon**
  Representative of Pennsylvania

**Jan Schakowsky**
  Representative of Illinois

**Bradley Scott Schneider**
  Representative of Illinois

**Hillary J. Scholten**
  Representative of Michigan

**Kim Schrier, M.D.**
  Representative of Washington

**David Scott**
  Representative of Georgia

**Terri A. Sewell**
  Representative of Alabama

**Brad Sherman**
  Representative of California

**Mikie Sherrill**
  Representative of New Jersey

**Lateefah Simon**
  Representative of California

**Adam Smith**
  Representative of Washington

**Eric Sorensen**
  Representative of Illinois

**Darren Soto**
  Representative of Florida

**Melanie A. Stansbury**
  Representative of New Mexico

**Greg Stanton**
  Representative of Arizona

**Haley Stevens**
  Representative of Michigan

**Marilyn Strickland**
  Representative of Washington

**Suhas Subramanyam**
  Representative of Virginia

**Thomas R. Suozzi**
  Representative of New York

**Eric Swalwell**
  Representative of California

**Mark Takano**
  Representative of California

**Shri Thanedar**
  Representative of Michigan

**Bennie G. Thompson**
  Representative of Mississippi

**Mike Thompson**
  Representative of California

**Dina Titus**
  Representative of Nevada

**Rashida Tlaib**
  Representative of Michigan

**Jill Tokuda**
  Representative of Hawaii

**Paul D. Tonko**
  Representative of New York

**Norma J. Torres**
  Representative of California

**Ritchie Torres**
  Representative of New York

**Lori Trahan**
  Representative of Massachusetts

**Derek T. Tran**
  Representative of California

**Juan Vargas**
 Representative of California

**Gabe Vasquez**
 Representative of New Mexico

**Marc Veasey**
 Representative of Texas

**Nydia M. Velázquez**
 Representative of New York

**Eugene Vindman**
 Representative of Virginia

**Debbie Wasserman Schultz**
 Representative of Florida

**Maxine Waters**
 Representative of California

**Bonnie Watson Coleman**
 Representative of New Jersey

**Nikema Williams**
 Representative of Georgia

**Frederica S. Wilson**
 Representative of Florida