```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


    _____

    STATE OF NEW YORK, ET AL,

                        Plaintiffs,        Civil Action
                                           No. 25-CV-10601-MJJ
    V.
                                           April 25, 2025
    LINDA MCMAHON, ET AL,

                        Defendants.
    _____
```

BEFORE THE HONORABLE MYONG J. JOUN

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210

```
             JAMIE K. HALPIN, CRR, RMR, RPR
                 Official Court Reporter
              John J. Moakley U.S. Courthouse
              1 Courthouse Way, Room 7-204
                   Boston, MA  02210
                   jkhhalpin@gmail.com
```

1    APPEARANCES:

2

     FOR THE PLAINTIFFS:

3

     Nathaniel J. Hyman
4    Massachusetts Attorney General's Office
     1 Ashburton Place
5    18th Floor
     Boston, MA 02108
6    617-963-2514
     Email: Nathaniel.j.hyman@mass.gov

7

     Rabia Muqaddam
8    NYS Office of The Attorney General
     28 Liberty St.
9    New York, NY 10005
     917-715-4172
10   Email: Rabia.muqaddam@ag.ny.gov

11   Yael Shavit
     Office of the Attorney General
12   One Ashburton Place
     Boston, MA 02108
13   617-963-2197
     Email: Yael.shavit@mass.gov

14

15   For Somerville Public Schools, et al

16   Rachel F. Homer
     Democracy Forward Foundation
17   P.O. Box 34553
     Washington, DC 20043
18   202-448-9090
     Email: Rhomer@democracyforward.org

19

     Elena Goldstein
20   Democracy Forward Foundation
     PO Box 34553
21   Washington, DC 20043
     202-448-9090
22   Email: Egoldstein@democracyforward.org

23   Victoria S. Nugent
     Democracy Forward
24   P.O. Box 34553
     Washington, DC 20043
25   202-862-1393
     Email: Vnugent@democracyforward.org

1

2    FOR THE DEFENDANTS:

3

     Eric J. Hamilton
4    Department of Justice
     950 Pennsylvania Avenue, NW
5    Washington, DC 20530-0001

6

7    Michael Benjamin Bruns
     DOJ-Civ
8    6705 13th Pl NW
     Washington, DC 20012
9    202-758-8520
     Email: Michael.bruns@usdoj.gov
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **P-R-O-C-E-E-D-I-N-G-S** |
| 2 | THE CLERK:  All rise. |
| 3 | (The Honorable Court Entered) |
| 4 | THE CLERK:  The court is now on the record in the |
| 5 | matter of *State of New York, et al v. Linda McMahon, Civil* |
| 6 | *Action 25-10601*.  Counsel, please identify yourselves for the |
| 7 | record. |
| 8 | MR. HYMAN:  Good afternoon, your Honor.  Nathaniel |
| 9 | Hyman of behalf of the Commonwealth of Massachusetts Attorney |
| 10 | General's office. |
| 11 | THE COURT:  Good afternoon. |
| 12 | MS. MUQADDAM:  Good afternoon.  Rabia Muqaddam for the |
| 13 | Office of the Attorney General. |
| 14 | THE COURT:  How do you say your last name? |
| 15 | MS. MUQADDAM:  Muqaddam, like a hard K sound. |
| 16 | THE COURT:  Okay, thank you. |
| 17 | MS. SHAVIT:  Good afternoon, your Honor.  Yael Shavit |
| 18 | for the Commonwealth of Massachusetts. |
| 19 | THE COURT:  Very nice to meet all of you. |
| 20 | MR. HAMILTON:  Good afternoon, your Honor.  Eric |
| 21 | Hamilton, Deputy Assistant Attorney General for the Federal |
| 22 | Programs Branch U.S. DOJ for defendants. |
| 23 | THE COURT:  Good afternoon. |
| 24 | MR. BRUNS:  Afternoon, your Honor.  Michael Bruns for |
| 25 | the United States for the Department of Justice. |

1            THE COURT:  Nice to meet you as well.  We've got some
2       more.
3            MS. HOMER:  Good afternoon, your Honor.  Rachel Homer
4       on behalf of the Somerville Plaintiffs.
5            MS. GOLDSTEIN:  Elena Goldstein also on behalf of the
6       Somerville Plaintiffs.
7            MS. NUGENT:  Good afternoon, your Honor.  Victoria
8       Nugent for the Somerville Plaintiffs.
9            THE COURT:  Excellent.  Also nice to meet you.  All
10      right, so who wants to start?  Great.
11           MS. MUQADDAM:  Good afternoon.  Rabia Muqaddam for the
12      plaintiffs.  I will be covering jurisdiction and likelihood of
13      success on the merits.  My colleague, Nate Hyman from the
14      Massachusetts Attorney General's office, will cover irreparable
15      harm and the equities, and then counsel for the Somerville
16      Plaintiffs will take over, and we have predecided how we're
17      going to split it up.
18           So I'd like to take the issues in this order:
19      Standing and ripeness, the APA claims, the constitutional
20      claims, the savings clause arguments and CSRA, C-S-R-A,
21      channeling.
22           At the outset, I'd like to emphasize the state of the
23      record here which I think underlies a lot of questions before
24      this Court.
25           A fundamental flaw throughout the Defendants'

1    arguments is an attempt to characterize the Department's

2    actions here as minor changes that will not affect statutory

3    functions, but this is completely belied by the extensive

4    factual record which is entirely unrebutted.

5        Declarations from a host of current and former Ed.

6    Employees attest that the actions have stripped the Department

7    of the resources necessary for it to carry out important

8    statutory mandates, and also represented here before you across

9    both sets of Plaintiffs are nearly every actor across the

10   educational systems of the states.  So we have frontline

11   educators represented to the state agency education heads, the

12   chancellors of state universities, and they all agree with the

13   current and former Ed. Employees that the Department is no

14   longer functioning and it is getting worse every day.

15       So turning to standing and ripeness, again, the

16   arguments the defendants have put forth are based on these

17   conclusory mischaracterizations of the record.  So they have

18   argued that the chain of harms is too attenuated, that there

19   are not current harms, but this is again belied by the

20   extensive record, and I think that a case that's actually cited

21   by the Defendants, which I think is instructive, is *Roman*

22   *Catholic Bishop of Springfield.*  So, in that case, the court

23   looked at some of the actions and determined they were ripe and

24   some of the actions and determined that they were not ripe, and

25   in the instance of those that were ripe, the court looked at a

1    particular action that if this is causing sufficient harm, it

2    is actually ripe right now.  So I think the action that we're

3    looking at here is much more in that category; whereas the

4    second category that the court looked at were things based on

5    an application that had not yet been filed, events that had not

6    yet occurred.

7          So all of the facts here go in support of the

8    Plaintiffs' request to enjoin two discrete separate things, and

9    one is the Mass Termination that was effectuated through the

10   RIF and then the second one is this Presidential or the

11   implementation of the Presidential directive on March 21 to

12   transfer functions outside of the Department.

13         So just speaking a little bit to that factual record,

14   my colleague will get into the harms to the states in

15   particular, but the record reflects a lot of different types of

16   functions that the Department is no longer able to accommodate

17   that are statutorily mandated.

18         So I point your Honor in particular to Exhibit 2 to

19   the Smith declaration which gets up as the Arne Duncan

20   declaration.  Arne Duncan was a very long-serving Secretary of

21   Education, and in his own words, "there is no way that the

22   Department can continue to meet its statutory mandates."  So

23   ECF 71-54, the loss of the ability to ensure compliance with

24   Title II.  ECF 71-60, the loss of Title III functions that are

25   statutorily mandated.  71-64, ESRA cannot be complied with.

1    71-66, the OGC is no longer able to satisfactorily articulate

2    to the Department what is legal and what is not.  ECF 71-61

3    through 63, all describing the way that Federal Student Aid

4    cannot accomplish its goals and its statutory mandates, and so

5    on and so on.  I won't continue, but I think the record is

6    extremely clear about that and again is totally unrebutted.

