THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, *et al.,*

      *Plaintiffs,*

    v.

LINDA McMAHON, *et al.,*

      *Defendants.*

Case No. 1:25-cv-10601-MJJ

SOMERVILLE PUBLIC SCHOOLS
167 Holland Street
Somerville, MA 02144

and

EASTHAMPTON PUBLIC SCHOOLS
50 Payson Avenue
Easthampton, MA 01027

and

AMERICAN FEDERATION OF TEACHERS
555 New Jersey Avenue N.W.
Washington, D.C. 20001

and

AMERICAN FEDERATION OF
TEACHERS MASSACHUSETTS
38 Chauncy Street
Suite 402
Boston, MA 02111

and

Case No. 1:25-cv-10677-MJJ

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
COUNCIL 93
8 Beacon Street
Boston, MA  02108

and

AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS
555 New Jersey Avenue NW, Suite 600
Washington, D.C. 20001

and

SERVICE EMPLOYEES INTERNATIONAL
UNION
1800 Massachusetts Ave, NW
Washington, D.C.  20036

and

THE ARC OF THE UNITED STATES
2000 Pennsylvania Avenue NW, Suite 500
Washington, D.C. 20006

     *Plaintiffs*,

v.

DONALD J. TRUMP, *et al.,*

     *Defendants.*

## FIRST AMENDED COMPLAINT

1.     Defendants seek to close the U.S. Department of Education.

2.     Defendants know that they cannot close the Department without Congress's consent, which Congress has not provided—or given any indication of providing. To get around Congress, Defendants have set about systematically dismantling the Department: staff, programs, funds.

3.      Defendants have fired more than fifty percent of the Department's employees, moved key Department functions and programs to other government agencies, and pledged billions of the Department's funds to those agencies. These actions are consistent with the President's March 20, 2025, Executive Order directing the Secretary to close the Department, an effort Secretary McMahon has described as the Department's "final mission."

4.      The problem with Defendants' "final mission" is that it is unlawful. Defendants' actions violate the Constitution, authorizing statutes, appropriations statutes, and the Administrative Procedure Act. More importantly, Defendants' actions will harm millions of students and their families, school districts, and educators across the nation.

5.      Established by Congress in 1979 to ensure equal access to education, the U.S. Department of Education administers over 50 statutes aimed at supporting diverse student populations, including those with disabilities, students in underfunded and rural schools, those seeking vocational training, and individuals requiring financial aid for higher education.

6.      Because the Department of Education was created by Congress—and mandated by Congress to operate various programs for the benefit of America's students, parents, and schools—it cannot be eliminated by the President or the Secretary of Education.

7.      Prior to January 20, 2025, the Department employed 4,133 employees. In March 2025, Secretary McMahon announced a massive reduction-in-force (RIF), after which just 2,183 employees were slated to remain. Another 465 employees were marked for termination in October 2025. The mass firing of the individuals who do the work of the Department means that the Department will be unable to perform its statutorily mandated duties, including effectively distributing funds for students with disabilities and providing support and technical assistance to parents, families, and states to ensure those services are provided most effectively; protecting students' civil rights; and providing financial aid for students seeking higher education.

8.      Since May 2025, Secretary McMahon and the Department have executed seven interagency agreements, and are working on several more, to place the key work of the Department into other federal agencies. Scattering Department of Education programs among agencies with no expertise in education or lacking key agency infrastructure will reduce the efficiency and effectiveness of these programs and will prevent the type of synergy that Congress intended to achieve by consolidating federal education activities in one cabinet level agency.

9.      These changes have eliminated—actually or functionally—offices, programs, and personnel that Congress explicitly created and placed in the Department of Education. They have also decimated or eliminated established organizational structures, units, and staff that the Department created to fulfill mandates, programmatic goals, and priorities issuing from Congress.

10.      This suit seeks declaratory and injunctive relief against Defendants' unlawful effort to dismantle the Department of Education, including through the March 11, 2025 decision to fire half of the Department's staff, interagency agreements to move Department programs to other federal agencies, and implementation of President Trump's Executive Order seeking to eliminate the Department as a whole.

## **BACKGROUND**

11.      The primary public responsibility for education in this country is reserved to the states, to local school systems, and to parents. The federal government's role in education has been to fill gaps in state and local capacity to ensure that no student is left behind for lack of knowledge, resources, or technical ability at the state or local level. In addition to providing substantial funds, support, and resources to teachers, instructional support aides, schools, school districts, administrators, state and local education agencies, and institutions of higher education, the federal government centralizes and distributes technical assistance that cannot be developed and maintained cost-effectively in every school district.

12.     While federal support for education dates back more than 150 years, Congress created the Department of Education in 1979 as a cabinet-level agency to fulfill this mission more efficiently. *See* Department of Education Organization Act, 20 U.S.C. §§ 3401, *et seq.* Congress placed programs that had been scattered across several departments into a single Cabinet-level department to "support more effectively State, local, and private institutions, students, and parents in carrying out their educational responsibilities," *id.* § 3401(7), through increased funding and improved "management and coordination of Federal education programs" led by a "single, full-time Federal education official directly accountable to the President, the Congress, and the people." *Id.* § 3401(7)–(10).

13.     Over the course of more than seven decades, Congress—popularly elected and expressing the will of its constituents—has established and defined the federal role in education. And since the modern Department of Education's creation in 1979, Congress has instructed the Department repeatedly, through numerous laws, to implement programs created by Congress, to ensure adherence to the requirements of those programs, to distribute funds appropriated by Congress, and to provide support, resources, and technical assistance as directed by Congress.

14.     The Department implements Congress's mandates by distributing funds to schools across the country: in the 2020-21 school year, the Department distributed $101 billion in federal funds to elementary and secondary schools across the country, in all 50 states.[1] This represents, on average, 11% of all funding for elementary and secondary schools in the country, although in some states, federal funds account for as high as 20%.[2] The Department also supports higher education through loans and grants to students, parents, and schools.

15.     The Department also provides support, technical assistance, and resources to parents, students, educators, and schools in alignment with the mission that Congress has charged the

---

[1] Nat'l Ctr. for Educ. Stats., *Public School Revenue Sources*, https://perma.cc/9WZM-D3L6 (last updated May 2024).
[2] *Id.*

Department with carrying out: to "promote student achievement and global competitiveness by fostering educational excellence and ensuring equal access to high-quality learning opportunities." 20 U.S.C. § 3402. It does this through many media: webinars and other online resources (such as how-to guides and FAQs), call centers, listening sessions, education-related publications, free site visits, and evidence-based recommendations for providing students with high-quality educations.

16.     For elementary and public education, two core areas of the Department of Education's work are to support local schools to serve low-income students and students with disabilities. Nearly 95% of all school districts, and 60% of all public schools, qualify for some funding designed to support low-income students. And through the Individuals with Disabilities Education Act, over 7 million students with disabilities across the country are served.

17.     On the higher education side, the Department of Education distributes $120 billion in loans and grants every year to students seeking a higher education, supporting nearly 10 million Americans annually. It manages the complex federal student aid program, including originating grants and loans, overseeing schools' participation in the program, and managing repayment on the $1.6 trillion in outstanding federal student loans.

18.     Across all levels of education, the Department's Office for Civil Rights protects civil rights in schools, including protecting students with disabilities.

19.     In all of these areas and more, the Department's staff and expertise are vital to ensuring that the Department can do its work. Among other things, the Department of Education's workers help students with disabilities, and their families, teachers, school districts, and states to provide students the support they need to succeed in school; advise students and parents as to how they can pay for college (and process the grants, loans, and repayment programs that allow students to do just that); protect students from discrimination and harassment; help rural school districts that struggle to afford student transportation in large but sparsely populated far-flung areas; and support students

from low-income families achieve a high-quality education. The Department's staff help grantees apply for much-needed funds, review and process applications, disburse money to support students and schools across the nation, and provide technical assistance to support students, families, schools, and states.

20.    Dismantling the Department of Education will bring these and other activities to a halt, harming students, educators, and school districts across the country.

## PARTIES

21.    **Plaintiff Somerville Public Schools (Somerville)** is a public school district located in Massachusetts. Somerville operates eleven schools, which serve nearly 5,000 students, and employs approximately 440 full-time teachers. In the 2024–25 school year, about $3.5 million of its budget came in the form of federal grants administered by the Department of Education. For the current school year, Somerville is receiving about $3.4 million in federal grants administered by the Department of Education.

22.    **Plaintiff Easthampton Public Schools (Easthampton)** is a public school district located in Massachusetts. Easthampton operates two schools, which serve approximately 1,400 students, and employs approximately 118 full-time teachers during the 2024–25 school year. During the 2024–25 school year, Easthampton received more than $800,000 in federal funding through the Department of Education. In the current school year, Easthampton is employing 121 full-time teachers, serving 1,368 students, and receiving approximately $915,000 in federal funding.

23.    **Plaintiff the American Federation of Teachers (AFT)** an affiliate of the AFL-CIO, is a membership organization representing 1.8 million members, who reside in every U.S. state, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands, and who are employed as pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government

employees; and nurses and other healthcare professionals. AFT's purpose is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and communities their members serve. AFT does so by ensuring its members receive fair pay and benefits for their critical work, and by fighting for safe working conditions that also benefit students, patients and all those who use public services. Helping children and students is at the core of AFT's mission. So too is the economic security and dignity of AFT's members and their families. AFT is headquartered in Washington, D.C.

24.    **Plaintiff American Federation of Teachers Massachusetts (AFT Massachusetts)** is a labor union in Massachusetts. It is an independent nonprofit organization constituted under Section 501(c)(5) of the Internal Revenue Code. AFT Massachusetts is a strong voice for collaborative education reform that is good for students and fair to educators. AFT Massachusetts represents more than 25,000 public school employees, higher education faculty and staff, and public librarians. Approximately 22,500 of its members—including teachers, paraprofessionals, guidance counselors, school nurses, social workers, and other school employees—teach in public pre-K-12 school districts across Massachusetts, including Boston and Lynn.

25.    **Plaintiff AFSCME Council 93**, affiliated with the American Federation of State, County and Municipal Employees, AFL-CIO, is a council of labor unions in Maine, Massachusetts, New Hampshire, and Vermont. AFSCME Council 93 is headquartered in Boston, Massachusetts. AFSCME Council 93 represents thousands of public-school employees in Massachusetts, including educators such as paraprofessionals and instructional aides, and other critical support personnel such as counselors, cafeteria workers, bus drivers, safety officers, and maintenance and administrative staff. Council 93's Massachusetts paraprofessional/instructional support members are employed in at least twelve school districts in Massachusetts. More than 6,000 AFSCME Council 93 members work at 27

8

public university, state and community college campuses in Massachusetts in one of the most respected and effective public higher education systems in the world.

26.     **Plaintiff the American Association of University Professors (AAUP)** is a nonprofit membership association that represents more than 43,000 faculty, librarians, graduate students, and academic professionals with members at institutes of higher education across the United States, including members in every state. AAUP is committed to advancing academic freedom and shared governance, defining fundamental professional values and standards for higher education, promoting the economic security of academic workers, and ensuring higher education's contribution to the common good. AAUP is incorporated in Washington, D.C.

27.     **Plaintiff the Service Employees International Union (SEIU)** is a labor union of approximately two million workers who provide public services, healthcare, and property services throughout the United States, Canada, and Puerto Rico. Nearly 300,000 of SEIU's members work for public school districts or institutions of higher education. SEIU represents public school employees in K-12 districts across the country, including professionals, paraprofessionals, administrative employees, janitors, bus drivers, food service employees, and other educational support staff, and higher education employees, including faculty, librarians, counselors, student workers, administrative employees, and janitors. In Massachusetts, SEIU represents approximately 7,000 education workers, including K-12 paraeducators, therapists, and other support staff who work with students with disabilities, as well as graduate student workers and other professional employees who rely on federal student aid. SEIU is committed to providing quality public services and ensuring that all students receive equitable access to education.

28.     **Plaintiff The Arc of the United States (The Arc)** is a private, nonprofit organization founded in 1950 that promotes and protects the human rights of people with intellectual and developmental disabilities (IDD) and actively supports their full inclusion and participation in the

community. Central to The Arc's mission is ensuring that students with intellectual and developmental disabilities receive "the education to which they are legally entitled." The Arc engages in public policy and legal advocacy and develops programs to support people with IDD to learn, live, participate in recreational activities, and work in their communities, with the supports they need to thrive. The Arc serves people with IDD both directly and through nearly 600 affiliated member chapters across the country. Most member chapters serve families, many of whom have school-aged children who are students with IDD. It is central to the mission of The Arc to ensure that students with disabilities receive the support and services they need to make progress and receive a "free appropriate public education" (FAPE), to ensure they have equal access to their education as their non-disabled peers, and to ensure they are not subjected to unnecessary segregation. Historically, The Arc and its chapters have led the way in groundbreaking litigation and advocacy to ensure the rights of children with disabilities and other students were overseen and protected at the federal level. Members of The Arc rely on Individuals with Disabilities Education Act (IDEA) funding provided by the Office of Special Education Programs to obtain vital services that allow them to fully access public education and receive a free and appropriate public education.

29. **Defendant Donald J. Trump** is the President of the United States. He is sued in his official capacity.

30. **Defendant Linda McMahon** is the Secretary of Education. She is sued in her official capacity.

31. **Defendant U.S. Department of Education** is an agency of the United States. It is headquartered in Washington, D.C.

## JURISDICTION AND VENUE

32. This Court has subject-matter jurisdiction because this action arises under the Constitution and laws of the United States, *see* 28 U.S.C. § 1331, and because the Defendants are

United States officials. 28 U.S.C. § 1346(a)(2). Jurisdiction is also proper under the judicial review

provisions of the APA. 5 U.S.C.§§ 702, 704, and the Court may grant declaratory relief, injunctive

relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705, 706.

33.     This Court has the authority to enter a declaratory judgment and to provide

preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil

Procedure, under 28 U.S.C. §§ 2201–2202, and under the All Writs Act.

34.     Venue lies with the District of Massachusetts because multiple Plaintiffs (namely,

Somerville, Easthampton, AFT Massachusetts, and AFSCME Council 93) reside in this judicial

district, and because other Plaintiffs (AFT, AAUP, SEIU, and The Arc) have members that reside in

this judicial district, and because a substantial part of the events or omissions giving rise to this

action occurred in this District. 28 U.S.C. § 1391(e).

## LEGAL FRAMEWORK

35.     The Department of Education is an essential support for American families. It

reflects a near half-century commitment from the American people, by and through their elected

members of Congress, to support American students, parents, and communities. The programs it

operates have been established by Congress and support crucial services for students with

disabilities, students in rural school districts, students from low-income backgrounds, students

attending college or university, and numerous other populations.

36.     Congress has passed more than fifty statutes that are administered by the

Department. Some create offices within the Department or place responsibilities inside the

Department, others create programs with explicit instructions for implementation, still others

establish priorities and leave the specific methods of fulfilling Congress's priorities to the expertise

of the Department.

37.     In addition to implementing programs authorized by Congress, the Department is charged by Congress with collecting and analyzing data needed to set education policy, allocate federal education funds, and disseminate data in support of best practices in administration and instruction at the state and local level.

38.     For the past 46 years, Congress has repeatedly appropriated funds for the Department to provide services to students, parents, schools, states, colleges, and more. Furthermore, Congress has repeatedly rejected efforts to shut down the Department. President Trump and Secretary McMahon, through their unlawful actions, seek to overrule 46 years of congressional decision-making.

39.     The Department is not simply a cash-dispensing machine. It is an active partner to the states and every school district in America, staffed by experts to help them—as well as students, parents, teachers, and schools—obtain and effectively use funds through programs that have been established by Congress and deliberately placed within the Department.

40.     Congress established the Department of Education by statute in 1979 through the Department of Education Organization Act (DEOA). *See* Pub. L. No. 96-88, 93 Stat. 668 (1979) (codified at 20 U.S.C. §§ 3401, *et seq*).

41.     The DEOA was passed by a majority of each house of Congress on a bipartisan basis, enrolled, and signed by the President. It is the law of the land.

