UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 25-10601-MJJ |
| LINDA MCMAHON, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

|  |  |  |
|---|---|---|
| SOMERVILLE PUBLIC SCHOOLS, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 25-10677-MJJ |
| DONALD J. TRUMP, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OF DECISION**

February 11, 2026

JOUN, D.J.

This case arises out of a March 2025 reduction-in-force ("RIF") impacting the Department of Education (the "Department") and various offices within the Department. Plaintiffs—a group of states, school districts, non-profit organizations, and labor unions—allege that the RIF is effectively a means to dismantle the Department without Congressional authorization and in violation of the Constitution and the Administrative Procedure Act

("APA"). On August 1, 2025, Defendants produced an administrative record (the "AR"). *See* [Doc. No. 158]. Plaintiffs argue that the AR is deficient and ask that I issue an order requiring Agency Defendants to (1) complete the AR and produce a privilege log, (2) supplement the AR with agency records relating to factors that the agency is required to consider under the APA before taking an action, and (3) produce extra-record discovery to clarify which rationale was considered and adopted by decisionmakers in implementing the RIF to determine whether the bases for the Agency Defendnats' actions were concealed from public view, as well as discovery related to Plaintiffs' irreparable harm. [Doc. No. 173 at 3–4]. For the reasons explained below, Plaintiffs' Motion for Discovery, [Doc. No. 172], is <u>GRANTED in part</u> and <u>DENIED in part</u>.

## I.   BACKGROUND

On May 22, 2025, I issued a preliminary injunction enjoining the Secretary of Education (the "Secretary") and the Department, (together with the Secretary, the "Agency Defendants") from implementing the RIF, ordering Agency Defendants to reinstate federal employees terminated as part of the RIF, and ordering Agency Defendants to restore the Department to the status quo such that it is able to carry out its statutory functions. *See generally* [Doc. No. 128]. Defendants appealed the decision to the First Circuit, which denied Defendants' request for a stay of the injunction pending appeal. *See* [Doc. No. 141]. On July 14, 2025, however, the Supreme Court entered a stay pending appeal. *McMahon v. New York*, 606 U.S. ----, 145 S. Ct. 2643 (2025). On October 1, 2025, after the First Circuit remanded the case to this court, I vacated the injunction. *See* [Doc. No. 179].

On August 1, 2025, Defendants produced an administrative record that consists of (1) organizational charts, (2) employee retirement forms, (3) email instructions and resources for employees terminated or impacted via the RIF, (4) spreadsheets of impacted positions, and (5) a

memorandum to the Office of Personnel Management ("OPM") requesting "Waiver of 90-day Competitive Area Requirement for Reduction in Force." *See* [Doc. No. 158]. On September 12, 2025, Plaintiffs moved for discovery seeking completion of the record, supplementation of the record, and extra-record discovery, including discovery regarding Plaintiffs' irreparable harms and production of a privilege log. [Doc. No. 173 at 5]. Plaintiffs argue that the AR is incomplete, inconsistent with public statements regarding the decision to implement the RIF and lacks information regarding how the decision was made or the particulars of the decision necessary for a court to review Plaintiffs' APA claims. [*Id.*]. On November 20, 2025, Defendants filed their opposition, arguing that the record is complete, that Plaintiffs have not made a showing of bad faith required to seek additional discovery, that the discovery requests are not narrowly tailored to the deficiencies in the administrative record, and that agency deliberative documents are not discoverable under the APA and need not be included in a privilege log. *See generally* [Doc. No. 186]. On December 5, 2025, Plaintiffs filed their reply. [Doc. No. 193].

## II.  LEGAL STANDARD

"[I]n order to permit meaningful judicial review, an agency must disclose the basis of its action." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (citation omitted). "[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Id.* This reflects the principle that "further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *Id.* at 780–781 (citing *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268, n. 18, (1977)). "Relatedly, a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's

priorities . . . [s]uch decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)." *Id.* at 781.

