# Exhibit 5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>LINDA McMAHON, in her official capacity as Secretary of Education, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-10601-MJJ |
| SOMERVILLE PUBLIC SCHOOLS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-10677-MJJ |

**DEFENDANTS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST AND SECOND SETS OF INTERROGATORIES**

Defendants the United States Department of Education and Secretary Linda McMahon, in her official capacity (Defendants), hereby object and respond, pursuant to Federal Rules of Civil Procedure (FRCP) Rules 26 and 33 and the local rules of the District of Massachusetts, to the State Plaintiffs' and Somerville Plaintiffs' (collectively, Plaintiffs) First Set of Interrogatories to Defendants, dated September 12, 2025, and Plaintiffs' Second Set of Interrogatories to Defendants,

dated March 27, 2026. The Defendants' discovery and investigation in connection with this case are ongoing. As a result, the Defendants' responses concern information obtained and reviewed to date, and the objections, limitations, and responses contained in this response are subject to and without waiver of any right of the Defendants to: (a) object to other discovery requests directed to the subject matter of the Interrogatories and this response; (b) make additional or supplementary objections to the Interrogatories; and (c) revise, correct, supplement, or clarify the contents of this Response, after considering information obtained or reviewed through further discovery and investigation.

## PRELIMINARY STATEMENT

1. The following responses are based upon present information and belief. Defendants reserve the right to amend or supplement their responses pursuant to FRCP 26(e). Defendants' response to any of these Interrogatories shall not be construed as a waiver of any objections, including but not limited to any objection as to competency, relevancy, admissibility, authenticity, or privilege, applicable to any information produced in connection with the response. Defendants reserve the right to exclude from discovery information based on the following privileges, exemptions, and restrictions: (a) the attorney-client privilege; (b) the deliberative process privilege; (c) the attorney work product doctrine; (d) any document protected by statute, absent a court order; and/or (e) any other applicable privilege or immunity.
2. Pursuant to the limitations on discovery by order of the Court (ECF 210), Defendants will limit their search for responsive information considered in the agency's decision-making and to information predating and relating to any reason for the inter-agency agreements

("IAAs") challenged in the above-captioned suits, consistent with the Court's prior order (Doc. No. 202) on Plaintiffs' first motion for discovery (Doc. No. 172). For further clarity, Defendants will not answer an Interrogatory relating to an IAA if to the extent the Interrogatory calls for information that postdates when the Department entered into the relevant IAA.

3. Defendants make no representations that the information provided in response to these Interrogatories are relevant to this case or admissible in Court.

**DEFENDANT'S OBJECTIONS AND RESPONSES TO THE FIRST SET OF INTERROGATORIES**

**INTERROGATORY No. 1:** Identify all individuals who were involved in the decision-making process related to the RIF, any reorganization of the Department, and any transfer of functions previously handled by the Department to other branches of the federal government, and their role, including but not limited to:

(a) all individuals who had decision-making authority regarding the RIF, including but not limited to deciding whom to include in the RIF, when to commence the RIF, and how to organize the Department following the RIF, and each individual's role;

b) all individuals who were responsible for effectuating the RIF and each individual's role; and

(c) all individuals who were responsible for implementation of the March 20th Executive Order and each individual's role.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

- The Office of the Secretary, including Linda McMahon, Rachel Oglesby, Jonathan Pidluzny, Nicholas Kent;
- The Office of the Deputy Secretary, including Richard Smith;
- The Office of Finance and Operations ("OFO"), including Denise Carter and Jacqueline Clay.

To the extent this Interrogatory seeks every individual by name beyond these officials and offices, Defendants maintain that all Department personnel are included because each is responsible for implementation of the March 20th Executive Order.

**September 7, 2026 Supplemental Response**:

- **Linda McMahon**: In her leadership capacity, provided executive oversight and policy-level direction to ensure any workforce actions were consistent with applicable law and the March 20 Executive Order; reviewed and approved structure-level frameworks.
- **Rachel Oglesby**: Coordinated leadership engagement and consolidated materials for executive review within the Office of the Secretary.
- **Jonathan Pidluzny**: Provided subject-matter input within the Office of the Secretary to inform framework-level organizational planning.
- **Nicholas Kent**: Participated in leadership review of structure-level options consistent with centralized organizational control.
- **Richard Smith**: Coordinated inter-office planning and requested inventory of statutory functions from program points of contact to inform leadership decisions.
- **Denise Carter**: Oversaw ministerial implementation steps within OFO (e.g., preparation of artifacts and notices) to carry out approved organizational changes.
- **Jacqueline Clay**: Prepared and maintained organizational charts and impacted-position artifacts and coordinated required communications to effectuate approved changes.