7         So turning to the APA claims, the Defendants have not

8    launched a particularly significant challenge to the merits

9    here.  Very little of their opposition addresses it, but I will

10   briefly touch on the arguments that Plaintiffs have raised

11   under the APA.

12        So first is that these actions are arbitrary and

13   capricious and there are three ways in which they are.  The

14   first one is that the reasoning is the Defendants have not

15   offered sufficiently rational explanation as to these actions,

16   and actually they have offered really no explanation.  The

17   proposal is that the Department is merely being pared back of

18   unnecessary bureaucracy but there is no explanation as to how

19   that is the case, and I think one of the interesting things

20   that has come out on the record is the testimony of in

21   particular the Tessitore declaration.

22        So there were members of the Department working on

23   developing this list to put forth to higher management about

24   which functions were in fact statutorily mandated, and that

25   list was not even due to upper management until two days after

1    the RIF and it's in all the documents associated with the RIF,

2    including the Dear Educator letter that was submitted to

3    attempt to explain it.  In no way has the Department

4    articulated why the functions were targeted, how the targeted

5    functions that accomplished Ashford mandates were going to be

6    transferred to others who could accomplish them and so these

7    are arbitrary and capricious actions without reasoning.

8           And the second reason is the basis for these actions

9    while not rational or reasonable is actually clear and that is

10   that the President and Secretary McMahon do not wish the

11   Department to exist, and there are statements cited throughout

12   our papers that explain the real basis for this is a desire to

13   eliminate it as much as possible, and despite the many

14   conclusory statements across Defendants' opposition, none of

15   the facts explain how this isn't a mere reorganization, these

16   aren't minor changes.  The RIF stripped the Department of key

17   functions that allow it to meet its mandates.  None of that is

18   rebutted and that also demonstrates arbitrary and capricious

19   action.

20          And then finally, a failure to consider the impact in

21   full.  No consideration of reliance interests, no consideration

22   of how the Department was going to meet its obligations, no

23   consideration about the impact on Plaintiffs or the many people

24   who rely on the Department.

25          And then finally on the APA, we've also challenged the

1    actions as contrary to law and that's because they're contrary

2    to the very limited authority of the Secretary of Education

3    articulated in Section 3473 and also contrary to the many,

4    many, many statutes that the Department administers.

5          So Defendants have raised two APA arguments that go to

6    whether these actions can be adjudicated under the APA.

7          So the first one of those is that these actions are

8    not final or discrete, and we think that is clearly not the

9    case.  So final agency action under the *Bennett* test, the first

10   part is does it mark the confirmation of agency

11   decision-making, and the second is whether it determines rights

12   or obligations from which legal consequences will flow, and

13   Defendants have argued essentially there are too main links

14   between what the challenged actions are and then the

15   consequences, and we think that's just simply not the case.

16         So here, the massive RIF and the direction and the

17   implementation of the March 21 directive clearly are not

18   interlocutory even if there may be more actions to further

19   destroy the Department, and so we think that for the same

20   reason as actually recently determined in Boy Scouts of America

21   had been dismantled by a final agency action, the same is true

22   here.

23         The other argument they've raised is that these

24   actions are simply unreviewable under the APA because they are

25   committed to agency discretion by law, and I just want to

1    emphasize how narrow that exception is to the presumption of

2    reviewability under the APA.  So in *Lincoln v. Vigil*, which is

3    the main case on this, the court said that basically there was

4    no statutory way by which to judge the agency action.  That

5    program had been created entirely by the agency.  There was no

6    specific statutory or other legal standard by which one might

7    judge it.  Whereas here, there are many very clear

8    administrative and constitutional standards by which to judge

9    the Defendants' conduct.

10          So on the constitutional claims, we've raised

11    separation of powers and the Take Care Clause claim.  The

12    Defendants have not pushed back much on that except with

13    respect to arguments in *Dalton* and *Heckler*.  In *Dalton*, the

14    court is very clear that a statutory claim may not be

15    constitutional but it also may, and here, clearly, the

16    Defendants have chosen to take actions that are contrary to

17    many, many federal statutes and the constitution.

18          And *Heckler* is a case that really relates only to the

19    ability of an agency to make enforcement decisions,

20    determinations, prioritization.  Here, we're talking about the

21    ability of OCR to actually do its job to begin with.  We're not

22    talking about discretion to bring a particular action or not.

23          And finally on the savings clause piece, so Defendants

24    have only raised that "insofar" as we are challenging the

25    executive order.  This motion does not seek an injunction

1    against the executive order.

2          And then finally on the CSRA channeling, C-S-R-A, so

3    that provides an administrative procedure solely for employees

4    and employee unions.  The Plaintiffs are sovereign states, and

5    this channeling does not apply here, and to hold otherwise

6    would actually deny the Plaintiff States a forum entirely.

7    There is no case that says that sovereign states have access to

8    CSRA procedures, and although the Defendants cite a particular

9    section that says an interested party may intervene, there is

10   no basis to think that sovereign states would be such

11   interested parties as might other actors in the employment

12   context, and it's worth raising that even in *National Treasury*

13   *Employees Union v. Vought*, which is a case that actually did

14   involve employees and unions, the court there also wasn't

15   convinced that CSRA channeling would be appropriate and applied

16   the *Bennett* test.

17          So I will conclude there unless the Court has

18   questions.

19          THE COURT:  So I just want to be clear that when you

20   say seeking injunctive relief as to two reasons, one of those

21   reasons you mentioned was the mass firings.  You're not

22   challenging the Department's discretion to terminate employees.

23   You're not interested in an order, for example, that they

24   reinstate these fired employees.  You're just interested in

25   whoever it is that there is enough bodies in the Department to

1    actually carry out its functions.

2         MS. MUQADDAM:  So the injunction we've sought is just

3    targeted at the March 11 RIF, but we have asked for the

4    employees that were terminated through that RIF to be

5    reinstated such that the Department can meet its mandates, but

6    we are in no way asking the Court to prevent the agency from

7    terminating employees lawfully in the future, solely with

8    respect to this Mass Termination.  It may be that the

9    Department can decide to engage in a RIF and do it in a way in

10   which the Department can continue to meet its mandates, but

11   that's not what happened here, and then we're also seeking to

12   enjoin an agency implementation of the transfer directive.

13        THE COURT:  And how do you respond to Defendants'

14   argument that basically this is just a reorganization?

15        MS. MUQADDAM:  I think the answer to that lies in the

16   factual record.  So if there was evidence that the Department

17   could meet the statutory mandates that the declarations

18   extensively document are being unmet, they were free to and

19   they have not, and so the only evidence in the record, which is

20   voluminous, explains the Department is unable to meet those

21   mandates.

22        THE COURT:  So to the extent that they have authority

23   to reorganize their Department, they're free to do it as long

24   as it doesn't compromise their ability to carry out its

25   functions?

1          MS. MUQADDAM:  Exactly, and I think it's worth looking

2     at the very, very limited discretion that the Secretary of

3     Education does have under statute.  So she can, for example,

4     make changes that are necessary and proper.  That's the quote

5     from the statute, and there are also a few functions that she

6     is permitted to even discontinue, but even there she has to

7     provide some notice to Congress.  So neither of those attempts

8     -- neither of those forms of discretion were exercised here.

9          THE COURT:  Thank you.

10          MS. MUQADDAM:  Thank you.

11          MR. HYMAN:  Good afternoon, your Honor.  Nate Hyman

12     again on behalf of the Commonwealth and on behalf of the

13     Plaintiff States.

14          My goal today is to discuss irreparable harm to the

15     Plaintiff States at this juncture.  As my colleague alluded to

16     a moment ago, we've got 1,100 pages of unrebutted evidence in

17     the record.  I am not going to be able to get through all of

18     it, and so my goal today is to put these categories of harm

19     into four broad buckets which I hope are useful for the Court

20     weighting through this material.