42.     Congress found that: "education is fundamental to the development of individual citizens and the progress of the Nation," and that "there is a continuing need to ensure equal access for all Americans to educational opportunities of a high quality." 20 U.S.C. § 3401(1), (2). Congress acknowledged and reaffirmed that "in our Federal system, the primary public responsibility for education is reserved respectively to the States and the local school systems and other instrumentalities of the States," *id.* § 3401(4), but that the need to "support" states and local

authorities necessitated an "improvement in the management and coordination of Federal education programs." *Id.* § 3401(7).

43.    To that end, Congress "declare[d] that the establishment of a Department of Education is in the public interest." *Id.* § 3402.

44.    The new Department was vested, by Congress, with authority, obligations, and Senate-confirmed personnel. Offices created by the DEOA include the Department's Office for Civil Rights, *id.* § 3413; the Office for Elementary and Secondary Education, *id.* § 3414; the Office of Postsecondary Education, *id.* § 3415; the Office of Special Education and Rehabilitative Services, *id.* § 3417; and the Office of English Language Acquisition, *id.* § 3420. Further, DEOA requires that each of these offices be led by an Assistant Secretary appointed by the President and confirmed by the Senate. *Id.* § 3412(b)(1).

45.    The DEOA does permit the Secretary of Education some limited authority to reorganize or discontinue offices within the Department that were not created by statute or were not transferred to the Department of Education from the Department of Health, Education, and Welfare (or other departments) by the DEOA. *Id.* § 3473. This authority to reorganize or abolish offices, by its very terms, does not extend to the offices created by statute, nor does it create any authority to violate subsequent statutes that require the Department (or specific offices within the Department) to carry out particular programs. Congress did not authorize the Secretary to eliminate or disrupt functions required by statute, or to cease performing the functions of the Department through mass terminations of Departmental staff.

46.    In the DEOA, Congress generally authorized the Department to prescribe rules and regulations necessary to carrying out its responsibilities, *id.* §§ 1221e-3, 3474, and provided subsequent additional authorizations in specific statutes.

47.    Congress also authorized the Secretary to provide technical assistance to state education agencies,[3] local education agencies, and institutions of higher education, in addition to the specific technical assistance authorized by particular programs. *Id.* § 1231c.

48.    Throughout the years since the Department's creation, Congress has assigned it the responsibility to operate numerous programs that have a profound, positive impact on American families. These programs ensure that students with disabilities, school systems that lack financial means, schools in sparsely populated counties, students who want practical career training rather than advanced degrees, and students who need financial assistance to pursue higher education, are all not left behind. Responsibility for these programs is vested—by Congress—in the Department, which is obligated by statute to carry out each of them.

## FACTUAL ALLEGATIONS

### Defendants Seek to Dismantle the Department of Education

49.    President Trump has long championed abolishing the Department of Education. For example, in a September 2023 campaign video, Trump vowed: "One thing I'll be doing very early in the administration is closing up the Department of Education in Washington, D.C."[4] As the campaign continued, he promised to "ultimately eliminate the federal Department of Education."[5] Following the election, Trump told Time magazine that he intended "[a] virtual closure of [the] Department of Education."[6]

---

[3] Most statutes that authorize or require the Department of Education to provide funds to states also include other entities that administer public school systems, such as the District of Columbia, Puerto Rico, or Guam, as eligible to receive funds. For convenience, we collectively refer to such entities as "states" throughout this complaint. *See, e.g.*, 20 U.S.C. § 1411(a)(1) (including "States, outlying areas, and freely associated States" as eligible to receive funds).
[4] Graham Kates, *Can Trump Dismantle the Department of Education? It Won't Be Easy, Experts Say*, CBS News (Feb. 4, 2025), https://perma.cc/Z22T-DTER.
[5] Katie Lobosco, *Trump Wants to Shut Down the Department of Education. Here's What That Could Mean*, CNN (Dec. 12, 2024), https://perma.cc/5X2N-Q2TQ.
[6] Time Staff, *Read the Full Transcript of Donald Trump's 2024 Person of the Year Interview with TIME,* Time (Dec. 12, 2024), https://perma.cc/8L52-DCWK.

50.     In nominating Secretary McMahon to lead the Department, President Trump directed her to "put [her]self out of a job."[7]

51.     Secretary McMahon has wholly embraced the President's goal of closing the Department. As part of her confirmation process, Secretary McMahon affirmed that she "wholeheartedly support[s] and agree[s]" that "the bureaucracy in Washington should be abolished."[8]

52.     Shortly after the Senate confirmed her on March 3, 2025, Secretary McMahon issued a memorandum instructing the entire Department of Education that their "historic final mission" would be the "elimination" and "transfer of educational oversight" out of the Department.[9]

53.     From the Oval Office on March 12, 2025, Trump committed: "We're going to move the Department of Education, we're going to move education into the states . . . so that the states can run education."[10]

54.     On March 20, 2025, President Trump took the next step of unlawfully abolishing the Department by signing Exec. Order No. 14,242, 90 Fed. Reg. 13679 (Mar. 20, 2025), entitled "Improving Education Outcomes by Empowering Parents, States, and Communities."[11] By its own terms, the Executive Order seeks to "clos[e]" the Department by directing the Secretary of Education to "take all necessary steps to facilitate the closure of the Department of Education."[12]

55.     At the same time, the Executive Order claims it will close the Department only "to the maximum extent" "permitted by law" and—acknowledging the importance of the Department's

---

[7] Ryan King, *Trump Says Education Secretary's Goal Will Be to 'Put Herself Out of a Job' as He Pushes to Abolish DOE*, N.Y. Post (Feb. 4, 2025), https://perma.cc/YSN3-KXCV.
[8] Kara Arundel, *McMahon Confirmed as Education Secretary*, K-12 Dive (Mar. 3, 2025), https://perma.cc/SD4U-RZ7J; Linda McMahon, *Post-Hearing Questions for the Record*, Elizabeth Warren (Feb. 14, 2025), https://perma.cc/5Z65-RNEE.
[9] Linda McMahon, Sec'y, Dep't of Educ., *Our Department's Final Mission* (Mar. 3, 2025), https://perma.cc/T3LT-CELR.
[10] Kayla Jimenez, *Trump Defends Decision to Cut Nearly Half of Education Department Staff*, USA Today (Mar. 12, 2025), https://perma.cc/37KB-Y9BH.
[11] Donald J. Trump, *Improving Education Outcomes by Empowering Parents, States, and Communities*, The White House (Mar. 20, 2025), https://perma.cc/ETD3-GUF6.
[12] *Id.*

work—instructs the Secretary of Education to take steps to ensure "effective and uninterrupted delivery of services, programs, and benefits on which Americans rely."[13] But this empty language provides no clarity, because it is not lawful to close the Department of Education, nor is it possible to do so without leading to the interruption in the delivery of the services, programs, and benefits on which Americans rely and are entitled to by law.

56.     Indeed, the implementation of Defendants' plan to eliminate the Department has been anything but lawful. Their strategy is simple: fire the Department's employees and redistribute the Department's programs and money to other federal agencies.

57.     Defendants' decision to hollow out the Department of Education is a final agency action subject to judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 704. Each of the specific steps actualizing that goal, described below, are also final agency actions.

**Defendants Announce a Massive RIF**

58.     Like all federal agencies, the Department of Education relies on its professional staff of career civil servants to serve the public and fulfill the mandates set by Congress. But on March 11, 2025, "[a]s part of the Department of Education's final mission," McMahon began the process of terminating more than half of the Department's staff.[14]

59.     Upon information and belief, these terminations were implemented pursuant to the Department's Agency RIF and Reorganization Plan.[15]

60.     Ordering these terminations, McMahon asserted that these mass firings were intended to bolster "efficiency, accountability, and ensuring that resources are directed where they

---

[13] *Id.*
[14] Press Release, Dep't of Educ., U.S. Department of Education Initiates Reduction in Force (Mar. 11, 2025), https://perma.cc/3D77-T8KF.
[15] *See* Memorandum from Russell T. Vought, Dir. of OMB, to the Heads of Exec. Dep'ts and Agencies, Guidance on Agency RIF and Reorganization Plans (Feb. 26, 2025), https://perma.cc/T3VU-4KCR.

matter most."[16] President Trump claimed that "[w]hen we cut—we want to cut—but we want to cut the people that aren't working or not doing a good job. We're keeping the best people. And Linda McMahon is a real professional, very, actually very sophisticated business person. She cut a large number, but she kept the best people, and we'll see how it all works out." Trump also baselessly accused Department employees of "not showing up to work" and "not doing a good job."[17]

61.     But even if President Trump's purported rationale of poor performance were the basis of Defendants' actions, that could not justify the mass terminations imposed on March 11, 2025. Agencies may only lawfully conduct a reduction in force (RIF) for certain specified reasons, including "lack of work; shortage of funds; insufficient personnel ceiling; [or] reorganization"—not for performance reasons. 5 C.F.R. § 351.201(a)(2).

62.     In any event, these purported rationales—efficiency, poor performance—were pretext for Defendants' real and frequently-stated goal: to dismantle the Department of Education.

63.     Indeed, McMahon already admitted the real purpose of the cuts—to begin shutting down the Department. As McMahon explained, these terminations are intended to dismantle the Department, per the "president's mandate." She said: "His directive to me, clearly, is to shut down the Department of Education."[18]

64.     That mass firing, along with other contemporaneous efforts to remove Department staff, reduced the entire staff of the Department by nearly half. Prior to January 20, 2025, the Department employed 4,133 employees; after, just 2,183 were slated to remain.[19]

---

[16]Sareen Habeshian, *Education Secretary Says Mass Layoffs First Step Toward Shutting Down DoE*, Axios (Mar. 11, 2025), https://perma.cc/TSE7-LCQK.
[17] Alex Gangitano, *Trump Says McMahon Made Decisions on Mass Layoffs at Education Department*, The Hill (Mar. 12, 2025), https://perma.cc/4VNU-FP6P.
[18] Habeshian, *supra* note 14.
[19] U.S. Department of Education Initiates Reduction in Force, *supra* note 12.

65. The mass removal of the hardworking individuals who do the work of the Department has destabilized the agency. Absent adequate staffing, the Department is becoming unable to perform its statutorily mandated duties, including effectively distributing funds for students with disabilities and providing support and technical assistance to parents, families, and states to ensure those services are provided most effectively; protecting students' civil rights; and providing financial aid for students seeking higher education.

66. The Department of Education was already the smallest of the 15 cabinet-level executive Departments in terms of staff (compare just over 4,000 employees at the Department of Education with the approximately 80,000 employees at the Department of State, for example).

67. These mass firings cut entire offices, not simply specific staff whose roles were being eliminated or reorganized. For example, upon information and belief:

1. More than half of all enforcement staff for the Office for Civil Rights were eliminated, including seven out of twelve regional offices;

2. The entire staff of the Office of English Language Acquisition were terminated

3. Within the Office of Special Education and Rehabilitative Services, the entire staff that provides policy and legal guidance to states and other grantees about how to implement IDEA, as well as the entire communications staff that ensures that key information gets out to students, parents, schools, and states, were terminated.

4. The entire staff of the offices that manage the operations of grants and fiscal risk for grants across the entire Department, and that manage the contract procurement office for the entire Department, were fired.

5. The entire staff in the office of State and Grantee Relations in the Office of Elementary and Secondary Education were terminated.

6. Virtually all staff of the Institute of Education Sciences have been eliminated.

7.   The entire staff of the Office of International and Foreign Language Education, which runs the well-known Fulbright-Hays program, were terminated.

8.   Within the office of Federal Student Aid, the entire team that supervises the Free Application for Federal Student Aid (FAFSA) and the entire team that supervises the contractors who collect student loan repayments (loan servicers) were terminated. In addition, the vast majority of the office that certifies and recertifies schools as eligible to participate in the Federal Student Aid Program—which all institutions of higher education must do on a regular basis for their students to continue to receive loans and grants—were fired, reducing the staff from approximately 400 to approximately 25.

9.   Within the Office of General Counsel, every single division except for the division of post-secondary education was abolished. That is, all attorneys who review and advise on all regulations or informal guidance, all attorneys who advise on any aspect of elementary and secondary education (including Title I of the Elementary and Secondary Education Act), all attorneys who advise on civil rights (including civil rights for students with disabilities), all attorneys who advise on legislation or how legislation would apply to the Department, all attorneys who advise on government officials' ethics obligations (including the Hatch Act), and all attorneys who advise on general legal matters—such as contract matters (including contracts to manage FAFSA and loan servicers), privacy issues (including the Privacy Act and the Federal Educational Rights Privacy Act), the Freedom of Information Act, and employment and labor matters—were all fired *en masse.*

68.   These drastic cuts will interfere with the Department's ability to carry out its statutorily required functions. This will harm students, parents, teachers, schools, colleges and

19

universities, and states. The Department's staff are integral to ensuring that it functions—there is no Department without its staff.

69.     The harms to the Department—and to the students, teachers, schools, and communities the Department serves—will be compounded by the speed at which Defendants are operating.

70.     Defendants informed staff on March 11, 2025, that they would be relieved of all duties and placed onto administrative leave on March 21, 2025—a mere ten days after the announcement of the mass terminations, with permanent separation slated for early June.

71.     The abrupt removal of so many staff from their duties cannot be squared with applicable regulatory requirements. Rather, when conducting a RIF, agencies are directed that they shall, when possible, "retain the employee[s] on active duty status" following the issuance of the notice of termination. 5 C.F.R. § 351.806.

72.     Nor can the March 21, 2025 deadline be squared with orderly decision-making and continued effective government operations.

73.     To the extent it would even be possible to effectively hand off statutorily required functions from the half of all staff who were laid off to the remaining skeleton crew, the short time frame hampered any serious effort to do so.

**Defendants' Implementation of the RIF after Subsequent Court Proceedings**

74.     On May 22, 2025, this Court granted a preliminary injunction that barred Agency Defendants from implementing the RIF, the President's March 20, 2025 Executive Order to close the Department, and the President's March 21, 2025 Directive to transfer management of federal student loans and special education functions out of the Department. The Court also ordered Defendants to reinstate the RIF'd workers back to the Department and report weekly on their progress in doing so.

75.     Defendants appealed the Court's order. During the six weeks that the injunction was in place, Defendants reported that no workers had returned to work, physically or virtually. Defendants also reported that they had been negotiating a memorandum of understanding with the Treasury Department regarding transferring student loan management out of the Department. *See* Oglesby Decl., Doc. No. 147-1 (25-cv-10601).

76.     This Court's injunction was stayed by the Supreme Court on July 14, 2025, without explanation. *McMahon* v. *New York,* 145 S. Ct. 2643 (2025).

77.     During a July 15, 2025 CBS News interview Secretary McMahon responded to a question about President Trump's goal of eliminating the Department, stating: "[I]t will be my job to show . . . Congress as we proceed with what we're doing—that as we take the different parts of the Department of Education and the things that they're responsible for and show how they can be maybe put in other agencies or . . . even taking a look at them and not all those things are necessary—I want to show Congress by taking different parts and placing them in other places the Department of Education's functions can actually be handled I think better and more efficiently by returning it to the states."[20]

78.     Shortly after the Supreme Court's decision, the Department implemented the RIF, with most affected employees terminated on August 1, 2025. Around 1,000 Department employees have thus far been terminated. Pls.' Mem. 2, Dkt. No. 164 (25-cv-10601).

79.     The part of the March RIF targeting the Office for Civil Rights (OCR) was enjoined in separate court actions for several months, but those injunctions were stayed. On October 14, 2025, the Department informed the 247 affected employees that their separation dates were

---

[20] CBS News, *Linda McMahon Says Dismantling Education Department "will take some time to do,"* at 1:16–1:55 (July 15, 2025), https://www.cbsnews.com/video/linda-mcmahon-dismantling-education-department-take-some-time/.

scheduled for November.[21] At the time of filing, the status of those RIFs is in question due to pending litigation.[22]

80.    The Department has since reversed a small number of terminations. In May, the Department reportedly recalled 74 employees.[23] In September, the Department posted positions for Education Research Analysts in the Institute of Education Services (IES),[24] despite having just terminated many of those positions via the RIF.[25] Applicants for those positions were subject to questions related to their loyalty to the Administration's agenda.[26]

**Defendants' October 10, 2025 RIF**

81.    On October 10, 2025, as part of mass firings directed across the federal government during a lapse of appropriations, 465 employees of the Department of Education—nearly a quarter of the skeleton crew left after the reductions earlier in the year—were issued RIF notices.