An administrative record must consist of "all documents and materials directly or indirectly considered by the agency decision-makers and includes evidence contrary to the agency's position." *Roe v. Mayorkas*, No. 22-cv-10808, 2024 WL 5198705, at *7 (D. Mass. Oct. 2, 2024) (citation omitted). The administrative record is "entitled to a presumption of administrative regularity." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993). This means that the court must "assume[] the agency properly designated the Administrative Record absent clear evidence to the contrary." *Id*. However, the presumption of regularity may be overcome in certain circumstances and plaintiffs may seek additional discovery in a few ways.

First, "[w]hen a showing is made that the record may not be complete, limited discovery is appropriate to resolve that question." *Mayorkas*, 2024 WL 5198705, at *11 (citation omitted). While "the First Circuit has not articulated the standard a party must meet to rebut the presumption of regularity when seeking <u>completion</u> of an administrative record," other courts in this district have adopted standards applied in other circuits which generally require "clear evidence" that the record is incomplete. *Id.* at *7 (emphasis in original).

Second, the First Circuit has recognized that there are two circumstances in which a court has "the discretion to supplement the agency record." *City of Taunton, Massachusetts v. United States Env't Prot. Agency*, 895 F.3d 120, 127 (1st Cir. 2018). First, supplementation may be appropriate to "facilitate our comprehension of the record or the agency's decision" where the decision involves "highly technical, environmental matters, . . . or when we are faced with a failure to explain administrative action as to frustrate effective judicial review." *Id.* (citation

4

omitted). Second, supplementation "is permissible where there is a 'strong showing of bad faith or improper behavior' by the agency." *Housatonic River Initiative v. United States Env't Prot. Agency, New England Region*, 75 F.4th 248, 278 (1st Cir. 2023) (citing *Town of Winthrop v. FAA*, 535 F.3d 1, 14 (1st Cir. 2008)); *City of Taunton*, 895 F.3d at 127.

Third, there is "a narrow exception to the general rule against inquiring into 'the mental processes of administrative decisionmakers.'" *Dep't of Com.*, 588 U.S. at 781 (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 (1977)). A court may order extra-record discovery—such as deposition testimony, interrogatories, or production of documents beyond the administrative record—upon "a strong showing of bad faith or improper behavior." *Ibid*.

### III. DISCUSSION

#### A. Completion Of The Record

First, Plaintiffs request that Defendants complete the administrative record and argue that the agency failed to include in the record materials that influenced its decision-making process.

> Because "[a] court should generally consider neither more nor less than what was before the agency at the time it made its decision, if a court determines that a party has rebutted the presumption of regularity by showing that there are extant documents falling within the whole record but which the agency omitted from the documents it certified as containing the whole record, a court can order an agency to add the documents to complete the true record for judicial review."

*Sierra Club v. United States Army Corps of Eng'rs*, No. 20-cv-00396, 2023 WL 4350730, at *2 (D. Me. July 5, 2023) (citation omitted). Plaintiffs must provide "reasonable, non-speculative grounds to believe that materials considered in the decision-making process are not included in the record." *Mayorkas*, 2024 WL 5198705, at *7 (citation omitted). Additionally, Plaintiffs must "identify the pertinent omitted materials with sufficient specificity, as opposed to merely proffering broad categories of documents and data that are likely to exist as a result of other

5

documents that are included in the administrative record." *Id.* (citation omitted). "Courts have examined factors such as: (1) when the documents were presented to the agency; (2) to whom; and (3) under what context." *Sierra Club*, 2023 WL 4350730, at *2 (citation omitted).