**INTERROGATORY No. 2:** Identify all documents and communications setting forth directives, instructions, data, analyses, criteria, considerations, or other bases that were used in the decision-making process related to the RIF.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

- ED Organizational Charts and Updates: EDNY_00001 – EDNY_00048 (Feb. 24 and Mar. 6, 2025). These charts establish baseline and revised structures considered in workforce actions.
- RIF Notices and Guidance: EDNY_00049 – EDNY_00058 (e.g., CHCO notice to impacted employees; waiver of 90-day competitive area requirement, EDNY_00058).
- Impacted Positions Lists: EDNY_00145 – EDNY_00155 (finalized tables of impacted positions by office.
- Statutory Duty Spreadsheet

**September 7, 2026 Supplemental Response**:

Defendants intend to respond to this Interrogatory by referencing a forthcoming production, pursuant to Rule 33(d).

**INTERROGATORY No. 3:** Identify all employees who were included in the RIF and the date on which the decision was made to include them in the RIF.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

See Impacted Positions Lists: EDNY_00145 – EDNY_00155 (finalized tables of impacted positions by office).

**INTERROGATORY No. 4:** Describe the process by which the Agency Defendants identified the individuals and Offices listed in EDNY_00145 – EDNY_00155 as being subject to the RIF, identifying in the response which offices, if any, the Department at any point planned to eliminate.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

Consistent with the Department's Organization Control System policy directive (ACSD-OFO-029), organizational changes proceeded through a centralized, policy-rooted review and approval process. The Administrative Record includes baseline and updated organizational charts (Feb. 24, 2025 and Mar. 6, 2025) and workforce communications, which together reflect the structured approach by which the Department evaluated functions and aligned positions.

In early- to mid-February 2025, following issuance of the Executive Order directing agencies to undertake workforce restructuring and optimization, the Department began planning for the March 2025 reduction in force (RIF) across all principal operating components (POCs). RIF planning encompassed all principal operating components ("POCs"). Decisions were coordinated through the Office of the Secretary, with the Executive Order's implementation leads participating, and with the Office of Human Resources ("OHR") executing the human capital mechanics. Decisions were finalized through the Office of the Secretary, with the Executive Order's implementation leads participating, and with the Office of Human Resources (OHR) executing the human capital mechanics. The Office of the Secretary, through Richard Smith (then Acting Deputy Secretary), requested from each POC an itemized list of statutory requirements and associated programs to ensure preservation of statutory functions at the adjusted scale. OHR compiled position and personnel attributes required for a legally compliant RIF (tenure, time-in-service, series/grade), defined competitive areas, and applied required controls, including the 90-day competitive-area waiver, so that RIF selections remained position-based and performance-independent consistent with OPM regulations. Prior to issuance of March 11 intent notices, POC leadership reviewed proposed organizational charts highlighting

in red boxes the units slated for RIF, which were then operationalized into impacted-position tables (EDNY_00145–EDNY_00155).

Beyond process, the Department's determinations were substantively driven by documented, nationwide performance and stewardship concerns, establishing a rational connection between the facts found and the choices made. In the grade-based National Assessment of Education Progress ("NAEP"), often referred to as the Nation's Report Card, national reading and mathematics scores fell in 2022 at both fourth and eighth grades, with reading returning to levels comparable to the early 1990s and math posting the largest declines ever recorded at these grades. The age-based Long-Term Trend (LTT) series—spanning five decades—shows that 13-year-olds experienced sharp drops from 2020 to 2023 (−4 in reading; −9 in math), continuing a slide that began around 2012, with both subjects still below pre-pandemic levels and reading performance at levels not seen since the 1970s. Although LTT and Nation's Report Card measure different cohorts and cannot be directly compared, both paint the same picture: over the longer arc, existing program structures have not delivered reliable, system-wide improvements in learning, particularly for adolescents.

Second, independent auditors for FY 2024 issued another disclaimer of opinion on the Department's consolidated balance sheet—citing errors in underlying data used to estimate the cost of student loan programs—signaling unreliable stewardship of federal education funds. These problems are long-standing rather than isolated: auditors likewise disclaimed opinions in FY 2023 and FY 2022 for similar data-reliability issues. The seriousness of these failures is magnified by the Department's role—through Federal Student Aid—in managing one of the largest assets in the U.S. government, a student-loan portfolio valued at more than $1.6 trillion and disbursing about $120.8 billion in federal student aid in FY 2024, effectively making the

Department one of the nation's largest financial institutions; control breakdowns at this scale pose immediate, material risks to taxpayers and federal reporting. Consistent with that risk, the Government Accountability Office has warned that Education's recurring control failures (including the 2024 disclaimer) contributed to GAO's inability to opine on the U.S. government's consolidated financial statements, underscoring the government-wide impact of the Department's weaknesses. See GAO, Financial Audit: FY 2024 and FY 2023 Consolidated Financial Statements of the U.S. Government, GAO-25-107421, p. 208 (explaining that GAO's independent auditor was unable to express an opinion on the U.S. government's consolidated financial statements, citing, among other material weaknesses, "the federal government's inability to reasonably estimate the value of loans receivable and loan guarantees, most notably at the [] Department of Education") (January 16, 2025). Taken together, the record shows long-standing, systemic control deficiencies, making structural realignment not only reasonable but necessary to protect taxpayer dollars and safeguard federal education funds.