21          The first is knowledge transfer.  Broadly speaking,

22     this is technical assistance, training, guidance, knowledge,

23     management and hard data, things that the states rely on every

24     single day to be able to continue to comply with their grant

25     obligations and fulfill their missions as state education

1    agencies and institutions of higher education; the second is

2    civil rights enforcement, something that the states and the

3    Federal Government have co-jurisdiction over in educational

4    settings; the third is FSA or Federal Student Aid, the

5    important role that that plays, and the fourth are impacts to

6    funding.

7            So, your Honor, I will start briefly by addressing one

8    item within that knowledge transfer section, knowledge

9    management.  One of the less talked about that I think is the

10   fascinating parts of the Education Department is that they've

11   got this group called the IES or Institute For Education

12   Statistics -- Sciences rather, I'm sorry, and what this group

13   does is it promulgates and allows folks to access a wide array

14   of data sets, best practices data.  They've got these regional

15   knowledge educational laboratories, and I think the record is

16   replete of state officials testifying about how much they rely

17   on this stuff, all impacted by the RIF, your Honor.  These

18   folks are no longer working.  They're no longer providing the

19   services to the states.  The states can't use this information

20   moving forward, and that is irreparable harm to the states

21   today.

22           Moving on to civil rights enforcement, your Honor.  As

23   your Honor likely knows, the Office for Civil Rights is the

24   preeminent organization within the Federal Government entrusted

25   with enforcing civil rights laws in educational institutions.

1    The way they've organized this RIF of the twelve regional

2    offices that did this throughout the country, seven of them are

3    gone.  So it's not as though they went to each office and said

4    we're going to take 25 percent of this head count and remove

5    these people.  They just abdicated responsibility for enforcing

6    civil rights laws in educational institutions in like 27 states

7    across the country, and what you see in the declarations, your

8    Honor, is that the practical impact of that is that our states

9    have to put additional resources, divert resources from other

10   things, and put them towards ensuring a fair and equal

11   experience for students in our school systems.  So you've got

12   declarations from California, from Illinois, from Rhode Island

13   testifying to this exact issue, that in light of the fact that

14   OCR San Francisco and OCR Chicago and OCR Boston are closed and

15   there aren't attorneys in those offices investigating and

16   attempting to remediate discrimination, the states are going to

17   have to fill that gap and indeed have begun to do so.

18        Moving on to FSA, we could spend four hours talking

19   about FSA.  I think the analogy that I find most useful in

20   thinking about FSA is that of a bank.  So what the Federal

21   Student Aid group does is it allows students to originate

22   funding to go purchase education.  It then services that debt

23   at about $1.6 trillion, about the same size as Wells Fargo.

24   The President makes that point in the EO.  And then finally, it

25   collects in the event that student borrowers go into default.

1    Wells Fargo has 250,000 employees.  FSA before the RIFs had

2    1,400.  My understanding is that number is now down to 700.

3              I want to focus on this origination step first because

4    I think it's the place that directly impacts the states the

5    most.  In particular, I want to talk about state universities.

6    So in order to qualify for Title IV funding under the FSA, this

7    is things like Pell Grants, direct loans, basically how most

8    people pay for college, you have to go through something called

9    the certification process and that's basically the government

10   kicking the tires on a university and ensuring that it's

11   actually going to provide meaningful education for the students

12   who attend there.

13             Failure to get certification is the kiss of death for

14   an institution.  I think you've got voluminous records before

15   you, your Honor.  Denise Barton for the UMass system, for

16   instance, provides this information, Exhibit 26.

17             So without this information -- without this

18   certification rather, your Honor, universities are not going to

19   be able to provide services.

20             The group that does certification within FSA has been

21   RIF'ed.  So for practical purposes, if you're a state

22   university and you want to open a new program or a new campus,

23   you can't do that because there is not somebody within FSA who

24   can take your certification application, look it over, and

25   allow you to proceed by receiving Title IV funding.

1          In particular, your Honor, for the Court just to have

2     an example, Evergreen State College in Washington State has a

3     declaration in there, your Honor, and there they remark that

4     they've had this certification for this new program pending for

5     some time, have no idea when it's going to go through but are

6     concerned it's not.  They've also got a recertification.

7     Recertification is a process that universities have to go

8     through every one to six years.  Again, heavily impacted by

9     this function.

10          One more data point in the FSA before I will move on,

11    you have before you the declaration of Chris Miller.  He's

12    somebody who worked in the Atlanta office before the RIF.  Now,

13    Miller ran a team of financial analysts.  This was an

14    important, perhaps not particularly outward facing, but an

15    important part of the certification process.  These were people

16    who had specialized technical experience looking at financial

17    statements from institutions and determining whether or not

18    they were viable universities moving forward.  There were 16

19    people who worked for this group before the RIF.  There is one

20    now.  There is something like 5,600 universities in the United

21    States of America.  So this one person is going to be

22    responsible for every certification and recertification process

23    that has to go through this financial analysis segment.

24          And for those reasons, your Honor, the impacts to the

25    FSA directly impact the states that is causing harm today and

1    it will continue to cause harm moving forward.

2         Finally, your Honor, I will touch briefly on impacts

3    to funding.  Three things I'd like to cover here.  The first

4    are conditions precedent, the second is threats to compliance

5    and the third is inherent uncertainty caused by the RIFs so I

6    will take each of those in turn, and just to provide the Court

7    with a concrete example, your Honor is likely familiar with

8    Title I funding.  So Title I funding, by dollar amount, one of

9    the largest sources of federal funding.  Oregon, for instance,

10   gets $150 million each year in Title I funding, and Title I

11   funding is a formula grant which means that Congress sets out

12   some formula that determines how much each state is going to

13   receive, and then the Department of Education's job is to just

14   allocate the funding that it gets from Congress according to

15   that formula.

16        In order to allocate those funds though, the group

17   that does Title I grant funding has to go to a group within IES

18   and use a data set that they maintain in order to allocate

19   these funds accordingly, and the problem is that the group that

20   maintains that data set just got RIF'ed.  So the next year when

21   it comes time to calculate Title I allocation, the Department

22   of Education is not going to have the underlying data set

23   necessary in order to ensure that the amount that each is

24   receiving is in fact in accordance with Congress' allocation

25   mechanism.

1            The next category is threats to compliance, your

2    Honor.  Every single day state education agencies, local

3    education agencies, state universities pick up the phone and

4    they call people in the Department of Education.  They ask them

5    questions.  They ask whether they can use their funding for a

6    particular purpose and be consistent with the federal law and

7    regulatory regime.  They ask about grant programs, they ask

8    about applications, and more often than not, when that request

9    comes, the program manager might not know the answer right away

10   and so they pick up the phone and they call OGC, Office of

11   General Counsel.

12           As a result of this RIF, 83 percent of OGC attorneys

13   are gone.  They are no longer working in this office, and what

14   this means for practical purposes, and you have record evidence

15   in front of you, this is happening as we speak, the program

16   officers aren't -- they're able to give the advice that they're

17   capable of giving but they're not able to give the fill panoply

18   of advice that they have historically given which dramatically

19   increases the odds that the states inadvertently run afoul of a

20   grant term that might result in termination of funding.  That's

21   a real harm that's happening right now.

22           The final point I'd like to make in terms of

23   irreparable harm, your Honor, and that is uncertainty.  Your

24   Honor may have noticed in the declarations there is a couple of

25   references to a funding program that arose out of the COVID-19

1    crisis, that there were these emergency funds that had been

2    given over to the states as part of a congressionally mandated

3    program, and several of the states were concerned because

4    they'd stopped receiving communications from the Federal

5    Government on these funds.  At the time, they believed that

6    that might be caused by the RIF, that Billy or Joe or whoever

7    it was that was supposed to be responding had been RIF'ed and,

8    therefore, wasn't responding.  We subsequently learned that

9    that is in fact an effort by the Federal Government to, in our

10   view, unlawfully impound those funds and this seems to be

11   happening over and over again.