82.    A breakdown of the RIF notices issued by office is as follows:

1.    Office of the Secretary (4 out of 58 employees)

2.    Office for Civil Rights (OCR) (137 out of the 199 employees that would remain post implementation of March RIF)

3.    Office of Special Education and Rehabilitative Services (OSERS) (121 out of 135 employees)

4.    Office of Communications (7 out of 26 employees)

---

[21] Clay Decl. at 5, *Am. Fed'n of Gov't Emps., AFL-CIO v. OMB*, 25-cv-08302 (N.D. Cal. Nov. 12, 2025), Dkt. No. 112-6.
[22] *See* Clay Decl. at 8, *Am. Fed'n of Gov't Emps, AFL-CIO v. OMB*, 25-cv-08302 (N.D. Cal. Nov. 21, 2025), Dkt. No. 117-2.
[23] CBS News, *Education Secretary Linda McMahon Testifies About Trump Admin Priorities at Budget Hearing*, at 54:20 (YouTube, streamed May 21, 2025), https://www.youtube.com/watch?v=j8IxYL5v_Ko (noting that the firings had cut into "muscle" instead of "fat").
[24] *Education Research Analyst GS-1730-14 (MP)*, USAJOBS, https://perma.cc/Y6QP-JPBP; *Education Research Analyst GS-1730-14 (DE)*, USAJOBS, https://perma.cc/TH5M-WAX9.
[25] *See* Disc., EDNY_00145.
[26] Dep't of Educ., *Vacancy Details*, Monstergovt.com, https://perma.cc/2YNQ-V5SV; *see* FEDweek Staff, *Upcoming Questions on Federal Job Applications Decried as Trump Loyalty Test*, FEDweek (June 3, 2025), https://perma.cc/6EQ5-FRKF.

5.   Office of Postsecondary Education (OPE) (64 out of 125 employees)

6.   Office of Elementary and Secondary Education (OESE) (132 out of 185

employees)[27]

83.     The RIFs would have gutted OSERS, which implements the IDEA, leaving only a

small staff remaining. OESE, which implements all Title I and numerous other programs, would

similarly have been destroyed. OCR would have lost almost 50% of its current 446 employees, and if

the March RIF was implemented, only 62 employees would have been left in all of OCR. As

described more fully below, the affected workers included almost the entire staff who work on key

formula grant programs, as well as those responsible for enforcing and protecting critical civil

rights.[28]

84.     On October 15, Secretary McMahon confirmed that the Department's underlying

rationale for the new RIF was the same as the March 11 mass terminations: to dismantle the

Department. In a post on X, she stated that "the federal Department of Education is unnecessary,

and we should return education to the states. The Department has taken additional steps to . . .  root

out the education bureaucracy that has burdened states and educators with unnecessary oversight."[29]

In a subsequent post on X on Halloween, she described "Closing the Department of Education" as

a "TREAT."[30]

85.     The October 10 RIFs were first enjoined by a federal court, *see Am. Fed'n of Gov't*

*Emps. v. OMB,* 25-cv-08302 (N.D. Cal.), and then on November 12, 2025, Congress effectively

undid them through H.R. 5371, which provided that "any reduction in force proposed, noticed,

initiated, executed, implemented, or otherwise taken by an Executive Agency between October 1,

---

[27] Clay Decl., *supra* note 19, at 4–5 (Dkt. No. 112-6).
[28] Mark Lieberman, *Education Department Layoffs Would Affect Dozens of Programs. See Which Ones*, EducationWeek (Oct. 16, 2025), https://perma.cc/5LN8-8EZZ.
[29] Secretary Linda McMahon (@EDSecMcMahon), X (Oct. 15, 2025, 1:01PM), https://perma.cc/32E9-BA8Y.
[30] Secretary Linda McMahon (@EDSecMcMahon), X (Oct. 31, 2025, 12:51PM), https://perma.cc/T3E9-VC5J.

2025, and the date of enactment, shall have no force or effect." The Department has since confirmed that it has rescinded the October 10 RIFs.[31]

**Defendants Move Core Departmental Functions to Other Agencies**

86.     On March 21, 2025, President Trump gave an interview where he announced plans to move key functions from the Department of Education to other Departments. He stated that "the student loan portfolio" will be "coming out of the Department of Education immediately" and will be moved to the Small Business Administration.[32] He further stated that the Department of Health and Human Services, not the Department of Education, "will be handling special needs."[33]

87.     In the months since, Defendants have completed arrangements to remove responsibility for more than one hundred education programs—affecting K-12 students, college students, vocational education, teacher training, school administration, and more—from the Department. The overwhelming number of these programs are moving to agencies that do not have the requisite expertise in these education programs or lack the necessary resources.

<u>Career and Technical Education Interagency Agreement</u>

88.     Citing Executive Order 14242, the Department signed an Interagency Agreement (IAA) on May 21, 2025 to move the administration of aspects of career and technical education (CTE) and programs under the Workforce Innovation and Opportunity Act (WIOA), 29 U.S.C. § 3271, from the Department of Education to the Department of Labor (DOL). That IAA was implemented on July 15, 2025.[34]

---

[31] Clay Decl., *supra* note 20, at 7 (Doc. No. 117-2).
[32] The White House, *President Trump and Secretary of Defense Pete Hegseth Deliver Remarks*, YouTube (Mar. 21, 2025), https://www.youtube.com/watch?v=MVyVfkL7PwM.
[33] *Id.*
[34] Press Release, Dep't of Educ., U.S. Department of Education and U.S. Department of Labor Implement Workforce Development Partnership (July 15, 2025), https://perma.cc/3N4S-SGH4.

89.     When Congress passed the *Strengthening Career and Technical Education for the 21st Century Act* in 2018 to reauthorize *Perkins*, it clearly vested responsibility for administering the law to the Department of Education. *See* 20 U.S.C. § 2302(45). As is evident in the legislative history, the Committee on Health, Education, Labor, and Pensions stated that "it is critical to ensure that career and technical education programs prepare all students with both the academic and technical skills they need to be successful in postsecondary education and the workforce, particularly in high-wage, high-skill occupations[]" and "that integrating academic and technical skills in instruction is a primary way to accomplish this." S. Rep. No. 109-65 (2005), 2005 WL 6342007. It also vested the Secretary of Education with a number of specific responsibilities. *See* 20 U.S.C. § 2321; 2323(b)(3)(A)(i)(II),(b)(3)(C)(iv); 2324(a); 2325–26; 2342(f); 2343(a)(2),(3); 2351(b); 2391(b); 2398.

90.     The law did not contain any provisions allowing the Secretary to offload those responsibilities to other agencies. Similarly, when Congress authorized the Secretary to carry out adult education programs in Title II of WIOA, it directed the Secretary to undertake certain responsibilities. *See* 29 U.S.C. § 3291(b), (c), (e), (g); 3331–3333. It did not permit the Secretary to offload those responsibilities to other agencies.

91.     *Perkins* CTE and adult education are education programs whose purpose is to expand educational opportunities to youth and adults. Congress understood that the Department of Education has the expertise in working with state educational agencies, institutions of higher education, and local school districts to administer these programs. Schools in local communities and state educational agencies rely on the guidance and technical expertise from the educational experts at the Department of Education to carry out these programs.

92.     Moving these programs to DOL fundamentally alters the purposes of the programs, contravenes laws enacted by Congress, annual appropriations requirements, and practice in states,

and upends decades of work that took place at the state and local level to embed CTE programs into secondary and postsecondary offerings and improve the quality of CTE and adult education.[35]

    November 18, 2025 IAAs

93.    On November 18, 2025, the Department of Education announced six new interagency agreements moving several key functions to four different federal Departments.[36]

94.    Secretary McMahon described these moves as a "bold action" and part of the "final mission" to "break up the federal education bureaucracy."[37]

95.    Shortly after the announcement, the Department of Education then posted a video compiling calls to shut the Department down, once again calling it "THE FINAL MISSION" and wrote "The clock is ticking."[38] In follow up interviews, Secretary McMahon described these IAAs as the most "decisive steps thus far" to send education back to the states.[39]

96.    In "Fact Sheets" explaining the IAAs, the Department noted that these moves are in accordance with Executive Order No. 14242, which seeks to close the Department. The day before, on November 17, 2025, the President put out a statement declaring that "[b]y dismantling the Department of Education, my Administration has returned control of education to where it

---

[35] Letter from Members of Cong. to Linda McMahon, Sec'y of the Dep't of Educ. (June 18, 2025), https://perma.cc/NTE4-65BM.

[36] The IAAs were signed on September 30, 2025, one day before the government shutdown due to lack of appropriations. When the shutdown ended, the official Department of Education X account posted a video featuring clips of the Kardashians, noting "did you really miss us at all?" U.S. Department of Education (@usedgov), X (Nov. 13, 2025, 8:00AM), https://x.com/usedgov/status/1988955181447610666?s=46. The Department followed up the next day with another attempt at humor, posting a fake image of a Department of Education out of office email with the subject line "OOO: Hopefully for Good Soon." U.S. Department of Education (@usedgov), X (Nov. 14, 2025, 9:00AM), https://perma.cc/MQ25-DK97. This post was in the context of a federal court determining on November 8, 2025, that the Department had violated the First Amendment rights of its employees by changing their out of office reply messages to reflect the administration's political views. *See Am. Fed'n of Gov't Emp's v. U.S. Dep't of Educ.*, No. 25-CV-3553, 2025 WL 3123707, at *17 (D.D.C. Nov. 7, 2025).

[37] Laura Meckler and Danielle Douglas-Gabriel, *Trump Administration Announces Dismantling of Parts of Education Dept.*, Washington Post (Nov. 18, 2025), https://perma.cc/4C2A-9PHZ.

[38] U.S. Department of Education (@usedgov), X (Nov. 18, 2025, 10:41AM), https://perma.cc/7DTB-TSP4.

[39] Secretary Linda McMahon (@EDSecMcMahon), X (Nov. 20, 2025, 2:15PM), https://x.com/EDSecMcMahon/status/1991586178362171469.

belongs—with States, local communities, and parents who are best equipped to meet the needs of their students."[40]

97.    Through these IAAs, the Department is attempting to move the substantive program management and execution of over a hundred education programs to other agencies, while leaving nominal administrative oversight to the Department.

IAA with the Department of Labor Relating to OESE (OESE IAA)

98.    The OESE IAA moves provision of services formerly carried out by OESE, to DOL's Employment and Training Administration (ETA). The affected programs are the primary funding for K-12 education in this country, including dozens of elementary and secondary education programs funded by the ESEA (as amended) including the following formula grant programs:

- Title I, Part A: Improving Basic Programs Operated by Local Educational Agencies
- Title I, Part B: Improving Academic Achievement of the Disadvantaged—State Assessment Grants
- Title I, Part C: Education of Migratory Children
- Title I, Part D: Prevention and Intervention Programs for Children and Youth Who are Neglected, Delinquent or At-Risk
- Title II, Part A: Supporting Effective Instruction State Grants
- Title III, Part A: English Language Acquisition State Grants
- Title IV, Part A, Student Support and Academic Enrichment (SSAE)
- Title IV, Part B 21st Century Community Learning Centers
- Title V Small, Rural School Achievement and Rural and Low-Income School Programs
- Impact Aid
- Education for Homeless Children and Youths
- Republic of Palau Grant
- Consolidated Grants to the Insular Areas

99.    The IAA also includes the following competitive grant programs:

- Comprehensive Literacy State Development
- Innovative Approaches to Literacy
- Supporting Effective Educator Development
- Charter Schools Program
- Assistance for Arts Education

---

[40] The White House, *Presidential Message on American Education Week* (Nov. 17, 2025), https://perma.cc/TCR3-N4X5.

- Washington D.C. Scholarships for Opportunity and Results (SOAR) Act
- Ready to Learn Programming
- Teacher and School Leader Incentive
- Teacher Quality Partnership Grant
- American History and Civics
- Statewide Family Engagement Centers
- Promise Neighborhoods
- Magnet Schools Assistance Program
- Full-Service Community Schools

100.    Under this IAA, DOL will manage and distribute these key formula grants, manage grant competitions, make new awards and administer such grants, provide technical assistance, and integrate ED's programs with the limited programs that DOL already administers.

<u>IAA with the Department of Labor Relating to Higher Education Programs (OPE IAA)</u>

101.    The OPE IAA moves provision of services formerly carried out by the Office of Postsecondary Education (OPE), to the Employment and Training Administration (ETA) at DOL. The affected programs are dozens of programs in support of higher education, that are currently authorized by and placed in the Department of Education by the Higher Education Act of 1965 (as amended) including:

- TRIO: Upward Bound, Upward Bound Math and Science, Veterans Upward Bound, Talent Search, McNair Scholars Program, Student Support Services Program, Educational Opportunity Centers, Training Program for Federal TRIO Programs.
- Gaining Early Awareness and Readiness for Undergraduate Programs (GEAR UP)
- Graduate Assistance in Areas of National Need (GAANN)
- Augustus F. Hawkins Center of Excellence
- Title III Part A Strengthening Institutions Program
- Title III Part B Strengthening Historically Black Colleges and Universities Program
- Master's Degree Programs at Historically Black Colleges and Universities Program
- Strengthening Historically Black Graduate Institutions (HBGI)
- Howard University
- Higher Education Emergency Relief Fund
- Transition and Postsecondary Programs for Students with Intellectual Disabilities (TPSID)
- Transition Programs for Students with Intellectual Disabilities Coordinating Center (TPSID-CC)
- Fund for the Improvement of Postsecondary Education (FIPSE)

- Higher Education Congressionally Funded Community Projects Program

102.    This IAA also includes programs geared toward K-12 students designed to increase college access, that are currently administered by the Education Department's OESE: the High School Equivalency Program (HEP) and the College Assistance Migrant Program (CAMP).

103.    Under this IAA, the DOL will effectively manage and monitor these grant programs in their entirety, make new awards and administer such grants, provide technical assistance, and integrate ED's programs with the existing limited programs that DOL already administers.

IAA with the Department of Interior (DOI) Relating to the Office of Indian Education (DOI IAA)

104.    The DOI IAA moves provision of services formerly carried out by multiple components of the Education Department (OESE, OPE, OCTAE, and OSERS) to provide support for Native American, Alaska Native, and Native Hawaiian students and communities, to the DOI. The affected programs are dozens of programs funded under ESEA (as amended), the Higher Education Act (as amended) the Strengthening Career and Technical Education for the 21st Century Act (Perkins V), and the Rehabilitation Act of 1973, including:

1. **From OESE:**

    - Indian Education Grants to LEAs
    - Special Programs for Indian Children - Indian Education Professional Development Grant Program (PD)
    - Special Programs for Indian Children - Demonstration Grants (DEMO)
    - State Tribal Education Partnership Program (STEP)
    - Native American and Alaska Native Language Program (NALED)
    - Native American Language Resource Center Program (NALRC)
    - Alaska Native Education Program (ANEP)
    - Native Hawaiian Education Program (NHEP) and the Native Hawaiian Education Council
    - Native American and Alaska Native Children in School (NAM) Program

2. **From OPE:**

- American Indian Tribally Controlled Colleges and Universities authorized under Title III, Part A of the Higher Education Act, Section 316 and Part F of the Higher Education Act, Section 371
- Indian Education-related Research and Development Infrastructure Grant program components authorized under Title VII, Part B of the Higher Education Act

**3.  From OCTAE:**

- Tribally Controlled Postsecondary Career and Technical Institutions Program

**4.  From OSERS:**

- American Indian Vocational Rehabilitation Services Program
- Continued support for IDEA Part D funding for Tribally controlled colleges and universities (TCCUs)

105.    Under this IAA, DOL will manage and distribute these key formula grants, manage grant competitions, make new awards and administer such grants, provide technical assistance, and integrate ED's programs with the limited programs that DOL already administers.