First, Plaintiffs argue that the administrative record is incomplete because the documents are inconsistent with one another. For example, Plaintiffs point to purported changes to the list of terminated employees between documents dated February 24, February 28, and March 6, 2025. [Doc. No. 173 at 8]. Plaintiffs argue that the documents reflect lists of terminated employees that are inconsistent with the RIF that actually occurred. For instance, one such document in the AR contemplated that there would be no cuts to the Office of English Language Acquisition, but the actual RIF terminated 12 employees. [*Compare* Doc. No. 173-8; *with* Doc. No. 71-60 at 4]. Accordingly, Plaintiffs seek documents that (1) explain these inconsistencies, and (2) specify the final and complete list of the eliminated positions. Agency Defendants respond that the changes to the lists of terminated employees cannot be characterized as "inconsistencies." Rather, the changes reflect an ongoing reorganization. Defendants argue that based on a reasonable search, documentation explaining the changes among the documents in the AR do not exist. [Doc. No. 186 at 15]. Here, I find that Plaintiffs have not put forth clear evidence that documents that explain the inconsistencies among these lists actually exist or were considered by Agency Defendants. *Suffolk Reg'l Off Track Betting Corp. v. United States Small Bus. Admin.*, No. 24-cv-07058, 2025 WL 2173727, at *4 (E.D.N.Y. July 31, 2025) (declining to order discovery where "no documents were shown to have been considered in the agency's decision that were omitted from the record."). However, Plaintiffs' request for documents or information that reflect the final and complete list of eliminated positions is reasonable given that it is sufficiently specific and non-speculative that an agency conducting a RIF would keep track of the employees and

offices that are impacted by the RIF. As such, I GRANT Plaintiffs' request for a final list of terminated positions and offices in order to complete the record but DENY Plaintiffs' request to the extent it seeks documents and information pertaining to the changes made in the list of terminated employees amidst the ongoing RIF.

As for the next category of information Plaintiffs seek, they have provided clearer evidence that those documents do exist, are missing from the record, and should have been included. In a sworn declaration by Lisa Tessitore, former Director of the Vendor Oversight Division at the Department's Federal Student Aid office, Ms. Tessitore explained that in February 2025, "FSA directors were asked to submit lists to [their] supervisors describing which of [their] functions are statutorily required, which [they] understood was being considered in the planning for a RIF." [Doc. No. 102-11 at 4]. A preliminary list was provided, and Ms. Tessitore explained that the final list of statutory functions was not due to upper management until March 13, 2025, two days after the RIF was announced on March 11th. [*Id.*]. Ms. Tessitore explained that "the entire process of identifying these statutory functions for review had taken place over the course of about two weeks." [*Id.*]. Despite evidence that at least a preliminary and final list of statutory functions exists, it was not included in the AR. Though Agency Defendants argue that Plaintiffs merely "speculate" that these lists were in fact relied upon, Ms. Tessitore's testimony demonstrates that these lists were created during the planning process for the RIF and coincided with the timing during which "President Trump and Linda McMahon were making public statements to the press about their intention to shut down the Department altogether." [*Id.*].

Plaintiffs also point to a February 26, 2025 memorandum to the heads of the executive departments and agencies from the Office of Personnel Management ("OPM") and the Office of Management and Budget ("OMB") titled "Guidance on Agency RIF and Reorganization Plans

7

Requested by *Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative*"[1] ("OPM Memorandum"). The OPM Memorandum directs Agency heads to submit Agency RIF and Reorganization Plans ("ARRPs") for review and approval by the OPM and the OMB that identifies, among other things: a list of agency components and offices, statutes that establish the agency as statutorily required entities, whether the agency or its subcomponents "should be eliminated or consolidated" or "expanded to deliver on the President's priorities," and "[t]he agency's suggested plan for congressional engagement." OPM Memorandum at 1–4. Again, the OPM Memorandum constitutes clear evidence that these plans exist and should be included in the AR.