Third, across two consecutive FAFSA cycles—2023–24 and 2024–25—the Department's administration of its flagship aid application suffered material operational breakdowns, including a months-late rollout and persistent technical defects documented by both the agency's own Knowledge Center and the GAO, resulting in widespread delays and errors. These failures suppressed applications and delayed valid aid awards, forcing students and institutions to make high-stakes enrollment and budget decisions without timely, reliable data. Given that FAFSA is the Department's principal public-facing service—the entry ramp through which millions of Americans access Pell grants and federal loans—the cumulative harms and risks identified by independent oversight made structural realignment and consolidation of lower-value functions not only reasonable, but necessary to stabilize delivery and protect borrowers. In short, the RIF

process remained deliberate and compliant—(1) statutory functions reviewed first; (2) competitive-area and regulatory compliance next; (3) organizational charts aligned to preserve statutory functions; (4) red-box determinations finalized by the Office of the Secretary with EO leads' participation; and (5) impacted positions tables generated (EDNY_00145–EDNY_00155)—and was substantively justified by longstanding organizational failures demonstrating nationwide performance stagnation, financial-control deficiencies, and operational failures in federal student aid systems, such that a disciplined workforce realignment served the public interest and statutory obligations.

**September 7, 2026 Supplemental Response**:

A publicly available version of the Department's Organization Control System policy directive can be found at https://www.ed.gov/sites/ed/files/policy/gen/leg/foia/acsom1103.pdf. Subject to the preliminary statement and the Court-ordered scope, Agency leadership understood—at a general, background level—that nationwide student-performance indicators, independent oversight reporting on financial stewardship, and recent public-facing delivery challenges (e.g., aid-application operations) collectively underscored the need for disciplined organizational realignment. These considerations informed the policy context in which structure-level options were reviewed; they did not operate as discrete evidentiary predicates, quantitative benchmarks, or employee-specific assessments, and they are not reflected in any single source document in the Administrative Record

**INTERROGATORY No. 5:** Describe what changes, if any, were made to the list of individuals impacted by the RIF after the finalization of EDNY_00145 – EDNY_00155 between February 28, 2025 and March 11, 2025. For each change in individual impacted by the RIF, state the basis for that change.

**Objection:** This Interrogatory falls outside of the limited scope of discovery ordered by the Court (ECF 202). Defendants object to responding on that basis.

**INTERROGATORY No. 6:** Identify which Offices, if any, have been eliminated as a result of or in conjunction with the RIF.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

Defendants refer to comparative organizational charts in the AR (EDNY_00001–EDNY_00048) and subsequent impacted positions lists (EDNY_00145–EDNY_00155).

**September 7, 2026 Supplemental Response**:

Defendants clarify that no principal operating components ("POCs") of the Department were eliminated as a result of or in conjunction with the March 2025 RIF. The comparative organizational charts in the Administrative Record for February 24, 2025 and March 6, 2025 reflect continuity of POC-level headings and governance, while the workforce changes occurred within sub-units and position-level roles. Those structure-level adjustments were effectuated through impacted-position tables (EDNY_00145–EDNY_00155) and did not dissolve any principal office. Consistent with ACSD-OFO-029's centralized organizational-control framework, the RIF was implemented to preserve statutory functions at an adjusted scale without eliminating Department POCs.

**INTERROGATORY No. 7:** Describe what steps the Department took to identify which statutorily-mandated functions each employee within the Department fulfilled, when these steps were taken, and identify any document(s), including any spreadsheet(s), concerning the information collected.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

The Department began planning for the March 2025 reduction in force (RIF) in or around early- to mid-February 2025, after issuance of the Executive Order directing agencies to undertake workforce restructuring and optimization. The Office of the Secretary, through Richard Smith (then Acting Deputy Secretary), requested from each POC an itemized list of statutory requirements and associated programs. The purpose was to ensure any RIF would preserve the capability to continue statutory functions at the adjusted scale.

**September 7, 2026 Supplemental Response**:

Defendants intend to respond to this Interrogatory by referencing a forthcoming production, pursuant to Rule 33(d).