12          What the RIF has done is made it impossible for the

13   states to know whether this is an intentional effort by the

14   Department of Education to impound funds in which case we need

15   to get this team together and file a lawsuit or if it's just

16   that Billy was laid off and his replacement hasn't taken over

17   yet, and so we just need to wait a couple of weeks to get

18   somebody on the line.  That is irreparable harm, your Honor.

19   It's happening right now.  It will continue to happen moving

20   forward.

21          With my remaining time, your Honor, I will just

22   briefly speak on the equities.  Your Honor, unequivocally in

23   this case the equities favor the Plaintiff States.  What we are

24   asking to do is the Department of Education simply has to

25   continue functioning in the way that Congress has dictated that

1    it should.  So Congress has said there shall be a Department of

2    Education; they'd like to dismantle it.  Congress has said that

3    Federal Student Aid will be managed by Education; they'd like

4    to move it to SBA.  Congress has said that IDEA, you know,

5    programming and funding, should rest in the Department of

6    Education; they are asking that it move to HHS.

7            We rely on these services every single day.  The lack

8    of those services damages us, and so we would respectfully

9    submit, your Honor, that the equities favor us.

10           With that, your Honor, I will reserve for rebuttal and

11   pass the baton to Democracy Forward.

12           THE COURT:  Thank you.

13           MS. HOMER:  Good afternoon, your Honor.  Rachel Homer

14   on behalf of the Somerville Plaintiffs.  I have four points to

15   focus on this afternoon briefly:  First, the harm to the

16   Plaintiffs; second, the relief that the Somerville Plaintiffs

17   are speaking; third, why these claims are not channelled; and

18   fourth, why the Mass Termination order is arbitrary and

19   capricious.

20           First, we have provided an extensive record of

21   irreparable harm to our Plaintiffs that is already occurring

22   due to Defendants' illegal Mass Termination order.  This

23   evidence is entirely unrebutted in the record.  The Defendants

24   have not rebutted that the Mass Termination order is already

25   causing and will continue to cause disruption and delays in the

1    funds from the Department and a degradation of the support and

2    resources that my colleagues and the states were just talking

3    about that the Department provides.

4            We have provided an unrebutted expert report by Dr.

5    Linos explaining that the delays and disruption are inevitable

6    in any public agency or even in private corporations when this

7    many staff are fired and that is especially true when there is

8    no time or plan to effectively transition work from the

9    employees who are fired to the remaining employees.  That's at

10   Exhibit 5, Pages 10 to 12.  And you've just heard from the

11   State Plaintiffs about the difficulty that states are already

12   having in accessing their funds.  That's at Exhibits 13, 22 and

13   31, for example.

14           This is further supported by the evidence in our case.

15   I would point your Honor to the Leheny declaration at Exhibit 6

16   which talks about the Office of General Counsel and explains

17   that every single attorney who reviews and advises on all K-12

18   grants, so that's all Title I grants and the other title

19   grants, and all IDEA grants, that's all grants under the

20   Individuals with Disabilities Education Act, every single one

21   of those attorneys have been fired.  Of course that will cause

22   and is already causing delays and disruptions and the

23   degradation of the resources and support that the Department

24   provides, exactly as our expert report describes.

25           This is also further supported by the declaration from

1    Katherine Neas which explains that IDEA applications must be

2    reviewed now in the spring for funding to get out in time, and

3    the key staff in the office that administers IDEA, the Office

4    of Special Education Programming and all of the relevant staff

5    in the Office of the General Counsel have been fired.  So,

6    again, delays are not only already occurring but they're, of

7    course, inevitable, and that's at Exhibit 8 in our case.

8           Let me tell the Court about how this is affecting our

9    Plaintiffs who are already right now experiencing irreparable

10   harm.  We represent school districts and unions of educators

11   and other school support staff.  These schools, Somerville,

12   Easthampton and Worcester, together represent a cross-section

13   of schools in this state.  They represent small communities and

14   urban communities, students of all racial backgrounds and

15   income levels, native English speakers as well as English

16   language learners.  The School Districts Plaintiffs' mission is

17   to educate students with the best education possible.  The

18   harms the school districts are experiencing are happening right

19   now and are already harming students and will continue to harm

20   students.

21          All three schools have described how right now, in the

22   spring, they need to be making staffing decisions and

23   programatic decisions for the next school year.  They can't

24   wait until the fall.  If they need to lay off teachers and

25   other staff, that will harm their mission of educating

1    students.  It will lead to larger class sizes, cuts to programs

2    such as summer school, arts education, athletic education,

3    preschool programming.  It will also lead to less support for

4    students who need additional supports, especially students with

5    disabilities, and it will lead to cuts for training for

6    teachers.

7        THE COURT:  For these three municipalities, what are

8    the perspective percentage of their funding that comes from the

9    Federal Government?

10       MS. HOMER:  Your Honor, those numbers are in our

11   brief, I don't have them in front of me, but it's approximately

12   10 percent for each, and without that certainty of federal

13   funding, they can't maintain their current staffing levels and

14   their current programming levels.  They will need to make those

15   cuts and once those cuts happen, they can't be easily reversed.

16   Teachers aren't widgets.  They can't simply be let go and then

17   re-hired.  There is a cycle to teacher hiring.  There is a

18   cycle to the school year.  And once experienced teachers are

19   lost, the new teachers who replace them typically won't have

20   that same level of expertise.

21       As the Superintendent of Somerville schools said in

22   his declaration at Exhibit 7, these harms "they are real and

23   they are already happening."  Easthampton and Worcester have

24   said the same in Exhibits 9 and 10.

25       The school districts are also right now and

continuously making curriculum decisions that rely on the
Institute of Education Sciences' data that my colleagues and
the states were just talking about.  For example, the
Superintendent of Worcester, Dr. Monarrez, explains that their
school relies on data from IES on an ongoing basis as they
evaluate curriculum, instructional methods, how to best support
and educate students, especially students with disabilities,
and in a rapidly changing world, they rely on constantly
updated resources from this Institute of Education Sciences,
and even any short-term degradation in those resources harms
their students at least to learning loss, and once students
fall behind, it becomes harder and harder for them to catch up.

Second, your Honor, I'd like to just briefly describe
the relief that the Somerville Plaintiffs are seeking.  We are
only challenging the Mass Termination order of March 11 and we
are seeking straightforward relief here.  We are seeking a
preliminary injunction, a restoring of the status quo to prior
to the illegal March 11 Mass Termination order, reinstating the
employees that were fired through that Mass Termination order.
We are not seeking any kind of order requiring the Department
to hire different or new employees and we're not precluding any
further RIFs that happen pursuant to the law.

Third, your Honor, I'd like to just very briefly talk
about channeling, which, again, my colleagues and the states
spoke about as well.  The key inquiry for channeling is whether

1    Congress impliedly intended this type of claim to be channeled.

2    Congress created and administrative review scheme where the

3    MSPB can hear claims brought by federal employees about

4    personnel actions, and the FLRA can hear claims about labor

5    management issues brought by employees, agencies and the

6    federal sector unions representing those employees.

7         This case does not involve any of those types of

8    claims or those types of plaintiffs.  We represent school

9    districts, and we represent unions of teachers and support

10   staff in schools.  We do not represent any federal employees or

11   any unions representing any federal employees at the

12   Department.  Our claims are simply not about any of those

13   issues whatsoever.  In contrast, the Administrative Procedure

14   Act explicitly makes this type of final agency actions

15   reviewable by a federal court.