<u>IAA with the Department of State Relating to International and Foreign Language Education (IFILE IAA)</u>

106.    The IFILE IAA moves provision of services formerly carried out by OPE to support foreign language education in higher education, to DOL's ETA. The affected programs are dozens of programs funded under the Higher Education Act of 1965 (as amended), and the Mutual Educational and Cultural Exchange Act, including:

- American Overseas Research Centers (AORC)
- Business and International Education (BIE) Program
- Centers for International Business Education (CIBE)
- Foreign Language and Area Studies (FLAS) Fellowships
- International Research and Studies (IRS) Program
- Language Resource Centers (LRC) Program
- National Resource Centers (NRC) Program
- Undergraduate International Studies and Foreign Language (UISFL) Program
- Fulbright-Hays Doctoral Dissertation Research Abroad (DDRA) Fellowships
- Fulbright-Hays Faculty Research Abroad (FRA) Fellowships
- Fulbright-Hays Group Projects Abroad (GPA) Program

- Fulbright-Hays Seminars Abroad Program

107. The administration did not fund some of these programs in Fiscal Year 2025. According to the Department, should Congress choose to fund these programs, under this IAA, the State Department will manage competitions, make new awards and administer such grants, provide technical assistance, and integrate ED's higher education programs with programs State already administers.

IAA with the Department of Health and Human Services Relating to CCAMPIS Program (CCAMPIS IAA)

108. The CCAMPIS IAA moves provision of services formerly carried out by OPE to HHS's Administration for Children and Families. The affected program is funded under Section 419N of the Higher Education Act of 1965, as amended.

109. The President's Fiscal Year 2026 Budget proposes to eliminate CCAMPIS. According to the Department, should Congress choose to fund the program, under this IAA HHS will provide grant administration services to ED in managing and overseeing the program, and will make new awards and administer such grants.

IAA with the Department of Health and Human Services Relating to the National Committee on Foreign Medical Education and Accreditation (NFCMEA IAA)

110. The NFCMEA IAA establishes a partnership between the Department and HHS related to the National Committee on Foreign Medical Education and Accreditation (NCFMEA), which was established under Section 102(a)(2)(B) of the Higher Education Act.

111. HHS will provide medical education subject matter expertise to NCFMEA for the Committee's reviews of requests by foreign countries to evaluate the standards of accreditation applicable to foreign medical schools where U.S. citizens are enrolled. Accordingly, HHS will be able to determine if those standards are comparable to the accreditation standards applied to U.S.

medical schools, as authorized by law. Additionally, HHS will coordinate the activities of the twice yearly NCFMEA meetings and any program administration requirements.

> The IAAs are Unlawful and are Poised to Upend the Affected Programs

112.    With the exception of the NFCMEA IAA, the Department's IAAs give the partner agencies full responsibility for monitoring grant recipients—including determining and ensuring compliance, and protecting against fraud, waste, and abuse. According to the Department's fact sheets, the IAAs also offload to partner agencies the provision of technical assistance to grant recipients. These activities are the central components of program management and execution: they require complete subject matter expertise, jurisdiction over grant recipients, and the authority not only to interpret the underlying statute but also to establish and enforce the legal standards to which grantees must adhere. Rather than having the partner agencies perform discrete tasks in support of grant distribution (such as IT system support for grant drawdowns or administrative assistance), the IAAs anticipate the full transfer of grant funds and administration from the Department to the partner agency. Without Departmental oversight and control over these funds and the program administration, the partner agency takes primary responsibility for program execution.

113.    The Department does not specify the amount of funding implicated by the November 18 IAAs and rather indicates that the Department will take amounts currently appropriated for FY2025 or FY2026, or funds leftover from prior years, and transfer the funds to the applicable agency. The amounts subject to transfer are significant. By one estimate, these IAAs may result in the transfer of as much as "$28 billion for elementary and secondary education operations. For postsecondary education operations, the management of about $3.1 billion will

transition to the Labor Department."[41] The CTE IAA alone authorized the transfer amount up to $2,673,000,000 in FY2025.

114.     As outlined further below, the DEOA and authorizing statutes for many of these programs specifically contemplate that the Department is responsible for the programs' functions, and the Department has the experience and expertise to fulfill Congress's intent. There is no Congressional authorization for other agencies to undertake the Department of Education's work.

115.     While the Department cites four main sources of authority for these IAAs (20 U.S.C. § 1231(a); 20 U.S.C. § 3475; 20 U.S.C. § 3479; 31 U.S.C. § 1535), none actually supports Defendants' actions, particularly when read in light of appropriations law and the DEOA.

116.     As described above, per 20 U.S.C. § 3473, the Secretary explicitly does not have the authority to allocate or reallocate the statutory functions transferred in the IAAs. Additionally, where the Secretary has the authority to delegate functions, those functions can only be delegated "among the officers of [the Department]." 20 U.S.C. § 3473(a).

117.     The annual appropriations statute also requires the Department of Education to carry out its programs, and Congress did not provide affirmative authority to the Department of Education to transfer its funding to other Departments.

118.     The only transfer authority provided to the Department of Education by the annual appropriations statute is the authority to transfer one percent of discretionary funds between education appropriations accounts, *see* Further Consolidated Appropriations Act, Pub. L. No. 118-47, Div. D, § 302, 138 Stat. 460, 691 (2024), but such a limited internal transfer is not what is described by these IAAs.

---

[41] Kara Arundel, *Education Department Outsources Program Management to Other Agencies,* K-12 Dive (Nov. 18, 2025), https://perma.cc/NP8Q-EH9T.

119.    Any other type of transfer is prohibited by section 512 of Division D of the Further

Consolidated Appropriations Act, 2024, which states, "None of the funds made available in this Act

may be transferred to any department, agency, or instrumentality of the United States Government,

except pursuant to a transfer made by, or transfer authority provided in, this Act or any other

appropriation Act." §512, 138 Stat. at 704. Section 512 was carried over by the Full-Year Continuing

Appropriations and Extensions Act, 2025, and the Continuing Appropriations, Agriculture,

Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, meaning

the funds from Fiscal Years 2024 through January 30, 2026 may not be transferred except in

accordance with Section 512.

120.    More IAAs are expected. A senior Education Department official who spoke during

a November 18 press call said the agency was continuing to explore options for transferring special

education, civil rights enforcement and student financial aid to other government agencies.[42]

121.    As is publicly being reported, the Department is making these transfers even though

it has not "landed on its statutory authority for making the changes."[43]

122.    Moreover, after an internal meeting with staff on November 19, 2025, employees

reported that the Department provided "little-to-no answers for staff on logistics on how [the

transfers] will work and when." [44] And while the Department publicly is touting efficiency as the

rationale for its trial run, a career staff member stated this move was a "big step backwards in

oversight capabilities," noting that the transfers "would not make anything easier for Education's

grant recipients . . . [because] Labor's grant management systems, for example, have much more

limited functionality than Education's custom-built platforms."[45] The Department has also

---

[42] *Id.*
[43] Eric Katz, *Trump Admin Acknowledges Difficulties in Transferring Education Programs to Other Agencies, Internal Documents Show*, Gov't Exec. (Nov. 20, 2025), https://perma.cc/3DQ8-Q9WY.
[44] *Id.*
[45] *Id.*

reportedly acknowledged the difficulty in transferring functions to other agencies and offices pursuant to IAAs in an after-action report on the CTE IAA. [46] That report also stated that "[l]arger formula grants and competitive grants are going to be much more difficult to migrate."[47]

**Defendants' Actions Will Prevent the Department From Providing Critical and Statutorily Required Support For Students, Parents, Teachers, and Schools**

123.    Congress has charged the Department of Education alone with the authority and responsibility to implement numerous programs that, collectively, distribute billions of dollars to every state in the country. The Department's elementary and secondary programs annually serve nearly 18,200 school districts and over 50 million students attending roughly 98,000 public schools and 32,000 private schools, while the Department's higher education programs provide services and support to more than 12 million postsecondary students.

124.    Schools, educators, and students all depend on federal programs. Because Agency Defendants are dismantling the Department wholesale, and have mass fired the professional staff, the information and actions coming out of the Department have been unpredictable, chaotic, and unprofessional. This experience is unprecedented in administration changes, and different in kind than the routine priority changes that happen with each new presidential administration. For example, funds based on formula grants have been unpredictably and unlawfully withheld and then released without explanation; directives upending long-standing guidance have been issued without legal justification; threats to withhold funds and cancel programs have been issued; and more—the chaos and disruption is myriad.  The movement of Department programs to agencies without the expertise, institutional knowledge, or infrastructure to manage them can only exacerbate these problems.

---

[46] *Id.*
[47] *Id.*

125. As a result, planning and relying on the Department as a partner has become difficult and Plaintiff school districts are being forced to expend considerable resources making contingency plans for fulfilling existing federal statutory obligations and Congressional objectives without federal support.

126. Funding uncertainty has a direct and disruptive impact on school districts, including Somerville and Easthampton, and their budgets, particularly when it comes to staffing and program planning. Districts must make many critical decisions months in advance, and without reliable information about federal funding, districts are left in a precarious position.

127. In Somerville, federal funds helped pay for at least 27 full-time and 12 part-time staff during the 2024–25 school year and are paying for 26 full-time and 12 part-time staff this school year. These funds allow Somerville to keep class sizes lower, run summer schools to ensure that students do not lose learning gains over the summer, deliver services to children with disabilities, offer free preschool, pay for low-income students to take advanced placement classes, and much more. Without reliable federal funds, and without certainty that allows Somerville to budget and plan with those funds, Somerville will need to make hard programmatic choices that will harm their students and staff. This instability makes long-term planning nearly impossible and weakens the district's ability to provide high-quality education and support.

128. As a smaller school district, Easthampton receives less money than Somerville— about $886,000 for the 2024–25 school year and $915,000 during the current school year. But that money plays a role no less critical at Easthampton. The federal funds administered by the Department of Education allow Easthampton to pay personnel, to keep class sizes low, to provide required and essential support for students with disabilities, and to pay for student transportation, among many other things.

129.     Due to current uncertainty, Easthampton expects to cut back staffing levels and programming available for students and staff. This would mean cutting personnel, increasing class sizes, and cutting discretionary spending, particularly arts, music, extracurricular activities, athletics and other programs. Already, Easthampton has held off on paying for certain professional development activities usually paid by federal entitlement funds, terminated a reading interventionist position in its K-8 school, and paused plans to increase its curricular offerings in its high school, to offer middle school foreign language classes, and to expand its pre-K program—all of which would have addressed local needs.

130.     In the spring, school districts will begin applications for 2026–2027 funding, and the Department employees who have historically provided information and assistance are gone. Additionally, cuts to personnel, education research and long-term studies directed by the IES will affect schools in coming years, when they will not have access to IES's data on the effectiveness of current instructional methods and administrative policies.

131.     By around May 15, decisions for the next full academic year must be made, including staffing commitments. Given the uncertainty about the funding and other support available from the Department, Easthampton and Somerville are already making contingency plans for reducing staffing, which will impact educators and staff who provide vital student services. For example, uncertainty is particularly concerning for free preschool programs, which are contingent on Title I funding. If those funds are delayed or unavailable, early childhood education access is put at risk.

132.     Harms experienced by the school districts are also felt by their students, families, faculty, and staff. But as described below, each of those constituencies depends on the Department of Education's funding and technical assistance independently and differently from their school districts.

133.    Key federal programs that the Department has successfully managed for decades are described below. A common thread runs through them all: they demonstrate Congress's repeated instructions that the Department implement the federal government's efforts to give all schoolchildren access to a high-quality public education, and an opportunity for higher education—and to provide schools, educators, parents, and students with tools for achieving these goals. Defendants' actions hollowing out of the Department's staff and ability to implement these programs will undermine these statutory mandates and harm Plaintiffs.

Individuals with Disabilities Education Act

134.    The Individuals with Disabilities Education Act (IDEA) makes a "free appropriate public education" available to all students, including those with disabilities. 20 U.S.C. § 1401(9). Congress was clear on the IDEA's purpose: "[I]t is in the national interest that the Federal Government have a supporting role in assisting State and local efforts to educate children with disabilities in order to improve results for such children and to ensure equal protection of the law." *Id.* § 1400(c)(6).

135.    Responsibility for the IDEA is vested in the Department of Education and cannot by law be transferred to another agency, including the Department of Health and Human Services. *See, e.g.,* 20 U.S.C. § 1402 (establishing the "Office of Special Education Programs" within the Department of Education as the "principal agency" to administer the IDEA); *Id.* § 3417 (establishing the same).

136.    Prior to the IDEA's enactment in 1975, "children with mental disabilities were labeled 'ineducable' and were categorically excluded from public schools to 'protect [non-disabled] children from them.'"[48]

---

[48] *Toledo v. Sanchez*, 454 F.3d 24, 37 (1st Cir. 2006).

137.    When Congress passed the IDEA, it required that states assure all children the right to a "free [and] appropriate public education." 20 U.S.C. § 1412(1).

138.    Under the IDEA, a core obligation of the Department of Education is supporting students with disabilities and the schools, parents, and teachers who educate students with disabilities.

139.    Congress designated a specific office within the Department of Education to administer the IDEA: "There shall be, within the Office of Special Education and Rehabilitative Services in the Department of Education, an Office of Special Education Programs, which shall be the principal agency in the Department for administering and carrying out this chapter and other programs and activities concerning the education of children with disabilities." 20 U.S.C. § 1402(a).

140.    This echoes the DEOA, which explicitly requires that "[t]here shall be in the Department an Office of Special Education and Rehabilitative Services, to be administered by the Assistant Secretary for Special Education and Rehabilitative Services[.]" *Id.* § 3417.

141.    The Office of Special Education and Rehabilitative Services directs, coordinates, and recommends policy for programs that are designed to:

1.  Meet the needs and develop the full potential of children with disabilities through the provision of special educational programs and services;

2.  Reduce dependency and enhance the productive capabilities of persons with disabilities through the provision of independent living and vocational rehabilitation services;

3.  Increase knowledge about, foster innovation in, and improve the delivery of services for persons with disabilities through the performance of rehabilitative and special education research and demonstration activities; and

4.  Disseminate information about services, programs, and laws affecting persons with disabilities.

142.  The Office of Special Education Programs (OSEP), within OSERS, is dedicated to improving results for infants, toddlers, children and youth with disabilities from birth through age 21 by providing leadership and financial support to assist states and local districts. The IDEA authorizes formula grants to states and discretionary grants to institutions of higher education and other non-profit organizations to support research, pilot programs, technology and personnel development, and centers to provide parents with training and information. OSEP distributes over $13 billion annually in IDEA formula grants to support early intervention (birth to age 2), preschool, K-12 education, and other services through age 21 (for students with disabilities who have not earned a regular diploma). OSEP also works with states to ensure that they understand how to comply with IDEA and provides technical assistance to states and localities so that they can meet their obligations and support students.

143.  Through the IDEA, Congress has created a comprehensive approach to support children with disabilities. Part A of the IDEA lays out the overall program and explicitly requires the Secretary to issue necessary regulations to ensure compliance with the Act. *Id.* § 1406 ("The Secretary shall issue regulations . . . "). No other Department is authorized to issue regulations implementing the IDEA for our nation's public schools.

144.  Part B of the IDEA establishes a grant program requiring the Department to provide funds to qualifying state and local educational agencies for the support of students with disabilities. *Id.* §§ 1411–19. Under the grant program for school-aged children, "[t]he Secretary shall make grants to States" and other entities according to a particular formula. *Id.* § 1411(a) (emphasis added). Under the grant program for pre-school aged children, "the Secretary shall provide grants under this section to assist States" in accordance with a specified formula. *Id.* § 1419(a) (emphasis added).

145.    Part C of the IDEA authorizes a grant program to aid each state in implementing a system of early intervention services for infants and toddlers with disabilities and their families. Part C requires each state to implement a public awareness program and "child find" activities to identify infants and toddlers who may be eligible for early intervention services.