Defendants, however, argue that the list of statutorily required functions and ARRPs are deliberative. "To protect agencies from being 'forced to operate in a fishbowl,' the deliberative process privilege shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Mayorkas*, 2024 WL 5198705, at *3 (citing *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021)). "The privilege therefore distinguishes between predecisional, deliberative documents, which are exempt from disclosure, and documents reflecting a final agency decision and the reasons supporting it, which are not." *Sierra Club, Inc.*, 592 U.S. at 268 (2021). "To decide whether a document communicates the agency's settled position, courts must consider whether the agency treats the document as its final view on the matter . . . [b]y contrast, a document that leaves agency decisionmakers free to change their minds does not reflect the agency's final decision." *Id.* (citation omitted).

---

[1] Memorandum from Russell T. Vought, Dir. of OMB & Charles Ezell, Acting Dir. of OPM, on Guidance on Agency RIF and Reorganization Plans Requested by Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative to the Heads of Exec. Dep'ts and Agencies (Feb. 26, 2025) (available at https://perma.cc/6XLR-QTD2) ("OPM Memorandum").

"To qualify for the deliberative process privilege, a document must be (1) 'predecisional,' that is, prior to the adoption of the agency policy, and (2) 'deliberative,' that is, related to the policy-making process." *In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35, 39 (D. Mass. 2008) (citing *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995)). In other words, a "document is 'predecisional' if it precedes in time the decision to which it was applied and it is 'deliberative' if it constitutes a statement of opinion regarding final policy rather than a description of the ultimate policy itself." *Id.* at 40 (citation omitted). Agency Defendants argue that the list statutorily required functions and ARRPs are deliberative because they reflect "deliberations before the final decision to conduct a RIF or otherwise reorganize itself," and "do not embody any final decisions on RIFs or reorganizations," as specified by the OPM Memorandum's "requirement to submit monthly progress reports," which shows that "the actual RIF plan may be different from the ARRP plan." [Doc. No. 186 at 17]. However, the OPM Memorandum itself, as well as the Administration's public statements regarding the Department, paint a very different picture. For instance, the OPM Memorandum requires that agencies must develop Phase 1 ARRPs "**no later than March 13, 2025.**" OPM Memorandum at 3 (emphasis in original). But the decision to implement the RIF in the Department was publicly announced on March 11, 2025, and plans to prepare for the RIF appear to have been formulating since February 2025.[2] The First circuit has held that a document is predicational if it is "antecedent to the adoption of agency policy." *Texaco Puerto Rico, Inc.*, 60 F.3d at 884 (citation omitted). Here, Plaintiffs have shown that the ARRPs were not created to decide whether the RIF should take place, but rather, they were created after the decision to implement the RIF had

---

[2] Press Release, Dep't of Education, U.S. Department of Education Initiates Reduction in Force (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force (available at https://perma.cc/3D77-T8KF).

already been made. The OPM Memorandum itself reflects this final policy: "President Trump required that 'Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law'. . . . [p]ursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions." OPM Memorandum at 1–2. This shows that the documents Plaintiffs seek are not predecisional, but rather post-decisional.

Next, deliberative documents may not be included in an administrative record because they often demonstrate a "personal opinion" of the agency policy that may "inaccurately reflect or prematurely disclose the views of the agency." *In re Pharm. Indus.*, 254 F.R.D. at 40. Here, the ARRPs and list of statutorily required offices are not deliberative, as they do not reflect any changing or inaccurate views of the Agency. Rather, these documents involve the mechanics of how the RIF will be implemented, after the policy of implementing the RIF had been decided.