**INTERROGATORY No. 8:** Describe any analyses used to determine that the positions, Offices, and roles eliminated would enhance operational efficiency, ensure compliance with statutory mandates, and improve fiscal sustainability as stated in EDNY_00058, including identifying who conducted these analyses, when the analysis was conducted, and what methodology underlay the analysis.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

ED compared baseline and proposed structures using the centrally maintained organizational charts to identify overlaps, duplication of support functions, and opportunities for consolidation, without impairing statutory delivery.

**September 7, 2026 Supplemental Response**:

The centrally maintained organizational charts referenced above are located in the Administrative Record at EDNY_00001–EDNY_00048 (February 24, 2025 and March 6, 2025 editions).

**INTERROGATORY No. 9:** Identify all employees who communicated a decision to voluntarily leave, retire, or separate from the Department between January 20, 2025, and March 31, 2025 and any option that they took to do so, including the Voluntary Early Retirement Authority ("VERA"), Voluntary Separation Incentive Payment ("VSIP") or "Fork-in-the-Road" voluntary separation offers. Include for each identified individual the position they held within the Department and the Office in which they were employed.

**Objection:** This Interrogatory falls outside of the limited scope of discovery ordered by the Court (ECF 202). Defendants object to responding on that basis.

**INTERROGATORY No. 10:** Describe what steps, if any, were taken by the Agency Defendants to consider the impacts of voluntary departures from the Department between January and March 2025 on the size and scale of the RIF.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

HR tracking of voluntary separations and program continuity assessments are and have always been components of ongoing workforce planning.

**INTERROGATORY No. 11:** Identify any alternatives to the RIF for achieving the objectives of the RIF the Agency Defendants considered prior to or instead of the RIF

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

Alternatives considered in workforce optimization may include attrition, hiring freezes, reassignments/details, and VERA/VSIP mechanisms.

**September 7, 2026 Supplemental Response**: No alternatives were considered.

**INTERROGATORY No. 12:** Describe what steps, if any, were taken to ensure that the Department could continue to fulfill its statutory obligations following the RIF.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

The Department concluded that the RIF did not jeopardize ED's ability to fulfill its statutory obligations; accordingly, no extraordinary measures beyond routine personnel actions and required communications under applicable federal personnel law were necessary or undertaken post-RIF. This determination was premised on the centralized organizational-control governance (ACSD-OFO-029) and the retention of statutory oversight within ED even as operational responsibilities were assigned by IAA to partner agencies for near-term stabilization and longer-term process improvements.

This structure addressed the systemic risks evidenced in the record—including national performance stagnation or decline, systemic and long-term financial-control weaknesses, and high-profile programmatic operational breakdowns—by concentrating ED's workforce on core statutory responsibilities (policy, oversight, compliance) and leveraging IAAs to remediate operational exposures without impairing statutory delivery.

Defendants are not aware of non-privileged records within the Administrative Record indicating that ED implemented extraordinary measures to preserve statutory functions following the RIF, because none were required under this governance model, which continued to operate as

reflected in the organizational charts and workforce communications contemporaneous with the RIF.

**INTERROGATORY No. 13:** Identify any analysis, report, memorandum, human resources report, Inspector General report, or other source relied upon by the Agency Defendants for the proposition that: (i) the Department was overstaffed; (ii) the RIF would result in increased efficiency; (iii) the RIF would result in better performance of the Department's statutory functions; (iv) there were employees within the Department performing duplicative functions; (v) the individuals terminated as a result of the RIF did not perform statutory functions; or (vi) the Department's ability to fulfill its statutory functions would not be impacted by the RIF.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

ED compared baseline and proposed structures using centrally maintained organizational charts to identify overlaps, duplication of support functions, and consolidation opportunities without impairing statutory delivery. The Administrative Record includes baseline and updated organizational charts (Feb. 24, 2025 and Mar. 6, 2025) and related workforce communications reflecting this analysis.

In addition, the Department's determination that efficiency gains and risk reduction would result from workforce realignment and IAAs was grounded in the broader context within which the Department had operated. For example, persistent and documented declines and stagnation across grades and subjects in recent testing cycles, demonstrating that existing program architectures were not delivering expected outcomes and warranted structural reform. Similarly, repeated independent audit findings highlighting persistent financial and management weaknesses, particularly in financial reporting and internal controls, supporting the conclusion

that consolidation and reallocation of responsibilities were necessary to strengthen financial stewardship and internal controls. This broader context provided a compelling factual basis for concluding that (i) parts of the Department were overstaffed in duplicative or low-value functions, (ii) a RIF—paired with IAAs—would increase operational efficiency and improve performance of statutory functions by concentrating ED's workforce on policy, oversight, and compliance, and (iii) the Department's ability to fulfill its statutory functions would not be impacted, because ED retained legal responsibility and oversight while operational roles were realigned under a centralized governance framework.