16        Finally, your Honor, I would just briefly like to talk

17   about the Administrative Procedure Act and the arbitrary and

18   capricious standard.  Your Honor asked about whether -- asked

19   my colleagues and the states about whether a reorganization is

20   authorized and my colleagues and the states explain the

21   statutory limitations on the Secretary's reorganization

22   authority.  We, of course, agree with that, and in addition

23   would add the Secretary's decision-making, like all government

24   decision-making, is always constrained by the Administrative

25   Procedure Act requirement that it not be arbitrary and

1    capricious.  Any final agency action needs to be reasoned

2    decision-making.  This is simply a core requirement of a

3    functional government in compliance with the law.

4         Here, the record is unrebutted that they did not

5    engage in the kind of reasoned decision-making when they

6    undertook the Mass Termination order that they are required to

7    do by law.  There is no analysis of what work needs to continue

8    to meet the Department statutory obligations.  There was no

9    consideration about how to transfer work from the staff who

10   were fired to the remaining staff.  There was no consideration

11   of the reliance interests of all of the many people across the

12   country that rely on the Department including the states,

13   including schools, including teachers, including parents,

14   including students.

15        And importantly, the reason for the Mass Termination

16   that they present in litigation of streamlining is not the real

17   reason because it's not the reason that the Secretary presented

18   in her order announcing the Mass Termination order where she

19   described the reason as the first step towards closing the

20   Department.  A government agency is obligated to provide the

21   genuine justification for its action.  When it fails to do so,

22   it fails to meet the reasoned decision-making requirement.

23        With that, your Honor, I will reserve the remainder of

24   my time unless you have any questions.

25        THE COURT:  So with regard to the Union Plaintiffs, if

1    you could make your best case for your irreparable harm.  It

2    seems to me the municipalities have a stronger argument here.

3    There is a more direct line between the reduction in force and

4    harm.  If you can make your best case on behalf of the unions.

5         MS. HOMER:  There is -- of course, your Honor.  There

6    is two types of irreparable harm that the Union Plaintiffs are

7    experiencing and that their members are experiencing.  The

8    first is that the Union Plaintiffs, their jobs, are dependent

9    on the funding that the Department of Education provides.  As

10   we have noted in our declarations, and I would be happy to

11   provide you with the citations later, the Union Plaintiffs

12   depend -- their jobs are dependent on Title I funding and IDEA

13   funding, and for Title I in particular, schools need to

14   identify how many jobs, how many educator jobs are dependent on

15   that funding.  So we have in the record the exact number of

16   jobs, of educator jobs, that are dependent on that funding.  So

17   any delays or disruptions in those funding streams directly

18   affect job loss, and there is case law that we have cited in

19   our brief that job loss and the attended loss of health

20   insurance that comes with job loss is irreparable harm.

21        In addition, the unions themselves, not just on behalf

22   of their members, they rely on the resources provided by the

23   Department of Education for things like teacher training and

24   for things like advising their members on options for student

25   loans and for grants to attend higher education and for

1  repayment for student loans.

2       So the degradation in the resources that Federal

3  Student Aid is able to provide harms union members as well as

4  the unions themselves.

5       THE COURT:  Thank you.

6       MS. HOMER:  Thank you, your Honor.

7       MR. HAMILTON:  Good afternoon, your Honor.  This Court

8  should deny Plaintiffs' motion for a preliminary injunction.

9  President Trump campaigned and was elected on a promise to

10  improve education in the United States by returning control of

11  our schools to state and local decision-makers, those who are

12  closest to the children in the United States.  His

13  administration has made it a legislative priority to close the

14  Department of Education, but that's distinct from his

15  administrative agenda to cut bureaucratic bloat wherever it

16  exists.  That's a mandate that applies equally to the

17  Department of Education and other agencies in the Federal

18  Government.

19       The Department of Education is one of the newest

20  agencies in the Federal Government established in 1979.  Over

21  the years, previous administrations under previous Presidents

22  have expanded the Department of Education beyond its statutory

23  minimum.  The trump Administration is going in a different

24  direction, and last month the Department issued a press release

25  announcing progress on its goals of streamlining the Department

1    of Education.  That press release is addressed to no one.  It's

2    signed by no one.  It is not a Mass Termination order as the

3    Plaintiffs allege.  Instead, it announces that some employees

4    in the Department of Education chose to accept early retirement

5    offers, other employees chose to participate in a voluntary

6    resignation program, and other employees had their positions

7    eliminated in a reduction in force.

8         Plaintiffs want to reverse all of that and take the

9    Department of Education back to what it looked like under our

10   previous President.  Their claims are fundamentally flawed, and

11   their motions for a preliminary injunction satisfy none of the

12   four *Winter* factors for that remedy.

13        I will start with likelihood of success on the merits.

14        THE COURT:  So before you get there, I just want some

15   clarification on what you meant by or I should say what

16   President Trump meant by when he said he is going to return

17   education to the states?  What does that mean in terms of what

18   he is doing now with the Department?

19        MR. HAMILTON:  Well, it means -- I think it's focusing

20   on the legislative agenda of closing the Department of

21   Education and giving states and local authorities more control

22   over decision-making and so that there is less interference

23   from Washington bureaucrats in the Department of Education, but

24   again that's distinct from the administrative agenda of making

25   the Department of Education as efficient as it can be, but we

1    don't even get to issues with what is going on in the

2    Department of Education because, you know, the questions about

3    that, because the Plaintiffs can't even satisfy the state

4    standing or standing for the Somerville Plaintiffs.

5          I want to start by --

6          THE COURT:  Sorry to interrupt again.  When you say

7    legislative agenda, where in the record can I find support that

8    the administration is working on a legislative agenda?

9          MR. HAMILTON:  I think the State Plaintiffs have

10   attached a number of statements by the President and Secretary

11   McMahon that talk about the goal of closing the Department of

12   Education.  Defendants acknowledge that that requires an act of

13   Congress, our brief says that, and the work that the Defendants

14   are doing to make the Department of Education more efficient

15   today is separate from that legislative goal.

16         THE COURT:  So when you say there is no agenda, you're

17   basically saying we acknowledge that it has to be an act of

18   Congress to abolish the Department, that's what you're saying,

19   it's not an agenda?

20         MR. HAMILTON:  Exactly.  It's a legislative proposal.

21         Returning to standing, I will start with a case that

22   was decided right about the same time we filed our brief.

23   That's the U.S. Supreme Court's decision in *OPM v. AFGE*.  This

24   was on the U.S. Supreme Court's emergency docket.  It was

25   decided on April 8, and the theory of the case that the

1    Plaintiffs proceeded on there is quite similar to the case

2    here.  There, a group of entities and organizations that had

3    relationships with different federal agencies sought the

4    reversal of the termination of probationary employees in

5    various agencies, and their theory for relief was downstream

6    injuries.  For example, they alleged that the termination of

7    probationary employees in the Department of Veterans Affairs

8    would delay mental health services, they alleged that the

9    termination of probationary employees in the Bureau of Land

10   Management would affect their access to outdoor spaces, and the

11   U.S. Supreme Court in an order on its emergency docket held

12   that the Plaintiffs had not made the requisite showing for

13   standing.  The same problem applies to the Plaintiffs' lawsuit

14   here which hang on these downstream injuries that they are

15   speculating could occur in the future.

16          THE COURT:  All of the Plaintiffs or some of the

17   Plaintiffs?

18          MR. HAMILTON:  All of the Plaintiffs, your Honor.  All

19   of the Plaintiffs are alleging that the termination of certain

20   employees, certain employees' acceptance of the voluntary

21   resignation programs is going to have -- it's going to cause

22   this chain of events that will end up having an effect on them.

23          The Plaintiffs aren't seeking, for example, a court

24   order to compel the Department of Education to pay out money

25   under the FSA.  They're instead trying to reverse personnel

1    decisions that the Department of Education has made.