146.    Part D of the IDEA provides grants to states for the training and development of instructional staff able to support and teach students with disabilities. *See id.* §§ 1450–82. Such staff (including special education teachers, speech pathologists, occupational therapists, and others) are in short supply and require specialized training to meet the physical, mental, and emotional needs of students with disabilities and ensure that they are being afforded a free and appropriate public education in the least restrictive environment as required by the IDEA.

147.    IDEA funds are used by schools to support students with disabilities and ensure that they receive a free appropriate education in the least restrictive setting. For example, by using these funds to train and develop school staff's skills to support the instructional needs of students with disabilities, including certified teachers, paraprofessionals, teachers aids, speech therapists, physical therapists, occupational therapists, psychologists, and more; compensate special education staff to support students with disabilities being integrated into all classrooms; purchase modified supplies, services, and materials to address the needs of students with disabilities such as transportation vehicles for students in wheelchairs, specialized instructional supports, and assistive technology in the classroom such as accessible desks and physical environments.[49]

---

[49] *See, e.g.*, Ohio Dep't of Educ., *Special Education Funds, Office for Exceptional Children Resource Management Section, Idea Part B Use of Funds Guidance*, https://perma.cc/BT58-5TQJ (last visited, Mar. 23, 2025.)

148.    In Fiscal Year 2024, IDEA funds supported at least 10% of the entire student population in every single state—and, in some states, as much as 20% of the entire student population.[50]

149.    Seven-and-a-half million disabled students ages 3–21 receive IDEA services nationwide. One in every five students educated in Massachusetts received services under the IDEA, through funds distributed by the Department, in the 2022–23 school year.[51]

150.    Importantly, Congress did not limit the Department's responsibilities to distributing funds. Rather, Congress required ongoing support to parents, students, and states in implementing the IDEA. Congress required that "[t]he Secretary shall . . . furnish technical assistance" to the states to implement the IDEA. 20 U.S.C. § 1417(a). The Department does this by providing substantial resources, support, and guidance to support schoolchildren, parents, families, educators, localities, and states to ensure a free and appropriate education for students with disabilities.

151.    This technical assistance is provided in many forms, including Technical Assistance Centers funded by the IDEA to offer trainings to parents of children with disabilities regarding how to advocate for their children; professional development for teachers and caregivers of kids with disabilities that teach them how to adapt their teaching styles to a student's unique needs; and supporting school administrators' recruitment of early childhood education staff.[52] These programs prepare personnel with the skills and knowledge necessary to help students with disabilities succeed in school.

---

[50] Dep't of Educ., *Summary: Investments and Reach of the U.S. Department of Education* (Jan. 2025), https://perma.cc/RPS2-D9G4.
[51] *See* Dep't of Educ., *Report on the Condition of Education 2024* at 16–17 (May 2024), https://perma.cc/8CAT-Z5Q5.
[52] Early Childhood Tech. Assistance Ctr., *OSEP Early Childhood IDEA Centers and the network of Parent Centers*, https://perma.cc/5HMF-RRK8 (updated Jan. 31, 2025).

152. The Department's employees are integral to ensuring that these funds are properly disbursed, troubleshoot issues when they arise, and are essential to ensuring that families, schools, and teachers are able to benefit from these funds.

153. In particular, OSEP staff—and the attorneys and other professionals they work with throughout the Department—are essential to ensuring that states and other grantees are able to receive, and effectively use, funds in a timely manner. To receive IDEA funds, states must submit annual applications that contain information required by statute. These applications are put together through an iterative process, involving collaboration between states and OSEP staff.

154. Per statute, state grantees are also required to provide annual performance data, which are then revised in an iterative process with OSEP staff (in coordination with other staff throughout the Department).

155. OSEP staff provide vital assistance to states and grantees with these applications and annual performance reports to allow these funds to be disbursed and ensure that state grantees effectively use IDEA funds to support students, parents, teachers, and schools.

156. Throughout the year, OSEP staff (in coordination with attorneys and other professionals throughout the Department) also provide substantial technical assistance to states and other grantees to help them use these funds effectively. This support happens through site visits, phone calls, emails, public-facing guidance documents, webinars, and in other formats of technical assistance. Without these staff, states (and through them, schools, teachers, students, and parents) will not have the support, technical assistance, and legal advice that they need to provide necessary services to students, parents, teachers, and schools. That will harm the students and parents who rely on these services, the schools who receive funds from states to provide these services, and the entire community.

157.    IDEA also directly supports parents. Part D funds are used for Parent Information Centers, which provide parents with training and information to help parents most effectively work with professionals to meet the early intervention and special education needs of their children with disabilities. These Parent Information Centers have experienced a dramatic increase in demand for assistance and training from parents and families during and following the COVID-19 pandemic, which disproportionately impacted students with disabilities who receive services through their school.

158.    Upon information and belief, all employees in OSEP—the office that administers IDEA—who create policy and legal guidance on permissible and effective uses of funds, all communications staff who share this guidance with states, schools, and the public (including parents, students, and teachers), and all staff that ensure data quality throughout the IDEA process—have been fired. Only a skeleton staff remains in OSEP.

159.    Upon information and belief, every single attorney in the Office of General Counsel (OGC) that advises on the IDEA has been fired.

160.    Upon information and belief, every single attorney in OGC that advises on regulatory matters, including issuing regulations under the IDEA and guidance about how states (and therefore schools) can spend their funds effectively, has been fired. Without these key staff in OSEP and OGC (and others throughout the Department), the Department will be unable to provide the technical assistance, guidance, and support that states (and through states, schools) and others need to be able to effectively and efficiently spend these funds. Nor is the Department able to issue regulations, or informal guidance, to implement and support the IDEA when every single attorney who advises on the IDEA has been fired.

161.    Like the students they serve, AFT's and AFT Massachusetts' members rely on IDEA funding and the technical assistance and support provided by the Department of Education. Many

of their members are special education teachers whose salaries are paid (in whole or in part) by IDEA funding.

162.    Others rely on IDEA-funded assistive technology to effectively teach their students, such as providing students with text-to-speech devices and word prediction devices, both of which facilitate communication between teacher and student, Braille displays, or talking calculators that support students with visual impairments. AFT and AFT Massachusetts members receive technical assistance—professional development as well as guidance on technology and instructional methods—provided by the Department of Education in order to most effectively teach and support their students with disabilities and provide the required free and appropriate public education. Loss of these supports will not only strip teachers of the tools they need to educate students with disabilities but will also put them in the impossible position of fulfilling the IDEA's "free and adequate public education" requirement without the tools that the IDEA is designed to provide.

163.    AFSCME Council 93's and SEIU's members similarly rely on IDEA funding. Across school districts in Massachusetts, Council 93 and SEIU represent paraprofessionals and other instructional aides who work with students with disabilities and specialize in special education and Applied Behavioral Analysis, and language support services. Each of the school districts that employ Council 93 and SEIU educators in special education settings receives IDEA funding. IDEA provides for these educators' salaries, professional development and continuing education, and critical classroom resources and technology.

164.    School districts, too, rely on IDEA funding and technical assistance to provide essential services for students with disabilities.

165.    For example, Somerville received nearly $1.8 million dollars in federal IDEA funds for the 2024–25 school year, and about the same this school year, which support special education teachers, paraprofessionals, and other specialists. Somerville also uses IDEA funds to provide

special education students with summer school to prevent educational backsliding, smaller class sizes, and otherwise provide supports for students with disabilities. These funds also help fund professional development for staff; materials, supplies, and equipment for students receiving special education services; equitable services for private school and homeschool children who have disabilities; translation services; and systems that help Somerville manage students' individualized education plans. Even a small reduction in federal funds of $100,000 (the equivalent of approximately 1.25 full-time educators' salaries), or any delay in receiving those funds, could impair Somerville's ability to provide special education services to students.

166.    Easthampton received more than $550,000 in IDEA funds for the 2024–25 school year. Easthampton uses its IDEA funds for many purposes, including paying staff, contracted services for providing direct services to students, providing summer programming, training staff on safety, and extended-year special education.

167.    If that funding were to be impaired, Somerville and Easthampton would not be able to provide the same level of services to their students with disabilities.

168.    School districts, including Somerville and Easthampton, also rely on technical assistance, guidance, training, and support from the Department of Education, much of which flows through states, to effectively implement the IDEA.

169.    Likewise, students will be harmed by delays and halts in the flow of IDEA funds caused by the March 11 mass terminations, which will reduce and impair the vital special education services on which those students rely.

170.    Members of The Arc rely on IDEA funding to obtain vital services that allow them to fully access public education and receive a free appropriate public education. Additionally, they rely on the technical assistance and support that the Department of Education has provided in the

past to spend those funds appropriately. For example, one chapter member of The Arc relies on the

Department of Education to monitor their state's education department's compliance with federal

rules for implementing the IDEA. Every year the Department of Education identifies areas of

improvement for the relevant state education department with respect to implementing the IDEA,

and that department then takes steps to correct procedures and demonstrate compliance with

federal obligations.

171.    On October 22, 2025, a spokesperson from the Department of Education confirmed

that the Department is actively exploring moving special education to another federal department –

taking a step to fulfill President Trump's March 21, 2025 announcement that the handling of

"special needs" would be moved out of the Department. The spokesperson went on to confirm that

this step was another meant to dismantle the Department, stating that "Secretary McMahon has

been very clear that her goal is to put herself out of a job by shutting down the Department of

Education and returning education to the states. The department is exploring additional partnerships

with federal agencies to support some education programs without any interruption or impact on

students with disabilities, but no agreement has been signed."[53]

172.    Moving the IDEA to a different department is not only unlawful, but would also

weaken the critical systems that ensure students with disabilities can learn, grow, and thrive –

thereby harming members of The Arc. The Department of Education is the only federal agency with

the expertise and infrastructure to uphold the IDEA's promise. No other agency is equipped to

work directly with state education agencies that oversee the IDEA implementation in local school

---

[53] Khaleda Rahman, *Trump Could Make Major Change to US Education*, Newsweek (Oct. 22, 2025),
https://perma.cc/NU7U-DFLD.

districts. The Department has decades of experience supporting these complex relationships and

ensuring compliance. No other agency has the experience and infrastructure to maintain and

strengthen this vital network. For example, the Department implements many supports including

the Parent Training and Information (PTI) centers, which provide essential, hands-on assistance to

parents. Additionally, because a large proportion of cases filed with OCR involve students with

disabilities, there is a history of collaboration between OCR and OSEP. These offices work together

to ensure that students have the resources and knowledge to service students with disabilities.

Moreover, the Department is the only agency authorized by law to conduct enforcement of key civil

rights laws and oversee enforcement of the IDEA, to ensure that students with disabilities receive

the necessary services to ensure a free and adequate public education.

The Federal Student Aid Program

173.    Congress has charged the Secretary of Education with administering the federal

student aid program, including issuing student loans and grants to support students' attainment of

higher education. *See, e.g.*, 20 U.S.C. §§ 1018, 1087a(a), 1087b(a), 1087b(c). The Department's Office

of Federal Student Aid (FSA) is statutorily mandated to do so and has the unique expertise to

manage the complex student aid program. The dramatic reduction in FSA's staff will impede its

ability to carry out its statutorily mandated functions and will cause enormous harm to borrowers;

students hoping to go to college; higher education institutions across the country; teachers and

professors; and the entire economy.

174.    Nor can any other agency take over FSA's work. The federal student aid program

(including student loans) is required by law to be implemented by the Secretary of Education. *See,

e.g., id.* § 3441(2)(C) (transferring all functions under the Higher Education Act to the Secretary of

Education); *id.* § 1018–1018b (establishing FSA as responsible for managing all student financial

assistance programs); *id.* §§ 1087a(a), 1087b(a), 1087b(c); *see generally, id* § 1001 *et seq.* (the Higher Education Act). It cannot be transferred to the Small Business Administration absent authorization by Congress.

175.    Over 30% of all undergraduate students receive Pell grants, which are grants based on financial need, to attend college or university. About 45 million Americans have student loans, representing almost 17% of Americans aged 18 and over.[54] Across all 50 states, 70% of undergraduate students will have student loans by the time they graduate.[55] The Department is statutorily required to issue Pell grants and loans and to administer many of the programs for repayment of these loans.

176.    These loans and grants are part of the Federal Student Aid program of Title IV of the Higher Education Act, which requires the Department to carry out several essential functions to ensure that institutions of higher education are appropriately participating in the Federal Student Aid program. This requires FSA staff to ensure that institutions are meeting the statutory and regulatory requirements to participate in the program, including certifying eligibility, conducting a financial analysis, confirming independent audits, and other functions to protect students and prevent fraud, waste, and abuse of federal funds.

177.    Congress specifically created FSA to administer all federal student aid. FSA was established as a "Performance Based Organization," a discrete management unit within the Department, so that it could more effectively administer the student aid program. *See* 20 U.S.C. §§ 1018–1018b.

178.    FSA has multiple functions, each implemented by the Department's staff. The core functions include:

---

[54] Cong. Rsch. Serv., R47196, *Federal Student Loan Debt Cancellation: Policy Considerations* (July 27, 2022), https://perma.cc/HL73-TQDC.
[55] Urban Inst., *Parent Borrowing*, https://perma.cc/ZK32-86XW (last visited Feb. 27, 2025).

1. Originating federal student loans; managing repayment of federally-held student loans (including operating deferments and forbearance, income-based repayment programs, and loan forgiveness programs—and some of each of these programs are required by statute);

2. Managing the participation in the student aid program of institutions of higher education (that is, colleges, for example, must be a participant in the federal student aid program for its students to receive loans and grants; to participate, the college must meet certain legal requirements, such as being accredited);

3. Issuing student aid grants (such as Pell grants for low-income students, TEACH grants for students in programs training teachers in high-need fields);

4. Operating the Free Application for Federal Student Aid (FAFSA); and supporting students, parents, borrowers, and schools throughout the entire process.

179.    In fact, Congress has, over the years, further centralized student loan origination under the Department. Prior to 2010, the Department issued federal direct loans to students (and their parents), as well as subsidized and guaranteed at least partial repayment of private student loans that were issued by private lenders under the Federal Family Education Loan program (FFEL). In 2010, Congress determined that publicly subsidized and guaranteed but privately held student loans were costly, inefficient, and harmful to student borrowers, and ended the FFEL program, instead moving all new federal student loans to be directly originated and held by the Department of Education. *See id.* § 1087a.[56] The Congressional Budget Office estimated that this change would save

---

[56] *See also* Dear Colleague Letter, from Daniel T. Madzelan, Acting Asst. Sec'y of Postsecondary Educ., (GEN-10-05) (GEN-10-05) Subject: Enactment of the Student Aid Provisions of the Health Care and Education Reconciliation Act of 2010, Dep't of Educ. (Apr. 2, 2010), https://perma.cc/3UBN-Y4V2; *see also* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010).

$61 billion over 10 years.[57] In other words, Congress has repeatedly and explicitly assigned the responsibility to originate new federal student loans to the Department of Education.

180.    For students to receive federal student aid (whether loans or grants), the institution of higher education must be certified as a participant in the Federal Student Aid program. By statute, the certification process requires the Department to take certain steps, including ensuring the fiscal responsibility of the institution to guard against the potential loss of federal funds. Every institution of higher education—approximately 4,000 institutions, including nearly every public and private college and university in the country—is required to be certified at least every 5 years (sometimes more frequently based on specific events).

181.    FSA is also statutorily required to manage repayment of student loans. This is not simply collecting checks from borrowers, but rather, operating numerous repayment and forgiveness programs, some of which are required by statute. These include, for example, deferment and forbearance programs (when a borrower temporarily suspends payment due to short-term financial hardship, such as per 20 U.S.C. § 1078(c)(3)(A)), income-based repayment programs (such as is required by *id.* § 1098e(b)), and loan forgiveness programs (some of which are required by statute, such as Public Service Loan Forgiveness (PSLF), *id.* § 1087e(m)(1), or temporary and permanent disability discharge, *id.* § 1087(a)(1)).