The deliberative process privilege is a qualified one, it is not absolute. *Id.* (citation omitted). "In deciding how to exercise its discretion, an inquiring court should consider, among other things, the interests of the litigants, society's interest in the accuracy and integrity of factfinding, and the public's interest in honest, effective government." *Texaco Puerto Rico, Inc.*, 60 F.3d at 885. "Consequently, where the documents sought may shed light on alleged government malfeasance, the privilege is routinely denied." *Id.* (citation omitted). As explained in more detail below, Plaintiffs have made a "strong showing of arbitrariness." *Id.* Given the "discretionary nature of the deliberative process privilege," I find that it does not apply here. *Id.* Agency Defendants must complete the record by responding to Plaintiffs' Requests for Production, Interrogatories, and Requests for Admissions that are narrowly tailored to obtain this

10

information.[3] However, requests that go beyond the scope of obtaining material necessary to complete the record as to the decision-making process regarding the RIF is overbroad. For instance, some of the requests seek information regarding DOGE personnel, tracking of OCR complaints, technical assistance to state and local education agencies, and tracking of Office of Federal Student Aid activity. [Doc. No. 186 at 23; Doc. No. 173-2 at 9–10; Doc. No. 173-3 at 10]. Those documents and information are outside of the scope of what the agency is required to produce at this stage.

    **B.**   **Supplementation Of The Record**

Next, Plaintiffs ask that the court order Agency Defendants to supplement the AR with documents that would further explain the agency's decision-making process. Specifically, Plaintiffs ask for "documents that provide a basis for the dismantlement of the Department, including internal memoranda and analyses, decision-making templates, and any other information about how the Department implemented the RIF and reorganization." [Doc. No. 173 at 14]. As discussed above, supplementation is permissible where the agency has failed to explain the reasoning behind their decision or where there is a strong showing of bad faith. *See Housatonic River Initiative*, 75 F.4th at 278–279. Supplementation may also be appropriate "when necessary to determine whether the agency considered all relevant factors in making its

---

[3] The Government's cases in support of their argument that they do not need to submit a privilege log only apply where the documents withheld are predecisional and deliberative. *See Mayorkas*, 2024 WL 5198705, at *10 (recognizing that "privilege logs are only required when 'a party withholds information otherwise discoverable by claiming that the information is privileged'") (citing Fed. R. Civ. P. 26(b)(5)). Having found that the documents the Government is purporting to withhold are *not* predecisional or deliberative documents, they are discoverable under the APA. To the extent that the Government continues to withhold documents under any other type of privilege, they must submit a privilege log. *See Exxon Mobil Corp. v. Mnuchin*, No. 17-cv-1930, 2018 WL 10396585, at *4 (N.D. Tex. June 26, 2018) (cleaned up) (rejecting "blanket invocations" of the deliberative-process privilege and holding that "[w]ithout a log, Plaintiffs would have no way of knowing what materials were withheld, whether they are relevant, or whether they contain information available from another source.").

decision" or "when the agency has relied on extra-record materials." *Id.* at 279 (citing *Ruskai v. Pistole*, 775 F.3d 61, 66 (1st Cir. 2014)).

Plaintiffs point to several documents that, if produced, would address the gaps in the record and help the court review the reasoning behind the agency's decision. Agency Defendants argue that the discovery Plaintiffs seek is overbroad. While supplementation is the exception, and not the rule, I find that such an exception is warranted here. As the AR currently stands, there is virtually *no* reasoning backing the agency's decision-making process reflected in the record. For instance, organizational charts, email instructions to *already terminated employees*, and a list of impacted offices within the Department do not inform the court *why* certain employees were terminated or why certain offices were closed, let alone "whether the agency considered all relevant factors in making its decision" or whether "the agency has relied on extra-record materials." *Housatonic River Initiative*, 75 F.4th at 279. The Agency Defendants respond that the AR contains "at least one statement for the reason for the reduction in force:

> Strategic realignment is necessary to:
> 
> - Enhance operational efficiency by consolidating functions and eliminating duplicative roles.
> - Ensure compliance with statutory mandates for the Department while discontinuing non-essential programs.
> - Improve fiscal sustainability by significantly reducing personnel costs."