**September 7, 2026 Supplemental Response**: No alternatives were considered.

**INTERROGATORY No. 14:** Identify any agreement or draft agreement between the Department and any other agency or body that would result in an entity other than the Department performing tasks or functions historically conducted by the Department, including but not limited to any such agreement to transfer some or all functions relating to Federal Student Aid to the U.S. Treasury Department or the U.S. Small Business Administration and the transfer of functions of the Office of Career, Technical, and Adult Education within the Department to the U.S. Department of Labor, and for each such agreement describe the basis for the decision to enter into that agreement.

**Objection:** This Interrogatory falls outside of the limited scope of discovery ordered by the Court (ECF 202). Defendants object to responding on that basis.

**INTERROGATORY No. 15:** Identify any artificial intelligence program that was used as part of the decision-making process that led to the RIF and/or was used to effectuate the RIF and, if an artificial program was used, describe how that program was utilized.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

No AI program has been identified as used in the RIF decision-making or implementation.

**INTERROGATORY No. 16:** Identify any staff members associated with or employed by the U.S. Department of Government Efficiency or the U.S. DOGE Services who worked on any aspect of the RIF.

**Objection:** This Interrogatory falls outside of the limited scope of discovery ordered by the Court (ECF 202). Defendants object to responding on that basis.

**INTERROGATORY No. 17:** Identify the total number of employees who received RIF notices in March 2025 for whom the Department has subsequently rescinded that RIF notice or offered to re-hire the employee in question. For each employee so impacted, identify the business unit in which that individual was employed before the RIF, the business unit that employee is currently assigned to, the date on which they were notified of the RIF, and the date on which they were invited to remain at or return to the Department.

**Objection:** This Interrogatory falls outside of the limited scope of discovery ordered by the Court (ECF 202). Defendants object to responding on that basis.

## DEFENDANT'S OBJECTIONS AND RESPONSES TO THE SECOND SET OF INTERROGATORIES

**INTERROGATORY No. 18:** Identify all documents and communications setting forth directives, instructions, data, analyses, criteria, considerations, or other bases that were used in the decision-making process related to the IAAs.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

Defendants state that information sufficient to answer this interrogatory can be found in the text of each IAA, at EDNY_00156-256.

**INTERROGATORY No. 19:** For each of the IAAs, identify each employee position (by job title and unit) that the Department plans to detail to its partner agency(ies), and describe when the Department plans to detail the employee position and for how long the detail is currently anticipated to last, to the extent such information was considered when the Department entered into each IAA.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

Defendants state that detailing policies and responsibilities are set forth in agency policy (HCP 300 (Detail of ED Employee)), including roles for OFO and CHCO/OHR; specific positions/durations are determined program-by-program. Defendants further state that the details associated with the IAAs postdate the IAAs themselves and are therefore outside of the limited scope of discovery ordered by the Court (ECF 202).

**INTERROGATORY No. 20:** Identify each Interagency Agreement the Department has entered into from January 20, 2025 to the present, and for each agreement, further identify: (i) the partner agency with which the Department has entered into an Interagency Agreement; (ii) the purpose of that Interagency Agreement; (iii) the programs, activities, or services covered by the Interagency Agreement.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

Defendants state that information sufficient to answer this interrogatory can be found in the text of each IAA, at EDNY_00156-256.

**INTERROGATORY No. 21:** Describe the process through which the Department selected programs and functions that would be subject to the IAAs and transferred to other federal agencies throughout the U.S. Government and which programs, activities, and functions would remain at the Department.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

Selections were guided by: (i) statutory authorities permitting interagency arrangements and the Economy Act (e.g., 20 U.S.C. §§ 1231(a), 3475, 3479; 31 U.S.C. § 1535); (ii) administrative-capacity alignment (e.g., DOL's workforce infrastructure; State's international education posture; HHS's childcare and accreditation expertise; Treasury's collections capacity); and (iii) a policy judgment to retain statutory responsibility and oversight at ED while assigning operational roles to partner agencies. This framework ensured continuity of statutory delivery while addressing immediate operational risks and long-standing programmatic shortcomings evidenced in the record.

Specifically, in light of NAEP-documented performance declines and stagnation and systemic, multiyear audit control deficiencies, ED prioritized IAAs that would (a) streamline and standardize cross-agency business processes; (b) implement stable financial controls at scale; and (c) focus ED's retained staff on core policy, oversight, and compliance functions where agency subject-matter expertise is uniquely necessary. In parallel, and in direct response to high-profile program management failures (e.g., FAFSA 2024–25), IAAs supported rapid remediation and risk-sharing for mission-critical IT and data operations, drawing on partner agencies'

engineering, program-delivery, and controls competencies to stabilize aid processing and reduce systemic exposure.