2        I will start with the injury in fact element.

3    Standing injury elements, of course, requires an actual injury

4    or an imminent injury.  There is no actual injury by any of the

5    Plaintiffs.  The State Plaintiffs certainly can't show an

6    actual injury.  Standing is measured at the time a complaint is

7    filed and the state sued on March 13.  The press release that

8    Plaintiffs hold out as a Mass Termination order announces that

9    employees would go on administrative leave starting on March 21

10   after Plaintiffs even filed their complaint.

11        They must instead rely on an imminent injury, but

12   before turning to that, I should address the Somerville

13   Plaintiffs which filed their lawsuit so close in time to that

14   March 21 date that they couldn't possibly allege any actual

15   injury from it, but again, none of the Plaintiffs establish an

16   imminent injury to their -- to themselves.  Under the *Clapper*

17   case, an injury has to be certainly impending.

18        Our brief at Page 10 highlights the language that

19   Plaintiffs use to try to establish an injury in fact and they

20   don't allege any certain impending injury.  Instead they say

21   things like cuts could or may or will likely cause delays.

22   That does not meet the requirements for standing.

23        At bottom, your Honor, the types of lawsuits that

24   Plaintiffs have brought in this lawsuit are very strange and

25   not the way that plaintiffs litigate disputes in federal

1    courts.  They're relying on this downstream injury chain of

2    causation and, again, not alleging specific violations of

3    statutes.  If the Plaintiffs are concerned about funding delays

4    or if they think that data scientists in the Department of

5    Education are not giving them data that they are owed, someone

6    who has standing needs to bring a lawsuit seeking a court order

7    requiring the Department of Education to produce data or pay

8    out money, but that isn't what Plaintiffs are doing here.

9    They're instead seeking a court order, putting themselves as

10   Chief Human Resources Officer for the Department of Education,

11   and trying to restore 1,900 employees into the Department of

12   Education.

13           THE COURT:  I am not sure that that is accurate.  I am

14   just going to push back on that a little bit.  Do you drink

15   coffee?

16           MR. HAMILTON:  I do.

17           THE COURT:  I drink coffee every morning.  I go to

18   Dunkin' Donuts, and when I walk in, there is a person behind

19   the counter.  There is a person making a fresh pot of coffee.

20   If I want a sandwich, there's a person at the sandwich station.

21   I don't think the Plaintiffs are saying that these employees --

22   let's say one morning there is no one there.  I don't think the

23   Plaintiffs are saying that Dunkin' Donuts should hire these

24   three employees back.  I think what they're saying is they want

25   their cup of coffee.

1        MR. HAMILTON:  I suppose I understood them to say, and

2    I believe your Honor asked a question to Plaintiffs about this,

3    and I understood their answer to be that accepting their

4    arguments would require the Federal Government to reinstate

5    employees who have been placed on administrative --

6        THE COURT:  Well, I think that's the effect that for

7    them to get their cup of coffee, Dunkin' Donuts will need to

8    hire those employees or some other employees, but the relief

9    that they're seeking is not that employees be hired but that

10    they want their cup of coffee.  There is a distinction.

11        MR. HAMILTON:  I agree there is a distinction and it's

12    our position that the way they have structured their complaint,

13    the proposed order is not give us a cup of coffee, it is

14    re-hire the barista, and that sort of framing of their lawsuit

15    we don't think is something that they have standing to

16    litigate.  If someone who has actually been denied funding that

17    they are owed, the plaintiff who can make that showing should

18    bring a lawsuit seeking funding, not the re-hiring of an

19    employee who may or may not have worked on that, and that is a

20    separate standing problem.  That's a traceability and

21    addressability problem because the Plaintiffs can't show that

22    the termination of any employee, the placement of someone on

23    administrative leave, would actually change what they are

24    speculating could happen into the future.

25        I will talk about the Evergreen declaration that my

1  friend on the other side noted because I think it illustrates

2  this.  That declaration talks about how the Department of

3  Education received an application for recertification from

4  Evergreen in August of 2024, months before the Department of

5  Education posted the March 2025 press release, and the

6  declaration says that in January of 2025 the Department of

7  Education told Evergreen that its application was under review,

8  and the Evergreen declaration further says that the Department

9  of Education continues to provide access to federal financial

10 aid to students.  So we understand the Plaintiffs' complaint to

11 rest on the speculation that into the future something is going

12 to change for Evergreen, not that something has already

13 happened for Evergreen and the other entities involved in

14 Plaintiffs' lawsuit.

15       I also wanted to touch on jurisdiction.  We have

16 argued that Federal District Courts lack jurisdiction over

17 these types of claims because they are precluded by the Civil

18 Service Reform Act.  The only entity by Congress' design that

19 can make that remedy of reinstating an employee, taking an

20 employee off administrative leave, would be the Merit Service

21 Protection Board or the Federal Labor Relations Authority.

22 That's Congress' choice.  They have made it so that those sorts

23 of claims are not justiciable in Federal District Courts and

24 this is something that courts have recognized in recent months

25 as Plaintiffs have brought cases challenging the work that

1    officials in the Trump Administration have done to streamline

2    operations in the federal bureaucracy.

3        For example, the recent *Maryland v. USDA* decision of

4    the Fourth Circuit, that case was a challenge to the

5    termination of a number of probationary employees.  The Fourth

6    Circuit there stayed a preliminary injunction entered by the

7    District of Maryland noting the jurisdiction problems with the

8    plaintiff's claim.

9        Here, in the District of Massachusetts, the *AFL-CIO v.*

10   *Ezell* case was a challenge to the fork-in-the-road Deferred

11   Resignation Program.  There the District Court held that the

12   Civil Service Reform Act precluded the sort of relief that the

13   Plaintiffs were seeking.

14       And I will also highlight the *NTEU v. Trump* case from

15   D.D.C.  That also involved an allegation or rather a challenge

16   to the termination of probationary employees in a reduction in

17   force and the District Court held that those sorts of claims

18   were channelled to the -- it was channelled under the Civil

19   Service Reform Act.  Jurisdiction would not be appropriate in a

20   Federal District Court.

21       I also want to touch on the Administrative Procedure

22   Act because there are multiple defects with the Administrative

23   Procedure Act claims that the Plaintiffs have brought.  To

24   start, Plaintiffs haven't challenged any final agency actions.

25   That's a requirement for every claim under the Administrative

1    Procedure Act.  They claim to be challenging a Mass Termination

2    order, but, again, that Mass Termination order is just a press

3    release.  It is not addressed to anyone, signed by anyone.  It

4    doesn't order anything.

5         THE COURT:  So this is the second time you have said

6    that about press releases.  So how should I take those public

7    statements?  As nothing?

8         MR. HAMILTON:  No.  I think they can be accepted for

9    what they are which is statements about the work that the

10   Department of Education is doing.  I think the problem that the

11   Plaintiffs are having is that a decision to put out a press

12   release isn't the same as agency action subject to review under

13   the APA.  The problem is also one of discreteness because

14   agency action has to be discrete, and what that press release

15   is doing is it is describing multiple decisions and actions and

16   determinations that have been made within the Department of

17   Education since the Trump Administration transitioned.

18        For example, there is a discussion of the offer of

19   Deferred Resignation Program participation.  The press release

20   notes that some employees chose to accept early retirement

21   offers.  It talks about the elimination of roles.  The

22   reassignment of tasks would be necessarily involved in that, as

23   would be the redirection of priorities and exercises of

24   enforcement discretion.  Now, to be clear, not all of that is

25   discussed in the press release, but that sort of multiplicity

1    of agency decision-making is implicit in what that press

2    release was announcing which is progress in the Trump

3    Administration's promise to the American people to make the

4    Department of Education as efficient and streamlined as it can

5    possibly be consistent with the statutory obligations that

6    Congress has placed on the Department of Education.

7         I want to highlight a case cited in our brief, the

8    *Lujan v. Natural Wildlife* case, which says that an ongoing

9    program or policy is not in itself a final agency action.