182.    In operating these programs, FSA provides significant guidance and support to the public—especially current or former students and their families—on which repayment options are available and appropriate for them. For example, the FSA has more than a dozen public webinars providing specific financial aid advice, online videos explaining repayment options, an online loan simulator, booklets and brochures in English and Spanish, comprehensive entrance and exit

---

[57] Letter from Douglas W. Elmendorf, Dir., Cong. Budget Off., to Nancy Pelosi, Speaker, U.S. House of Representatives (Mar. 20, 2010), https://perma.cc/DUJ2-W6V9.

counseling guides, and hosts an annual FSA Training Conference for Financial Aid Professionals, which provides detailed guidance to over 20,000 financial aid professionals across the country about the most recent developments in financial aid and repayment.

183.    FSA also issues grants to students pursuing higher education, including Pell Grants for low-income students, and Teacher Education Assistance for College and Higher Education (TEACH) grants for students enrolled in programs designed to train students to become K-12 teachers in high-need fields. 20 U.S.C. §§ 1070a, 1070b–b-4, 1070g–g-4. The effects of these programs are vast: more than 7.1 million students received Pell Grants in 2024–2025, with over 133.6 million recipients since the program began in 1980; and about 20,000 TEACH grants are distributed every year, with over 400,000 TEACH grants being disbursed since 2008.

184.    So that students are able to access this suite of federal student aid options, FSA is required by Congress to develop and maintain the Free Application for Federal Student Aid (FAFSA). *See id.* §§ 1087kk–1087vv.[58]

185.    The staff at FSA have been dramatically cut in a way that will impede FSA's ability to perform its statutorily required functions.

186.    For example, upon information and belief, through the March RIF, all staff at seven out of nine offices that perform the required certifications (and recertifications) of all institutions of higher education have been terminated *en masse*, reducing the overall staff performing that function from over 400 to approximately 25.

187.    Upon information and belief, the only team qualified to perform the statutorily required financial analysis of institutions of higher education has been fired.

---

[58] *See also* Consolidated Appropriations Act, Pub. L. No. 117-103, 136 Stat. 49, Div. R. (2022) (the FAFSA Simplification Act).

188.     Without these functions, FSA cannot timely and efficiently certify or recertify institutions of higher education for participation in the Federal Student Aid program as is required by statute. If the institution's certification lapses, its students will not be able to receive any grants or loans from the Department of Education and will not be able to enroll or complete degrees at their colleges and universities.

189.     As another example, upon information and belief, the entire office within FSA that oversees outside contractors has been laid off. These outside contractors operate FAFSA and the complex student loan repayment systems (known as loan servicers). Both of these are functions that FSA is required by law to perform (including through its vendors). FSA cannot perform its statutorily required function of operating the FAFSA and administering loan repayment programs if the contractors are not managed by the Department—which cannot happen with zero staff performing that function. Indeed, multiple reports from GAO in the last decade have stressed the importance of FSA closely supervising the FAFSA vendor and the student loan servicers.[59]

190.     School districts, including Somerville, rely on FSA services in helping to support their students to seek higher education—a core function and mission of their district and schools. Without FSA services, including the FAFSA and student loan and grant programs, college would be out of reach for the vast majority of their students. As part of their college counseling services, Somerville and Easthampton rely heavily on materials produced by FSA.

191.     AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members receive innumerable benefits from the many services that FSA provides. AFT, AFT Massachusetts,

---

[59] *See*, e.g., Marisol Cruz Cain, U.S. Gov't Accountability Off., GAO-24-107783, *Preliminary Results Show Strong Leadership Needed to Address Serious Student Aid System Weaknesses* (Sept. 24, 2024), https://perma.cc/6NBP-JR96; U.S. Gov't Accountability Off., GAO-23-104832, *Department of Education Should Improve Enforcement Procedures Regarding Substantial Misrepresentation by Colleges*, (Dec. 2022), https://perma.cc/8B8N-BJ2K.

AFSCME Council 93, SEIU and their members, will be immediately harmed now that FSA will not be able to provide these services or is only able to provide them ineffectively.

192.    For example, thousands of AFT, AFT Massachusetts, and SEIU members have benefited from the student aid program through receiving federal student loans or grants. Thousands of their members currently have student loans. These members use repayment programs, such as income-based repayment programs, or deferments or forbearance, to manage repayment of their loans while serving as teachers and in other essential professions. Inefficiencies or ineffectiveness in the operation of those programs, including in receiving technical assistance from FSA (and the loan servicers, as FSA's agents), and delays in any aspect of loan administration, including processing repayments and applications for deferral or forbearance, have begun to harm these members. Historically, they relied on the guidance, webinars, and other technical assistance that FSA provides to understand which repayment options are best for them and their families. Now, members struggle to get into contact with any staff at FSA, and AFT is having to field an increased volume of calls as a result.

193.    Many AFT, AFT Massachusetts, and SEIU members are enrolled in PSLF. Through the PSLF program, the student loans of borrowers who are employed by governments or nonprofits (such as teachers in K-12 public schools or at public or nonprofit universities) are forgiven after 120 qualifying payments.[60]

194.    Since the administration's actions to gut FSA, many AFT members' student loans have been stuck in limbo. AFT members who have satisfied the requirements of the PSLF program, meaning that they diligently made qualifying loan payments for ten years while working in qualifying public service jobs, have been unable to avail themselves of loan forgiveness due to the dysfunction

---

[60] Fed. Student Aid, *Public Service Loan Forgiveness (PSLF)*, https://perma.cc/D4MR-TRL7 (last visited Nov. 23, 2025).

at FSA.[61] Members are unable to transition into PSLF-eligible income-based repayment plans because FSA has failed to process their applications. An AFT member in New York, who has worked in public service for 10 years as an English teacher, reports that the Department of Education has not processed her application to switch to an income-based repayment plan that would enable her to make additional PSLF-qualifying payments. She has received no communication from the Department this year, and has no way to pay down her debt either on her own or through the PSLF program. Another AFT member, a college counselor, expressed concern that because of the impasse at FSA, she does not even know what their monthly payments will be on an income-based repayment plan – if the Department ever processes her application.

195.    Similar delays exist with regards to the PSLF Buy Back Program, which permits eligible borrowers to earn forgiveness credits for months when the borrower did not make loan payments because the loans were in deferment or forbearance. Another AFT member in New York reported that while she applied to buy back PSLF-qualifying credits through the program to reach 120 PSLF-qualifying payments, the Department of Education has told her that because of its delays, she should make additional loan payments instead of waiting for FSA to approve her application. And because her loans are in forbearance, she was told to switch to a different repayment plan that would result in significantly higher monthly payments. These delays in processing requests to "buy back" credits are imposing a significant financial burden on affected members.

196.    For over a decade, AFT has assisted its members who are burdened by student debt to receive forgiveness through PSLF. For example, AFT hosts "student debt clinics" for its members to guide them through the PSLF application process. These debt clinics, which are led by

---

[61] Removal of income driven repayment applications and deliberate interruptions in application processing, effectively blocking the ability of borrowers to make progress towards PSLF, were the subject of litigation that has resulted in an agreement to move loan applications forward in a timely fashion— but under the current conditions at the Department, Plaintiffs do not know whether or how that will happen.

AFT staff and are held in-person and virtually, are designed to educate members about income-driven repayment programs and loan forgiveness programs such as PSLF, address member questions, and educate members about how to manage their student loans. AFT has hosted hundreds of these clinics, reaching tens of thousands of its members since launching the clinics.

197.    SEIU has similarly assisted its members by educating them about student loan repayment options, providing guidance on the PSLF application process, and addressing member questions about federal student aid. SEIU's membership includes many essential professions that rely heavily on federal student aid, including educators, doctors, nurses, and social workers. SEIU has held student debt clinics in-person and online, including hosting national webinars at which Department of Education employees presented information directly to members.

198.    To create the content for these clinics, AFT and SEIU rely heavily on technical assistance provided by the Department of Education—such as guidance documents, loan repayment calculators on the Department's website, instructions, and more—that are designed to advise borrowers regarding which student loan forgiveness program to enroll in. Because these resources have not been updated to reflect changes in the programs or accurate information, they are no longer able to rely on these resources. This interferes with AFT's and SEIU's ability to provide accurate loan counseling services to their members.

199.    Similarly, AFSCME Council 93, whose membership is comprised of individuals who work in the public service such as special education paraprofessionals, and would be eligible to participate in the program, rely on federal student loans and grants to fund their education and training. Many members have student loans and use FSA programs and resources to find the right repayment options for them. These AFSCME Council 93 members, including its special education paraprofessionals members, rely on the PSLF program to afford their student loan repayments.

200.    Should the contractors who process PSLF payments not be properly supervised—a near certainty given that the entire office that performs this function was laid off—then AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members will not be able to benefit from the statutorily-required PSLF program.

Civil Rights Enforcement

201.    America's schools must be a place where civil rights are protected.

202.    Since the moment the DEOA was enacted, Congress has required: "There shall be in the Department an Office for Civil Rights, to be administered by the Assistant Secretary for Civil Rights[.]" 20 U.S.C. § 3413. The Assistant Secretary must be appointed by the President and confirmed by the Senate, *id.* § 3412; must collect particular data, *id.* § 3413(b)(2); must make annual reports, *id.* § 3413(b)(1); and has independent hiring authority, *id.* § 3413(2)(c).

203.    Through the DEOA, Congress also transferred to the new Office for Civil Rights (OCR) in the Department of Education various functions that had previously been assigned to the Department of Health, Education, and Welfare or other agencies prior to 1979. *See id.* § 3413. No other agency, including the Department of Health and Human Services, is authorized to oversee the OCR.

204.    The OCR is charged by Congress with ensuring equal access to education and to promote educational excellence by enforcing specific civil rights statutes with respect to entities that receive federal funds from the Department of Education. These statutes include:

1.    Title VI of the Civil Rights Act of 1965, 42 U.S.C. § 2000d, prohibiting discrimination on the basis of race, color, and national origin in any program or activity that receives federal financial assistance;

2.  Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, prohibiting discrimination based on sex in any education program or activity that receives federal financial assistance;

3.  Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, prohibiting discrimination based on disability in any program or activity that receives federal financial assistance;

4.  Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 *et seq.*, prohibiting discrimination based on disability in state and local government services;

5.  The Age Discrimination Act of 1975, 42 U.S.C. § 6101, *et seq.*, which prohibits age discrimination in any program or activity that receives federal financial assistance; and

6.  The Boy Scouts of America Equal Access Act, 29 U.S.C. § 7905, which prohibits public schools that provide opportunities for outside organizations to meet on school premises to deny the same access to the Boy Scouts of America or any other youth group listed in Title 36 as a patriotic organization.

205.    The protections that OCR enforces are essential. OCR enforces the rights of students with disabilities to learn in their least-restrictive environments. OCR conducts investigations to ensure that schools properly address sexual harassment and sexual assault and to ensure that schools do not discriminate based on race.

206.    In addition to their enforcement and investigative work, OCR provides training and technical assistance to state and local educational agencies on civil rights laws, including trainings relating to accessibility for individuals with disabilities.

207.    OCR's public complaints have increased by 200% in the last five years leading to a substantial backlog. For example, in 2023, OCR received 19,201 complaints.[62] Disability claims make up a substantial and rising portion of OCR's docket. According to a former official who led OCR in two previous administrations, the level of firings has left OCR "effectively a shell of itself." She explained that staff caseloads would increase from 50 to 120 per person: "There's no civil rights investigator anywhere who could effectively investigate and resolve that high a number of cases."[63]

208.    On March 12, 2025, the Department closed seven of the twelve regional OCR offices,[64] including sending RIF notices to 299 OCR employees.[65] As a consequence, the Department has redirected cases filed in the Chicago and Boston offices to OCR's Denver office. Case backlogs in the offices that remain open have only grown larger and more intractable. As of June 2025, remaining OCR attorneys had unmanageable caseloads of 168 cases per attorney.[66] The mass office closures and terminations are hindering the Department's ability to efficiently and effectively conduct investigations and enforcement. Moreover, it will continue to hinder the Department's ability to provide clear, effective guidance to schools regarding how to meet their obligations under civil rights laws.

209.    Members of The Arc rely on OCR to vindicate the rights of children with intellectual and developmental disabilities (IDD) under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act. OCR is the only agency that is empowered to accept and investigate allegations that a school or school district violated Section 504 of the Rehabilitation Act.

---

[62] Catherin E. Lhamon, Assistant Sec'y for C.R., *Fiscal Year 2023 Annual Report to the President and Secretary of Education*, Dep't of Educ. Off. for C.R. (2024), https://perma.cc/EMH4-BFM2.

[63] Michelle Diament, *Ed Department Cuts May Leave Students With Disabilities 'Little To No Recourse'*, Disability Scoop, (Mar. 18, 2025), https://perma.cc/55MF-P6QW.

[64] Collin Binkley, *Education Department Layoffs Gut its Civil Rights Office, Leaving Discrimination Cases in Limbo*, AP News (Mar. 12, 2025), https://perma.cc/9N9P-ZLU9.

[65] Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://perma.cc/64CJ-UEHH; Clay Decl., *supra* note 19, at 5 (Dkt. No. 112-6)

[66] Letter from Sens. to Linda McMahon, Sec'y of the Dep't of Educ. (Oct. 20, 2025) at 3, https://perma.cc/3U65-FNAC.

210.    The Arc's chapters assist families in filing complaints with OCR for disability discrimination. Historically, OCR has offered critical resolution processes in cases involving individual students. The resolution process allows the parties to reach legally binding agreements without having to resort to a costly legal process. The resolution procedures allow issues to be resolved in a timely manner, and in fact the process frequently helps to restore the working relationship between the family and the school and school district, while also, ensuring greater accountability for school districts.

211.    Even as the Department has recently launched the administration's own investigations of universities regarding compliance with Title VI,[67] the drastic reduction in staffing at OCR offices across the country will interfere with the Department's ability to review complaints filed by students, parents, and teachers. Without effective, efficient, and timely OCR enforcement of the protections that Congress requires the Department to effectuate, students will not have their rights protected and teachers will not be able to teach effectively. Without timely and effective intervention by OCR, students, parents, teachers, and schools might be propelled into costly litigation.

212.    Educators and staff (including AFT, AFT Massachusetts, AFSCME Council 93, AAUP, and SEIU members) benefit directly and indirectly from OCR's enforcement of civil rights laws. For example, an educator who faces retaliation because they acted as a whistleblower by reporting their school's non-compliance with civil rights laws protecting students, can file a complaint with OCR and is protected by OCR's authority to investigate and reach an agreement with the school to cease the retaliation. A teacher with a disability who uses a wheelchair and

---

[67] Press Release, Dep't of Educ., U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment (Mar. 10, 2025), https://perma.cc/TR92-EU4L; Karina Tsui and Elizabeth Wolfe, *Department of Education Investigating 60 Colleges and Universities over Antisemitism Claims*, CNN (Mar. 11, 2025), https://perma.cc/DYT5-369H.

complains that he and his students cannot get to the auditorium because of physical barriers is protected by OCR.

213.    Likewise, graduate students—including AFT, AAUP, and SEIU members—are protected by OCR. For example, a graduate student experiencing sexual harassment at a university may file an OCR complaint.

214.    Teachers and other school professionals (including AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members) also benefit from OCR's enforcement of their students' civil rights. Their work in the classroom, and throughout the schools, would be far less effective if, for instance, Black students were constantly subjected to a systemically hostile school environment, or if English learners were deprived of adequate language support to participate in their classrooms, or if students with disabilities did not have suitable transportation to their school.

215.    Students, particularly students with disabilities, will be harmed by increased delays in OCR's ability to resolve disability civil rights claims. With the gutting of OCR's workforce, OCR is unable to timely and efficiently review complaints. Students rely on OCR's complaint resolution process to protect their (and their children's) civil rights. Absent an effective OCR process, students are faced with an impossible choice. They can either bring an OCR complaint that is unlikely to result in timely enforcement or incur the massive expenses of private litigation to obtain the services to which they are entitled to under federal law. Because of the growing backlogs and the closure of regional OCR offices, some families are choosing not to file OCR complaints altogether and those who have filed complaints are being left in the dark as their cases are left in limbo.