[Doc. No. 186 at 25; *see also* Doc. No. 173-9 at 2]. Not only is this explanation inconsistent with public statements indicating that the RIF was part of a broader effort to shut down the Department completely, *see infra* Section III.C., the explanation contained in the AR amounts to nothing more than a vague word salad. Indeed, how does the elimination of 50% of the entire Department improve "efficiency"? What programs are considered "non-essential"? While reducing personnel costs may improve fiscal sustainability, will the consequences of

12

hamstringing the functioning of these Departments result in other unanticipated costs that impact the budget? Were any of these questions asked or considered?

Agency Defendants relegate Plaintiffs' request to a "wish list" of what they want the administrative record to be, but I am hard-pressed to believe that these three bullet points constitute the entire "reasoning" behind such a large-scale layoff to a statutory mandated Department. Even if Agency Defendants are correct that this is all they have to show for their reasoning, I will allow Plaintiffs to seek out the information they request in order to facilitate this court's review of the decision. To the extent that there are other documents that exist that demonstrate the factors that the Agency considered, or any other records that can provide the court with a more fulsome comprehension of the decision, Agency Defendants must produce them.

C.  **Extra-Record Discovery**

Plaintiffs seek extra-record discovery—additional documents and other forms of discovery outside the AR such as deposition testimony—because they argue the Agency Defendants have acted in bad faith and this discovery will aid Plaintiffs in understanding the true reason behind the RIF. Additionally, plaintiffs seek discovery as to their own irreparable harm.

Extra-record discovery requires a strong showing of bad faith or improper behavior. Pretext may be evidence of bad faith or improper behavior justifying extra-record discovery. *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 786 F. Supp. 3d 237, 255 (D. Mass. 2025). "In particular, 'unlike a typical case in which an agency may have both stated and unstated reasons for a decision,' when 'an explanation for agency action ... is incongruent with what the record reveals about the agency's priorities and decisionmaking process,' the Court is not required to 'ignore the disconnect between the decision made and the explanation given.'" *Id.* (citing *Dep't*

*of Com.*, 752 U.S. at 784–85). While judicial "review is deferential, [] we are 'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com.*, 752 U.S. at 785 (citing *Dep't of Com.*, at *United States v. Stanchich*, 550 F.2d 1294, 1300 (CA2 1977) (Friendly, J.)). "The explanation must be the one invoked contemporaneously at the time of the action, not created in hindsight." *Nat'l Institutes of Health*, 786 F. Supp. 3d at 255.

Multiple public statements made by the Secretary have confirmed that the RIF was implemented to achieve the Secretary's and the Administration's goals of shutting down the Department entirely. For instance, and as detailed in my decision on the preliminary injunction motion, Section 2 of the March 20, 2025 Executive Order is titled, "Closing the Department of Education and Returning Authority to the States," and clearly directs the Secretary to "take all necessary steps to facilitate the closure of the Department of Education." [Doc. No. 71-1 at 3]. In fact, prior to the RIF's announcement on March 11, 2025, on March 6, 2025, the New York Times reported on President Trump's statements to reporters regarding his "desire to do away with the department entirely," his hope that the Secretary "would effectively put herself out of a job," as well as President Trump's desire "to close [the Department] immediately." [Doc. No. 71-9 at 3]. According to news reports published the day after the RIF's announcement, the Secretary confirmed that the mass layoffs are the first step toward shutting down the Education Department, and that President Trump's "directive to [the Secretary], clearly, is to shut down the Department of Education." [Doc. No. 187 at ¶ 63].

None of these goals are reflected in the AR. What's more, statements from the Administration confirm that part of the goal is to return the Department of Education to the states so that the states can run education, [*Id.* at ¶ 53], and to keep "the best people" but "cut the people that aren't working or not doing a good job," [*Id.* at ¶ 60]. These goals are not reflected in

the AR either. There is nothing in the record that indicates how the RIF will return education decision-making back to the states or that provides any criteria as to what constitutes "doing a good job" in the Department.