Accordingly, programs and activities remained at ED where statutory policy-making, rulemaking, and compliance oversight are central (and not efficiently transferable), while operationally intensive functions with clear analogs in other agencies' infrastructure were assigned by IAA to achieve near-term stabilization and longer-term process improvements—each transfer bounded by ED's retained oversight and documented within the centralized organizational-control governance reflected in the Administrative Record.

**INTERROGATORY No. 22:** Identify any analysis, report, memorandum, human resources report, Inspector General report, or other source relied upon by the Department for the proposition that the OIE-DOI IAA will:

(a) "further[] and improv[e]. . . American Indian education in the United States." EDNY_00156.

(b) "(1) enables administrative reforms to agency policies and programmatic requirements; (2) provides process improvements to enhance the experience for American Indian education program participants; and (3) connects ED and DOI American Indian education programs to provide a coordinated federal Indian education system that centers the rights of families." EDNY_00156; and

(c) "will enhance opportunities to invest in, and improve, Indian education through collaboration with state, local, and tribal education providers." EDNY_00156.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

While Defendants have not identified pre-decision, formal analyses specifically authored to substantiate each quoted evaluative proposition prior to executing the respective IAA, the Department advanced these partnerships through established, documented IAA governance and legal review processes; relied on program expertise and prior operational experience; and implemented risk, privacy, and performance controls standard to interagency work.

**INTERROGATORY No. 23:** Identify any analysis, report, memorandum, human resources report, Inspector General report, or other source relied upon by the Department for the proposition that the OESE-DOL IAA will:

(a) "empower parents and states, promote innovation, and deliver process improvements in pursuit of better outcomes for students in elementary and secondary education in the United States, by establishing a partnership that (1) enables administrative reforms to agency policies and programmatic requirements; (2) provides process improvements to enhance the experience for education and workforce program participants; and (3) connects ED education and workforce development programs with DOL workforce programs to provide a coordinated federal education and workforce system." EDNY_00167; and

(b) "enhance opportunities to invest in the education and upskilling of American students to meet rapidly evolving skill demands of industries; provide common programmatic requirements for identifying alternatives to the 4-year college degree path that are consistent with the specific skill

needs of prospective employers; promote flexibilities to empower greater state and local alignment between education and workforce systems; and implement efficiencies to streamline information collection by harmonizing performance reporting, reducing the burden on state and local educational institutions, and ensuring that performance outcomes are measured suing the most reliable data sources." EDNY_00167.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

While Defendants have not identified pre-decision, formal analyses specifically authored to substantiate each quoted evaluative proposition prior to executing the respective IAA, the Department advanced these partnerships through established, documented IAA governance and legal review processes; relied on program expertise and prior operational experience; and implemented risk, privacy, and performance controls standard to interagency work.

**INTERROGATORY No. 24:** Identify any analysis, report, memorandum, human resources report, Inspector General report, or other source relied upon by the Department for the proposition that the OCTAE-DOL IAA will:

(a) "return authority over education to the States and local communities while ensuring the effective and uninterrupted delivery of services, programs, and benefits on which Americans rely. . . ." EDNY_00179.

(b) "enhance opportunities to invest in the upskilling of American students and workers to meet rapidly evolving skill demands of industries, including the use of Artificial Intelligence in the workplace; provide common

programmatic requirements for identifying and making transparent alternative credentials and assessments to the 4-year college degree that can be mapped to the specific skill needs of prospective employers; and implement efficiencies to streamline information collection by harmonizing performance reporting, reducing the burden on grantees, and ensuring that performance outcomes are measured using the most reliable data sources." EDNY_00179.

(c) allow the Department and the Department of Labor to "coordinat[e] program administration and grant administration funds appropriated to ED's Office of Career, Technical, and Adult Education (OCTAE) for the adult education and family literacy programs funded under Title II of WIOA and career and technical education (CTE) programs funded by Perkins V." EDNY_00179; and

(d) "leverage WIOA Title I adult, youth, and dislocated worker program funds; WIOA Title II adult education and family literacy funds; WIOA Title III Wagner-Peyser funds; and Perkins CTE program funds, in order to provide a seamless workforce development system designed to assist youth and adults with receiving training and postsecondary education needed to enter into, and persist in, high-wage, high-demand, high-skill occupations." EDNY_00179 – EDNY_00180.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

While Defendants have not identified pre-decision, formal analyses specifically authored to substantiate each quoted evaluative proposition prior to executing the respective IAA, the Department advanced these partnerships through established, documented IAA governance and legal review processes; relied on program expertise and prior operational experience; and implemented risk, privacy, and performance controls standard to interagency work.