10   That's exactly the sort of impermissible APA challenge that the

11   Plaintiffs are seeking to bring here.

12        THE COURT:  Before you turn to something else, I just

13   want to explore this a little bit.  Usually when somebody says

14   they're going to do something and then they start taking

15   actions to accomplish what they said they were going to do, I

16   can take meaning from that to say they're going to do exactly

17   what they said they're going to do, right, normally?

18        So there has been public statements, multiple public

19   statements from President Trump, for example, that he is going

20   to close the Department.  He told the Secretary that she should

21   I think his words were something like "put herself out of a

22   job" and then she herself has said that her final mission is to

23   close the Department, and I believe there is more than press

24   releases here.  I think there was an actual Department memo

25   directing the reduction in force.

1          So why shouldn't I take from all of that that there

2     was final agency action, the memo, and now this is simply an

3     implementation of that final decision?

4          MR. HAMILTON:  Well, a few points, your Honor.  The

5     references to closing the Department of Education are

6     references to working with Congress to enact the laws that

7     would be needed to do that and our brief says that, and I'd

8     also highlight the March 20th executive order.  It's an

9     executive order that postdated the March 11th press release

10    that Plaintiffs are calling a Mass Termination order, but that

11    March 20th executive order talks about closing the Department

12    of Education, but in talking about returning authority to the

13    states, it tells the Department of Education's Secretary,

14    Secretary McMahon, to only do so to the maximum extent

15    appropriate and permitted by law and to "ensure the effective

16    and uninterrupted delivery of services."

17         So the Department is committed to carrying out its

18    statutory obligations until there is an act of Congress that

19    changes the Department's statutory obligations.

20         THE COURT:  So if I understood the Plaintiffs

21    correctly, they would respond in two ways to that:  One, which

22    is that the Department says that it is fully committed to

23    ensuring that the Department carries out its function but in

24    reality they're incapable of doing that; and the second thing

25    is it's kind of like when my kids were teenagers and they would

1    throw a party at the house and say, to the extent that my

2    parents give me permission to, I am throwing this party.  It

3    doesn't excuse having thrown the party.  They never got

4    permission, but by including that verbiage, it's almost like to

5    the extent that Congress has authorized, but there is nothing

6    in the record that shows that Congress has authorized the

7    closure of the Department.  There is nothing in the record to

8    show that the administration is working with Congress to close

9    down the Department, right?

10          MR. HAMILTON:  I mean, I don't think that the

11   legislative work that, you know, the Trump Administration -- I

12   don't think its legislative priorities really fit into

13   Plaintiffs' claims.  Our brief comes out and acknowledges that

14   the Department of Education is not closed and it is not closing

15   absent an act of Congress.  So I don't think that we could be

16   clearer on our position on that.  Instead, what is happening in

17   the Department of Education is that, like other agencies in the

18   Federal Government, the agency is streamlining itself and

19   making it the most efficient version of itself it can be until

20   Congress acts and decides what to do on President Trump's

21   legislative priorities with respect to the Department of

22   Education.

23          I will touch on the other elements under the *Winter*

24   test and I will start with irreparable harm which is also not

25   satisfied by the Plaintiffs for all of the reasons that they

1   also lack standing.  The balance of the equities and public

2   interest elements also disfavor a preliminary injunction.  On

3   the one hand the Plaintiffs have brought this, again,

4   enormously unusual lawsuit based on speculative downstream

5   harms that they claim may befall them, but on the other hand is

6   the enormous expense to the Federal Government of having to

7   reinstate 1,900 employees at the Plaintiffs' urging.

8           In addition, it would be enormously disruptive to the

9   Executive Branch's management of the federal workforce for

10  Plaintiffs' claims to succeed and for Plaintiffs to place the

11  District Court in the role of superintending the Department of

12  Education's decision-making with respect to human resources,

13  and it would also be enormously disruptive in particular to the

14  572 employees described in the March press release as having

15  made a decision to accept an early retirement offer or to have

16  chosen to participate in the voluntary resignation program.

17          Finally, your Honor, I would just note that if the

18  Court does enter preliminary injunctive relief, we have argued

19  that a bond should be required of the Plaintiffs, and under

20  Rule 65 that bond must reflect the enormous expense that

21  injunctive relief would place on the Federal Government, and in

22  addition, we request a stay pending any appeal authorized by

23  the Solicitor General.

24          If the Court has no further questions, we'd ask that

25  the Court would deny the Plaintiffs' motions for a preliminary

1    injunction.

2                THE COURT:  Thank you.

3                MR. HAMILTON:  Thank you, your Honor.

4                MS. MUQADDAM:  I'd just like to touch on five points,

5    but briefly first, I think our brief is quite clear that we are

6    not seeking relief as to those who took the voluntary buyouts,

7    only those who were terminated through the RIF or effectuated

8    through that termination, so not the people who took the

9    fork-in-the-road offer, for example, only those that were

10   RIF'ed, and that their terminations were effectuated through

11   that particular action on March 11.

12               So to the first point, I would bring the Court back to

13   the record.  Defendants have described the situation as very

14   strange, unusual, and that is exactly right.  It has never

15   happened before this year that the Federal Government has

16   attempted to fire so many people out of an executive agency

17   that it can no longer function.  The dismantling of the

18   Department of Education is unfortunately not the only instance

19   we have seen of that thus far in this administration, but

20   Plaintiffs are unaware of another example in the past when

21   something like this has actually occurred.  In fact, Presidents

22   in previous administrations have taken action to try and

23   persuade Congress to eliminate the Department of Education and

24   they have failed.  So this is strange, and the record is in

25   fact extremely unusual, but that record is a voluminous

1    testament to how the Department can no longer do what it does.

2    It does not have the resources to maintain compliance with

3    Title II or Title IV.  It cannot operate sufficient procedures

4    to protect student borrowers.  It cannot get the data it needs

5    to award Formula Title I and IDEA funding.

6            And so Defendants have said, and the President and

7    Secretary McMahon have articulated, that they would like to

8    close the Department, and the reality is that's exactly what

9    happened, and those declarations have not been rebutted.  If

10   Defendants had evidence that the Department was able to meet

11   the mandates that Plaintiffs have explained cannot be met, they

12   have not done so.

13           So I'd like to touch on the cases that Defendants

14   pointed to as supposedly analogous to the situation.  Defendant

15   cited a case about *OPM* probationary employees, the *USDA* case in

16   Maryland, and the *AFL-CIO* case.  So all of those are quite

17   different from the situation here.  For one, the courts

18   determined that there was not the same kind of direct harm that

19   we have here and also they are cases about the procedures that

20   were used to terminate employees.  So those cases involved

21   arguments about whether, for example, the RIF had been

22   procedurally correct.  A RIF requires a number of things

23   including notice to states about procedures about protective

24   areas.  So those cases touched on those questions.

25           Here, Plaintiffs are not bringing a challenge to how

1    the Department engaged in the RIF.  The arguments here are that

2    the particular actions, the terminations effectuated through

3    the March 11 RIF, not the acceptance of voluntary buyouts that

4    are also described in the memo and the March 21 directive to

5    transfer functions, those things have caused the Department to

6    be unable to provide direct services to the states, and so

7    there is no attenuation, and the harm is already occurring and

8    it will continue to get worse, especially once the RIF is fully

9    complete, but most of the harms have already manifested and

10   that's because the employees have been on administrative leave

11   since March 21.          And just to use the Evergreen example

12   that Defendants touched on.  That school needs its

13   certification to operate.  The people who could provide that

14   certification no longer exist in the Department.  So that is a

15   current harm that is also an irreparable harm and one that is

16   not going to get better.

17          So I wanted to touch on the scope of the relief here.

18   There were a few questions about reinstatement, and again,

19   Plaintiffs are not seeking to prevent the Department from

20   engaging in a RIF.  The Department can engage in a reasoned

21   decision-making process that results in the termination of

22   employees consistent with law.  Here, the restatement of the

23   RIF employees is necessary for the Department to continue to

24   function, and I think, as some of your questions got at, your

25   Honor, those employees as yet have not been finally terminated.

1    They are not fully terminated until the expiration of the RIF

2    period.