216.    Due to Defendants' actions, OCR as all but stopped functioning as a resource and partner for The Arc, its chapters, or for families with children with IDD. Since March, some of The Arc's chapters, and families they work with, have entirely stopped filing complaints with OCR because of closures of local field offices, OCR's delays in case processing, and overall lack of

responsiveness. Some families who have filed complaints have reported to The Arc's chapters that OCR has not responded to the complaints for months; others have reported that the respective OCR office never even set up an automatic email to confirm receipt of their filing.

217.    One of The Arc's chapters, for example, used to receive regular communication from the OCR regarding pending complaints. Now, that organization is hearing nothing from OCR about pending complaints.

218.    Given the dysfunction at OCR, members of The Arc are increasingly looking towards remedies available under state law (where applicable) or with state agencies to address their disability discrimination claims. However, because OCR is the only agency that accepts and investigates allegations that a school or school district violated Section 504 of the Rehabilitation Act, and is typically the best positioned to investigate allegations of ADA violations within schools, the remedies that the statutes require be available to students are being curtailed.

219.    In addition to enforcement under each of these statutes, OCR provides significant technical assistance to support recipients of Department funds in complying with the requirements of these statutes. *See, e.g.,* 34 C.F.R. §§ 100.6(a), 100.12(b) (requiring OCR to provide assistance, guidance, and detailed instructions to implement civil rights protections). For example, OCR provides guidance documents, FAQs, pre-recorded webinars and webcasts, resources for drafting policies that comply with civil rights statutes, and many other resources.[68]

220.    Without the technical assistance provided by the Department, which will be dramatically curtailed by the mass layoffs, schools——and correspondingly, educators and staff – including AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members as well as chapter and individual members of The Arc——are being harmed.

---

[68] Dep't of Educ., *Civil Rights Tutorials and Technical Assistance*, https://perma.cc/RP5N-E5K9 (last reviewed Jan. 14, 2025).

221.    Likewise, school districts—including Somerville and Easthampton—rely on guidance from OCR on civil rights issues. School districts like Easthampton directly rely on resources provided by OCR to help their students and their families. As the civil rights landscape evolves, and new directives are issued, OCR plays a vital role in providing guidance on how to comply with the law and safeguard civil rights in schools. Easthampton, for example, is spending more of its staff time on addressing civil rights issues and is having to pay outside counsel for work on special education issues because of OCR's unavailability. Easthampton also relies heavily on OCR technical support in the form of language translation assistance guidance to allow its educators to communicate effectively with those students' families.

<u>Title I of the Elementary and Secondary Education Act</u>

222.    One of the Department's most significant functions is to support K-12 schools around the country through Title I of the Elementary and Secondary Education Act of 1965 (ESEA).

223.    Congress has explained that Title I's purpose "is to provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational achievement gaps." 20 U.S.C. § 6301. Title I represents by far the largest federal funding component of the ESEA. Congress has repeatedly reauthorized the ESEA, including as recently as 2024.[69]

224.    Through Title I, the Department fulfills Congress's instruction to provide critical funding to state and local education agencies that serve over 26 million students from low-income backgrounds. Title I is a grant program that entitles local education agencies (typically, school districts or charter school organizations) to federal funds based on the number of children from low-income families in that community.

---

[69] *See* H.R. 8070, 118th Cong. (2024).

225.    The majority of America's schools are eligible for Title I funds: in the 2021–22 academic year, 63% of traditional public schools and 62% of public charter schools were eligible for Title I funds.[70] In 2024, more than 26 million students were served by Title I funds. Often, Title I funds are used for purposes that benefit all students in that community, regardless of their families' income level (often known as schoolwide Title I programs).

226.    Schools use the vast majority of Title I funds for "instruction and instructional support." This includes, for example, after-school tutoring programs for children who need help reaching their math and reading goals; additional teaching personnel to give students more one-on-one and small-group instruction during the school day; hiring more qualified educators to reduce class size; hiring additional professional staff to help teachers personalize the learning experience in response to the unique needs of every student; and routine assessments to help understand whether students are learning.

227.    Title I funds are also used to support families, through family and parent engagements so that caregivers can fully partner with educators at their child's school to support their child's education; preschool programming to prepare young children for kindergarten; and extended-day programs before and after school and during summers and vacations to continuing accelerating students' academic engagement and achievement.

228.    The Title I program could not be efficiently or effectively implemented without the staff who work on these programs. The Department's employees are essential for ensuring that states receive Title I funds. To receive funds, states work with Department staff through an iterative process to submit a state plan (or amendments to a pre-existing state plan), as required by statute. If the Department does not have sufficient staff (or staff with the right expertise and sufficient time) to

---

[70] Nat'l Ctr. for Educ. Stats., *Fast Facts*, https://perma.cc/8YAG-DCDR] (last visited Feb. 26, 2025).

support each state throughout this process, Title I funds cannot be distributed in a timely and efficient manner, as is required by law.

229.     Throughout the year, states (and through them, schools) work with Department staff to receive technical assistance, advice, and support on how to effectively spend those funds. Department staff use phone calls, emails, site visits, public-facing guidance documents, webinars, and other media to support these efforts. This technical assistance is essential for states (and through them schools) to spend the funds in a manner that meets the state's educational goals.

230.     Upon information and belief, a substantial number of staff from the Office of Elementary and Secondary Education, which implements Title I, were fired as part of the March 11 terminations, including the entire office of State and Grantee Relations (which works with states). In addition, the entire division in the Office of General Counsel that advises on all elementary and secondary education matters (including Title I) was fired. As a result, the Department cannot effectively and efficiently perform its statutorily required function of administering Title I, including supporting states applying for Title I funding, reviewing applications and advising on corrections, working with states to advise on the allowable uses of Title I funds, and more.

231.     Without adequate staff to administer Title I funds, there will be inevitable delays in releasing funds, an absence of necessary advice for states as to how to spend funds effectively, and barriers to obtaining timely waivers (which allow greater flexibility in how and when schools can spend the funds). At bottom, firing the staff responsible for administering the Title I program will undermine efficacy and efficiency of the program itself.

232.     Additionally, the Department's OESE IAA will further destabilize the program by moving pieces to the DOL, creating additional uncertainty for stakeholders.

233.     This interference with the Department's ability to effectively administer the Title I program by removing the programmatic work done by the Department diminishes the impacts that

AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members are able to make on the students they serve. It will also curtail access to training and development that AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members rely on in order to support the needs of their students.

234.    As funds, advice, and waivers are delayed or denied, states and schools will not be able to support teacher salaries and their students (including the nearly 50% of Massachusetts schoolchildren who attend schools supported by Title I) will be left in crowded classrooms with larger class sizes, less instructional support, and reduced availability of interventions to support academic achievement. Educators, including AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members, will experience increased workloads and job losses. And without certainty about the availability and timing of federal funds, school districts like Somerville and Easthampton are being harmed, as they depend on the continuity and regularity of these funds for planning their budgets and paying their bills. Any impediment to timely and efficient distribution of Title I funds, and the substantial support and guidance that the Department provides on applying for those funds and how to effectively use those funds, will mean AFT, AFT Massachusetts, and AFSCME Council 93 will divert resources from existing purposes to instead provide the sorts of trainings and other supports that their members currently receive through Title I funding. And AFT, AFT Massachusetts, and AFSCME Council 93 members will shoulder more responsibilities for young people, if services are cut.

235.    Somerville received $1.1 million dollars in Title I funding for this school year, and Easthampton receives more than $250,000 in Title I funding. In Somerville, those funds support educators (ten reading teachers and three math interventionists are supported in part by these funds), pre-kindergarten educators, tutoring for at-risk students, and professional development designed to help staff maximize their effectiveness.

236.     Similarly, Easthampton historically has used its Title I funding for (among other things) paying for three full-time reading specialists and all intervention services. Easthampton also is eligible to use Title I funds for its K-8 school-wide student body, so it relies on Title I funding to pay for schoolwide programming. Because of uncertainty about whether it will receive these statutorily required federal funds in the future, Easthampton laid off a reading interventionist, whose position was paid for through Title I funds. Losing this reading interventionist has harmed reading programs at the school, impacting literacy outcomes for students who stood to benefit the most from the program.

Career and Technical Education

237.     The Department is also required by statute to support career and technical education. *See* 20 U.S.C. § 3416 (creating an office of Career, Technical, and Adult Education).

238.     Career and technical education (CTE) is instruction for both youth and adult students that focuses on practical knowledge required for specific jobs or fields of work for which the economy has an immediate need. CTE programs teach skills like advanced manufacturing, health sciences, and information technology—all of which allow students to earn well-paying jobs without a college degree. It provides real-world training and educational experience to set students up for success in the workforce, especially focused on providing activities to prepare students for high-skill, high-wage, or in-demand industry sectors. CTE programs do this in numerous ways, including by providing work-based learning opportunities and providing opportunities to grain postsecondary education credit in a high school setting.

239.     For example, CTE students might learn computer programming skills for a career leading a company's information technology staff; medical coding or nursing procedures to work in hospitals; or graphic design and 3D printing to help a manufacturer test a new prototype.

240.    The Department administers CTE primarily through the statutorily required Perkins V grant program, which supports over 11 million students across all 50 states.[71]

241.    The severe cuts to the staffing across the Department, including to the Office of Career, Technical, and Adult Education—which administers this program—will interfere with the Department's ability to carry out its statutorily required duties for CTE. Upon information and belief, as with other programs, the Department will not be able to do the fundamental staff work of administering the program, such as processing applications, providing technical assistance, and other functions that are necessary to ensure that the full amount of funds get distributed efficiently and effectively.

242.    As described above, on July 15, 2025, the Department implemented the IAA moving CTE programs and adult education programs to DOL

243.    The loss of CTE Department personnel and the movement of these programs to DOL will harm CTE students, teachers, and support staff, including many AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members. Classroom sizes would rise; schools would not be able to afford to replace or update existing equipment, depriving CTE students of the chance to learn on the same equipment that they would use in the professional world; and Congress's intention to "increase[] the employment opportunities for populations who are chronically unemployed or underemployed" would be thwarted. 20 U.S.C. § 2301(8).

244.    Likewise, school districts, including Somerville, Easthampton, who operate robust CTE programs funded and assisted by the federal government, will be harmed. Somerville's federal funding supports more than 17 programs designed to train and support students in careers like

---

[71] *See* Carl D. Perkins Career and Technical Education Act of 2006, Pub. L. No. 109-270, 120 Stat. 683 (2006), as amended by the Strengthening Career Education for the 21st Century Act, Pub. L. No. 115-224, 132 Stat. 1563 (2018) (collectively, known as "Perkins V").

nursing and dental assistant fields, advanced manufacturing, and cosmetology. About 25% of Somerville high school students participate in the program.

245.    Likewise, Easthampton receives funding that supports technical training tracks for their students, including an early education & care track, engineering technology track, programming & web development track, and a graphic communications track. Roughly one-quarter of Easthampton's high school students are on an in-district vocational training track or attending career technical programs in cooperating neighboring districts.

246.    Following the transfer of CTE programs to DOL, states have faced multiple problems stemming from an unclear chain of command and delay in grant funding. As of November 19, only 35 of 57 grantees had actually received their Perkins grant funding, which is closing in on two months overdue.[72]

Slashing the Department Will Undermine Numerous Other Programs

247.    The hollowing out of the Department will impair the Department's ability to carry out its numerous other statutorily required functions and in so doing, harm the students, schools, and teachers that benefit from those programs.

248.    For example, the Department is also charged by Congress with administering several programs to support rural education. This is primarily through Title V of the ESEA.

249.    Rural school districts often are located in areas that are more sparsely populated and (in the aggregate) less wealthy than urban and suburban school districts. As a result, those rural districts' local tax bases are usually unable to support their local schools at levels sufficient to

---

[72] House Committee on Education & Workforce, *From Classroom to Career: Strengthening Skills Pathways Through CTE*, YouTube (Nov. 19, 2025), https://www.youtube.com/live/dGeNSCFSUAc at 25:15–25:43. For example, the State of Maryland was unable to access its Perkins funds until November 19, 2025, even though the funds should have been available on October 1. *See* Juan Perez Jr., Nick Niedzwiadek and Bianca Quilantan, *The Education Department Gave Another Agency Power to Distribute Its Money. It hasn't Gone Well*, Politico (Nov. 24, 2025), https://perma.cc/J75Q-XVSU.

provide their children the same high-quality education as districts with higher tax bases. For that reason, rural school districts are significantly more dependent on federal support.

250.    The Department supports rural education through numerous grant programs and technical assistance, such as the Rural Education Achievement Program, the Full-Service Community Schools Program, the Education Innovation and Research Program, the Promise Neighborhoods program, the Rural Postsecondary & Economic Development Grants Program, and the Regional Education Laboratory Program.

251.    Upon information and belief, a substantial number of staff from the Office of Elementary and Secondary Education, which implements these programs, were fired as part of the March 11 mass terminations. In addition, the entire division in the Office of the General Counsel that advises on all elementary and secondary education matters (which includes these programs) was fired, as was the entire division that issues regulations and guidance documents, such as guidance on the appropriate uses of these funds and the specific flexibilities that are available to rural schools under law. As a result, the Department cannot effectively and efficiently perform its statutorily required function of administering these programs.

252.    Additionally, many of these programs are subject to the OESE IAA, and are now thrown into further uncertainty and chaos.

253.    These actions will harm plaintiffs, including AFT, AFSCME Council 93, and SEIU members who teach in rural districts.

254.    In addition, the statutorily mandated Office of English Language Acquisition, Language Enhancement administers grants and invests in research to prepare teachers to support English learners, and disseminates information about best educational research, practice, and policies for English learners. *See* 20 U.S.C. § 3420.

255.    These programs benefit school districts like Somerville which—like most school districts in the country—serve English learners. Somerville serves more than 1,200 students (nearly a quarter of Somerville's total enrollment) who are English learners and depends on federal funds to provide adequate support, including summer programs to ensure that these students have continuity for their language learning.

256.    Likewise, Easthampton's enrollment includes a small but growing segment of schoolchildren with parents for whom English is not their first language.

257.    These programs also benefit teachers like AFT and AFT Massachusetts members who work with English learners.

258.    Yet, upon information and belief, Secretary McMahon functionally abolished this Office by laying off every single employee of that office, except one staff member.

259.    The Department is also charged with implementing several programs to serve Native American students and is required to have an Office of Indian Education. 20 U.S.C. § 3423c.

260.    The DOI IAA removes much of the Department's support for and expertise on Native American educational issues as they pertain to Native American students in the public school system. AFT members teach these students in schools across the country. AFT members will be affected by these changes, and the degradation of services they portend. For example, one consequence of moving the Department's programs to DOI will be that the Office of English Language Acquisition will be less able to coordinate with the Office of Indian Education in supporting the many Native American public-school students who are English language learners, placing additional burdens on educators.

261.    Likewise, Defendants' cuts to the statutorily mandated Institute of Education Sciences, the non-partisan, statistics, research, and evaluations arm of the Department of Education, will also harm Plaintiffs. The IES was established by the Education Science Reform Act of 2002,

and helps evaluate federal education program efficacy, collect education statistics, and fund education sciences. *See* 20 U.S.C. §§ 3419, 9511(a) (establishing the Institute of Education Sciences); *id.* § 9531(a) (establishing a National Center for Educational Research); *id.* § 9541(a) (establishing the National Center for Education Statistics); *id.* § 9561(a) (establishing the National Center for Education Evaluation and Regional Assistance); *id.* § 9567(a) (establishing the National Center for Special Education Research). Upon information and belief, Defendants have fired the vast majority of IES's staff.

262.    The National Center for Education Statistics calculates the allocation of federal funds for a number of formula-based grant application programs, including Title I. Accordingly, the proper distribution of federal Title I aid to low-income schools and other formula grants will be impaired in future years given the gutting of IES.