In *Dep't of Commerce*, for example, the Secretary of Commerce announced in a memorandum that he had decided to reinstate a question about citizenship on the 2020 decennial census questionnaire. 588 U.S. at 761. The Secretary stated that he was acting at the request of the DOJ, which sought to improve data regarding citizen voting-age population for the purposes of enforcing the Voting Rights Act ("VRA"). *Id.* A group of plaintiffs challenged the decision and moved to compel the government to complete the administrative record. *Id.* at 765. After the parties agreed to the addition of 12,000 pages to the administrative record, plaintiffs sought extra-record discovery, which the District Court authorized. *Id.* The Supreme Court ruled that the District Court prematurely ordered extra-record discovery but ultimately agreed that the new material that was added to the administrative record showed "that the VRA played an insignificant role in the decisionmaking process." *Id.* at 782. This evidence supported "a prima facie showing that the VRA rationale was pretextual." *Id.* Among other things, "this evidence established that the Secretary had made up his mind to reinstate a citizenship question well before receiving DOJ's request, and did so for reasons unknown but unrelated to the VRA." *Id.* at 783 (citation omitted). As such, the Supreme Court held that "the evidence tells a story that does not match the explanation the Secretary gave for his decision." *Id.* at 784; *see also Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 191 n.46 (D. Mass. 2025) (ordering extra-record discovery following submission of administrative record because "[g]iven the thinness of that record," the court is "unable to analyze the agency's action and the grounds for it without these extra-record materials.").

Here too, the goals stated in the AR of improving "operational efficiency" and "fiscal sustainability" are inconsistent with public statements that the RIF is intended to shut down the Department, return education to the states, and cut employees who the Department considers are not doing a good job. These inconsistencies, combined with the suspicious timing of the public statements relative to the record documenting the decision-making process, are enough prima facie evidence of pretext to warrant a finding of bad faith. *Dep't of Commerce*, 588 U.S. at 785 ("We are presented, in other words, with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process."). While the Supreme Court in *Dep't of Commerce* found that the District Court acted prematurely in ordering extra-record discovery, there, unlike here, the Government acknowledged that its initial submission of the administrative record was incomplete, and the parties agreed to additional pages. *Id.* at 782. Here, the Government is firm on its stance that the current AR is the entire AR. In this case, extra-record discovery is warranted in order for the court to scrutinize the Agency's decision. After all, "[a]ccepting contrived reasons would defeat the purpose of the enterprise. If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case." *Id.* at 785.

Accordingly, Defendants are ordered to comply with Plaintiffs' document requests, interrogatories, request for admissions, and request for depositions. However, any extra-record discovery must be limited to topics and questions pertaining only to the decision-making process regarding the RIF in the Department of Education. To the extent Plaintiffs seek discovery into their own harm, that is unwarranted at this time. The discovery I am ordering here is aimed at the production of a full AR from which I can review the Agency's decision. Plaintiffs' request for discovery into their own harm is premature, particularly where I have already found sufficient

evidence of irreparable harm. To the extent that Plaintiffs seek discovery regarding harm to non-parties, that request is not tailored to the scope of the claims here either.

## IV.     CONCLUSION

For the reasons explained above, Plaintiffs' Motion for Discovery, [Doc. No. 172], is <u>GRANTED in part</u>, such that Defendants must (1) complete the record by providing a final list of terminated employees and offices, list of statutorily required functions, and ARRPs, (2) supplement the record with information sufficient to aid the court in understanding the Agency's decision-making, and (3) comply with Plaintiffs' requests for extra-record discovery to the extent those requests are narrowly tailored toward understanding the true reason behind the RIF. The Motion is <u>DENIED</u> as to Plaintiffs' request for documents explaining the inconsistencies among the list of terminated employees, for discovery into Plaintiffs' own harms, or discovery outside the limited scope of understanding the Agency's decision-making with respect to the RIF. SO ORDERED.

/s/ Myong J. Joun<br>
United States District Judge