**INTERROGATORY No. 25:** Identify any analysis, report, memorandum, human resources report, Inspector General report, or other source relied upon by the Department for the proposition that the OPE-DOL IAA will: "promote innovation and process improvements in pursuit of better employment and earnings outcomes for students and other stakeholders in higher education institutions, by establishing a partnership that (1) enables administrative reforms to agency policies and programmatic requirements; (2) provides process improvements to enhance the experience for students and stakeholders in higher education institutions; and (3) connects ED education programs with DOL programs to provide a coordinated federal approach to higher education and workforce development." EDNY_00187.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

While Defendants have not identified pre-decision, formal analyses specifically authored to substantiate each quoted evaluative proposition prior to executing the respective IAA, the Department advanced these partnerships through established, documented IAA governance and legal review processes; relied on program expertise and prior operational experience; and implemented risk, privacy, and performance controls standard to interagency work.

**INTERROGATORY No. 26:** Identify any analysis, report, memorandum, human resources report, Inspector General report, or other source relied upon by the Department for the proposition that the CCAMPIS IAA will:

(a) "further[] and improv[e]. . . childcare support for parents in school through the Child Care Access Means Parents in Schools (CCAMPIS) program." EDNY_00200.

(b) "promote innovation and process improvements in pursuit of better outcomes for parents and children, by establishing a partnership that (1) enables administrative reforms to agency policies and programmatic requirements; (2) provides process improvements by better leveraging the expertise and resources of HHS-ACF to provide campus-based child care students to low-income students." EDNY_00200.

(c) "reduce the administrative burden on States by reducing reporting requirements and aligning performance reporting requirements for programs covered under the agreement, to the extent permissible under existing statutory authorities." EDNY_00200.

**Response:** Subject to this their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

While Defendants have not identified pre-decision, formal analyses specifically authored to substantiate each quoted evaluative proposition prior to executing the respective IAA, the Department advanced these partnerships through established, documented IAA governance and legal review processes; relied on program expertise and prior operational experience; and implemented risk, privacy, and performance controls standard to interagency work.

**INTERROGATORY No. 27:** Identify any analysis, report, memorandum, human resources report, Inspector General report, or other source relied upon by the Department for the proposition that the NCFMEA IAA will:

(a) assist the Department in "evaluating the standards of accreditation of foreign medical schools attended by U.S. citizens who receive Federal student loans to ensure comparability with equivalent schools in the U.S." EDNY_00207.

(b) "provide[] process improvements to enhance existing NCFMEA procedures for determining whether accreditation standards used by a foreign country to accredit medical schools are comparable to standards applied to medical schools in the United States . . . ." EDNY_00207.

(c) "provide[] the NCFMEA with access to HHS medical education and accreditation subject matter expertise. . . ." EDNY_00207.

(d) "provide[] a coordinated approach by the Federal government to consistent standards of accreditation for medical education of all U.S. physicians, 25 percent of whom are graduates of foreign medical schools." EDNY_00207.

(e) "better ensure that U.S. students can only receive federal student loans for enrollment at foreign medical schools that are subject to standards of accreditation determined by the NCFMEA to be comparable to the standards applied to U.S. medical schools, consistent with section 102 of the Higher Education Act." EDNY_00207; and

(f) "improve[] assurance that graduates of foreign medical schools can meet the educational requirements necessary to pursue postgraduate medical education (i.e., residencies) in the U.S." EDNY_00207.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

While Defendants have not identified pre-decision, formal analyses specifically authored to substantiate each quoted evaluative proposition prior to executing the respective IAA, the Department advanced these partnerships through established, documented IAA governance and legal review processes; relied on program expertise and prior operational experience; and implemented risk, privacy, and performance controls standard to interagency work.

**INTERROGATORY No. 28:** Identify any analysis, report, memorandum, human resources report, Inspector General report, or other source relied upon by the Department for the proposition that the IFLE IAA will:

(a) "further[] and improv[e]. . . the Title VI and Fulbright-Hays grant and fellowship programs that prepare U.S. students, teachers, and citizens to address global challenges by fostering a deeper understanding of languages, cultures, places, and peoples currently administered by the Office of International and Foreign Language Education." EDNY_00213.

(b) "(1) enable[] administrative reforms to agency policies and programmatic requirements; (2) provide[] process improvements to enhance the experience for program participants; (3) restructure[] and consolidate[] education programs; and (4) connect[] ED education programs with State to provide a coordinate system." EDNY_00213; and

(c) "streamline program funding to enhance opportunities to invest in the education and understanding of participants; to respond to the ongoing national need for individuals with expertise and competence in world languages and areas or international studies; to advance national security by developing a pipeline of highly proficient linguists and experts in critical world region; to contribute to developing a globally competent workforce able to engage with a multilingual and multicultural clientele at home and abroad; to expand access to international and foreign language learning, especially for traditionally underserved students; to support teaching and research on critical world regions, languages, and issues; and to implement efficiencies to streamline information collection by harmonizing performance measures, reducing the burden on grantees, and ensuring that performance outcomes are measured using the most reliable data sources." EDNY_00213.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

While Defendants have not identified pre-decision, formal analyses specifically authored to substantiate each quoted evaluative proposition prior to executing the respective IAA, the Department advanced these partnerships through established, documented IAA governance and legal review processes; relied on program expertise and prior operational experience; and implemented risk, privacy, and performance controls standard to interagency work.