3         So what we're asking for is really just a return to

4    the status quo.  So reinstate these employees.  We are not

5    saying that the Department needs to keep particular employees.

6    The Department can engage in lawful efforts to terminate

7    employees.  It could hire new employees.  It can do all of

8    those things, but in order to return to the status quo here,

9    which we think is justified by the irreparable harm, both

10   actual and imminent, is necessary to do that.

11        So third, I'd like to touch on final agency action.

12   So I think it's worth thinking about how different *Lujan* is to

13   the situation.  In *Lujan*, Plaintiffs brought basically what was

14   described as a programatic challenge but the challenge was to

15   the way in which the Bureau of Land Management operated an

16   entire program.  So there were arguments that they were acting

17   unlawfully in a lot of different ways.  Perhaps they were

18   approving permits that might have been unlawful.  They were

19   maintaining the land in a way that Plaintiffs objected to.

20   Here, it's not that we're challenging a whole slew of different

21   actions that are all subject to discretion.  We're challenging

22   two particular administrative actions that have had concrete

23   and immediate effects.  So the RIF is one action that

24   immediately terminated over 1,000 employees, that is one

25   action, and then the implementation of the March 21 directive

1    is also a singular action.

2            And I just want to touch on that March 21 directive as

3    well because I think that's been less developed certainly in

4    Defendants' brief.  So that directive, which Secretary McMahon

5    has indicated she plans to implement, would remove FSA entirely

6    to the SBA which on the same day that this directive was

7    announced experienced a 40 percent RIF.  The SBA was also a

8    relatively small organization.  SBA has no experience or

9    qualification to administer this incredibly complex and

10   incredibly essential program, and so what declarants have said

11   in the record is that if that happens, it's already

12   catastrophic enough that FSA is not functioning, and if that

13   happens, FSA would basically fall apart entirely.

14           And then secondly, the directive to move what the

15   President described as special needs out of the Department and

16   into HHS, also completely unexplained, and HHS is similarly

17   unqualified and has no relative experience in administering

18   those incredibly essential programs.

19           And I think just to touch on the savings clause point,

20   I think for one, Plaintiffs are not seeking to preliminarily

21   enjoin implementation of the EO.  So any savings clause

22   language in that order is irrelevant, but I think your Honor

23   pointed to something which is that an action cannot be held to

24   destroy itself through a savings clause, and the court and many

25   circuit courts have explained this.  So it may say something

1   like what the directive in these instances says is we are going

2   to eliminate the staff necessary to comply with our statutory

3   mandate.  If they include something at the end that says

4   consists with applicable law, that actually cannot rescue this

5   from the reality of this situation.

6          And on the topic of the bond, I think imposing a bond

7   would be extremely unusual.  For one, this is a case relating

8   to an important matter of public concern so that's unusual to

9   begin with, and also Defendants are asserting that they will

10  have to expend money to comply with the relief that we have

11  asked for, but to be clear, Congress has appropriated funds for

12  the government to administer to meet its statutory mandates.

13  So there is no injury to the state from being pressed to merely

14  expend the money including our salaries and other things to

15  comply with that statutory mandate.  So we would ask that bond

16  is not imposed.

17         THE COURT:  All right, thank you.  I just have one

18  question for Mr. Hyman.  I'm sorry, not Mr. Hyman.  Mr. Homer.

19  My apologies.

20         MS. HOMER:  I'm Ms. Homer, your Honor.

21         THE COURT:  I've got it all wrong.  I'm sorry, you

22  were again?

23         MR. HAMILTON:  My name is Eric Hamilton.

24         THE COURT:  Hamilton, Mr. Hamilton.  I guess as I was

25  listening to both of you, it wasn't clear in my mind as to

1    whether or not the Defendants are claiming that the President

2    was acting under some statutory authority or are you claiming

3    that the President is acting in some inherent powers under

4    Article II?

5         MR. HAMILTON:  It would be inherent authority under

6    Article II supervising the Secretary of Education.  That would

7    be the authority for the executive order that he issued, but

8    again, that executive order postdated the press release that

9    Plaintiffs are saying is a Mass Termination order that is

10   subject to the Court's review.

11        THE COURT:  Sure, but that leads me to a second

12   question because I think you alluded to this earlier about the

13   time of the complaint.  You're not suggesting that whatever

14   concrete harm comes, let's say even after today, that I cannot

15   consider that?

16        MR. HAMILTON:  Well, I think the Plaintiffs would have

17   to amend their complaint if they want to challenge some other

18   administrative action, and actually, the States Plaintiffs'

19   challenge to what they're calling this transfer of function

20   order fits that description.  They're saying that a statement

21   that the President made to the press on March 21 is some sort

22   of a transfer order and that also postdates the filing of their

23   complaint.  They haven't amended their complaint.  There is no

24   mention of that obviously in the complaint since it didn't

25   exist and so the Court -- we don't think it's part of the case

1    or something that the Court can review barring an amendment to

2    the complaint, and as Plaintiffs appear to acknowledge, my

3    friend on the other side was speaking in terms of the future,

4    the transfer of any -- you know, the functions that the

5    Plaintiffs are talking about being transferred to the Small

6    Business Association and the Department of Health and Human

7    Services has not happened.

8         THE COURT:  All right.  Thank you very much.  I will

9    take this under advisement -- I'm sorry, do you want to speak?

10        MS. HOMER:  If your Honor doesn't mind, I just have a

11   few very quick points.

12        THE COURT:  Sure.

13        MS. HOMER:  First, I would like to just clarify that

14   the only relief we are seeking is about the Mass Termination

15   order on March 11.  It does not include the employees who were

16   voluntary separated, that 579.

17        Second, opposing counsel appears to be arguing that

18   this Court is not empowered to consider under the APA, the

19   claim that the Mass Termination order is arbitrary and

20   capricious or violates the APA in a variety of other ways that

21   we have articulated, and we would just like to point your Honor

22   to two cases that might be helpful on this.  The first is the

23   *Widakuswara* case that was submitted through a 28(j) letter two

24   days ago.  The second is the *NTEU v. Trump* case that we cite,

25   not the *NTEU v. Trump* case that they cite, both of which have a

 1   helpful explanation about how gutting an agency whether through

 2   firing all employees or taking some other actions that that

 3   itself can be a violation of the APA and is not merely a matter

 4   of RIFs or some other narrower consideration.  Thank you, your

 5   Honor.

 6          THE COURT:  Thank you, and sorry about the name mixup.

 7   We will stand in recess.

 8          MS. MUQADDAM:  Your Honor, could I respond to one

 9   thing?

10          THE COURT:  Do want to file something?

11          MS. MUQADDAM:  We could.  It's just a very short

12   thing.

13          THE COURT:  All right, sure.

14          MS. MUQADDAM:  I just wanted to respond to the point

15   about amending the complaint.  So our complaint does extend to

16   Presidential direction to dismantle the Department, and we

17   think that the scope of the complaint well includes both the

18   RIF and implementation of the directive.

19          THE COURT:  Yes, I will go back to the complaint, but

20   I think to Mr. Hamilton's point, you know, I can only provide

21   relief that's sought in the complaint.

22          MS. MUQADDAM:  We think it covers that.

23          THE COURT:  All right, great.  All right, thank you

24   very much.

25                 **(A-D-J-O-U-R-N-E-D)**

1

2                          - - - - - - - - - - -

3                               CERTIFICATION

4          I certify that the foregoing is a correct transcript

5     of the record of proceedings in the above-entitled matter to

6     the best of my skill and ability.

7

8

9

10    /s/Jamie K. Halpin_____        April 27, 2025_____
      Jamie K. Halpin, CRR, RMR, RPR              Date
11    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25