263.    Among other statutorily mandated functions, the research centers of the IES compile "full and complete statistics" on the "condition and progress of education," including through tracking student achievement data across the nation. IES conducts research and compiles guidance for educators and schools on evidence-based, effective practices to support teaching and learning. They publish practice guides and resources to support teachers and schools on issues like meeting academic standards, addressing bullying, and supporting students with significant behavioral issues, all designed to identify best practices and make those practices accessible to students, educators, and schools.

264.    These programs IES supports, and many others like them, benefit students, schools, and educators alike. Defendants' efforts to close the Department, including through mass terminations, will come at their expense.

265.    For example, the work of IES allows school districts like Somerville and Easthampton to identify effective curricula and practices to implement in their schools. For

example, when Somerville adopted a new literacy program, Somerville used IES resources to help them choose a reliable and effective program.

266.    IES allows teachers, including AFT and AFT Massachusetts's members, to be more effective in their classrooms and more efficient in identifying practices that will actually improve student learning.

267.    AFT leadership and its members utilize the large-scale, evidence-based studies the IES publishes to support proposed contract terms like class-size limits, professional development time, or staffing levels with national evidence. AFT members historically have used IES's research, which is often national in scope, to argue for reforms that have been demonstrated to work in schools. Because many IES projects have focused on community engagement and family partnerships, the AFT and other unions use IES grants to build stronger community coalitions around education issues. IES promotes and disseminates evidence-based practices that help improve outcomes for students with disabilities and tracks data to reflect progress made on a host of metrics.

268.    IES also produces statistics relied on by University faculty and AAUP members in their research and for teaching in education programs.

269.    Faculty and faculty organizations, including AAUP members and chapters and AFT and its members, also rely on data produced by National Center for Education Statistics (NCES) on things such as faculty salary, number and makeup of faculty at different institutions, basic financial information about institutions, and student tuition when negotiating faculty salary, bargaining, and determining which institution to seek employment. Members also rely on the data in their own professional work as researchers, and lacking up-to-date data harms their ability to research, publish, and advance their careers through promotion and tenure.

270.    AFT typically depends on resources produced by third-party research organizations that rely on data sources that are released and reported by the Department. One of these resources,

which AFT has used to support presentations to the field, to share information to support affiliate inquiries, to engage in policy advocacy, and to inform analyses that can be used for collective bargaining, likely will not be updated this year. The IES staff who oversee the production of the data used to develop the resource are no longer employed by the Department. As a result, AFT will be left without this resource to support its work.

271.    Due to the nature of IES's work, the true cost of its destruction will continue to materialize as time goes on.

**CAUSES OF ACTION**

**COUNT ONE**
**Violation of Separation of Powers**
**(against all Defendants)**

272.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

273.    Plaintiffs have a non-statutory right of action to declare unlawful official action that is ultra vires.

274.    The President has only the powers conferred upon him by the Constitution and federal statutes.

275.    Congress has the exclusive authority under Article I of the Constitution to pass laws creating government agencies, to assign their duties, and to appropriate funds for the effectuation of those duties.

276.    Congress has the exclusive authority under the Spending Clause and the Appropriations Clause to establish and fund federal programs and to direct payment of federal funds to the states for purposes defined by Congress.

277.    Defendants' actions to close the Department of Education, including the March 11 and October 10 mass terminations, the Executive Order, the interagency agreements, and plans to

move portions of the Department to other agencies—like IDEA to HHS and student loans to Treasury, and any other related steps to implement the Executive Order, exceed presidential and executive authority and usurp legislative authority conferred by the Constitution, in violation of the separation of powers.

## COUNT TWO
### Violation of Take Care Clause
### (against Defendant Trump)

278.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

279.    Article II of the Constitution confers upon the President the duty to "take care that the Laws be faithfully executed." U.S. Const., art. II § 3.

280.    The Take Care Clause is judicially enforceable against presidential action that violates or undermines statutes duly enacted by Congress.

281.    Defendants' actions to dismantle the Department of Education, as instructed by President Trump's Executive Order directing the closure of the Department, violate the Take Care Clause because they are directly contrary to the duly enacted statutes establishing the Department; establishing offices and programs within the Department; and establishing the Department's duties.

282.    President Trump's actions to dismantle the Department of Education also violate the Take Care Clause because they are directly contrary to the duly enacted statutes appropriating funds to the Department and directing the Department to distribute and use such funds to aid states, schools, and others in educating the children of the United States.

## COUNT THREE
### Ultra Vires Action
### (against all Defendants)

283.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

284.    Neither the President nor an agency may take any action that exceeds the scope of their constitutional and/or statutory authority.

285.    Only Congress has the authority to abolish federal executive agencies or to enact, amend, or repeal statutes.

286.    The statutes authorizing the Department of Education permit or require Defendants to take numerous actions. For example, pursuant to those statutes, Defendants are obligated to administer Title I of the ESEA; a series of programs to support rural schools under ESEA Title V; administer the IDEA, including providing assistance to states to adhere to the requirements of the IDEA and providing assistance to parents in advocating for their children to receive a free and appropriate education; enforcing civil rights; supporting career and technical education; and providing federal student aid to students pursuing higher education.

287.    But these statutes do not authorize Defendants to dismantle the Department that Congress has created.

288.    Nor do the operative statutes and regulations governing reductions-in-force permit Defendants to gut the Department for this unlawful purpose. *See* 5 C.F.R. § 351.203.

289.    Defendants lack authority to dismantle the Department, in whole or in part, including by issuing the Executive Order, effectuating mass terminations of the Department's staff, or transferring portions of the Department to other federal agencies.

290.    Defendant' actions to dismantle the Department, including the March 11 and October 10 mass terminations, the Executive Order, the interagency agreements, and plans to transfer portions of the Department to other federal agencies—like IDEA to HHS and student loans to Treasury, and subsequent steps to implement the Executive Order, are outside of Defendants' authority to act.

**COUNT FOUR**
**Administrative Procedure Act – 5.U.S.C. § 706(2)(B)**
**Actions Contrary to Constitutional Right**
**(against Defendants McMahon and the Department of Education)**

291.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

292.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right." 5 U.S.C. § 706(2)(B).

293.    Congress has the exclusive authority under Article I of the Constitution to pass laws creating government agencies, to assign their duties, and to appropriate funds for the effectuation of those duties.

294.    Congress has the exclusive authority under the Spending Clause and the Appropriations Clause to establish and fund federal programs and to direct payment of federal funds to the states for purposes defined by Congress.

295.    Defendants' actions to dissolve the Department of Education, including by effectuating mass terminations of the Department's staff, the interagency agreements, and plans to transfer portions of the Department to other federal agencies—like IDEA to HHS and student loans to Treasury, and subsequent steps to implement the Executive Order,  usurp legislative authority conferred by the Constitution to Congress, in violation of the separation of powers.

## COUNT FIVE
### Administrative Procedure Act – 5 U.S.C. § 706(2)(C)
### Excess of Statutory Authority
### (against Defendants McMahon and the Department of Education)

296.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

297.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

298.    Only Congress has the authority to abolish federal executive agencies or to enact, amend, or repeal statutes.

299.    The statutes authorizing the Department of Education permit or require Defendants to take numerous actions. For example, pursuant to those statutes, Defendants are obligated to administer Title I of the ESEA; a series of programs to support rural schools under ESEA Title V; administer the IDEA, including providing assistance to states to adhere to the requirements of the IDEA and providing assistance to parents in advocating for their children to receive a free and appropriate education; enforcing civil rights; supporting career and technical education; and providing federal student aid to students pursuing higher education.

300.    But these statutes do not authorize Defendants to dismantle the Department that Congress has created.

301.    Nor do the operative statutes and regulations governing reductions-in-force permit Defendants to gut the Department for this unlawful purpose. *See* 5 C.F.R. § 351.203.

302.    Defendants lack authority to dismantle the Department, in whole or in part, including by effectuating mass terminations of the Department's staff, transferring portions of the Department to other federal agencies, or otherwise implementing the Executive Order's directive.

303.    Defendant' actions to dismantle the Department, including the March 11 and October 10 mass terminations, the interagency agreements, and plans to transfer portions of the

Department to other federal agencies—like IDEA to HHS and student loans to Treasury, and subsequent steps to implement the Executive Order, exceed Defendants' authority to act.

## COUNT SIX
### Administrative Procedure Act – 5 U.S.C. § 706(2)(A)
### Actions Not in Accordance with Law
### (against Defendants McMahon and the Department of Education)

304.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

305.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

306.    Defendants' actions are contrary to law in numerous respects.

307.    First, the Department of Education is created by statute and cannot be abolished, dismantled, or closed by the President or Secretary. That is equally true whether this closure is accomplished by an Executive Order, by mass firings of the Department's employees (without staff, there is no Department; just a building), by transferring Department functions to other agencies, or by any other means. Thus, Defendants' dismantlement of the Department of Education is contrary to the DEOA, which created the Department of Education in order to "coordinate," "strengthen," and "supplement and complement" efforts to improve the quality of education. 20 U.S.C. § 3402.

308.    For example, pursuant to the DEOA, Defendants must operate OCR. OCR is charged with, among other tasks, "compliance and enforcement activities," "identifying significant civil rights or compliance problems," 20 U.S.C. § 3413(b), and employing staff "necessary to carry out the functions" of OCR. *Id.* § 3413(c). Defendants are required to accept complaints from students experiencing discrimination and must "make a prompt investigation" of such complaints. 34 C.F.R. § 100.7.

309.    By shuttering more than half of OCR's offices, and upon information and belief, slashing more than half of the staff charged with investigating and enforcing civil rights laws, Defendants' actions will hobble their ability to investigate, protect, and enforce students' civil rights protections. As such, Defendants' actions are contrary to the DEOA and to OCR's regulations.

310.    Second, Defendants' actions are contrary to the IDEA. The IDEA requires Defendants to, inter alia, "ensure" that children with disabilities have access to educational opportunities, "ensure" that the rights of those children and their parents are protected, "assist" states, localities and other entities in providing effective and coordinated services to those children, "support[]" coordinated research, technical assistance, technology development, and other supports, and "assess, and ensure the effectiveness of, efforts to educate children with disabilities." 20 U.S.C. § 1400(d)(1).

311.    By mass firing the essential staff required for effectively administering the IDEA and thereby decimating the Department's ability to perform these functions, Defendants' actions are contrary to the IDEA.

312.    Third, Defendants' destruction of the Department of Education is also contrary to statutes vesting in the Department overarching responsibility for implementing federal student aid. By law, FSA is required to undertake a variety of functions. As described above, some of the offices required for FSA to perform its statutorily required functions—including managing student loan repayment (by overseeing the contractors who collect repayments), administering the FAFSA (which also requires overseeing contractors), and certifying institutions of higher education to participate in the student loan program—have been gutted by mass firings affecting the vast majority of the relevant staff.

313.    Fourth, Defendants' actions are contrary to the many other specific laws requiring offices to perform different functions. This is particularly true with regard to the programs and functions the Department is seeking to transfer via its interagency agreements.

314.    Fifth, Defendants' interagency agreements specifically contravene applicable appropriations law, in particular Section 512 of Division D of the Further Consolidated Appropriations Act, 2024, and laws incorporating Section 512. The interagency agreements also are unauthorized under The Economy Act, 31 U.S.C. § 1535, and the General Education Provisions Act (GEPA), 20 U.S.C. § 1231.

315.    In sum, Defendants' actions to incapacitate the Department of Education are in contravention of numerous Congressional directives requiring federal support for education.

## COUNT SEVEN
### Administrative Procedure Act – 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious
### (against Defendants McMahon and the Department of Education)

316.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

317.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

318.    The Defendant's effective dismantling of the Department encompasses both its mandatory and its discretionary programs, and is arbitrary and capricious in numerous respects.

319.    For example, the Department failed to consider the effects of mass terminations on effective provision of government services and the continued operations of Departmental programs and failed to articulate a reasoned explanation for entirely shuttering numerous divisions.

320.    Defendants' decision to put staff on administrative leave as of March 21, 2025–just ten days after issuing the mass termination notices—is likewise arbitrary and capricious. Defendants

have proffered no reason why they disregarded regulations requiring agencies to maintain staff in "active duty status" during the RIF notice period, 5 C.F.R. § 351.806, nor any explanation as to how orderly shutdown and transfer of activities and duties are possible with just ten days of notice.

321. Defendants have also failed to consider the reliance interests of students, families, schools, states, colleges and universities, and other entities that depend on the effective operations of the Department.

322. Defendants' interagency agreements, as well as its plan to transfer additional Department functions to other agencies, like IDEA to HHS and student loans to Treasury, fail to account for congressional statutes disallowing such transfers. Additionally, in pursuing these actions Defendants have failed to consider the impact on institutional knowledge, technical expertise, continuity of services, and other potential harms attendant to such transfers.

323. Nor did Defendants consider more limited alternatives designed to improve government efficiency and operations or offer a reasoned explanation for their actions.

324. Defendants' decision is inconsistent with the evidence before the agency. For example, students subject to discrimination who seek to file complaints with OCR faced a backlog of more than 12,000 pending investigations as of January 2025. But Defendants nonetheless decimated OCR's staff—exacerbating problems rather than fixing them.

325. Defendants' actions are arbitrary and capricious because they impede—rather than enhance—their ability to perform the Department's functions.

326. And finally, Defendants' stated rationale for the March 11 and October 10 mass terminations—to cut so-called "bureaucratic bloat" and allocate resources efficiently—is inconsistent with facts and mere pretext for their openly acknowledged true goal: the elimination of the Department.

**PRAYER FOR RELIEF**

Wherefore, the Plaintiffs pray that the Court will grant the following relief:

a) Issue a declaratory judgment that President Trump's Executive Order directing the dismantlement of the Department of Education is unlawful because it violates the Constitution;

b) Issue a declaratory judgment that the March 11, 2025 mass termination, the interagency agreements, and other actions implementing President Trump's directive to close the Department by Agency Defendants are unlawful because they violate the Constitution and the Administrative Procedure Act;

c) Declare unlawful and set aside the Agency Defendants' March 11, 2025 reduction in force and interagency agreements as contrary to the Constitution under 5 U.S.C. § 706(2)(B), not in accordance with law under 5 U.S.C. § 706(2)(A), in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C), and arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A);

d) Declare unlawful and set aside the Agency Defendants' implementation of the Executive Order's directive to close the Department as contrary to the Constitution under 5 U.S.C. § 706(2)(B), not in accordance with law under 5 U.S.C. § 706(2)(A), in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C), and arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A);

e) Issue permanent relief against the Agency Defendants, barring Agency Defendants, their officers, employees, and agents from further implementing the Executive Order's directive to dismantle the Department of Education;

83

f)   Order Agency Defendants to take actions sufficient to carry out all functions of the Department that have not been terminated or removed from the Department by Congress, including restoring sufficient staffing to carry out those functions and returning Department functions that have been transferred to other agencies.

g)   Award the Plaintiffs reasonable costs and attorney's fees; and

h)   Any other further relief that the Court deems fit and proper.

RESPECTFULLY SUBMITTED this 25th day of November 2025.

By: /s/ Rachel F. Homer

Rachel F. Homer (MA State Bar No. 693642)
Kali Schellenberg (MA State Bar No. 694875)
Will Bardwell* (DC Bar No. 90006120)
Elena Goldstein* (NY State Bar No. 4210456)
Victoria S. Nugent* (DC Bar No. 470800)
Adnan Perwez* (DC Bar No. 90027532)
Shiva Kooragayala* (Ill. Bar No. 6336195)
Paul R.Q. Wolfson* (DC Bar No. 414759)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
Telephone: 833-391-4732
Facsimile: 202-796-4426
rhomer@democracyforward.org
kschellenberg@democracyforward.org
wbardwell@democracyforward.org
egoldstein@democracyforward.org
vnugent@democracyforward.org
aperwez@democracyforward.org
skooragayala@democracyforward.org
pwolfson@democracyforward.org
Counsel for Plaintiffs

* Admitted pro hac vice

Counsel for Somerville Plaintiffs

**CERTIFICATE OF SERVICE**

I certify that this document was filed through the CM/ECF system and will be sent

electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).


By: */s/ Rachel F. Homer*
Rachel F. Homer