**INTERROGATORY No. 29:** Identify any analysis, report, memorandum, human resources report, Inspector General report, or other source relied upon by the Department for the proposition that the FSA-DOT IAA will:

(a) "enhance the administration of Federal student aid programs, mitigate the continuing fallout and cost to taxpayers from the Biden Administration's mismanagement of the Federal student loan portfolio, and facilitate the return of defaulted borrowers to repayment;"[1] and

(b) "dramatically improv[e]… the administration of Federal student aid programs that millions of American students, families, and borrowers rely on to access higher education."

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

While Defendants have not identified pre-decision, formal analyses specifically authored to substantiate each quoted evaluative proposition prior to executing the respective IAA, the Department advanced these partnerships through established, documented IAA governance and legal review processes; relied on program expertise and prior operational experience; and implemented risk, privacy, and performance controls standard to interagency work.

[1] *See* "U.S. Department of Education and U.S. Department of the Treasury Announce Historic Federal Student Assistance Partnership," U.S. Department of Education (Mar. 19, 2026), accessed at: https://www.ed.gov/about/news/press-release/us-department-of-education-and-us-department-of-treasury-announce-historic-federal-student-assistance-partnership.

**INTERROGATORY No. 12:**[2] Describe the process through which the Department negotiated each of the IAAs.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

Negotiations were conducted under authorities 20 U.S.C. §§ 1231(a), 3475, 3479 and the Economy Act (31 U.S.C. § 1535), with ED retaining policy and statutory responsibilities and the partner agencies agreeing to provide specified operational services.

**INTERROGATORY No. 13:** Identify any alternatives to the IAAs for achieving the objectives of the IAAs the Department considered prior to or instead of the IAAs.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

Alternatives may have included: (i) continuing administration within ED; (ii) memoranda of understanding (MOUs) or shared service arrangements short of full IAAs; and (iii) contractor/vendor augmentation.

**INTERROGATORY No. 14:** Describe what steps were taken or what analysis was performed, if any, by the Department prior to entering into the IAAs to ensure that the Department could continue to fulfill its statutory obligations.

**Response:** Subject to their preliminary statement, and within the parameters of the limited time frame for discovery the Court ordered, Defendants respond as follows:

---

[2] Plaintiffs included two "Interrogatory 12" in their Second Set of Interrogatories to Defendants. Defendants maintain Plaintiffs numbering scheme.

The IAA texts and agency fact sheets emphasize that ED retains statutory responsibilities/oversight while partner agencies provide operational support under the Economy Act and ED authorities. These documents reflect the intended alignment with statutory mandates.

DATED: September 8, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

BRAD P. ROSENBERG
Special Counsel

*/s/ Michael Bruns*____
Michael Bruns
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
michael.bruns@usdoj.gov
(202) 514-4011

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

Undersigned counsel hereby certifies that the following counsel were served with a copy of DEFENDANTS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST AND SECOND SET OF INTERROGATORIES via email on September 9, 2026.

'Hyman, Nathaniel (AGO)' Nathaniel.J.Hyman@mass.gov

Pascucci, Michelle (AGO) Michelle.Pascucci@mass.gov

Lumelsky, Anna (AGO) Anna.Lumelsky@mass.gov

Kali Schellenberg kschellenberg@democracyforward.org

Rachel Homer rhomer@democracyforward.org

Victoria Nugent vnugent@democracyforward.org

molly.thomas-jensen molly.thomas-jensen@ag.ny.gov

Bull, Gina gina.bull@ag.ny.gov

Lucia Choi Lucia.Choi@doj.ca.gov

James Stanley james.stanley@doj.ca.gov

Carpenter, Caitlyn B caitlyn.b.carpenter@hawaii.gov

Dated: September 9, 2026

*/s/ Michael Bruns*

Michael Bruns

**VERIFICATION OF INTERROGATORY ANSWERS**

I certify under penalty of perjury that the foregoing supplemental answers to Plaintiffs' First Set of Interrogatories to Defendants and Second Set of Interrogatories to Defendants are true and correct to the best of my knowledge, information, and belief, with the understanding that the Department reserves the right to further supplement its answers.

Dated: September 8, 2026

Kevin Slupe
______________________________